No. 02-88991-A
No. 02-89543-A*

## IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ARY JEWELERS, L.L.C., )
)
    Plaintiff-Appellee, )
)
v. )
)
SCOTT KRIGEL, )
    Individually and as Trustee of )
    the Scott W. Krigel Revocable Trust, )
)
    Defendant-Appellant. )

## BRIEF OF APPELLEE
## ARY JEWELERS, L.L.C

Appeal from the District Court of Johnson County,
Honorable Thomas E. Foster, Judge
District Court Case No. 01-CV-02633

Earry L. Pickens,    KS #15822
SPENCER FANE BRITT & BROWNE LLP
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
Telephone:    (816) 474-8100
Facsimile:    (816) 474-3216

\* Motion to Consolidate pending.

**ORAL ARGUMENT:**
**20 Minutes**

WA 663718.2



EXHIBIT
C

ARY - 02038

No. 02-88991-A
No. 02-89543-A*

## IN THE COURT OF APPEALS OF THE STATE OF KANSAS

ARY JEWELERS, L.L.C.,                    )
                                          )
    Plaintiff-Appellee,                  )
                                          )
v.                                        )
                                          )
SCOTT KRIGEL,                             )
    Individually and as Trustee of       )
    the Scott W. Krigel Revocable Trust, )
                                          )
    Defendant-Appellant.                 )

## BRIEF OF APPELLEE
## ARY JEWELERS, L.L.C

**Appeal from the District Court of Johnson County,**
**Honorable Thomas E. Foster, Judge**
**District Court Case No. 01-CV-02633**

Barry L. Pickens,    KS #15822
SPENCER FANE BRITT & BROWNE LLP
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
Telephone:    (816) 474-8100
Facsimile:    (816) 474-3216

**ORAL ARGUMENT:**
**20 Minutes**

* Motion to Consolidate pending.

WA 663718.3

ARY - 02039

# TABLE OF CONTENTS

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    1.   Krigel's, Inc. Becomes Insolvent & Defendant Finds a Buyer . . . . . . . . . . . . . . 2

    2.   Negotiations of the Financing/ "Walk-Away Clause" . . . . . . . . . . . . . . . . . . . 3

    3.   Krigel's has Secured Debt of Approximately $8 Million with Foothill
       Capital; Agreement Calls for its Continued Financing . . . . . . . . . . . . . . . . . . . 5

    4.   Foothill Capital Does Not Consent to Continued Financing . . . . . . . . . . . . . . . . 6

    5.   The Agreements Require Written Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    6.   Krigel's Files for Bankruptcy while The Parties Continue to Seek Financing . . . . 8

    7.   Litigation History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        a.   Krigel Files Adversary Proceeding in Bankruptcy Court . . . . . . . . . . . . 9

        b.   Krigel's Inc.'s Unsecured Creditors file Suite in U.S. District Court . . . 10

        c.   ARY Files this Lawsuit in Johnson County District Court . . . . . . . . . . . 10

ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I.   THE DISTRICT COURT CORRECTLY INTERPRETED THE AGREEMENT
    AND PROPERLY GRANTED PLAINTIFF SUMMARY JUDGMENT . . . . . . . . . . 12

    A.   Paragraph 4(c) Required Foothill Capital's Consent to Continued
       Financing and Was Not a Condition That the Seller Scott Krigel
       Could Waive . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.   Clear Missouri Law Provides That Financing Contingencies Always
            Inure to Purchaser's Benefit and are Not Waivable By Seller . . . . . . . . 13

*Maynard v. Bazazzadegan,* 732 S.W.2d 950 (Mo.App. 1987) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Century 21 Al Burack Realtors v. Zigler,* 628 S.W.2d 915 (Mo. App. 1982) . . . . . . . . . . . . . 13

i

ARY - 02040

*Berger v. McBride & Son Builders, Inc.*, 447 S.W.2d 18 (Mo.App. 1969) . . . . . . . . . . . . . 13

*De Freitas v. Cote*, 174 N.E.2d 371 (Mass. 1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Dygert v. Crouch*, 36 S.W.3d 1 (Mo. App. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Fleischer v. McCarver*, 691 S.W.2d 930 (Mo. App. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Errante v. Kadean Real Estate Service, Inc.*, 664 S.W.2d 27 (Mo. App. 1984) . . . . . . . . . . . 14

*Baumann v. Brittingham*, 759 S.W.2d 880 (Mo. App. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 15

2.     Krigel's Construction Entirely Ignores the Second Sentence of ¶4(c), and Essentially Reads it Out of the SPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Tuttle v. Muenks*, 21 S.W.3d 6 (Mo. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Transit Cas. Co. v. Certain Underwrites at Lloyd's of London*, 963 S.W.2d 392 (Mo.App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

3.     Krigel's Interpretation Exalts Form Over Substance and Ignores Black Letter Principles of Contractual Construction that Require Application of the Contract's Terms Without Regard to Inconsistent Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.*, 169 F.3d 43 (1st Cir. 1999) . . . . . 17

*St. Germain & Son, Inc. v. Taunton Redevelopment Auth.*, 340 N.E.2d 916 (Mass.App.Ct. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Charles I. Hosmer, Inc. v. Commonwealth*, 19 N.E.2d 800 (Mass.App.Ct. 1939) . . . . . . . . . 17

*Herlihy Mid-Continent Co. v. Sanitation Dist. Of Chicago*, 60 N.E.2d 882 (Ill. 1945) . . . . . . 18

*Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Owner-Operator Independent Drivers Ass'n, Inc. v. New Prime, Inc.*, 192 F.3d 778 (8th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Minnesota Transp. Regulation Bd. v. United States*, 966 F.2d 335 (8th Cir. 1992) . . . . . . . . 18

*National Fuel Gas Distribution Corp. v. TGX Corp.*, 950 F.2d 829 (2nd Cir. 1991) . . . . . . . . 18

WA 663718.3

ARY - 02041

17A Am.Jur.2d *Contracts* §392 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

17A C.J.S. *Contracts* §302 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Williams v. Barkley*, 58 N.E. 765 (N.Y. 1900) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Chicago Daily News, Inc. v. Kohler*, 196 N.E. 445 (Ill. 1935) . . . . . . . . . . . . . . . 18

*Illinois Central RR.Co. v. Michigan Central R.R. Co.*, 152 N.E.2d 627 (Ill.App.Ct. 1958) . . . 18

*Chu v. Ronstadt*, 498 P.2d 560 (Ariz.App. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Ingalls Iron Works Co. v. Ingalls*, 53 So.2d 847 (Ala. 1951) . . . . . . . . . . . . . . . . 18

      4.    Paragraph 4(c) Does Not Address Sellers' "DIP" Financing . . . . . . . . 18

      5.    Defendant's Construction Leads to the Absurd Result That Scott Krigel Had the Unilateral Power to Require ARY to Double its Cash Outlay by Buying out Foothill for $8,000,000 . . . . . . . . . . . . . . . . . . . 20

*State ex rel. Missouri Dam and Reservoir Safety Council v. Rocky Ridge Ranch Property Owners Ass'n*, 950 S.W.2d 925 (Mo. App. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

      6.    The Parties Intended ¶4(c) To Protect ARY, Not Scott Krigel . . . . . . . 20

*Tumlinson v. Norfolk & Western Rwy. Co.*, 775 S.W.2d 251 (Mo.App. W.D. 1989) . . . . . . . . 20

    B.    The District Court Properly Granted ARY Summary Judgment, Because Even If Paragraph 4(c) Was a Representation and Warranty, it "Affected" ARY, and ARY's Waiver Was Required . . . . . . . . . . . . . . . . . . . 22

*Bellos v. Winkles*, 14 S.W.3d 653 (Mo. App. 2000) . . . . . . . . . . . . . . . . . . . . . . . 22

    C.    The District Court Properly Granted ARY Summary Judgment, Because the SPA Required ARY's Written Waiver, and No Such Waiver Was Given . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

II.    KRIGEL FAILED TO PLEAD OR OTHERWISE RAISE THE AFFIRMATIVE DEFENSES OF WAIVER AND ESTOPPEL AND IS THEREFORE PROHIBITED FROM ARGUING THEM ON APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

WA 663718.3

ARY - 02042

A.     Krigel Did Not Raise Below ARY's Alleged Waiver and/or Estoppel
       of the Written Notice Requirement under Paragraph 8(c) . . . . . . . . . . . . . . . 25

*Wood v. Groh*, 269 Kan. 420, 7 P.3d 1163 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Midwest Iron and Metal, Inc. v. Zenor Elec. Co.*, 28 Kan. App. 2d 353, 19 P.3d 181 (2000) . . 25

*Ripley v. Tolbert*, 260 Kan. 491, 921 P. 2d 1210 (1996) . . . . . . . . . . . . . . . . . . . . . 25

*Griffin v. Dodge City Cooperative Exchange*, 23 Kan. App. 2d 139, 927 P. 2d 958 (1996) . . . 25

*Lostutter v. Estate of Larkin*, 235 Kan. 154, 679 P. 2d 181 (1984) . . . . . . . . . . . . . . . 26

*Seaman U.S.D. No. 345 v. Kansas Comm'n on Human Rights*, 26 Kan. App. 2d 521,
       990 P.2d 155 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*St. Francis Regional Medical Center, Inc. v. Weiss*, 254 Kan. 728, 869 P. 2d 606 (1994) . . . . 26

10A Wright, Miller & Kane, *Federal Practice and Procedure*: Civil 3d §2716 . . . . . . . . . . . . 26

73 Am.Jur.2d, *Summary Judgment* §43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

B.     Krigel Did Not Plead His New Affirmative Defenses . . . . . . . . . . . . . . . . . . . . 26

K.S.A. § 60-208(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Geis Irrigation Co. v. Satanta Feed Yards, Inc.*, 214 Kan. 373, 521 P.2d 272 (1974) . . . . . . . 26

*Timi v. Prescott State Bank*, 220 Kan. 377, 553 P.2d 315 (1976) . . . . . . . . . . . . . . . . . . 26

*Strouhal v. Allied Development Co.*, 220 F.2d 541 (10th Cir. 1955) . . . . . . . . . . . . . . . . . 27

*King v. Pimentel*, 20 Kan.App.2d 579, 890 P.2d 1217 (1995) . . . . . . . . . . . . . . . . . . . . 27

C.     No Evidence Exists to Support Krigel's Newly Asserted Theories . . . . . . . . . . 27

       1.     No Evidence Supports an Estoppel Claim . . . . . . . . . . . . . . . . . . . 27

*Brown v. State Farm Mut. Auto. Ins. Co.* 776 S.W.2d 384 (Mo. 1989) . . . . . . . . . . . . . . . 27

*King v. Pimentel*, 20 Kan.App.2d 579, 890 P.2d 1217 (1995). . . . . . . . . . . . . . . . . . . . 28

WA 663718.3

ARY - 02043

     2.    No Evidence Supports a Waiver Claim . . . . . . . . . . . . . . . . . . . . . . 28

*Brown v. State Farm Mut. Auto. Ins. Co.* 776 S.W.2d 384 (Mo. 1989) . . . . . . . . . . . . . . . 28

*Berger v. McBride & Son Builders, Inc.,* 447 S.W.2d 18 (Mo.App. 1969) . . . . . . . . . . . . . . 29

*Baumann v. Brittingham,* 759 S.W.2d 880 (Mo. App. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . 29

III.    THE DISTRICT COURT PROPERLY DENIED KRIGEL'S MOTION FOR SUMMARY JUDGMENT, BECAUSE EVEN IF THE SPA HAD NOT TERMINATED, FACT ISSUES REMAIN ON THE EXISTENCE AND EXTENT OF KRIGEL'S DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Davis v. Miller,* 269 Kan. 732, 7 P.3d 1223 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . 30

    A.    The Purchase Price Is an Invalid Penalty, Not Liquidated Damages, and a Question of Material Fact Exists as to the Extent of Krigel's Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Goldberg v. Charlie's Chevrolet, Inc.,* 672 S.W.2d 177 (Mo.App.1984) . . . . . . . . . . . . . . 31

*Grand Bissell Towers, Inc. v. Joan Gagnon, Enter., Inc.,* 657 S.W.2d 378 (Mo.App.1983) . . . 31

*Paragon Group, Inc. v. Ampleman,* 878 S.W.2d 878 (Mo.App. E.D. 1994) . . . . . . . . . . . . . . 31

    1.    Defendant Presented No Evidence of Damages Caused by the Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    2.    The Default Provision Is Not a Reasonable Forecast of Krigel's Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Grand Bissell Towers, Inc. v. Joan Gagnon, Enter., Inc.,* 657 S.W.2d 378 (Mo.App.1983) . . . 32

*Northwest Collectors, Inc. v. Enders,* 446 P.2d 200 (Wash. 1968) . . . . . . . . . . . . . . . . . . . 32

*Lake River Corp. v. Carborundum Co.,* 769 F.2d 1284 (7th Cir. 1985) . . . . . . . . . . . . . . 33

    3.    Lack of Damage Evidence Precludes Summary Judgment for Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

WA 663718.3

ARY - 02044

BRIEF OF APPELLANT ARY JEWELERS, L.L.C. (Case No. 02-89543-A) . . . . . . . . . . . . 35

NATURE OF THE CASE AND OF THE ORDER APPEALED FROM . . . . . . . . . . . . . . . . 36

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Hamilton v. State Farm Fire & Casualty Co.*, 263 Kan. 875, 953 P.2d 1027 (Kan. 1998) . . . . 37

*General Surgery, P.A. v. Suppes*, 24 Kan. App. 2d 753, 953 P.2d 1055 (Kan. App. 1998) . . . . 37

I.    THE DISTRICT COURT ERRED IN INTERPRETING PARAGRAPH 5 OF THE
      ESCROW AGREEMENTS AS A WAIVER OR LIMITATION ON ARY'S
      ENTITLEMENT TO INTEREST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*In re Tax Protests of Midland Indus., Inc.*, 237 Kan. 867, 703 P.2d 840 (1985) . . . . . . . . . . . 37

K.S.A. 16-201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

K.S.A. 16-204(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

      A.    ARY Is Entitled to Interest Pursuant to K.S.A. 16-201 and 16-204,
            Unless ARY Contractually Waived Its Entitlement in the Escrow
            Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Federal Land Bank of Wichita v. Vann*, 20 Kan. App. 635, 890 P.2d 1242 (1995) . . . . . . . . . 38

*Royal College Shop v. North Ins. Co. of New York*, 895 F.2d 670 (10th Cir. 1990) . . . . . . . . . 39

*Al-Husry v. Nilsen Farms Mini-Markets, Inc.*, 31 Cal.Rptr.2d 28 (Cal. App. 1994) . . . . . . . . 39

*J.R. Waymire Co. v. Antares Corp.*, 975 S.W.2d 243 (Mo. App. 1998) . . . . . . . . . . . . . . . . 39

*Schulman v. Wolske & Blue Co., L.P.A.*, 708 N.E.2d 753 (Ohio App. 1998) . . . . . . . . . . . . . 39

*Greenhaw v. Board of Commissioners*, 245 Kan. 67, 774 P.2d 956 (1989) . . . . . . . . . . . . . . 39

WA 663718.3

ARY - 02045

B.    The District Court Erroneously Construed Paragraph 5 As a Waiver of ARY's Entitlement to Statutory Interest Because that Paragraph Is Silent Regarding Statutory Interest . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*TMG Life Ins. Co. v. Ashner*, 21 Kan.App.2d 234, 898 P.2d 1145 (1995) . . . . . . . . . . . . . . 40

*Johnson County Bank v. Ross*, 28 Kan.App.2d 8, 13 P.3d 351 (2000) . . . . . . . . . . . . . . . . . 40

*General Surgery, P.A. v. Suppes*, 24 Kan.App.2d 753, 953 P.2d 1055 (1998) . . . . . . . . . . . 41

*Lauck Oil Co. v. Breitenbach*, 20 Kan.App.2d 877, 893 P.2d 286 (1995) . . . . . . . . . . . . . . 41

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

APPENDICES

A.    November 21, 2000 Stock Purchase Agreement
B.    Consulting and Noncompetition Agreement for Scott Krigel
C.    Escrow Agreement for Scott Krigel
D.    Escrow Agreement for Scott Krigel Trustee

WA 663718.3

ARY - 02046

## STATEMENT OF ISSUES

Appellee ARY Jewelers concurs in Krigel's statement of the first and second issues necessary to dispose of the appeal.

ARY objects to Krigel's statement of the third and fourth issues on appeal, as those issues were not raised below, were not pleaded as affirmative defenses as required by Kansas rules, and should not be considered by this court. *See also* Argument Section II, *infra*.

1

WA 663718.3

ARY - 02047

## STATEMENT OF FACTS

1. <u>Krigel's, Inc. Becomes Insolvent & Defendant Finds a Buyer</u>

Defendant-Appellant Scott Krigel was the president of Krigel's, Inc., a family-owned chain of jewelry stores. Mr. Krigel is also the Trustee of the Scott W. Krigel Revocable Trust ("Krigel Trust"). R. at 101. The Krigel Trust was the sole shareholder of Krigel's, Inc. R. at 101.

The Krigel's, Inc. chain of stores became insolvent in the year 2000. R. at 102. At the time, Foothill Capital was Krigel's Inc's only secured lender. R. at 421. That same year, Scott Krigel entered into negotiations to sell Krigel's, Inc. to plaintiff ARY Jewelers, LLC. R. at 102. The negotiations culminated on November 21, 2000 with the execution of a Stock Purchase Agreement ("SPA" or "Agreement") between the Krigel Trust and ARY. R. at 107, 113. (The SPA is attached hereto as Appendix A.) At the time the SPA was signed, Krigel's owed Foothill Capital approximately $8 million. R. at 421.

The terms of the SPA were straightforward. Contingent on the willingness of Foothill Capital to continue financing the operation of the Krigel's, Inc. stores, the SPA provided that all Krigel's stock would be sold to ARY Jewelers for $50,000.00. R. at 102, 65, 74. Because the SPA contemplated purchasing Krigel's out of bankruptcy, it provided that, on closing, ARY Jewelers would pay Krigel's, Inc.'s unsecured creditors 60 cents on the dollar in settlement of their claims. R. at 195, 204 and 205; Appendix A at ¶¶1(a), 4(c), and 4(e). The SPA contained no provision for payment of Krigel's, Inc.'s secured lender, Foothill. R. at 195.

Ancillary to the SPA, the parties also executed a Consulting and Noncompetition Agreement ("Consulting Agreement"), which provided that Scott Krigel, personally, would receive compensation for "consulting" services and a non-competition agreement. R. at 108 and 129. (The

2

ARY - 02048

Consulting Agreement is attached hereto as Appendix B.) Specifically, upon the transfer of Krigel's stock to ARY as contemplated under the SPA, $1,450,000.00 held in escrow would be released to Scott Krigel as consideration for consulting services ($950,000.00) and a covenant not to compete ($500,000.00). R. at 212, 217; App. B at ¶¶1, 4, and 9. To effectuate the two agreements, the parties also entered into related Escrow Agreements. R. at 89 and 96. (The escrow agreements are attached hereto as Appendices C and D.)

ARY complied with all the conditions precedent to performance of the SPA, including depositing $1,450,000.00 in escrow with Assured Quality Title Company as consideration for the Consulting Agreement. R. at 102. Fifty thousand dollars ($50,000.00) was deposited in a separate escrow account with Assured Quality Title Company for the purchase of the Krigel's, Inc. stock. R. at 103. ARY also deposited $6 million into a domestic, federally insured bank. R. at 310 and 315. That amount roughly equaled the anticipated 60% payout to Krigel's Inc.'s unsecured creditors. R. at 310 and 315.

## 2. Negotiations of the Financing / "Walk-Away Clause"

Throughout contract negotiations, ARY insisted that the SPA include a term that made ARY's securing a commitment for adequate financing a condition of its closing under the agreement. R. at 224. Earlier drafts of the Agreement included such a provision in the section of the contract that set forth general conditions to closing. R. at 224. For example, a draft of the Agreement that ARY's then-counsel, Max Jevinsky, faxed to defendant's counsel Sandy Krigel on or around 5:48 p.m. on November 17, 2000 included the following provision at paragraph 5(b):

> (b) The obligations of the Sellers hereunder are, at the option of the Purchaser, subject to the satisfaction on or prior to the closing of the following conditions:

3

WA 663718.3

ARY - 02049

(i) All current bank loans at Foothill Capital, . . .shall be renegotiated with the Company and with the other parties to such agreements in a manner acceptable to the Purchaser, in the sole and absolute discretion of the Purchaser.

R. at 224, 229. Sandy Krigel initially proposed revising this condition to establish an "objective standard" for what terms ARY would deem acceptable in its renegotiation of the Krigel's, Inc. loan from Foothill Capital. R. at 224. Later, on November 18, 2000, Sandy Krigel prepared a separate draft of the Stock Purchase Agreement, which ARY never accepted, that would have eliminated the financing condition and required ARY to represent or warrant that it would pay off all of Krigel's, Inc.'s "secured obligations" – including the Foothill loan – at closing. R. at 224-25. The latter provision was set forth at paragraph 4(c) of that draft of the Agreement. R. at 224, 246.

On November 20, 2000, Mr. Jevinsky advised Sandy Krigel that the financing condition was a necessary term. R. at 225, 262. To satisfy the Sellers' desire that ARY make a representation regarding how Krigel's, Inc.'s "secured obligation" to Foothill Capital would be paid off and ARY's desire for a financing condition, paragraph 4(c) was revised to include two separate sentences. R. at 225, 262. In the first sentence of this November 20, 2000 draft, ARY would have represented that it would give Sellers evidence within a specified time frame that Foothill had consented to an assumption of the loan by Purchaser. R. at 225, 262. The second sentence set forth the financing condition which provided that if ARY did not receive Foothill's consent to its assumption of the loan, the transaction would be void and of no further effect. R. at 225, 262.

During a meeting at the offices of Krigel & Krigel, Mr. Jevinsky and Sandy Krigel negotiated the final revisions to the Stock Purchase Agreement. R. at 225. During that meeting, they agreed to two changes from the November 20, 2000 draft of paragraph 4(c) that are set forth in paragraph

4

WA 663718.3

ARY - 02050

4(c) of the executed Stock Purchase Agreement dated November 21, 2000. R. at 225, 204. First, they agreed that the time for ARY to obtain consent from Foothill would be four weeks from the date of execution of the Agreement. R. at 225, 204. Second, they agreed that paragraph 4(c) should provide that ARY would give evidence of Foothill's consent to "continued" financing rather than consent to ARY's assuming the existing loan. R. at 225, 204. These changes are reflected in the executed version of the Stock Purchase Agreement. R. at 225, 204.

During these meetings between Mr. Jevinsky and Sandy Krigel on November 19 or 20, 2000, Sandy Krigel referred to the second sentence of paragraph 4(c) of the Stock Purchase Agreement as ARY's "walk away" clause. R. at 226.

3.    **Krigel's has Secured Debt of Approximately $8 Million with Foothill Capital; Agreement Calls for its Continued Financing.**

Krigel's, Inc. had borrowed approximately $8 million from Foothill Capital, and that amount was secured debt owed by Krigel's, Inc. at the time the parties entered into the SPA and Krigel's, Inc. filed its bankruptcy petition. R. at 421. Continued financing of that debt was a necessary term of the SPA. R. at 225. Accordingly, Paragraph 4(c) of the SPA provides that:

> Representations, Warranties and Covenants of Purchaser.    Purchaser hereby represents, warrants, and covenants to Seller that:
> . . . (c)  Within four weeks from the date hereof Purchaser shall provide Seller with evidence of Foothill Capital's consent to the continued financing of Company's obligations to Foothill Capital. *In the event Foothill Capital does not consent within the foregoing time period this Stock Purchase Agreement and related agreements shall be void and of no further effect.*

R. at 204; Appendix A (SPA) at ¶4(c)(emphasis added). The SPA was executed on November 21, 2000. R. at 103, 195. The deadline for Foothill Capital's consent was, therefore, December 19, 2000. R. at 204; Appendix A (SPA) at ¶4(c).

WA 663718.3

ARY - 02051

4.    **Foothill Capital Does Not Consent to Continued Financing.**

By December 19, 2000, ARY had not received a commitment from Foothill Capital for continued financing. R. at 227. Instead, on December 15, 2000, Foothill Capital issued a proposal to ARY attaching at least ten separate conditions and explicitly declaring,

> Please let this letter serve as an expression of Foothill Capital's interest in reviewing the opportunity to provide the *emergence financing* for Krigel's Jewelers under ARY, LLC's ownership, *but should not be considered a commitment to lend.*

R. at 284, 287-93 (emphasis added). Scott Krigel was critical of the December 15 Foothill proposal. R. at 287. Nonetheless, he claimed to accept it as complying with paragraph 4(c) of the SPA. R. at 296-297, 368.

ARY, however, did not accept it, and on December 19, 2000, Mr. Jevinsky sent a letter to Scott W. Krigel on behalf of ARY advising him that Foothill Capital had not consented to continued financing within the four weeks specified by paragraph 4(c). R. at 226, 278, 298-299. In that same letter, Mr. Jevinsky expressed his hope that, despite the failure of this condition, this deal could nevertheless be revived. R. at 226, 278. Mr. Jevinsky advised Mr. Krigel that Mr. Jevinsky believed a lending commitment that satisfied ARY's requirements could be obtained if the parties agreed to extend the deadline for that commitment to January 18, 2001. R. at 226, 278. Mr. Jevinsky requested that Mr. Scott Krigel execute a duplicate copy of that letter to accept this proposal. R. at 226, 278. However, Mr. Jevinsky never received a signed copy of that letter, and Krigel never agreed to extend the acceptance date. R. at 226, 278, 298-300.

Krigel admits that the December 15 Foothill proposal letter did not satisfy the requirements of paragraph 4(c) of the SPA. R. at 301-302. Instead, Scott Krigel claims that the December 15

6

WA 663718.3

ARY - 02052

Foothill proposal gave him "peace of mind enough to be able to waive paragraph 4(c)." R. at 301-302. ARY did not waive paragraph 4(c). R. at 680.

On January 4, 2001, Scott Krigel received a proposal from Foothill Capital for Debtor In Possession ("DIP") financing for Krigel's. Forwarding the proposal onto Gohar Husain and Max Jevinsky, Mr. Krigel wrote that the proposal "needs MAJOR work to negotiate a decent deal," and that he had contacted three other potential lenders. R. at 363 (emphasis in original). Negotiations, and Foothill Capital's series of proposals, continued through January, February, March and into April. R. at 104. At no time, however, did Foothill Capital commit in writing, or otherwise, to the continued financing of Krigel's on any terms, much less the same terms that were currently in effect with Krigel's. R. at 285. Indeed, as Tom Morgan, the Foothill representative responsible for its negotiations with Krigel's, Inc. and ARY testified:

> Q:   So it would be absolutely and totally false for anyone to represent that as of March 27th or any date thereafter Foothill had issued a commitment to ARY; is that true?
>
> A:   We did not issue a commitment, that's true.
>
> *Q:   And if someone alleged that you had consented to finance ARY on any terms whatsoever, that would also be equally false; would it not?*
>
> *A:   Yes, it would be.*

R. at 285.

5.   **The Agreements Require Written Notice.**

The Agreement requires written notices. Section 8(d) of the SPA provides that "*All notices, requests, and other communications required or permitted to be given hereunder shall be in writing . . ..*" R. at 207; Appendix A (emphasis added). Section 5 of the Consulting Agreement provides that "*Any notices, consents, waivers and other communications pursuant to this Agreement, must be in writing . . ..*" R. at 213; Appendix B (emphasis added).

7                                WA 663718.3

ARY - 02053

6.  <u>Krigel's Files for Bankruptcy While The Parties Continue to Seek Financing.</u>

Notwithstanding Foothill Capital's refusal to consent to continued financing, the parties continued to negotiate with Foothill Capital in an effort to salvage the transaction. R. at 104. Mr. Krigel secured the pre-approval of Krigel's, Inc.'s creditors for a plan of reorganization incorporating the SPA, and on January 19, 2001, Krigel's filed for bankruptcy.[1] R. at 57, 104. On January 26, 2001, Mr. Krigel presented the proposed plan of reorganization to the Bankruptcy Court as a prepackaged reorganization plan. R. at 57, 104. The date for the proposed plan of reorganization to be confirmed by the Bankruptcy Court was set for March 5, 2001. R. at 104.

Because financing was still not available, ARY Jewelers asked counsel for Krigel's to continue the March 5, 2001 hearing so that additional time would be available to secure financing. R. at 306. Krigel's refused. R. at 306. ARY then sought a continuance from the Bankruptcy Court, but the request was denied. R. at 306. At the conclusion of the March 5 hearing, the Bankruptcy Court confirmed the Plan, and set the effective date for March 15, 2001. R. at 58, 104.

As the effective date for the Reorganization Plan approached, ARY Jewelers again made the parties aware of the fact that financing was not available and again requested an extension of time to continue the search for acceptable financing. R. at 58, 104. Although Krigel's position was that ARY Jewelers did not have standing to ask for a modification of the Plan, Krigel consented to extend the effective date by two weeks until March 30, 2001. R. at 58, 104.

On March 28, 2001, ARY notified Scott Krigel that Foothill had not consented to continued financing of Krigel's. R. at 309. ARY requested that Mr. Krigel use whatever influence he had with

---

[1]  Case No. 01-40276-11-JWV, in the United States Bankruptcy Court for the Western District of Missouri, Western Division.

8

WA 663718.3

ARY - 02054

Foothill Capital to persuade them to continue financing Krigel's according to the same terms that were in place as of November 21, 2001. R. at 309. ARY also sought an additional extension of the March 30, 2001 effective date so that financing could be arranged. R. at 105. Krigel's refused to consent to the extension. R. at 105. The Bankruptcy Court denied ARY's requested extension, holding additionally that ARY lacked standing to object to or modify the Plan. R. at 105, 375-377.

On April 5, 2001, ARY notified Krigel's that Foothill Capital's categorical refusal to provide continued financing made moving forward with closing impossible. R. at 360. Krigel's, Inc. was subsequently sold to Hannoush Jewelers at auction in April 2001. R. at 105.

7.    **Litigation History**

On March 31, 2001, Scott Krigel made a demand upon the Assured Quality Title Company for the release of $1,450,000.00 to Mr. Krigel personally, and for the release of $50,000.00 to the Krigel Trust. R. at 106. Under the terms of the escrow agreements, an objection by ARY Jewelers to the release of the escrowed funds prohibits Assured Quality Title Company from such release until such time as it receives written directions from both parties, or receives a final, unstayed, order from a court of competent jurisdiction directing the disposition of the funds. R. at 106. On April 2, 2001, ARY Jewelers notified Assured Quality Title Company that it was contesting the release of the escrowed funds. R. at 106.

a.    Krigel Files Adversary Proceeding in Bankruptcy Court.

On April 10, 2001, Scott Krigel, through Krigel's, Inc., filed an Adversary Proceeding in the Bankruptcy Court against ARY Jewelers and two other defendants, claiming that ARY breached the SPA. R. at 313, 317. On June 8, 2001, the Bankruptcy Judge, the Honorable Jerry W. Venters, entered an order abstaining from the case. R. at 313.

9

WA 663718.3

**ARY - 02055**

b.    Krigel's Inc.'s Unsecured Creditors File Suit in U.S. District Court.

On June 25, 2001, several of Krigel's, Inc.'s unsecured creditors filed a lawsuit against ARY Jewelers, LLC, in the United States District Court, Western District of Missouri ("the *Fabrikant* Action"), alleging, *inter alia,* breach of contract based on the failure to close on the SPA. R. at 333. The Plaintiffs in the *Fabrikant* Action sought preliminary injunctive relief to freeze ARY's domestic assets. R. at 333. The Court initially granted a temporary restraining order freezing ARY's assets, but after a hearing found that the plaintiffs did not have a substantial likelihood of success on the merits, dissolved the TRO, and denied the Motion for preliminary injunction. R. at 352. On August 24, 2001, the unsecured creditors dismissed the federal lawsuit. R. at 356.

c.    ARY Files this Lawsuit in Johnson County District Court.

On April 24, 2001, ARY filed this lawsuit seeking a declaration that it was entitled to the return of its escrowed funds. R. at 5. On or about August 9, 2001, Krigel filed his counterclaim, claiming for the third time that ARY had breached the SPA. R. at 100. Both parties moved for summary judgment. R. at 176, 179. On May 29, 2002, the district court granted ARY summary judgment and denied Krigel's motion for summary judgment. R. at 159. The court held that the Agreement was null and void as of December 19, 2000, and ordered that the escrowed funds be released to ARY. R. at 159-65.

On June 10, 2002, ARY moved the court for further relief pursuant to the Declaratory Judgment Act for an award of pre- and post-judgment interest on the escrowed funds. The district court denied the motion on September 13, 2002, and ARY timely filed its notice of appeal on September 16, 2002.

WA 663718.3

ARY - 02056

### ARGUMENT AND AUTHORITIES

This case turns on whether or not the November 21, 2001 Stock Purchase Agreement between ARY and the Krigel Trust became void on December 19, 2000, as a result of the lack of a financing commitment from Foothill Capital. The trial court found that it did, and its ruling should be affirmed.

The case boils down to an interpretation of ¶ 4(c) of the contract, which provides:

> Representations, Warranties and Covenants of Purchaser.    Purchaser hereby represents, warrants, and covenants to Seller that:
> . . . (c) Within four weeks from the date hereof Purchaser shall provide Seller with evidence of Foothill Capital's consent to the continued financing of Company's obligations to Foothill Capital. *In the event Foothill Capital does not consent within the foregoing time period this Stock Purchase Agreement and related agreements shall be void and of no further effect.*

Paragraph 4(c) unambiguously required Foothill's consent to continued financing as a condition to ARY's performance under the SPA. As Judge Venters held in the bankruptcy court, "in the event Foothill Capital did not consent to the continued financing within the four-week period following the execution of the Agreement, the Agreement was to be void and of no further effect." R. at 315.

There is no dispute here: *Foothill Capital did not consent to the continued financing of Krigel's.* Therefore, the SPA and the Consulting Agreement were void on December 19, 2001, and the trial court correctly ruled that ARY is entitled to the return of its $1.5 million in escrowed funds.

Nonetheless, Krigel and the Krigel Trust (hereinafter collectively "Krigel") put forward a variety of arguments, claiming that only he could waive the financing requirement because it only "benefitted" him. As demonstrated herein, the financing requirement was a condition subsequent

WA 663718.3

ARY - 02057

that could not be waived under Missouri law.[2]  Even if it could be waived, it had to be waived by the "affected party" under the terms of the SPA.  Lack of financing obviously affects the buyer: without financing, the buyer has to pay cash.  In this case, lack of financing would have forced ARY to pay an additional $8 million in cash – more than doubling ARY's cash outlay.  As an "affected party," ARY's waiver was required, and the SPA required such a waiver to be in writing.  No such waiver occurred.  Accordingly, Krigel's arguments have no merit, and the Court should affirm the District Court's judgment in ARY's favor.

I.    **THE DISTRICT COURT CORRECTLY INTERPRETED THE AGREEMENT AND PROPERLY GRANTED PLAINTIFF SUMMARY JUDGMENT.[3]**

   A.    **Paragraph 4(c) Required Foothill Capital's Consent to Continued Financing And Was Not a Condition That The Seller Scott Krigel Could Waive.**

   Krigel's only defense to the undisputed fact that Foothill Capital did not consent to continued financing is that the financing contingency was really just a warranty from ARY to Mr. Krigel.  Krigel contends that he and only he – at his sole discretion – could and did waive this "warranty."  Therefore, according to Krigel, the SPA and Consulting Agreement were not void.

   The trial court held that ¶ 4(c) was a representation and warranty that could be waived, but because it affected both parties, both parties had to waive it.  ARY believes that the trial court's ruling that ¶ 4(c) is a representation and warranty was error.  While the first sentence of ¶ 4(c) may be a representation or warranty, the second sentence stands alone as a traditional financing contingency that voids the contract where – as here – financing was not available.  This Court should

---

   [2]  Both the SPA (¶8(a)) and the Consulting Agreement (¶18) provide that they shall be governed by Missouri law.

   [3]  ARY concurs that the standard of review of the summary judgment is *de novo*.

WA 663718.3

ARY - 02058

affirm the lower court's judgment by holding that Krigel could not waive the free-standing financing

contingency contained in ¶ 4(c)'s second sentence.

> **1.    Clear Missouri Law Provides That Financing Contingencies Always Inure to Purchaser's Benefit and are Not Waivable By Seller.**

Continued financing by Foothill would have accomplished exactly what <u>every</u> financing

contingency clause is designed to accomplish – the purchase of the asset on credit as opposed to with

cash. The purpose of this financing clause, like any financing clause, was to relieve the purchaser

of the obligation to fund the purchase in cash. Thus, ¶4(c) of the SPA is a "condition subsequent"

that operates to the exclusive benefit of the buyer. As a matter of law, when Foothill did not consent

within the four-week period specified in the SPA, the SPA terminated.

Under Missouri law, a contractual clause that requires financing is a condition subsequent.

*Maynard v. Bazazzadegan*, 732 S.W.2d 950, 954 (Mo.App. 1987); *Century 21 Al Burack Realtors*

*v. Zigler*, 628 S.W.2d 915, 916 (Mo. App. 1982)("[A financing] provision is a condition subsequent

to the existence of the contract, which, upon the non-occurrence of the stipulated event, may be

raised to avoid the contract . . . ."). The failure to obtain financing when required in a condition

subsequent clause automatically voids the agreement as a matter of law. *Berger v. McBride & Son*

*Builders, Inc.*, 447 S.W.2d 18, 19 (Mo.App. 1969). A financing contingency of the type contained

in the SPA operates to the exclusive benefit of ARY, as ARY was the only party to the SPA with any

interest as to whether the Foothill's loans were paid off or continued to be financed.[4]   This is

---

[4]   The general rule was explained by the Supreme Judicial Court of Massachusetts:

> The buyer was dependent upon financial assistance in order to fulfill his obligations under the contract. It was obviously to the buyer's advantage that he be released from his obligation in the event he should be unable to procure financial assistance. It would be of no importance to the [sellers] whether the buyer was offered a .... loan if the buyer was still able to tender the full purchase price.

WA 663718.3

ARY - 02059

consistent with the well accepted rule that financing contingencies operate to the exclusive benefit of the purchaser. *Dygert v. Crouch*, 36 S.W.3d 1, 5 (Mo. App. 2001) (citing cases).

Absent an unusual circumstance, the financing contingency can only be waived by the purchaser. *Fleischer v. McCarver*, 691 S.W.2d 930, 934 (Mo. App. 1985). Even where the seller had an interest in the financing, the seller could not waive the contingency without the buyer's consent. *Id.* A condition subsequent can be waived only prior to the date on which the condition terminates the contract. Because the contract automatically terminates upon the failure of the condition, a subsequent waiver cannot, as a matter of law, revive the contract. *Errante v. Kadean Real Estate Service, Inc.*, 664 S.W.2d 27, 30 (Mo. App. 1984). Thus, once the December 19 deadline for financing had passed, the SPA itself was void and of no effect. It is impossible as a matter of law for any subsequent act – of either Krigel or ARY – to have "waived" the condition subsequent clause, because there was no contract in existence between the parties. *Berger,* 447 S.W.2d at 21. Quoting Williston, the *Berger* Court wrote:

> Thus, where a clause in a contract is interpreted as making it void or automatically cancelled upon the happening of a certain contingency, an attempted waiver after the occurrence of the condition can be supported, if at all, only as the recreation of a contract, for, the old contract having ceased to exist, only a new contract can reinstate the respective rights and duties.

*Id.* at 20 (quoting 3 WILLISTON ON CONTRACTS § 667 at 1917). The Court continued and held that because no consideration was given for an alleged new contract, none had been created. *Id.*

---

*De Freitas v. Cote*, 174 N.E.2d 371, 373-4 (Mass. 1961). *See also Dygert v. Crouch*, 36 S.W.3d 1, 6 (Mo. App. 2001) ("If the buyer actually has the purchase price in cash to pay to the seller as required by the contract, it should not make any difference to the seller how the cash is obtained.").

14

WA 663718.3

ARY - 02060

In a case that is exactly on point, the Court in *Baumann v. Brittingham* held that the failure to obtain financing within the contractual window voided the contract, and that even though the defendants continued to seek financing after that date, the contract was void and unenforceable as a matter of law. 759 S.W.2d 880, 881 (Mo. App. 1988). Because the contract "ceased to exist" on the "date of the contingency" a "so-called waiver would not revive the Sale Contract." *Id.* at 882.

Paragraph 4(c) was a financing contingency in the buyer's favor. As a matter of Missouri law, Krigel could not waive it. Accordingly, lack of financing terminated the SPA on December 19, 2000, and this Court should affirm the District Court's order granting summary judgment to ARY.

### 2.    Krigel's Construction Entirely Ignores the Second Sentence of ¶4(c), and Essentially Reads it Out of the SPA.

The Court is obligated to read the contract in such a manner that words, phrases, and clauses are not rendered meaningless or superfluous. *Tuttle v. Muenks*, 21 S.W.3d 6, 11-12 (Mo. App. 2000). The parties are presumed not to have intended nullities, and the preferred construction is one that provides a "reasonable meaning to each phrase and clause," without "leaving some of the provisions without function or sense." *Transit Cas. Co. v. Certain Underwrites at Lloyd's of London*, 963 S.W.2d 392, 297 (Mo.App. 1998). Despite these settled principles of contract interpretation, Krigel asks this Court to ignore the second sentence of ¶4(c).

The second sentence of ¶4(c), which is found nowhere else in the contract, unambiguously provides that "In the event Foothill Capital does not consent within the foregoing time period this Stock Purchase Agreement and related agreements shall be void and of no further effect." Foothill Capital <u>never</u> agreed to continue financing. R. at 285. As a result, the SPA terminated by its own terms on December 19, 2000, and the related Consulting Agreement also terminated.

15

Krigel nonetheless claims that upon receiving Foothill Capital's December 15, 2000 emergent financing proposal – that explicitly states that it is <u>not</u> a commitment to lend – he waived this financing requirement because he was "comfortable" with Foothill's financing proposals. Krigel's reading of the contract, however, makes the financing requirement a waste of paper. Indeed, according to Krigel, ¶4(c) is to be treated as any other provision of Section 4. Section 5 of the SPA, however, provides that the representations and warranties in Section 4 had to be true as of the closing date, or "this Agreement shall be null, void, and of no further effect, unless waived by the affected party." R. at 205. Under Krigel's theory that ¶4(c) is merely a representation or warranty, lack of Foothill's consent would terminate the Agreement pursuant to the terms of Section 5, even without the second sentence of ¶4(c). Thus, Krigel's construction gives the second sentence of ¶4(c) no meaning at all, and this Court should reject it. *See Transit Cas. Co.*, 963 S.W.2d at 297.

The only explanation that gives meaning to the second sentence of ¶4(c) is that it is a *condition subsequent* that *automatically terminates* the Agreement if financing is not available. The reason that the second sentence appears where it does, and is contained within a section otherwise related to Purchaser's representations is simple: this is where Foothill's financing is discussed. Thus, the provision relating to the consequences of a refusal to finance is in the same place. No other condition contained in Section 4 has its own termination language either in that section or elsewhere.

This Court should interpret the contract in a manner that gives meaning to both parts of ¶4(c), not just the first sentence. Given the existence of otherwise unnecessary and superfluous termination language, the only reasonable meaning is that ¶4(c) is a self-executing financing contingency.

16

WA 663718.3

ARY - 02062

3.    **Krigel's Interpretation Exalts Form Over Substance and Ignores Black Letter Principles of Contractual Construction that Require Application of the Contract's Terms Without Regard to Inconsistent Headings.**

As he has before, Krigel claims again that ¶4(c) must be a waivable condition because of where it appears in the contract. However, the placement of the condition subsequent does not control its interpretation. Well-established interpretative rules require that contractual provisions be given their plain meaning, and not be limited by the headings or section titles in which they are found. For example, in *Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.*, the First Circuit examined just such a question of interpretation. 169 F.3d 43, 53 n. 15 (1st Cir. 1999). The insured argued that the title of an exclusion limited the effect of the contractual provision contained within, but the Court rejected the argument and reversed:

> We recognize that the title of the SR&CC clause, "Strikes, Riots & Civil Commotions," may seem to suggest a narrower focus for that clause than is accorded by our reading of the "malicious acts" provision. But *to the extent there is a difference between the title and the plain language of the clause, the latter prevails. See Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 118 S.Ct. 1952, 1956, 141 L.Ed.2d 215 (1998) (title of statute cannot limit or control meaning of text). The practical need for brevity in a title may result, as here, in a less than perfect match-up. Here, for example, the title likewise makes no reference to "martial law, military, or usurped power" nor to "lockouts." *We don't believe that the title wags the dog.*

Other courts have reached similar conclusions. In *St. Germain & Son, Inc. v. Taunton Redevelopment Auth.*, the court held, "The text and not the title is controlling. A title may be considered when construing the text, but the scope of the text cannot be expanded by the title." 340 N.E.2d 916 (Mass.App.Ct. 1976); *see also Charles I. Hosmer, Inc. v. Commonwealth*, 19 N.E.2d 800, 804 (Mass.App.Ct. 1939) ("The body of the article is no more governed by its title than it would be by a preamble to the contract itself.") (citing numerous cases applying the same principal to

17                                          WA 663718.3

ARY - 02063

statutory interpretation); *Herlihy Mid-Continent Co. v. Sanitation Dist. Of Chicago*, 60 N.E.2d 882, 885-86 (Ill. 1945) (contract provision entitled "Unavoidable Delays" did not control clear textual language waiving damages for "any delay or delays").

~~Settled interpretative rules call for analysis of the text, not titles.~~[5] Paragraph 4(c) contains a financing contingency, not a warranty waivable by Krigel. The judgment should be affirmed.

    4.        **Paragraph 4(c) Does Not Address Sellers' "DIP" Financing.**

Krigel next claims that the purpose of ¶4(c) was to provide Scott Krigel with assurances that debtor in possession ("DIP") financing would be available so that Krigel's could weather the interim bankruptcy proceedings until its stock was purchased by ARY. Krigel's Brief at 19.

At the risk of pointing out the obvious, ¶4(c) <u>just</u> <u>does</u> <u>not</u> <u>say</u> <u>that</u>. It says "continued financing," not "DIP financing" or "interim financing" or anything else of the type. Indeed, to make this argument, Krigel necessarily claims more than simply that ¶4(c) *includes* DIP financing; he

---

[5] In addition to contract titles, the rule applies to statutory interpretation, *see, e.g.,* *Pennsylvania Dep't of Corrections v. Yeskey*, 524 U.S. 206, 118 S.Ct. 1952, 1956, 141 L.Ed.2d 215 (1998); *Owner-Operator Independent Drivers Ass'n, Inc. v. New Prime, Inc.*, 192 F.3d 778, 784 (8th Cir. 1999) (where plain language of statute allowed injunctive relief for violation of statute, fact that section was entitled "Enforcement of Order" did not limit private suits to mere enforcement of agency orders; plaintiffs could sue for violations of statute); *Minnesota Transp. Regulation Bd. v. United States*, 966 F.2d 335, 339 (8th Cir. 1992); *National Fuel Gas Distribution Corp. v. TGX Corp.*, 950 F.2d 829, 835 (2nd Cir. 1991) ("There can be no doubt that the text of the statute must take precedence over its title. While a title or heading may help clarify or point the meaning of an imprecise or dubious provision, it may not alter or limit the effect of unambiguous language in the body of the statute itself."), and contractual recitals. *See generally* 17A Am.Jur.2d *Contracts* §392 (1991); 17A C.J.S. *Contracts* §302 (1999); *Williams v. Barkley*, 58 N.E. 765, 767 (N.Y. 1900); *Chicago Daily News, Inc. v. Kohler*, 196 N.E. 445, 451 (Ill. 1935); *Illinois Central RR. Co. v. Michigan Central R.R. Co.*, 152 N.E.2d 627, 633 (Ill.App.Ct. 1958) ("It is too well established to require citation of authority that the legal effect to be given an instrument is not to be determined by the label which it bears or the technical term it contains."); *Chu v. Ronstadt*, 498 P.2d 560, 563 (Ariz.App. 1972)("The character of contract must be determined by their provisions rather than by labels."); *Ingalls Iron Works Co. v. Ingalls*, 53 So.2d 847, 849-50 (Ala. 1951).

WA 663718.3

*ARY* - 02064

must claim that it means *only* DIP financing. Otherwise, he has to concede – as the District Court properly held – that like all buyers, ARY had an interest in the financing contingency, and, as an "affected party," ARY's consent would have been required to waive it. No basis for Krigel's interpretation is found in the SPA.

Such a claim also makes no sense from a practical standpoint. Why, if it was so important, would Krigel place the obligation upon ARY – which did not yet own Krigel's, Inc. – to obtain DIP financing for Krigel's during the pendency of the bankruptcy? Only Scott Krigel, not ARY, would be authorized to negotiate a DIP financing package at this time. Indeed, the fact that ¶4(c) obligated *purchaser* (i.e., ARY) to seek financing is the strongest possible evidence that "continued financing" referred to financing for purchaser's benefit – that is emergence, not DIP, financing.

Mr. Krigel's new assertion is also contrary to the facts. DIP financing was handled on a separate track from the emergence financing. The December 15, 2000 correspondence from Foothill proposed only emergence financing. R at 288. While Mr. Krigel suggests that he was so happy with the emergence financing that he was satisfied that the as-yet-unseen DIP financing would be acceptable, his contemporaneous writings differ greatly. In fact, he was highly critical of the December 15 proposal. R at 293. In addition, at this same time, he was expressing his considerable frustration with, and disappointment in, Foothill's response. R at 293. Indeed, it was three more weeks before Foothill made a DIP proposal, and Scott Krigel had major problems with it at that time. R at 363. Krigel's contemporaneous actions make it hard to believe that DIP financing alone inspired ¶4(c), or that Krigel was so satisfied with the December 15, 2000 emergence proposal that he would assume that satisfactory DIP financing was forthcoming.

WA 663718.3

ARY - 02065

The second sentence of Paragraph 4(c) is a freestanding financing contingency that a seller cannot waive under Missouri law. When Foothill Capital failed to consent to continued financing, the SPA was null and void. Accordingly, the trial court's judgment in favor of ARY Jewelers should be affirmed.

### 5. Defendant's Construction Leads to the Absurd Result That Scott Krigel Had the Unilateral Power to Require ARY to Double its Cash Outlay by Buying out Foothill for $8,000,000.

Krigel's interpretation also leads to an absurd result. Under Krigel's construction, Scott Krigel had sole authority to determine whether ARY would either (a) assume the Foothill debt, or (b) spend an additional $8 million to buy Foothill out. It strains credulity that a reasonable interpretation of the contract would cede to Mr. Krigel the unilateral right to change such a fundamental term. ARY's entire cash outlay for the transaction as contemplated was only $7,500,000. Nevertheless, Defendant suggests that a reasonable construction of the contract would have given Mr. Krigel the unilateral right to more than double it by requiring an additional $8 million cash payout. Contractual interpretations which involve such unreasonable results should be rejected. *See State ex rel. Missouri Dam and Reservoir Safety Council v. Rocky Ridge Ranch Property Owners Ass'n*, 950 S.W.2d 925, 929 (Mo. App. 1997).

### 6. The Parties Intended ¶4(c) To Protect ARY, Not Scott Krigel.

The evidence concerning the drafting of the SPA makes it perfectly clear that this language was intended to be more than just ARY's representation to Seller. Earlier drafts of the SPA

WA 663718.3

ARY - 02066

explicitly required ARY to pay cash to buy out Foothill.[6]  That language even appeared in this section of the SPA.  Obviously, the parties knew how to draft a provision requiring a cash purchase.

Significantly, the early language requiring immediate cash payoff of Foothill was removed ~~from subsequent drafts.  Because the original language requiring a cash payment had been placed~~ in ¶4(c), the revised language was left in the same place, even though it included a much broader protection for ARY.  That is why the condition subsequent ended up in this section of the contract.

ARY absolutely intended this clause to operate as a condition subsequent that would terminate the contract if financing was not available.  R. at 226.  It was not the intention or understanding of ARY that this provision be waivable by Scott Krigel.  R. at 226; 305.

Furthermore, the Krigels understood throughout the negotiations and drafting of the SPA that the purpose of ¶4(c) was to protect ARY.  Sandy Krigel, Scott's brother and the attorney responsible for Krigel's negotiation of the SPA, referred to this clause as ARY's *"walk away"* clause.  Their subsequent actions bear this out.  During March of 2001, by far the most important and discussed issue *vis a vis* whether this transaction would close was whether Foothill would consent to financing.

---

[6]  To be clear, ARY contends that the SPA unambiguously requires Foothill's consent to continued financing, and that parol evidence is thus unnecessary to determine that the SPA was null and void on December 19, 2000 when that consent had not been given.  However, reading the financing contingency as merely a representation waivable solely by the seller would lead to an absurd result that Scott Krigel could unilaterally more-than-double ARY's cash outlay at closing.  Parol evidence should be considered before the Court accepts such a construction.  *Tumlinson v. Norfolk & Western Rwy. Co.*, 775 S.W.2d 251, 252 (Mo.App. W.D. 1989) ("An absurdity is a result which is contrary to reason or which could not be attributed to a man in his right senses.").  No buyer in his right senses would have left it to the seller to unilaterally more-than-double the $7.5 million cash outlay.  This absurd result – advocated by Krigel – would create an ambiguity that would allow the Court to consider parol evidence.  *Id.* ("Even an apparently unambiguous contract may be rendered ambiguous and open to construction if its words, taken literally, lead to absurdity or illegality when applied to the facts.").

WA 663718.3

ARY - 02067

Despite numerous appearances in the Bankruptcy Court, no one ever articulated the position that

ARY was <u>contractually obligated</u> to buy out Foothill with cash.

Paragraph 4(c) was a financing contingency in the buyer's favor, and Krigel, the seller, could

not waive it. Accordingly, lack of financing terminated the SPA on December 19, 2000, and the trial

court's order granting summary judgment to ARY should be affirmed.

> **B.    The District Court Properly Granted ARY Summary Judgment, Because Even If Paragraph 4(c) Was a Representation and Warranty, it "Affected" ARY, and ARY's Waiver Was Required.**

Even assuming that the District Court was and Krigel is correct that ¶4(c) was a

representation or warranty that could be waived, Krigel's argument that only he had authority under

Section 6 to waive compliance with its terms is not correct. The trial court properly rejected this

argument, holding that Paragraph 4(c) also affected the buyer, ARY. Therefore, ARY's waiver was

required, and the judgment should be affirmed.

Even if ¶ 4(c) could be waived, the SPA required it to be waived by the "affected party." *See*

R. at 205; Appendix A, SPA §§ 5(c) and 6(a). Krigel claims that because the financing contingency

is included in a section of representations and warranties to the seller, the seller was the only party

that was affected by and benefitted from this provision. Krigel's Brief at 16. Krigel fails to explain

why ARY was not also affected by the failed financing contingency. Krigel cannot do so, because

it simply is not true.

Indeed, the absence of Foothill's consent required ARY to spend an additional $8 million in

cash to pay off the Foothill debt. As negotiated, however, ARY's entire cash outlay for the

transaction was only $7.5 million ($6 million to the unsecured creditors and $1.5 million to Krigel).

The failed financing contingency thus "affected" ARY to the tune of $8 million – more than doubling

22

WA 663718.3

the cash outlay required from ARY. Thus, ARY was an "affected party" of the failed financing provision, and ARY's waiver was required. A "party cannot by his waiver affect the rights of the other party to the contract." *Bellos v. Winkles*, 14 S.W.3d 653, 655 (Mo. App. 2000). Without ARY's waiver, the financing contingency remained, and the Agreement became null and void on December 19, 2000.

Krigel ignores the $8 million effect of a waiver on the actual purchase price. Instead, he simply argues that because the representation about financing was to his "benefit," only he could waive it. This argument ignores the plain language of the SPA. Sections 5(c) and 6(a) state that required conditions must be waived by the "<u>affected</u>" party." They do <u>not</u> say "benefitted" party. These two words are not synonymous, and Krigel's argument lacks merit.

The trial court properly concluded that the failed financing contingency "affected" the buyer ARY, and this Court should affirm the summary judgment in its favor.

**C.    The District Court Properly Granted ARY Summary Judgment, Because the SPA Required ARY's Written Waiver, and No Such Waiver Was Given.**

Rather than address the $8 million effect that Krigel's alleged waiver would have had on ARY, Krigel claims that Gohar Husain, ARY's then-managing agent, repeatedly stated that if the financing failed, ARY would still close on the SPA by paying cash. ARY disputes this claim, but for purposes of summary judgment and this appeal, it doesn't matter: *the SPA required waivers permitted by the SPA to be made in writing.* R. at 207; SPA ¶8(d).

Section 8(d) of the SPA provides that "*All notices, requests, and other communications required or permitted to be given hereunder shall be in writing . . . .*" R. at 207; Appendix A (emphasis added). Section 5 of the Consulting Agreement provides that "*Any notices, consents,*

23

WA 663718.3

ARY - 02068

*waivers and other communications pursuant to this Agreement, must be in writing . . .*" R. at 213; Appendix B (emphasis added).

The Agreements required written notice of waiver. Therefore, even assuming that Mr. Husain made the statement that ARY *would* pay cash to the secured lender,[7] such a statement has no legal effect. Indeed, in compliance with the SPA's terms, Mr. Krigel's (alleged) waiver was made in writing (by e-mail). R. at 368. There is no claim, however, that any such written waiver was ever made by ARY. Faced with this undisputed fact, Krigel claims (for the first time on appeal) that fact issues exist with regard to whether ARY waived this notice provision or should be estopped from asserting it. *See* Krigel's Brief, Issues III and IV. Because these arguments were not raised below, this Court should not consider them. *See also* Section II, *infra.* Even so, Seller has put forth no evidence suggesting ARY waived the written notice provision or should be estopped from enforcing the express notice provisions of the contract. *See also* Section II, *infra.*

There was no written waiver of the financing contingency by ARY. Therefore, the financing contingency remained, and because Foothill did not consent to continued financing, the SPA became null and void on December 19, 2000. The summary judgment in ARY's favor should therefore be **AFFIRMED.**

---

[7] Mr. Jevinsky's affidavit indicates that Mr. Husain said only that ARY *could* do so if it so chose. R. at 223.

WA 663718.3

ARY - 02069

## II. KRIGEL FAILED TO PLEAD OR OTHERWISE RAISE THE AFFIRMATIVE DEFENSES OF WAIVER AND ESTOPPEL AND IS THEREFORE PROHIBITED FROM ARGUING THEM ON APPEAL.[8]

For the first time on this appeal, Krigel argues that summary judgment was inappropriate because factual issues remain regarding whether ARY should be estopped from relying on the written notice requirements of the agreements and/or waived those requirements. Because Krigel did not raise these issues below and failed to plead these affirmative defenses in his answer or raise them in his counterclaim, Krigel has waived these defenses and may not present them for the first time to this Court.

### A. Krigel Did Not Raise Below ARY's Alleged Waiver and/or Estoppel of the Written Notice Requirement under Paragraph 8(c).

Krigel asks this Court to reverse the summary judgment against him based on the ARY's alleged waiver of the SPA provisions requiring written notice. However, Krigel did not raise these arguments at the trial court, and this Court should not be the first to entertain these new theories.

"Issues not raised before the trial court cannot be raised for the first time on appeal." *Wood v. Groh*, 269 Kan. 420, 433, 7 P.3d 1163 (2000). *See also Midwest Iron and Metal, Inc. v. Zenor Elec. Co.*, 28 Kan. App. 2d 353, 355, 19 P.3d 181 (2000) (quoting *Ripley v. Tolbert*, 260 Kan. 491, 513, 921 P. 2d 1210 (1996) ("We will not consider an issue for the first time on appeal."); *Griffin v. Dodge City Cooperative Exchange*, 23 Kan. App. 2d 139, 143, 927 P. 2d 958 (1996) ("Defendants cannot now raise this issue for first time on appeal."). "It is a well recognized concept of appellate

---

[8] ARY concurs that the standard of review of the summary judgment is *de novo*.

WA 663718.3

ARY - 02070

procedure that a point not raised before the trial court may not be raised for the first time on appeal."

*Lostutter v. Estate of Larkin*, 235 Kan. 154, 166, 679 P. 2d 181 (1984).[9]

Moreover, Krigel did not argue below that disputed issues of fact should preclude summary judgment. In fact, he filed a cross-motion seeking summary judgment on the very same legal issues. "[I]f both parties move for summary judgment on the same evidentiary facts and on the same issues and theories, the parties effectively stipulate that there is no genuine issue of material fact." 73 Am.Jur.2d, *Summary Judgment* §43.

Krigel did not raise these issues below. Accordingly, he cannot raise these issues here. The summary judgment of the trial court should be affirmed.

### B.    Krigel Did Not Plead His New Affirmative Defenses.

Krigel's newly-asserted theories are the affirmative defenses of waiver and estoppel. Affirmative defenses, however, must be specifically pleaded:

> In pleading to a preceding pleading, a party shall set forth affirmatively . . . estoppel, . . . waiver, and any other matter constituting an avoidance or affirmative defense.

K.S.A. § 60-208(c); *Geis Irrigation Co. v. Satanta Feed Yards, Inc.*, 214 Kan. 373, 377-78, 521 P.2d 272, 276 (1974) (rejecting estoppel argument because appellant failed to plead it as a defense); *Timi v. Prescott State Bank*, 220 Kan. 377, 386, 553 P.2d 315, 323 (1976) (refusing to consider

---

[9]  *See also Seaman U.S.D. No. 345 v. Kansas Comm'n on Human Rights*, 26 Kan. App. 2d 521, 523, 990 P.2d 155 (1999); *St. Francis Regional Medical Center, Inc. v. Weiss*, 254 Kan. 728, 747, 869 P. 2d 606 (1994); 10A Wright, Miller & Kane, *Federal Practice and Procedure*: Civil 3d §2716 at 282-284 n.12-13:

> The appellate court is limited in its review [of an order granting summary judgment]. The parties cannot add exhibits, depositions, or affidavits to support their positions. Nor can they advance new theories or raise new issues in order to secure a reversal of the lower court's determination.

WA 663718.3

ARY - 02071

statute of frauds defense because not raised at trial); *Strouhal v. Allied Development Co.*, 220 F.2d 541, 544 (10th Cir. 1955) (applying Federal Rule 8(c) and holding that failure to plead estoppel in the trial court waived the defense and precluded review on appeal).

The burden of pleading and proving an affirmative defense rests upon the defendant. *See King v. Pimentel*, 20 Kan.App.2d 579, 583, 890 P.2d 1217, 1221 (1995). Here, Krigel's argument is premised on the theory that ARY waived paragraphs 8(d) (notices) and 8(e) (entire agreement) of the SPA. Nowhere does such a theory appear in Krigel's answer and counterclaim. R. at 100. Indeed, Krigel did not plead a single affirmative defense in his answer. R. at 100. Neither is Krigel's counterclaim for declaratory judgment premised on the theory that ARY waived Krigel's compliance with these provisions. R. at 107. In short, Krigel's pleadings did nothing to alert ARY that Krigel would advance such a theory. ARY would be grossly prejudiced by consideration of Krigel's newly-asserted theory at this late stage in the proceedings.

**C.    No Evidence Exists to Support Krigel's Newly Asserted Theories.**

Not only did Krigel omit any such affirmative defense in his pleadings, the summary judgment record provides no factual support sufficient to meet Krigel's burden of presenting a triable issue of fact. For this additional reason, this Court should reject Krigel's new legal theories.

1.    <u>No Evidence Supports an Estoppel Claim.</u>

Estoppel requires "(1) an admission, statement, or act inconsistent with the claim afterwards asserted and sued upon, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such other party, resulting from allowing the first party to contradict or repudiate the admission, statement, or act." *Brown v. State Farm Mut. Auto. Ins. Co.* 776 S.W.2d

27

ARY - 02072

384 (Mo. 1989). It is Krigel's burden to plead and prove these affirmative defenses. *King v.*
*Pimentel, supra.* He failed to do so.

Krigel now claims that ARY is estopped from relying on the written notice requirement.
Until now, Krigel has merely argued (though never pleaded) that ARY waived *the financing*
*contingency* contained in SPA ¶ 4 (c) by telling Krigel that it would close on the deal even without
financing. Never, however, has Krigel argued – or presented supporting evidence – that ARY ever
mentioned the notice and integration provisions of the SPA. Nor has Krigel argued – or presented
evidence – that ARY at any time suggested that Krigel need not comply with those provisions or
require ARY to comply with those provisions. Thus, with regard to the written notice requirement,
Krigel has failed to produce any evidence as to the first element of his affirmative defense. ARY
simply never made any statements about those provisions.

Further, no evidence exists that Krigel took any action in reliance on the disputed statements
of Mr. Husain. Even assuming a statement about written notices existed, Krigel could not have
relied upon it. The only thing he could have done as a result of such statements was not to require
ARY's written waiver of the financing contingency in ¶4(c). Throughout these proceedings,
however, he has argued that ARY did not even have the <u>right</u> to waive the financing contingency.
He cannot now argue that some alleged statements of Mr. Husain prevented him from demanding
the very waiver he denies was allowed.

    2.   <u>No Evidence Supports a Waiver Claim.</u>

Waiver requires proof of "the intentional relinquishment of a known right." If waiver is
"implied from conduct, the conduct must clearly and unequivocally show a purpose to relinquish the
right." *Brown v. State Farm Mut. Auto. Ins. Co.* 776 S.W.2d 384 (Mo. 1989). Krigel has put forth

WA 663718.3

ARY - 02073

no evidence that ARY intentionally relinquished the financing requirement. Indeed, on December 19, ARY's then-attorney wrote to Krigel and requested a written, 30-day extension of ¶4(c)'s financing requirement. R. at 278. No such extension was granted. R. at 226.

As to the requirement that waivers be in writing, Krigel offers no evidence that ARY waived that provision or made any mention of it. Moreover, as discussed above, conduct and statements made after December 19, 2000 are irrelevant. Once the deal was terminated, it could not be revived absent a entirely new agreement. *Berger v. McBride & Son Builders, Inc.*, 447 S.W.2d 18, 19 (Mo.App. 1969); *Baumann v. Brittingham*, 759 S.W.2d 880, 881 (Mo. App. 1988).

Krigel has no evidence to support either of his newly-asserted, unpleaded affirmative defenses. He has no evidence because none exists, and there is no reason to remand this case for consideration of a theory asserted for the first time to the appellate court. Waiver and estoppel constitute affirmative defenses that must be affirmatively pleaded pursuant to K.S.A. § 60-208(c). Krigel's failure to so plead precludes this Court from consideration of Krigel's Issues on Appeal numbers III and IV. The judgment should be affirmed.

### III.    THE DISTRICT COURT PROPERLY DENIED KRIGEL'S MOTION FOR SUMMARY JUDGMENT, BECAUSE EVEN IF THE SPA HAD NOT TERMINATED, FACT ISSUES REMAIN ON THE EXISTENCE AND EXTENT OF KRIGEL'S DAMAGES.[10]

As discussed above, the undisputed facts demonstrate that ARY was entitled to summary judgment because the SPA was null and void when Foothill had not consented to continued financing by December 19, 2000. Accordingly, the District Court's judgment should be affirmed.

---

[10] ARY concurs that the standard of review of the summary judgment is *de novo*.

WA 663718.3

ARY - 02074

Should this Court rule, however, that the District Court's ruling was error, the case should nonetheless be remanded for a trial on Krigel's claims, because questions of fact remain regarding the existence and extent of damages that flow from the alleged breach.

The summary-judgment standard is well settled:

> Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The district court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with the evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find that reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.

*Davis v. Miller*, 269 Kan. 732, 737, 7 P.3d 1223 (2000) (citations omitted). The record does not contain sufficient damages evidence to support the entry of summary judgment in Krigel's favor. Indeed, the District Court found the SPA null and void and thus had no occasion to reach the issue of Krigel's damages at all. R. at 159.

A.    **The Purchase Price Is an Invalid Penalty, Not Liquidated Damages, and a Question of Material Fact Exists as to the Extent of Krigel's Damages.**

Defendant claims that the SPA's and Consulting Agreement's Default provisions are actually liquidated damages provisions entitling the Defendant to the entire purchase price of the contract. Krigel's Brief at 25. The provision at issue, however, establishes the purchase price as a penalty for failing to pay *third parties*. The purchase price bears no relationship to Defendant's damages for the default covered by the relevant clause, and Defendant's damages caused by the defined Default

30

ARY - 02075

are zero: ARY's obligation was to third parties, not Defendant. Therefore, the provision is not one for liquidated damages; it is a penalty which should not be enforced.

Missouri law requires a showing of actual harm to trigger a liquidated damages clause. ~~Goldberg v. Charlie's Chevrolet, Inc., 672 S.W.2d 177, 179 (Mo.App.1984)~~; *Grand Bissell Towers, Inc. v. Joan Gagnon, Enter., Inc.,* 657 S.W.2d 378, 379 (Mo.App.1983). Liquidated damages clauses are enforceable, but penalty clauses are not, and without evidence of damages, a liquidated damages clause actually becomes a penalty and is unenforceable. *Grand Bissell Towers,* 657 S.W.2d at 379, n. 4. For a liquidated damages clause to be valid: (1) the amount fixed as damages must be a reasonable forecast for the harm caused by the breach; and (2) the harm must be of a kind difficult to accurately estimate. *Paragon Group, Inc. v. Ampleman,* 878 S.W.2d 878, 881 (Mo.App. E.D. 1994).

      1.    **Defendant Presented No Evidence of Damages Caused by the Default.**

The Default clause is a penalty because it bears no relationship to Krigel's actual damages from the alleged Default. The Default/Penalty clause in the Consulting Agreement states:

> If Purchaser fails to provide [evidence of ability to pay 60% of Krigel's, Inc.'s unsecured creditors' claims] or if Purchaser fails to pay 60% of Company's unsecured creditors' claims on the effective date of Company's chapter 11 plan, Krigel shall be immediately entitled to receive all funds escrowed pursuant to paragraphs 4 and 9 of this Agreement and Scott W. Krigel, Trustee of the Scott W. Krigel revocable trust, shall be entitled to receive all funds escrowed pursuant to paragraph 1.(b) of the Stock Purchase Agreement.

R at 218; *see also* R. at 208 (SPA § 9) (with parallel language). *The only parties damaged by ARY's failure to pay the unsecured creditors' claims are the unsecured creditors.* Defendant – both individually and as trustee – suffered no loss from ARY's failure to pay the creditors. Thus, the alleged liquidated damages provision is not even triggered.

31

WA 663718.3

ARY - 02076

### 2.    The Default Provision Is Not a Reasonable Forecast of Krigel's Damages.

Krigel suffered no damages as a result of ARY's failure to pay the unsecured creditors' claims.  Accordingly, he presented the District Court with no evidence of any such damages. Without evidence of actual damages, it is impossible to determine whether the liquidated damages amount was a reasonable forecast for the harm caused by the alleged breach.[11]  In short, Defendant's claim on this point is merely a conclusion, lacking any evidence of actual damages or explanation as to why $1.5 million approximates the alleged damage.[12]  Without such evidence, a liquidated damages is an unenforceable penalty.  *See Grand Bissell Towers,* 657 S.W.2d at 379, n.4.

Even if Defendant could bootstrap the $50,000 price of the Krigel's Stock and the $1.45 million price of the Consulting Agreement to the Default provision (which he cannot do), there is no evidence that these figures are a reasonable approximation of Defendant's actual damages. Indeed, where the seller has the ability to sell the relevant property and can otherwise mitigate his damages by performing other services, a provision fixing the complete purchase price as liquidated damages *cannot* be a reasonable forecast for the harm caused.  *See Northwest Collectors, Inc. v. Enders,* 446 P.2d 200, 206 (Wash. 1968) ("where, as here, the leased property is capable of being used by others and the lessor can recoup his losses by leasing or selling it, the extraction of its full value for a default in the lease which does not render it valueless is clearly a penalty").  Such a

---

[11]    Like Krigel's argument that the financing contingency is actually just a warranty and representation, his argument on this point is limited to the statement "the amounts fixed for damages in this case are a reasonable forecast of the harm caused . . . ." Krigel's Brief at 26.  Defendant saying it is so does not make is so, however, and in the absence of actual evidence of harm, fact issues remain.  Thus, the Court should affirm the District Court's denial of Krigel's Motion for Summary Judgment.

[12]    Defendant also baldly asserts that Defendant's damages are difficult to estimate.  Krigel's Brief at 26.

WA 663718.3

ARY - 02077

provision by its very nature assumes that no one else would pay anything for the goods or services in question, and that their market value is zero. Because it ignores the potential for mitigation, liquidated damages in the amount of the full contract price is a penalty that should not be enforced. *See Lake River Corp. v. Carborundum Co.*, 769 F.2d 1284, 1291 (7th Cir. 1985) (Posner, J.).

### 3.    Lack of Damage Evidence Precludes Summary Judgment for Defendant.

Because the Default provision Defendant relies upon is a penalty clause that may not be enforced, Defendant must present actual evidence of damages caused by the alleged breach. That evidence must meet the summary judgment standard. He did not do so, and the denial of his motion for summary judgment should be affirmed.

Defendant claims that Krigel's stock "had no value" after the Chapter 11 bankruptcy plan failed. There is no evidence to support such a claim, however, and, not surprisingly, it does not appear in Defendant's statement of facts. Nor do defendants make any record citation to support their claim.[13] Thus, Defendant has put forth evidence only of the contract price of the stock. In order to properly measure damages, however, the market value of the stock must be deducted from the contract price. Therefore, a question of fact exists with regard to whether defendant actually suffered damages and to what extent.

The District Court's denial of Krigel's motion for summary judgment should be **AFFIRMED**.

---

[13]  *Compare* Supreme Court Rule 6.02 (d) (requiring fact statements to be keyed to record on appeal, or they will be presumed to be without support in the record).

WA 663718.3

ARY - 02078

## CONCLUSION

Krigel's entire argument reduces itself to his claim that ¶4(c) of the SPA is a warranty and representation because – despite what the two sentences in that subparagraph actually say – they appear under such a heading. Krigel ignores the plain language of the actual provision, which required the consent of Foothill Capital to continue financing Krigel's as a condition of ARY closing on the sale. Without that consent (which never came), the SPA and the Consulting Agreement became null and void on December 19, 2000.

On the basis of his erroneous reading of ¶4(c), Krigel claims he waived the SPA's financing contingency. He claims that he could do because it was a mere representation and warranty that *only* affected him. Krigel is conspicuously silent regarding the failed financing contingency's effect on ARY. Without Foothill's continued financing, ARY would have been required to infuse an extra $8 million in cash into the transaction. Because ARY was affected by ¶4(c), the SPA required ARY's written waiver of this provision. No such waiver occurred.

THEREFORE, the District Court properly granted summary judgment in favor of ARY, and that judgment should be **AFFIRMED**.

WA 663718.3

ARY - 02079