**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

M. FABRIKANT & SONS, INC., ET AL.   )
                                 )
                                 )
                                 )
       Plaintiffs,               )
                                 )   Case No. 01-0671-CV-W-5
v.                               )
                               )
ARY JEWELERS, L.L.C.,           )
                               )
       Defendant.             )

**ARY JEWELERS, L.L.C.'S SUGGESTIONS IN OPPOSITION TO PLAINTIFFS'
EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER**

Defendant ARY Jewelers, L.L.C. ("ARY") hereby responds to plaintiffs' Emergency Motion for

Issuance of a Temporary Restraining Order:

### *INTRODUCTION*

This suit is the proverbial second bite at the apple. For sound reasons, the United States

Bankruptcy Court for the Western District of Missouri abstained from this dispute, determining the case

"properly belongs in state court." An action is pending in Johnson County, Kansas between the <u>actual</u>

parties to the contract at issue, and two of the alleged third-party beneficiary unsecured creditors. The

Kansas action will determine the validity of that contract and the creditors' rights. The reason these seven

creditors chose to return to square one by filing this action is apparent – they request an unauthorized

prejudgment attachment of ARY's American assets without having to comply with state prejudgment

attachment requirements, even though the lawyer who now represents these plaintiffs told the Bankruptcy

Court (when he represented the committee of all such creditors) that prejudgment attachment was proper

because <u>state law</u> permits that remedy and is applicable herein by operation of Fed. R. Civ. P. 64. That

request runs directly afoul of a recent United States Supreme Court decision that holds federal courts lack



authority to freeze assets prior to judgment in suits seeking money damages. *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bonding Fund, Inc.*, 527 U.S. 308 (1999). Subsequent Courts of Appeals decisions make clear *Grupo* cannot be evaded simply by tacking on a claim for constructive trust or by alleging that a money judgment may otherwise not be collectible. *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1518 (11th Cir. 1994); *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1531 (11th Cir. 1994); *Bender v. Centrust Mortgage Corp.*, 51 F.3d 1027, 1030 (11th Cir. 1995) ("concern for the ultimate collectibility of a judgment" does not support "asserted right to set aside a [constructive trust]").

Plaintiffs seek money damages, but append a request for an equitable remedy in the hope this will evade the Supreme Court's rule. When it granted ARY's motion to abstain, the Bankruptcy Court recognized these very claims seek money damages. Plaintiffs' request for a "constructive trust" to enforce a money damage judgment they seek is as transparent as it is ineffectual. If this allegation were sufficient, every plaintiff can now ignore *Grupo* by engaging in artful labeling of the remedies hey seek. These claims seek money damages; plaintiffs do not change that by asking the Court to impose a "constructive trust" for their collection of such damages.

Even if prejudgment attachment under Rule 65 were not foreclosed by *Grupo,* plaintiffs have not and cannot meet the evidentiary burden they must show to be entitled to injunctive relief. They cannot demonstrate a likelihood of success. Nor can they show that balancing the hardships involved favors freezing ARY's assets. A prejudgment attachment is a drastic remedy, and in this case plaintiffs seek to freeze not only all of defendants' present assets, but also the next $5.5 million of ARY's assets. The hardships on ARY would be real. ARY could not conduct business; it could not invest its assets, borrow against them, or obtain credit. Plaintiffs simply ignore the requirements of Rules 64 (and the Missouri attachment law it borrows) and 65 that they provide sufficient security to protect ARY.

2

Given the emergency nature of the motion, ARY cannot respond fully to allegations in plaintiffs' Complaint and supporting suggestions for the motion. However, ARY disputes plaintiffs' characterizations. To provide context, it sets forth below the dispute's background.

### *Factual Background*

Krigel's, Inc. ("Krigel's") was a family-owned chain of jewelry stores, run by Scott Krigel, and its stock was owned by various members of the family. Because of continuing financial losses, Krigel's, Inc. sought to sell its stores in the summer of 2000. On November 21, 2000, ARY and Scott Krigel agreed to a Stock Purchase Agreement ("Agreement") (Exhibit 1).

ARY's obligations in the Agreement were contingent on the willingness of Krigel's existing lender, Foothill Capital ("Foothill"), to consent to continued financing after the sale. The Agreement provided ARY would purchase Krigel's stock for $50,000.00, and upon closing, ARY would pay Scott Krigel $1,450,000.00 for consulting services and an agreement not to compete. The Agreement also provided that, upon closing, ARY would pay Krigel's unsecured creditors sixty (60) cents on the dollar in full settlement of their claims. Scott Krigel secured approval of the plan from the creditors, and presented it to the Bankruptcy Court as a prepackaged plan of reorganization.

Undeniably, Foothill's consent to continued financing was a precondition to ARY's obligation to consummate the sale. Paragraph 4(c) of the Agreement provides:

> Within four weeks from the date hereof Purchaser shall provide Seller with evidence of Foothill Capital's consent to the continued financing of Company's obligations to Foothill Capital. *In the event Foothill Capital does not consent within the foregoing time period this Stock Purchase Agreement and related agreements shall be void and of no further effect.*

Ex. 1 (emphasis added). The deadline for Foothill's consent was four weeks from November 21, or December 19, 2000. It is equally undeniable that Foothill refused to consent to continued financing by December 19, and refused continuously thereafter. Foothill made its first proposal in a December 15, 2000

3

"terms sheet" (Exhibit 2). This proposal explicitly states it is for discussion only, and should not be construed by anyone as a commitment to lend; every subsequent proposal also so stated. Rather than continuing the financing available to Krigel's , Foothill proposed terms on December 15 that were very different. That proposal never became commitment, and for several reasons, was never accepted. On December 19, ARY notified Scott Krigel the proposal did not comply with paragraph 4(c), *and offered to extend the paragraph 4(c) acceptance date to January 18, 2001.* Exhibit 3. However, Krigel's never agreed to extend the 4(c) date, and accordingly, the Agreement became void by its own terms on December 19, 2000. In his abstention order, Judge Venters recognized ARY's obligations under the Agreement were contingent on Foothill's consent:

> [T]he Agreement provided that within four weeks from the execution date of the Agreement, ARY was to provide Scott Krigel with evidence of the consent of Foothill Capital to the continued financing of Krigel's obligations to Foothill Capital, and further provided that *in the event Foothill Capital did not consent to the continued financing within the four-week period following the execution of the Agreement, the Agreement was void and of no further effect.*

Abstention Order (Exhibit 4) at 3 (emphasis added). Foothill's consent to continued financing was never obtained. At a deposition taken in the bankruptcy case, Foothill's representative to Krigel's confirmed this fact. The Agreement thus terminated on December 19, 2000.

On December 20, 2000, Krigel's circulated a Disclosure Statement with the proposed Plan of Reorganization to its creditors. While ARY neither signed nor ratified it, the Disclosure Statement correctly states:

> [U]nder paragraph 4(c) of the Stock Purchase Agreement, if Foothill did not give its consent to the continued financing of Debtor's obligations to Foothill within such four (4) week period, the Stock Purchase Agreement and related documents would be void and of no force or effect. . . . Foothill sent the Buyer a letter within the four (4) week period expressing an interest in reviewing the opportunity to provide emergence financing for Debtor under ARY Jewelers, LLC's ownership, although *the letter was not a commitment to lend because such commitment would be subject to several conditions, including approval of Foothill Capital's Credit Committee.*

4

"terms sheet" (Exhibit 2). This proposal explicitly states it is for discussion only, and should not be construed by anyone as a commitment to lend; every subsequent proposal also so stated. Rather than continuing the financing available to Krigel's , Foothill proposed terms on December 15 that were very different. That proposal never became commitment, and for several reasons, was never accepted. On December 19, ARY notified Scott Krigel the proposal did not comply with paragraph 4(c), *and offered to extend the paragraph 4(c) acceptance date to January 18, 2001.* Exhibit 3. However, Krigel's never agreed to extend the 4(c) date, and accordingly, the Agreement became void by its own terms on December 19, 2000. In his abstention order, Judge Venters recognized ARY's obligations under the Agreement were contingent on Foothill's consent:

> [T]he Agreement provided that within four weeks from the execution date of the Agreement, ARY was to provide Scott Krigel with evidence of the consent of Foothill Capital to the continued financing of Krigel's obligations to Foothill Capital, and further provided that *in the event Foothill Capital did not consent to the continued financing within the four-week period following the execution of the Agreement, the Agreement was void and of no further effect.*

Abstention Order (Exhibit 4) at 3 (emphasis added). Foothill's consent to continued financing was never obtained. At a deposition taken in the bankruptcy case, Foothill's representative to Krigel's confirmed this fact. The Agreement thus terminated on December 19, 2000.

On December 20, 2000, Krigel's circulated a Disclosure Statement with the proposed Plan of Reorganization to its creditors. While ARY neither signed nor ratified it, the Disclosure Statement correctly states:

> [U]nder paragraph 4(c) of the Stock Purchase Agreement, if Foothill did not give its consent to the continued financing of Debtor's obligations to Foothill within such four (4) week period, the Stock Purchase Agreement and related documents would be void and of no force or effect. . . . Foothill sent the Buyer a letter within the four (4) week period expressing an interest in reviewing the opportunity to provide emergence financing for Debtor under ARY Jewelers, LLC's ownership, although *the letter was not a commitment to lend because such commitment would be subject to several conditions, including approval of Foothill Capital's Credit Committee.*

4

Exhibit 5 at 7 (emphasis added). Krigel's repeated this same language acknowledging Foothill's lack of consent in the Plan of Reorganization. Exhibit 6 at 6.

The Agreement became void, by its own terms, on December 19, 2000. Notwithstanding Foothill's refusal and the termination of ARY's obligations under the Agreement, ARY wanted to buy Krigel's and continued to negotiate in an effort to resurrect the transaction. On January 19, 2001, Krigel's filed its bankruptcy petition, and on January 26, 2001, submitted its Disclosure Statement and Plan of Reorganization to the Court. The Plan was modified on January 31, 2001, and a confirmation hearing for the plan was set for March 5, 2001. Because financing was still not available, ARY asked Krigel's to agree to continue the March 5 confirmation hearing but Krigel's refused. Because financing was not in place, ARY sought a one-week extension from the Bankruptcy Court, but was denied. The Plan was confirmed despite ARY's clear notice to all parties that financing was not in place. Exhibit 7 (Affidavit of Ron Weiss).

At the March 5 hearing, Foothill confirmed that it had made no commitment to lend. Exhibit 8 (Transcript) at 36, lines 19-21. Plaintiffs' allegations notwithstanding, that transcript reveals that ARY neither represented to the Court that financing was available, or that it would waive that condition. Contrary to subsequent characterizations, the only discussion of that issue is a single sentence of Scott Krigel's testimony where he recounts his understanding of ARY's intentions – an understanding flatly inconsistent with ARY's request to delay confirmation of the plan to allow time for it to obtain adequate financing. The Court confirmed the Plan and set March 15, 2001 as its effective date. Exhibit 7. As March 5 approached, ARY again advised the parties that it did not have the financing it required, and requested an extension of the effective date. Although Krigel's argued ARY lacked standing to modify the effective date, it sought and obtained an extension of the effective date to March 30, 2001. Exhibit 7.

Thereafter, negotiations with Foothill continued but without progress. Had acceptable financing

5

been available, ARY still wanted to close. Foothill offered two more term sheet proposals – the most onerous for ARY – on March 20 and 27, 2001. These proposals added more onerous terms that limited the amount Foothill would advance against inventory and required ARY not to use $2 million of the proposed loan; these proposals essentially required ARY to self-finance. Thus, on March 28, 2001, ARY notified Scott Krigel that Foothill had not consented to continued financing. Exhibit 9. Even then, ARY requested Mr. Krigel to use whatever influence he had with Foothill to persuade them to continue financing on the same terms in place on November 21, 2000.

ARY also sought another extension of the effective date to allow it time to seek financing. Exhibit 7. Krigel's refused to seek an extension and objected that ARY lacked standing to seek one. Krigel's also contended that on March 27, 2001, Foothill issued a loan commitment to ARY. It thus contended the Agreement's condition had been satisfied. This was false; the March 27 term sheet was no more a commitment to lend than any prior proposal. Nevertheless, Krigel's argued Foothill made a loan commitment to ARY on March 27. The Court held ARY lacked standing otherwise denied its request to extend the March 30 effective date. ARY continued its work to obtain financing. However, Foothill refused to modify its terms further. ARY notified Krigel's on April 5, 2001 that Foothill's refusal to consent made closing impossible. Exhibit 10. Despite ARY's best intentions, and its continued negotiations after the Agreement was void, ARY could not go forward.

This result was unfortunate for all, including ARY. It committed thousands of dollars and great effort to this deal. In the hope and expectation that the acquisition would be possible, ARY brought nearly $10 million into the United States, and despite the Agreement's termination on December 19, 2000, ARY continued to negotiate in good faith, and at great expense, to secure continued financing. As a consequence of Foothill's refusal to consent to continued financing, ARY cannot recoup its expenses from the business, thus resulting in losses to ARY exceeding most of the creditors' losses. ARY has not profited from this

transaction's failure and will not. The unsecured creditors seek to compound ARY's losses by extracting *all* the consideration due from ARY now when ARY cannot reap any benefit. In addition, they seek to freeze all of ARY's American assets prior to any determination of their entitlement to a judgment on their meritless claims.

### *Procedural Background*

On April 10, 2001, Krigel's, Inc. filed an adversary proceeding in the Bankruptcy Court, alleging, inter alia, that ARY breached the Agreement. Krigel's obtained an ex parte temporary restraining order (TRO) freezing all of ARY's American assets.[1] Krigel's, Inc. also sued two individuals, Gohar Husain and Haji Abdul Razzak, alleging they made misrepresentations. On April 25, the Court extended the TRO. While preserving its objections to the issuance of any TRO, ARY consented to an extension of the TRO so that it could prepare its opposition to the preliminary injunction. The Court set the preliminary injunction a hearing for May 31. That hearing was again extended, again with ARY's consent under objection to the TRO's issuance, until August of 2001 so that depositions of relevant witnesses could be taken.

On April 24, ARY filed its own action in Johnson County, Kansas[2] naming Scott Krigel and the Krigel Revocable Trust (the signatory of the Agreement) as defendants. That action seeks a judgment declaring that the conditions precedent to the Agreement were never satisfied and that ARY is thus not liable under it. On June 13, ARY filed an amended petition, adding two of the unsecured creditors (neither of whom is a plaintiff in this suit), so the Kansas Court could adjudicate the third party beneficiary status of unsecured creditors. That petition is attached as Exhibit 11.

On May 9, the Official Committee of Unsecured Creditors – comprised of the same seven

---

[1]Relying on Bankruptcy Rule 7065, Krigel's successfully argued that a bankrupt debtor is not required to post a bond. In direct contrast, Fed. R. Civ. P. 65(c) requires a bond.

[2]*ARY Jewelers, L.L.C. v. Scott Krigel, Individually and as Trustee of the Scott W. Krigel Revocable Trust, et al.*, Case No. 01 CV 02633, Johnson County, Kansas District Court, Div. 12.

creditors who filed this action, and represented by the same counsel – filed a motion to intervene and a proposed Complaint in the Bankruptcy case, asserting the claims they assert herein.

ARY filed a motion for abstention in the Bankruptcy Court. On June 8, the Bankruptcy Court granted that motion, holding that the claims at issue were claims at law, not equity. That court held that because these claims belonged in state court, and because defendants had a jury trial right, it should abstain. Judge Venters' June 8 Order is attached as Exhibit 4. Judge Venters concluded that these legal claims "were best resolved by the state courts" and that, if anything, Krigel's had engaged in forum shopping because the case "belongs in the state court." The court delayed the effective date of that Order to June 19, so the Committee and Krigel's could assess their options for obtaining a freeze of ARY's assets in another court. At the Committee's request, that date was further extended to June 29. As a result of the abstention, no evidentiary hearing was ever held on plaintiffs' entitlement to injunctive relief.

## ARGUMENT

This case is a garden-variety breach of contract case seeking money damages. The injunctive relief plaintiffs seek is nothing more than a prejudgment attachment of funds from which they would seek to recover those contractual damages. What plaintiffs seek is an impermissible expansion of the Court's equity power that runs directly afoul of *Grupo Mexicano*. Without a lien or equitable interest in a specific fund that would be subjected to the proposed injunction, neither of which is present here, such prejudgment attachment is impermissible. Plaintiffs' artful attempt to re-style the relief they seek as a "constructive trust" does nothing to assist their effort to escape *Grupo Mexicano*. Under Missouri law, a constructive trust is not an appropriate remedy here. Even if it were, the burden of proof for such relief is so high plaintiffs cannot demonstrate a likelihood of would entitlement to that relief, even if they could prove a likelihood of success on the underlying claims.

8

## I.    PLAINTIFFS FAIL TO SATISFY THEIR BURDEN FOR INJUNCTIVE RELIEF

Plaintiffs simply cannot meet their burden to satisfy each of the traditional elements required for their entitlement to injunctive relief. In order to be entitled to a preliminary injunction or TRO, plaintiffs must demonstrate the following elements:

1.    A substantial likelihood of success on the merits. *U.S. v. Microsoft Corp.*, 147 F.3d 935, 943 (D.C. Cir. 1998);

2.    The potential for irreparable injury. *Sampson v. Murray*, 415 U.S. 61, 88 (1974);

3.    A balancing of the equities, including the hardship imposed to the defendant if the injunction is issued. *Microsoft*, 147 F.3d at 943; and

4.    The effect on the public interest. *DSC Comm. Corp. v. DGI Tech., Inc.* 81 F.3d 597, 600 (5th Cir. 1996).

Plaintiffs must come forward with competent evidence to support each element. They have not done so, and cannot.

### A.    No Likelihood of Success on the Merits

Plaintiffs assert five causes of action, although the last four depend entirely on the first – plaintiffs' claim that ARY breached the Agreement.[3]  Plaintiffs cannot show the requisite likelihood of success on any claim. Further, plaintiffs' inappropriate attempt to seek a constructive trust, raises their burden of proof even higher, under Missouri law:

> To establish a constructive trust, an extraordinary degree of proof is required. . . . The evidence must be so clear, cogent, and convincing as to exclude every reasonable doubt.

*Miller v. Miller*, 872 S.W.2d 654, 657 (Mo. App. 1994) (citation omitted).  It is against this extraordinarily high standard that plaintiffs' proof in support of this request must be measured.

### 1.    Counts I and II – Third-Party Beneficiary Contract Claims

---

[3]Count V, Injunctive Relief, clearly does not state an independent claim.  It is expressly premised upon plaintiffs' success on another claim.

Plaintiffs first allege that ARY breached the Agreement, and a bankruptcy order incorporating it wholesale. Even assuming plaintiffs were intended third party beneficiaries, which ARY denies, the Agreement is unambiguous – if Foothill did not consent to continued financing, the Agreement terminated, by its own terms, on December 19, 2000. There is no dispute that Foothill never gave the required consent. *As plaintiffs are well aware given their counsel's presence at the deposition,* the Foothill representative who negotiated with ARY, Tom Morgan, testified:

> Q:   [D]id you hear Randall Klein's comments to the Court that to be clear Foothill has never once extended a commitment to ARY, or words to that effect? Did you hear him say that?
> A:   Yes, I did.
> Q:   And that was true at the time he said it, wasn't it?
> A:   That's correct.
> Q:   And it's still true today; is it not?
> A:   Yes, it is.
> Q:   So it would be absolutely and totally false for anyone to represent that as of March 27th or any date thereafter Foothill had issued a commitment to ARY: is that true?
> A:   We did not issue a commitment, that's true.
> *Q:   And if someone alleged that you had consented to finance ARY on any terms whatsoever, that would also be equally false; would it not?*
> *A:   Yes, it would be.*

May 21-22, 2001 Deposition of Tom Morgan, at 250, ll. 4-23 (Exhibit 13) (emphasis added).

Paragraph 4(c) unambiguously required Foothill's consent as a condition precedent to ARY's performance under the Agreement. As Judge Venters held, "in the event Foothill Capital did not consent to the continued financing within the four-week period following the execution of the Agreement, the Agreement was void and of no further effect." Exhibit 4 at 3. No evidence exists that this condition precedent was satisfied. Plaintiffs offer none. They therefore cannot prevail on their contract claim, the lynchpin of every other claim.

Plaintiffs' suggest that ARY somehow represented it might waive the financing requirement. Such

10

a waiver never happened, nor could ARY have done so after the Bankruptcy Court confirmed the plan. Once that court approved the plan, which incorporated all the original terms of the Agreement, neither ARY nor any party could have modified the incorporated Agreement's terms without seeking court approval. No one sought such approval for a transaction with all-cash financing. Exhibit 7 (Affidavit of Ronald Weiss). Furthermore, on several occasions, ARY sought to extend the confirmation date or its effective date, explicitly advising that financing needed to be, but was not yet, in place for it to consummate the plan.

### 2.     Count III – Fraudulent Transfer

Plaintiffs must prove a fraudulent transfer by clear and convincing evidence. *Behr v. Bird Way, Inc.*, 923 S.W.2d 470 (Mo. App. 1996). This claim depends entirely on plaintiffs' contract claim to give rise to the "debt" upon which this claim is based. A "claim" under the Uniform Fraudulent Conveyances Act is defined as a "right to payment." R.S.Mo. §428.009(3). Other than the alleged breach of contract, plaintiffs do not allege ARY owed them another "debt."[4]

### 3.     Detrimental Reliance

Despite its label, this claim also recasts the contract claim: the only act plaintiffs allegedly relied upon was ARY's execution of the Agreement. When the Agreement terminated by its own terms on December 19, ARY's obligations ceased; plaintiffs could not have legally relied thereon.

### B.     No Irreparable Injury

---

[4]The Act does not create a separate equitable cause of action. It provides a vehicle, when there is a disputed claim, to prohibit certain transfers, but is completely silent as to any party's entitlement to disputed funds. Moreover, the enforcement mechanisms of the Act are entirely dependent on the validity of plaintiffs' underlying claims.

11

As discussed further below, a federal court simply does not have authority to enter a preliminary injunction freezing assets in a suit at law alleging money damages. This is consistent with established authority holding that when there is an adequate remedy at law – namely a suit for money damages – a plaintiff is not entitled to injunctive relief. *Commercial Ins. Co. of Newark*, 558 F.2d at 954.

This is a suit for money damages, not rescission or some other equitable remedy. Because money damages are the appropriate remedy if plaintiff's allegations are proven, an injunction is not appropriate. The sole argument asserted by plaintiffs is that absent a preliminary injunction the assets necessary to satisfy any money judgment may not be present. This does not change the law. As the Court noted in *Rosen v. Cascade Int'l, Inc.,* 21 F.3d 1520 (11th Cir. 1994):

> Bringing an action to recover money damages "does not entitle the claimant to equitable relief simply because the complaint alleges uncertainty of collectibility of a judgment if a fund of money is permitted to be disbursed. The test of adequacy of a remedy at law is whether a judgment could be obtained, not whether, once obtained it will be collectible."

*Rosen*, 21 F.3d at 1531.

Plaintiffs' legal recourse is not through a federal court preliminary injunction, but through compliance with Missouri prejudgment attachment law. They have made no effort to do so, and this motion cannot fairly be construed as an attempt to satisfy Missouri law under Rule 64. Among other defects, plaintiffs have made no effort to satisfy the security requirement of Missouri law that is a precondition to attachment.

## C.    Balance of Hardships

The TRO would freeze 100% of ARY's U.S. assets – over $500,000.00. Furthermore, ARY cannot seek or acquire additional capital without making new funds (up to $6,000,000.00) subject to the TRO. ARY cannot borrow money, and cannot invest money it has. In effect, the requested TRO would

12

effectively prohibit ARY from doing business in the U.S.  As ARY's sole asset is money currently frozen in Bank of Blue Valley and the Habib Bank, plaintiffs seek to have the Court freeze funds necessary for ARY to pay its legal expenses.

There is no existing hardship to the unsecured creditors other than their concern about whether a money judgment would ultimately be collectible.  In other words, ARY's funds, which are its only asset, need not be frozen in order to "secure the status quo" *vis a vis* the unsecured creditors.  Whether the funds are frozen or not makes no difference to their operations between now and the time a final judgment is rendered, but it makes every difference to ARY.

**D.    Public Interest**

There is absolutely no public interest factor that weighs in favor of the issuance of a preliminary injunction.  A money judgment, if any, in this case would operate only in favor of the unsecured creditors. No party, let alone parties with a "public interest," has any stake in the controversy between plaintiffs and ARY other than ARY and the unsecured creditors.

**II.    THE TRO ORDERING "PREJUDGMENT ATTACHMENT" OF ARY'S ASSETS THAT PLAINTIFFS SEEK HERE IS FORECLOSED BY *GRUPO MEXICANO***

Plaintiffs seek a temporary restraining order freezing what amounts to one hundred percent of the assets of ARY.  In doing so, they impermissibly attempt to circumvent the Supreme Court's clear ruling that a federal court does not have the power to order the prejudgment attachment of assets when the complaint upon which the injunction is founded seeks only damages at law. Federal Rule of Civil Procedure absolutely requires that in an action at law, the only permissible mechanism for prejudgment attachment is through Fed. R. Civ. Proc. 64, which requires the plaintiffs to follow Missouri state prejudgment attachment

13

requirements.  Plaintiffs attempt to circumvent this requirement because they have not complied with Missouri law.

### A.    *Grupo Mexicano* Prohibits The Prejudgment Attachment TRO that Plaintiffs Seek Absent Compliance With Rule 64

In *Grupo*, the United States Supreme Court addressed this precise circumstance, and held that federal courts lack the authority to issue a prejudgment injunction freezing a defendant's assets simply to guarantee that funds will be available to satisfy an anticipated judgment. Even though there was no question of the plaintiff's success on the merits (they had already obtained a summary judgment at the time of this appeal), the Court rejected a Rule 65 attachment remedy. *Id.* at 313. It unequivocally held that a federal court lacks authority to issue such an injunction. *Id.* at 333. While recognizing a district court's traditional equitable powers, *id.* at 318, the Court concluded these powers do not permit a district court to issue an order freezing assets prior to judgment in an action at law where plaintiff had no equitable interest in specific money subjected to the order. *Id.* at 319. The Court quoted an earlier decision, concluding:

> [It is difficult to see why a plaintiff in any action for a personal judgment in tort or contract may not, also, apply to the chancellor for a so-called injunction sequestrating his opponent's assets pending recovery and satisfaction of a judgment in such a law action. No relief of this character has been thought justified in the long history of equity jurisprudence.

*Id.* at 327 (citing *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 222-23 (1945)).

In *Rosen*, the Court did not mince words when describing the "fundamental errors" with which any attempt to freeze assets to satisfy a money judgment is "infected." *Id.* at 1528. The Court wrote: "We repeat: preliminary injunctive relief freezing a defendants assets in order to establish a fund with which to satisfy a potential judgment for money damages is simply not an appropriate exercise of a federal district court's authority." *Id.* at 1530. Plaintiffs in that case, as in this one, did not attempt to utilize Rule 64's

14

incorporation of state law. That was fatal to their effort. "The use of injunctive relief as a substitute for the [state law] remedy of prejudgment attachment, with its attendant safeguards, is improper." *Id.* at 1531.

*Grupo* also noted that recognizing such an inherent equitable power would render Rule 64 meaningless. *Id.* at 330-31. Plaintiffs clearly recognize they must demonstrate some reason their request is not governed by *Grupo*. They attempt to do so by claiming they seek equitable relief – a constructive trust – rather than purely money. This equitable veil is insufficient to escape *Grupo*.

### B.    Plaintiffs Cannot Seek a "Constructive Trust"

As part of the requested relief for each claim, plaintiffs seek a constructive trust. Plaintiffs clever labeling notwithstanding, each claim seeks a money damage judgment. A constructive trust is not an available remedy to them in this circumstance.

Under Missouri law a constructive trust is only appropriate if there is no adequate remedy at law. *Broadview Lumber Co., Inc. v. Southwest Missouri Bank of Carthage*, 118 F.3d 1246, 1253 (8th Cir. 1997) (citing *Newmark v. Vogelgesang*, 915 S.W.2d 337, 339 (Mo.App. 1996)); *see also, Strom v. Goldman, Sachs & Co.*, 202 F.3d 138, 144 n. 6 (2nd Cir. 1999). Plaintiffs already have admitted they have an adequate remedy at law – their proposed complaint in the Bankruptcy case sought only money damages.

A constructive trust is used only when a party has wrongfully been <u>deprived</u> of title to property, *Fix v. Fix*, 847 S.W.2d 762, 765 (Mo. App. 1993). Where a person has been deprived of inheritance, life insurance proceeds, or real property by fraudulent inducement, a constructive trust may be available. In addition to fraud, constructive trusts have been imposed where title was lost to someone based on an alleged breach of fiduciary duty, a fact not presented here. A constructive trust might have been available if ARY had acquired the property at issue by fraud, duress or undue influence. *Skidmore v. Back*, 512 S.W.2d 223, 230, (Mo.App. –1974). That is not the case here: these moneys are ARY's own funds, and

15

plaintiffs only claim to them is based on ARY's alleged breach of contract.[5]  The Third Circuit explained

that when there is no dispute as to legal or equitable title, only contractual obligations, a constructive trust

is inappropriate:

> Nor is this case similar to cases in which courts have imposed a constructive trust.
> [citations omitted] ...AMC agreed that the creditor, Savings, would take possession of the
> Treasury Bonds in return for cash payment. It is true that Savings breached its contractual
> duty to return the bonds on February 21, 1985.  The proper remedy for breach of
> contract, however, is an award of damages at law, not the equitable remedy of
> constructive trust.

*In the Matter of Bevill*, 896 F.2d 54, 58 (3rd Cir. 1990).

A constructive trust is not appropriate to remedy a breach of contract.  Failure to pay a contractual

debt will not give rise to a constructive trust because title to the disputed funds will never have vested in the

plaintiff. *McKey v. Paradise*, 299 U.S. 119, 122-3 (1936)("It would be impossible to state all the

circumstances in which equity will fasten a constructive trust upon property in order to frustrate a violation

of fiduciary duty [citation omitted].  But the mere failure to pay a debt does not belong in this category.").

"Fraud, actual or constructive, is the essential element of a constructive trust." *Gwin v. Gwin*, 219

S.W.2d 282, 285 (Mo.App. 1949).

A claim for money due under a contract is "quintessentially an action at law" not equity. *Wal-Mart

Stores, Inc. Assoc. Health and Welfare Plan v. Wells*, 213 F.3d 398, 401 (7th Cir. 2000), *cert.

denied*, — U.S. —, 121 S. Ct. 441 (2000).  Equitable remedies have no place in an action at law for

breach of contract. *McCoy v. Spelman Memorial Hosp.*, 845 S.W.2d 727, 730 (Mo.App. 1993).  In

particular, an action by an alleged third party beneficiary is necessarily an action at law.  *See, e.g.,

Commercial Ins. Co. of Newark v. Pacific-Peru Constr. Corp.*, 558 F.2d 948, 954-55 (9th Cir.

---

[5]Another required element for a constructive trust is that defendant would be unjustly enriched if
permitted to retain the funds. *Id.*  ARY has gained nothing.  The transaction was never consummated so
ARY did not acquire Krigel's.  Simply stated, ARY gained nothing from this deal.

1977)(third party beneficiary entitled only to money damages and could not seek equitable remedies).

Plaintiffs cannot simply re-label the damages they seek a "constructive trust" and magically transform their claims into an equitable action. Imposition of constructive trust is only appropriate in limited circumstances under Missouri law:

> It is equally axiomatic that one who pleads and proves a cause of action cognizable at law, may not convert the matter into a non-jury proceeding in equity merely by seeking an equitable remedy to which the pleaded facts show no entitlement.

*Blue Cross Heath Services, Inc. v. Sauer*, 800 S.W.2d 72, 75 (Mo.App. 1990). In *Sauer* the Missouri Court of Appeals held, as a matter of law, that a constructive trust was not an available remedy to recover insurance payments mistakenly sent to the wrong party. The Court wrote, "nothing in the record shows Blue Cross is entitled to anything more than a simple money judgment. To invoke equity jurisdiction the plaintiff must plead and prove there is no adequate remedy at law." *Id.* As a consequence, the Court held that equity jurisdiction had not properly been invoked.

Federal opinions consistently hold that a simple contract claim cannot be converted into an equitable action simply by seeking a constructive trust. Appellate courts have little patience for such gamesmanship in nomenclature. In *Rosen,* the Eleventh Circuit held that "a district court lacks the authority to issue a preliminary injunction freezing the assets of a defendant in a case seeking only money damages." 21 F.3d at 1531. The Court continued:

> Cases in which the remedy sought is recovery of money (whether as collection on a debt or as damages) do not fall within the jurisdiction of equity. . . and the imposition of a constructive trust will generally not be the appropriate remedy.

*Id.* In *Bender v. Centrust Mortgage Corporation,* the Eleventh Circuit rejected a similar attempt to use a constructive trust to freeze assets, and explained that "concern for the ultimate collectibility of a judgment" does not support the asserted right to set aside a fund while the claims are being resolved. 51 F.3d 1027,

17

1030 (11th Cir. 1995), *op. mod. on reh'g*, 60 F.3d 1507 (11th Cir. 1995). Addressing, and rejecting,

the identical tactic plaintiffs employ in this case, the Eleventh Circuit wrote:

> An examination of the record in this case reveals that Mitsubishi is not entitled to the
> equitable remedy of a constructive trust because it has an adequate remedy at law.
> Although the facts as stated by Mitsubishi indicate possible fraud in this case, such fraud
> arose in the context of a contractual, commercial relationship ....As such, the remedy
> Mitsubishi should have sought is the recovery of money for breach of a promise to pay or
> for an account stated (and not the imposition of a constructive trust).

*Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1519-20 (11th Cir. 1994).

Simply styling a complaint as one for a constructive trust is ineffective. *Mitsubishi* held:

> **When faced with motions appearing to call for an attachment but labelled [sic]
> something else, federal courts again look past the terminology to the actual nature
> of the relief requested.** See, e.g., *Lechman v. Ashkenazy Enter., Inc.*, 712 F.2d 327,
> 329-30 (7th Cir.1983); *Ashland Oil Co. v. Gleave*, 540 F.Supp. 81, 83
> (W.D.N.Y.1982) [parenthetical omitted]. **As is the case when we evaluate our
> jurisdiction, we will call a duck a duck when characterizing district court rulings in
> this context.**

*Id.* at 1521.

A detrimental reliance claim that seeks as its remedy contractual damages is legal, not equitable.

*Merex v. Fairchild Weston Sys., Inc.*, 29 F.3d 821, 825 (2nd Cir. 1994). Even where there is alleged

fraud, an action for damages, not a constructive trust, is the appropriate remedy. *Mitsubishi*, 14 F.3d at

1521.[6]

This action is clearly an action at law. Attached as Exhibit 12 is a copy of the proposed complaint

filed by these same creditors (as part of the official creditors' committee) in the Bankruptcy Court. In that

complaint, plaintiffs alleged similar claims, and sought $5,450,000 in money damages, but not a

---

[6]Even if plaintiffs could state an estoppel cause of action, the measure of damages is separate and
distinct from their contract claims – in a manner that is fatal to their attempt to impose a constructive trust.
Damages under that cause of action are for out of pocket reliance expenses. Accordingly, the plaintiffs
have no specific identifiable interest, under this theory, in six million dollars, or what remains of ARY's
funds in the Habib Bank and the Bank of Blue Valley. Accordingly, a constructive trust is not appropriate
here either because there is no identifiable *res* associated with the damages attributable this cause of action.
*Sauer*, 800 S.W.2d at 75.

"constructive trust." Having pleaded the very same claims as a legal action, these plaintiffs cannot now claim they have no adequate legal remedy.

### C.    Contrary to Plaintiffs' Assertion, They Have No Equitable Interest in ARY's Funds Which Would Entitle Them to an Injunction

Cases decided after *Grupo* permit a prejudgment attachment of money only if the money is subject to an equitable lien of plaintiff or other equitable interest that earmarks the money, but reject such an attachment in all other circumstances. *United States v. Oncology Assoc., P.C.*, 198 F.3d 489, 496 (4th Cir. 1999)("[a] debt claim leads only to a money judgment and does not in its own right constitute an interest in specific property. Accordingly, a debt claim does not, before reduction to a judgment, authorize prejudgment execution against the debtor's assets.").

Plaintiffs' erroneously assert that the moneys they seek to attach are somehow identifiable as required by post-*Grupo* decisions. The Agreement did not create any right for plaintiffs in the specific moneys deposited by ARY as proof of its ability to pay the creditors. In marked contrast to the $1,450,000.00 placed in escrow to pay Scott Krigel, the Agreement did not require any trust or escrow for funds that would be used to pay the unsecured creditors. The additional funds deposited by ARY were simply, "[t]o evidence its ability to pay sixty percent (60%) of Company's unsecured creditors' claims." Exhibit 1 at 14. Had the Agreement closed, ARY would have had no obligation to use those specific funds to pay the unsecured claims.

Nothing in the Agreement created any security interest, lien, or other equitable interest in any particular amount or source of money. Had the parties intended to establish a specifically identifiable fund, they knew how to do so. The Agreement could have required ARY to place additional  funds into an

19

escrow, as Mr. Krigel demanded for himself.[7]

The proposed TRO would freeze all of ARY's assets, not just the $ 6 million plaintiffs claim was contemplated for their claims. ARY deposited approximately $7.5 million, not $6 million. ARY deposited the additional $1.5 million as potential operating capital if the Agreement had closed.   Plaintiffs have no basis to suggest that the $500,000 at issue here is part of the $6 million "identified" for them rather than the money anticipated for use as operating capital.

### D.      Plaintiffs' Suggestion That the Bankruptcy Confirmation Order Creates Some Right to Payment Is Simply False

Plaintiffs assert that the Bankruptcy Court found that ARY was obligated to close on the transaction, and suggest that an enforceable contract was created by the confirmation order. This allegation is false. The Bankruptcy Court never entered such an order. It confirmed a Plan of Reorganization, which was nothing more than the Krigel's proposed plan.   ARY did not sign that Plan nor did it consent to be bound by Krigel's representations therein. On more than one occasion, Krigel's argued, and that court held, ARY lacked standing to address that plan. On three separate occasions, ARY advised the parties and the Court that the additional time was necessary to secure financing so that the transaction could be consummated. Exhibit 7.

That plan simply incorporates the terms of the Agreement. To the extent the conditions precedent to closing on the Agreement were never met, performance of "the court-ordered obligation" was never due. Krigel's own disclosure statement, confirmed by that court, conceded that the requisite financing was not in place.

Judge Venters recognized the weakness in plaintiff's suggestion in his abstention order:

---

[7]Paragraph 9 further identifies the escrowed funds for Scott Krigel by addressing disposition of the money therein in the event of a default by ARY.  However, the Agreement has no similar provision regarding the funds evidencing ARY's ability to pay the creditors.

While the Court is mindful of the references to the Agreement in the Plan of Reorganization, the Disclosure Statement, and the Confirmation Order, the crux of this action is the interpretation of the Stock Purchase Agreement, along with determinations of whether ARY breached the Agreement, whether the Plaintiffs detrimentally relied on the Agreement, and whether the individual Defendants made fraudulent misrepresentations in procuring the Agreement. The cause of action alleging violation of the Confirmation Order is heavily dependent upon the construction of the Stock Purchase Agreement incorporated into the Order and is, therefore, significantly intertwined with state law contractual issues.

Ex. 4 (Abstention Order) at 10.

### E.    Plaintiffs Have Not Complied with Rule 64, Missouri Prejudgment Attachment Law, or Due Process

Plaintiffs not only ask this Court to enter a prejudgment attachment TRO freezing assets in a case that seeks money damages, but also apparently ask the Court to do so without requiring them to post a bond. However, plaintiffs can obtain neither a prejudgment attachment of ARY's American assets, nor a TRO intended to accomplish exactly the same result, without first posting an adequate bond for double the amount to be frozen. Such a bond is mandated by Rules 64 and 65 of the Federal Rules of Civil Procedure, by the Missouri attachment statutes incorporated through Rule 64, and by the Due Process Clause of the Fourteenth Amendment.

Rule 64 provides:

> [D]uring the course of an action, all remedies providing for seizure of . . . property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held . . . .The remedies thus available include . . . attachment.

Fed. R. Civ. P. 64.

The Missouri statutes, specifically section 521.130, provide authority for a plaintiff to "sue out an attachment in [any civil] action, on filing an affidavit and bond." R.S.Mo. §521.130. The Missouri Supreme Court has held that "[s]trict compliance with all of the requirements formerly imposed by statutes and now also enjoined by [the Missouri Supreme Court's] civil rules is essential to confer and support jurisdiction" for attachment. *State ex rel. Eagle Bank & Trust Co. v. Corcoran*, 659 S.W.2d 775, 777

(Mo. banc 1983).

In addition to filing an affidavit that complies with subsection 60,[8] the Missouri attachment statute

requires a plaintiff to file a bond complying with subsection 70, which provides in relevant part that:

> the bond shall be executed by . . . and one or more sureties . . . *in a sum at least double the*
> *amount sworn to in the affidavit* [as the amount to be attached]

R.S.Mo. §521.070. "Missouri courts consistently have held, and we most recently have affirmed, that the

statutory bond requirement is a mandatory condition to a plaintiff maintaining an" attachment. *State ex rel.*

*Froidl v. Tillman*, 662 S.W.2d 907, 909 (Mo. App. 1983); *see also*, *Salenia, A.B. v. Air Nat'l*

*Aircraft Sales, Inc.*, 712 S.W.2d 386, 390 (Mo. App. 1986) ("The law in Missouri as to prejudgment

writs of attachment requires a proper bond be filed prior to issuance where a nonresident defendant is

involved. This jurisdictional requirement cannot be waived by the parties or later remedied").[9]

This double-the-amount bond requirement is essential to the constitutionality of the Missouri

attachment scheme. As the Missouri Court of Appeals has recognized:

> Pre-judgment attachments are not favored, principally because they are subject to a constitutional
> attack on due process grounds. *Fuentes v. Shevin*, [407 U.S. 67 (1972)].

*State ex rel. Belle Star Saloon, Inc. v. Patterson*, 659 S.W.2d 789, 790-91 (Mo. App. 1983). The

---

[8]The affidavit offered to support the motion is not executed by a plaintiff, but instead by Scott Krigel. Among other reasons, this affidavit does not comply with the Missouri statute because it utterly fails to allege that Scott Krigel "has good reason to believe, and does believe, in the existence" of one of the bases entitling a party to attachment under R.S.Mo. §521.010. In stark contrast to the required averments, Scott Krigel recites only hearsay statement about facts that were "represented" to him. Ex. A to Pltffs. Motion at ¶¶ 2-3.

[9]Over a century ago, in Stevenson v. Robbins, the Missouri Supreme Court voided a writ of attachment where the writ was issued before a bond was filed by plaintiff, holding that:
> a writ of attachment . . . is a remedy given by the statute on extraordinary occasions. . . . *It is*
> *unreasonable to suppose the legislature ever wished that a plaintiff,* who has taken out a
> writ, by which so much mischief might be done, *should be indulged in the filing of a bond*
> *after the writ was issued.*
5 Mo. 18 (1837) (emphasis added; quoted by Froidl, 662 S.W.2d at 909).

Eighth Circuit recently reviewed the safeguards required for an attachment to satisfy due process. *Audio Odyssey, Ltd. v. Brenton First Nat. Bank*, 245 F.3d 721 (8th Cir. 2001) (citing *Watertown Equip. Co. v. Norwest Bank Watertown, N.A.*, 830 F.2d 1487, 1491 (8th Cir. 1987). The Eighth Circuit held that, unlike the South Dakota statute it invalidated in *Watertown*, the Iowa statute was constitutional because, in part, it requires a creditor to post a bond of at least "twice the value of the property" attached. Id. at 730. The United States Supreme Court has "repeatedly recognized the utility of a bond in protecting property rights affected by the mistaken award of prejudgment remedies." *Connecticut v. Doehr*, 501 U.S. 1, 19 (1991) (citing *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 606 n.8 (1974); *N. Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 610-11 (1975) (Powell, J., concurring); *id.* at 619 (Blackmun, J., dissenting)). *Doehr* is the Court's most recent decision addressing safeguards constitutionally required. Four Justices – the only four who reached the issue – are on record in *Doehr* that an adequate bond is constitutionally necessary, though not by itself sufficient, for an attachment to satisfy due process. *Doehr*, 501 U.S. at 18-20.

Independently, the Federal Rules require an applicant to post adequate security before obtaining injunctive relief. Rule 65(c) provides, in relevant part:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant in such sum as the court deems proper course of an action, all remedies providing for seizure of . . . property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held . . . .The remedies thus available include . . . attachment.

Fed. R. Civ. P. 65(c). The Eighth Circuit holds that adequate security is a mandatory requirement for all injunctive relief. In *Telex Corp. v. Int'l Bus. Mach. Corp.*, for example, the Court struck down a temporary restraining order, in part, because it failed "to require the giving of security by the applicant as required by Rule 65(c)." 464 F.2d 1025 (8th Cir. 1972). *See also, Rathmann Group v. Tanenbaum,*

23

889 F.2d 787, 789 (8th Cir. 1989)("district court abused its discretion" by granting preliminary injunction without consideration of separate bond from TRO bond, and holding district court did not have discretion to require only $10,000 bond because that amount was "inadequate to protect [defendant] in the event that a trial on the merits results in a decision in his favor").

Apart from the same constitutional concerns addressed above, Rule 65's bond requirement serves several other important purposes. It helps to ensure that: (1) the enjoined defendant will have a source of recovery for injury caused by an improper injunction; and (2) the applicant seeks relief for proper purposes and believes strongly in his or her claim. It cannot harm a plaintiff who has a meritorious claim. *Cf. Doehr*, 501 U.S. at 18-20. Thus, "[w]hen setting the amount of security, district courts should err on the high side." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000). The Seventh Circuit explained this rule:

> [S]etting the bond at a high amount] would not [entitle defendants] to that sum; [defendants] still would have [] to prove [their] loss. . . .An error in setting the bond too high thus is not serious. (The fee for a solvent firm such as [plaintiffs] . . . to post a bond . . .is a very small fraction of the sum involved.) . . . Unfortunately, an error in the other direction produces irreparable injury because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond.

Id. at 888. The bond should be set at double the amount to be seized.

### *CONCLUSION*

This is a breach of contract case. A Supreme Court decision makes it absolutely clear that the Court cannot use its equitable power to issue a prejudgment attachment absent strict compliance with state attachment law. Plaintiffs have made no attempt to invoke or comply with Missouri law. Instead, they propose a construction of Rule 65 that would render Rule 64 meaningless. Rule 64 and *Grupo Mexicano* allow a plaintiff to obtain prejudgment attachment, but only through strict compliance with state law. This Court should not use Rule 65 to circumvent Rule 64 in this manner. Furthermore, plaintiffs cannot make the required showing of the elements for injunctive relief.

24

For the reasons set forth herein, ARY Jewelers, L.L.C. requests the Court to deny plaintiffs'
motion for a temporary restraining order and preliminary injunction.

Respectfully submitted,

SPENCER FANE BRITT & BROWNE LLP
 /s/ Barry L. Pickens
Teresa A. Woody            MO #35358
Barry L. Pickens           MO #43379
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
(816) 474-8100
(816) 474-3216– Fax

John B. Beckworth
Joseph G. Thompson, III
WATT, BECKWORTH & CARRIGAN, L.L.P.
1010 Lamar, Suite 1600
Houston, Texas 77002
(713) 650-8100
(713) 650-8141– Fax
ATTORNEYS FOR ARY JEWELERS, L.L.C.

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of June 2001, the above and foregoing was electronically filed
and served by hand delivery on:

Stephen B. Sutton, Esq.
Lathrop & Gage, L.C.
2345 Grand Boulevard, Suite 2800
Kansas City, MO 64108
816-292-2001– fax
ATTORNEYS FOR PLAINTIFFS

 /s/ Barry Pickens
Attorney for ARY Jewelers, L.L.C.

25

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

M. FABRIKANT & SONS, INC., *et al.*              )
                                                  )
      Plaintiffs,                            )
                                                  )
v.                                                )    Case No. 01-0671-CV-W-5
                                                  )
ARY JEWELERS, L.L.C.                              )
                                                  )
      Defendant.                             )

## NOTICE REGARDING EXHIBIT ATTACHMENTS

Exhibits 1-13, which are attachments to ARY Jewelers L.L.C.'s Suggestions in Opposition to Plaintiffs'

Emergency Motion for Temporary Restraining Order and for Preliminary Injunction, are in paper form only and

are being maintained in the case file in the Clerk's office.

Exhibit 1– Stock Purchase Agreement

Exhibit 2– Lending Proposal from Foothill Capital dated 12/15/00

Exhibit 3– Letter from Max Jevinsky to Scott Krigel dated 12/20/00

Exhibit 4– Order Dated June 8, 2001 in Bankruptcy Court granting ARY's Motion to Abstain

Exhibit 5– Disclosure Statement

Exhibit 6– Plan of Reorganization

Exhibit 7– Affidavit of Ronald Weiss

Exhibit 8– Excerpt of hearing transcript from March 5, 2001

Exhibit 9– Letter from ARY dated 3/28/01

Exhibit 10– Letter from ARY dated 4/05/01

Exhibit 11– ARY's Amended Petition filed in Johnson County, Kansas

WA 599218.1

Exhibit 12– Proposed Complaint of Creditor's Committee in Adversary Proceeding

Exhibit 13– Excerpts from Deposition of Tom Morgan

Date:  June 28, 2001.

SPENCER FANE BRITT & BROWNE LLP

/s/ Barry L. Pickens
Scott J. Goldstein        MO #28698
Barry L. Pickens          MO #43379
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
(816) 474-8100
(816) 474-3216– Fax

John B. Beckworth
Joseph G. Thompson, III

WATT, BECKWORTH & CARRIGAN, L.L.P.
1010 Lamar, Suite 1600
Houston, Texas 77002
(713) 650-8100
(713) 650-8141– Fax

ATTORNEYS FOR ARY JEWELERS, L.L.C.

WA 599218.1