**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**
**WESTERN DIVISION**

M. FABRIKANT & SONS, INC., ET AL.   )
                                    )
        Plaintiffs,              )
                                    )    Case No. 01-0671-CV-W-5
v.                               )
                                    )
ARY JEWELERS, L.L.C.,            )
                                    )
        Defendant.            )

**ARY JEWELERS, L.L.C.'S SUPPLEMENTAL SUGGESTIONS**
**IN OPPOSITION TO PRELIMINARY INJUNCTION**

Defendant ARY Jewelers, L.L.C. ("ARY") hereby files its Supplemental Suggestions in Opposition to Preliminary Injunction. As plaintiffs did, ARY incorporates its previously filed Suggestions in Opposition to Temporary Restraining Order, and provides additional argument, authority and evidence for the Court's consideration.

**I.    INTRODUCTION**

Faced with the undisputed fact that Foothill did not consent to continue financing Krigel's, plaintiffs have engaged in a creative reinterpretation of the contract and advance yet another new argument in support of their request for a prejudgment attachment of ARY's assets. Scott Krigel now has provided an affidavit in support of the remarkable proposition that the financing contingency was in the contract for **his** benefit, not ARY's, and this was the intent of the language. It is a particularly remarkable stretch, *as his lawyer (and brother) Sandy Krigel, who participated in drafting the SPA, referred to this provision as ARY's* ***"walk away clause"*** *as it was drafted.*

The plaintiffs' interpretation is patently unreasonable. It would delegate to Scott Krigel the sole right to decide for ARY whether ARY could finance the purchase or was obligated to spend an additional



$9,000,000.00 to fund the transaction. It is also a construction that cannot survive analysis under Missouri interpretive rules, and one that flies in the face of the intention of the parties – including Mr. Krigel's own understanding as expressed by his lawyer.

From the beginning, plaintiffs' claims have been a moving target. These plaintiffs first sued ARY, through the creditors' committee, in Bankruptcy Court. There, their claim was for money damages. When they learned such a claim could not survive analysis under the Supreme Court's *Grupo* decision, they recaptioned their pleadings to seek "equitable" relief – in the form of money damages, however. In the Bankruptcy Court, the debtor contended that Foothill consented to financing, thereby obligating ARY to close. It was, in fact, Erlene Krigel's incorrect representation that a financing commitment had been received that, in part, led the Bankruptcy Court to refuse ARY's request to extend the effective date of the reorganization plan. After the deposition of Foothill's representative, Tom Morgan, this claim was abandoned; it was then incontrovertible Foothill never consented.[1] Now, however, Scott Krigel urges an insupportable construction of ¶4(c).

Plaintiffs could have properly sought the relief they want by complying with Missouri's prejudgment attachment statute. Their unwillingness to post a meaningful bond, as is required for such an attachment, is telling with respect to their own belief in their likelihood of success. Their choice was deliberate, and they must now bear its consequences. ARY has had all of its assets frozen for months. There is little chance

---

[1] Tom Morgan, the Foothill representative responsible for its negotiations with Krigel's, Inc. and ARY testified:

Q:    So it would be absolutely and totally false for anyone to represent that as of March 27th or any date thereafter Foothill had issued a commitment to ARY: is that true?

A:    We did not issue a commitment, that's true.

*Q:    And if someone alleged that you had consented to finance ARY on any terms whatsoever, that would also be equally false; would it not?*

*A:    Yes, it would be.*

May 21-22, 2001 Deposition of Tom Morgan, at 250, ll. 4-23 (Ex. 13) (emphasis added).

plaintiffs will succeed on the merits of their claims, through appellate review, despite their unceasing creativity. Their motion should be denied.

## II.    BACKGROUND

ARY incorporates by reference its Suggestions in Opposition to Plaintiffs' Motion for Temporary Restraining Order. ARY, however, provides the following chronology, with descriptions and annotations to the evidentiary record, for the Court's convenience:

| Date | Event | Reference |
|---|---|---|
| Late 2000 | Krigel's, Inc. is insolvent and needs to find a buyer for its stores | Disclosure Statement, Exhibit 5 at 5 |
| November, 2000 | Negotiation of the Stock Purchase Agreement (SPA) | |
| | ARY insists on financing to cover Foothill's secured debt | Affidavits of Haji Abdul Razzak Yacoob (Ex. 22) and Max Jevinsky (Ex. 15) |
| | Early drafts of SPA obligate ARY to pay off the Foothill debt in cash | Affidavit of Max Jevinsky (Ex. 15) Previous draft, attached to Exhibit 15 as "B" at 9 |
| | This language is removed at ARY's request | Affidavit of Max Jevinsky (Ex. 15) |
| | New language in ¶4(c) added. Sandy Krigel terms it "ARY's walkaway clause" | SPA, attached to Exhibit 15 as "C" Affidavit of Max Jevinsky (Ex. 15) |
| November 20, 2000 | Stock Purchase Agreement signed | Exhibit 1 |
| November - December, 2000 | Attempts to have Foothill commit to continued financing. DIP and emergence financing being handled separately | Email from Krigel to Husain, 12/05/00    (Ex. 16) |
| December 13, 2000 | Scott Krigel complains about Foothill's foot-dragging on both the emergence financing and debtor-in-possession financing | Email from Krigel to Husain, 12/13/00    (Ex. 17) |
| December 15, 2000 | Foothill issues non-binding term sheet proposal for emergence financing only | Exhibit 2 |
| | Scott Krigel sends email comments criticizing terms of the proposal | Email to Gohar Husain, 12/15/00 (Ex. 18) |

3

| December 19, 2000 | Scott Krigel attempts to waive ¶4(c) | |
| December 19, 2000 | Max Jevinsky faxes Scott Krigel stating financing is not acceptable per SPA, and offering an extended date under ¶4(c) to obtain a commitment.<br><br>Scott Krigel never responds or accepts ARY's offer. | Letter from Max Jevinsky to Scott Krigel, attached to Exhibit 15 as "D"<br><br>Affidavit of Max Jevinsky (Ex. 15) |
| December 20, 2000 | Krigel's circulates disclosure statement | Exhibit 5 |
| January 5, 2001 | First DIP financing proposal received from Foothill, which Scott Krigel characterizes as "outrageous" | Email from Scott Krigel to Husain, 1/05/01 (Ex. 19) |
| January – March, 2001 | A series of unsuccessful negotiations with Foothill regarding acceptable financing. No commitment is ever received. | |
| February 28-March 3, 2001 | Scott Krigel is told by Tom Morgan of Foothill Capital that Foothill has serious concerns about ARY's investors, and unless something changed, would never consent to financing. | Deposition of Tom Morgan, p. 145, line 3 to p. 162, line 8 (Ex. 14) |
| March 4, 2001 | Meeting with Byrd, Weiss, Krigel, Husain, Jevinsky, Brenneman. Plaintiffs' claim that Mr. Husain stated that ARY would just pay cash if Foothill did not commit.<br><br>No evidence that contractual commitment was ever made. No party sought to amend Plan of Reorganization.<br><br>Affidavits of Weiss and Jevinsky, Gohar Husain said ARY had financial ability, but did not make a commitment. | Affidavits of Ron Weiss and Max Jevinsky   (Exs. 20 and 15) |
| March 5, 2001 | ARY asks for extension of confirmation date of Plan of Reorganization because financing is not in place.<br><br>Krigel's objects that ARY does not have standing to seek any relief under the plan.<br><br>Scott Krigel testifies that financing is close to being completed, and that ARY will just pay cash. Mr. Krigel does not tell the Court that within the previous few days, Foothill had told him they had no intention of committing to financing.<br><br>The plan is confirmed. | Affidavits of Ron Weiss and Max Jevinsky. (Exs. 20 and 15)<br><br>Transcript, attached as Exhibit J to plaintiffs' supplemental suggestions, at 14. |
| March 15, 2001 | At ARY's request, effective date of the plan is extended to March 30, 2001. The basis of the request, as explained to Court and parties is that financing is not in place. | Affidavits of Ron Weiss and Max Jevinsky |
| March 28, 2001 | ARY again notifies Krigel's that financing is not in place. Requests further assistance with Foothill negotiations. States that will not close without financing. | Letter from ARY to Krigel's (Ex. 9) |

| March 29, 2001 | ARY again seeks extension of effective date because financing is not in place.<br><br>Erlene Krigel represents that a commitment has, in fact, been made, and objects to ARY's standing to ask for more time. She states that she believes ARY will default, and asks that effective date not be postponed so she can force ARY's hand. | Transcript of 3/29/01 hearing, attached as Exhibit K to plaintiffs' supplemental suggestions, at 4-5, 8 |
|---|---|---|
| March 30, 2001 | Effective date of Plan of Reorganization | |
| April 5, 2001 | After unsuccessful negotiations with Foothill, ARY has no choice but to notify Krigel's that pursuant to ¶4(c) it cannot close on the stock purchase. | Letter from ARY to Krigel's (Ex. 10) |
| April 10, 2001 | Krigel's files adversary action in Bankruptcy Court, obtains ex parte T.R.O. freezing all of ARY's assets | |
| April 24, 2001 | ARY files declaratory judgment action in Johnson County, Kansas | |
| May 9, 2001 | Unsecured Creditors attempt to intervene in adversary proceeding | |
| June 8, 2001 | Bankruptcy Court abstains. | Abstention Order  (Ex. 4) |
| June 13, 2001 | ARY amends declaratory judgment action to implead two unsecured creditors | Exhibit 11 |

## III.   PLAINTIFFS CANNOT SATISFY THEIR BURDEN TO OBTAIN INJUNCTIVE RELIEF

Plaintiffs cannot meet their burden to satisfy the elements required for entry of a preliminary injunction; in particular, they cannot show they are likely to prevail on the merits. In the Eighth Circuit, this is the <u>most important</u> factor. *Shrink Missouri Government PAC v. Adams*, 151 F.3d 763, 764 (8th Cir. 1998). Plaintiffs' inappropriate attempt to seek a constructive trust raises their burden even higher. Under Missouri law, to establish a constructive trust the "*evidence must be so clear, cogent and convincing as to exclude every reasonable doubt.*" *Miller v. Miller*, 872 S.W.2d 654, 657 (Mo. App. 1994) (citation omitted; emphasis added).

Plaintiffs' entire claim is premised on the enforceability of the SPA. In order to have any likelihood of success at all, they must show that the SPA did not terminate on December 19, 2000. The argument boils down to an interpretation of the contract itself. Paragraph 4(c) provides:

> Within four weeks from the date hereof Purchaser shall provide Seller with evidence of Foothill Capital's consent to the continued financing of Company's obligations to Foothill

Capital. ***In the event Foothill Capital does not consent within the foregoing time period this Stock Purchase Agreement and related agreements shall be void and of no further effect.***

Paragraph 4(c) unambiguously required Foothill's consent as a condition to ARY's performance under the SPA. As Judge Venters held, "in the event Foothill Capital did not consent to the continued financing within the four-week period following the execution of the Agreement, the Agreement was void and of no further effect." Exhibit 4 at 3.

## IV.   PARAGRAPH 4(c) REQUIRED CONSENT, AND WAS NOT A CONDITION THAT COULD BE WAIVED BY SCOTT KRIGEL

Plaintiffs now are asserting that the financing contingency was really just a warranty from from ARY to Mr. Krigel, which Mr. Krigel, at his sole discretion, had the ability to waive. They claim he did so, and the SPA was therefore still enforceable.

Plaintiffs attempt to bolster their claims by asserting that representations occurring months after the Stock Purchase Agreement was signed indicated that ARY was agreeing to fund the transaction with cash. Notably, they identify nothing even remotely contemporaneous with the execution of the SPA to bolster this statement. Instead, they ask the Court to believe that these representations amount to a binding agreement upon ARY, despite the fact that nowhere in the agreements, or documents describing the agreements, or the Bankruptcy Court's Order approving the plan, is there any written obligation for ARY to buy out Foothill's position. It would be bizarre, indeed, that if such a monumental modification had been made – one that represented, if plaintiffs are correct, the single largest cash outlay of the entire transaction – it was never committed to writing.

### A.   Black Letter Principles of Contract Interpretation Demonstrate that ¶4(c) Could Not be Waived

#### 1.   Plaintiffs' Construction Ignores Entirely the Second Sentence of ¶4(c),

**Which Would Become Superfluous Thereunder**

The Court is obligated to read the contract in such a manner that words, phrases, and clauses are not rendered meaningless or superfluous. *Tuttle v. Muenks*, 21 S.W.3d 6, 11-12 (Mo. App. 2000). The parties are presumed not to have intended nullities, and the preferred construction is one that provides a "reasonable meaning to each phrase and clause," without "leaving some of the provisions without function or sense." *Transit Cas. Co. v. Certain Underwrites at Lloyd's of London*, 963 S.W.2d 392, 297 (Mo.App. 1998). Yet, this is precisely what plaintiffs ask.

According to plaintiffs, ¶5(a)(ii) makes the purchaser's Section 4 representations a condition to closing unless waived pursuant to ¶6(a). This much is correct. However, *unlike every other condition, representation, warranty, covenant, ¶4(c) has its own, self-executing, termination language.* The second sentence of ¶4(c), which is found nowhere else in the contract, unambiguously provides that "In the event Foothill Capital does not consent within the foregoing time period this Stock Purchase Agreement and related agreements shall be void and of no further effect." Plaintiffs' reading of the contract makes this language entirely meaningless, as according to them, ¶4(c) is to be treated as any other provision of Section 4. The contract would terminate anyway, even without the second sentence, pursuant to the terms of Sections 5 if not waived by Scott Krigel. Under plaintiffs' construction, the second sentence of ¶4(c) has no meaning at all.

The only explanation for the second sentence that gives it any meaning at all is that it is a condition subsequent, that automatically terminates the agreement if financing is not available. The reason that the second sentence appears where it does, and is contained within a section that otherwise is limited to Purchaser's representations is simple. This is the part of the contract where Foothill's financing is discussed, and it makes sense to have the contractual provision relating the consequences of a refusal to

7

finance in the same place. No other condition contained in Section 4 has its own termination language. The Court should interpret the contract in a manner that gives meaning to both parts of ¶4(c), and not just the first sentence. The only reasonable meaning, given the existence of otherwise unnecessary and superfluous termination language, is that ¶4(c) is a self-executing condition subsequent.

 2. **Plaintiffs' Interpretation Exalts Form Over Substance and Ignores Black Letter Principles of Contractual Construction that Require Application of the Contract's Terms, Without Regard to Inconsistent Headings**

Plaintiffs suggest that ¶4(c) can only be considered as a waivable condition because of where it appears in the contract. How it got there will be explained in Section B, below. More importantly, however, the placement of the condition subsequent is not controlling as to its interpretation. Well established interpretative rules require that contractual provisions be given their plain meaning, and not be limited to the headings or section titles in which they are found. For example, in *Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co.*, the First Circuit examined just such a question of interpretation. 169 F.3d 43, 53 n. 15 (1st Cir. 1999). In rejecting an insurer's attempt to use the title of a section to limit the effect of the contractual provision contained within, the Court reversed:

> We recognize that the title of the SR&CC clause, "Strikes, Riots & Civil Commotions," may seem to suggest a narrower focus for that clause than is accorded by our reading of the "malicious acts" provision. But *to the extent there is a difference between the title and the plain language of the clause, the latter prevails. See Pennsylvania Dep't of Corrections v. Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 1956, 141 L.Ed.2d 215 (1998) (title of statute cannot limit or control meaning of text). The practical need for brevity in a title may result, as here, in a less than perfect match-up. Here, for example, the title likewise makes no reference to "martial law, military, or usurped power" nor to "lockouts." *We don't believe that the title wags the dog.*

Other courts have reached similar conclusions. In *St. Germain & Son, Inc. v. Taunton Redevelopment Auth.*, the court held, "The text and not the title is controlling. A title may be considered when construing the text, but the scope of the text cannot be expanded by the title." 340 N.E.2d 916

8

(Mass.App.Ct. 1976); *see also Charles I. Hosmer, Inc. v. Commonwealth,* 19 N.E.2d 800, 804

(Mass.App.Ct. 1939) ("The body of the article is no more governed by its title than it would be by a

preamble to the contract itself.") (citing numerous cases applying the same principal to statutory

interpretation); *Herlihy Mid-Continent Co. v. Sanitation Dist. Of Chicago,* 60 N.E.2d 882, 885-86

(Ill. 1945) (contract provision entitled "Unavoidable Delays" did not control clear textual language waiving

damages for "any delay or delays," thus plaintiff could not recover damages stemming from avoidable

delays).

As indicated, the rule applies equally to statutory interpretation. Indeed, both *Ferrara* and

*Hosmer* cite cases involving statutes in support of their application of the rule to contracts.[2] This same rule

establishes that a contract's recitals do not limit its terms.[3]

### 3.    Clear Missouri Law Provides That Financing Contingencies Always Inure to Purchaser's Benefit , and are Not Waivable By Seller

Plaintiffs half-heartedly attempt to claim¶ 4(c) is not a typical financing contingency because it did

not relate to ARY's financing the purchase price of Krigel's (presumably the $50,000 stock price). This

strains credibility. "Continued financing" is still financing, and if Foothill did not consent it would have raised

---

[2]*Pennsylvania Dep't of Corrections v. Yeskey,* 524 U.S. 206, 118 S.Ct. 1952, 1956, 141 L.Ed.2d 215 (1998) (Scalia, J.); *Owner-Operator Independent Drivers Ass'n, Inc. v. New Prime, Inc.,* 192 F.3d 778, 784 (8th Cir. 1999) (where plain language of statute allowed injunctive relief for violation of statute, fact that section was entitled "Enforcement of Order" did not limit private suits to mere enforcement of agency orders; plaintiffs could sue for violations of statute); *Minnesota Transp. Regulation Bd. v. United States,* 966 F.2d 335, 339 (8th Cir. 1992; *National Fuel Gas Distribution Corp. v. TGX Corp.,* 950 F.2d 829, 835 (2nd Cir. 1991) ("There can be no doubt that the text of the statute must take precedence over its title. While a title or heading may help clarify or point the meaning of an imprecise or dubious provision, it may not alter or limit the effect of unambiguous language in the body of the statute itself.").

[3]*See generally* 17A Am.Jur.2d *Contracts* §392 (1991); 17A C.J.S. *Contracts* §302 (1999);
*Williams v. Barkley,* 58 N.E. 765, 767 (N.Y. 1900); *Chicago Daily News, Inc. v. Kohler,* 196 N.E. 445, 451 (Ill. 1935); *Illinois Central RR.Co. v. Michigan Central R.R. Co.,* 152 N.E.2d 627, 633 (Ill.App.Ct. 1958) ("It is too well established to require citation of authority that the legal effect to be given an instrument is not to be determined by the label which it bears or the technical term it contains."); *Chu v. Ronstadt,* 498 P.2d 560, 563 (Ariz.App. 1972)("The character of contract must be determined by their provisions rather than by labels."); *Ingalls Iron Works Co. v. Ingalls,* 53 So.2d 847, 849-50 (Alab. 1951).

the purchase price for ARY by some $9,000,000. Continued financing by Foothill would have accomplished exactly what <u>every</u> financing contingency clause is designed to accomplish – to allow the purchase of the asset on credit as opposed to with cash. One way or another, the price of Krigel's, Inc. included the price of its debt. The purpose of this financing clause, like any financing clause, was to relieve the purchaser of the obligation to fund the purchase in cash. There is no principled basis for claiming that this is not an archetypal financing clause.

¶4(c) of the SPA is a "condition subsequent." As a matter of law, when Foothill did not consent within the four-week period specified in the SPA, the SPA terminated. A contractual clause that requires financing is, under Missouri law, a condition subsequent. *Maynard v. Bazazzadegan*, 732 S.W.2d 950, 954 (Mo.App. 1987); *Century 21 Al Burack Realtors v. Zigler*, 628 S.W.2d 915, 916 (Mo. App. 1982)("[A financing] provision is a condition subsequent to the existence of the contract, which, upon the non-occurrence of the stipulated event, may be raised to avoid the contract...."). The failure to obtain financing when required in a condition subsequent clause automatically voids the agreement as a matter of law. *Berger v. McBride & Son Builders, Inc.*, 447 S.W.2d 18, 19 (Mo.App. 1969). A financing contingency of the type contained in the SPA operates to the exclusive benefit of ARY, as ARY was the only party to the SPA with any interest as to whether the Foothill's loans were paid off or continued to be financed.[4] This is consistent with the well accepted rule that financing contingencies operate to the exclusive

---

[4]The general rule was explained by the Supreme Judicial Court of Massachusetts:

The buyer was dependent upon financial assistance in order to fulfill his obligations under the contract. It was obviously to the buyer's advantage that he be released from his obligation in the event he should be unable to procure financial assistance. It would be of no importance to the [sellers] whether the buyer was offered a .... loan if the buyer was still able to tender the full purchase price.

*De Freitas v. Cote*, 174 N.E.2d 371, 373-4 (Mass. 1961).

benefit of the purchaser. *Dygert v. Crouch*, 36 S.W.3d 1, 5 (Mo. App. 2001).

Absent an unusual circumstance, the financing contingency can only be waived by the purchaser. *Fleischer v. McCarver*, 691 S.W.2d 930, 934 (Mo. App. 1985). It is absolutely clear that in no event could such a contingency be waivable by the seller if the purchaser does not consent. *Id.* A condition subsequent can be waived only prior to the date on which the condition terminates the contract. Because the contract automatically terminates upon the failure of the condition, a subsequent waiver cannot, as a matter of law, revive the contract. *Errante v. Kadean Real Estate Service, Inc.*, 664 S.W.2d 27, 30 (Mo. App. 1984). Once the December 19 deadline for financing had passed, the SPA itself was void and of no effect. It is impossible as a matter of law for any subsequent act of ARY to have "waived" the condition subsequent clause, because there was no contract in existence between the parties. *Berger*, 447 S.W.2d at 21. Quoting Williston, the *Berger* Court wrote:

> Thus, where a clause in a contract is interpreted as making it void or automatically cancelled upon the happening of a certain contingency, an attempted waiver after the occurrence of the condition can be supported, if at all, only as the recreation of a contract, for, the old contract having ceased to exist, only a new contract can reinstate the respective rights and duties.

*Id.* at 20 (quoting 3 WILLISTON ON CONTRACTS § 667 at 1917). The Court continued and held that because no consideration was given for an alleged new contract, none had been created. *Id.*

In a case that is exactly on point, the Court in *Baumann v. Brittingham* held that the failure to obtain financing within the contractual window voided the contract, and that even though the defendants continued to attempt to obtain financing after that date, the contract was void and unenforceable as a matter of law. 759 S.W.2d 880, 881 (Mo. App. 1988). Because the contract "ceased to exist" on the "date of the contingency" a "so-called waiver would not revive the Sale Contract." *Id.* at 882.

### 4.    Paragraph 4(c) Simply Does Not Address Sellers' "DIP" Financing

Plaintiffs' new argument is that the purpose of ¶4(c) was to provide Scott Krigel with assurances that debtor in possession (DIP) financing would be available so that Krigel's could weather the interim bankruptcy proceedings until its stock was purchased by ARY.

At the risk of pointing out the obvious, ¶4(c) <u>just does not say that</u>. It says "continued financing," not "DIP financing" or "interim financing" or anything else of the type. Plaintiffs claim more than simply that ¶4(c) <u>includes</u> DIP financing, they are attempting to persuade the Court that it means <u>only</u> DIP financing. Otherwise, they would have to concede that ARY had an interest in the financing contingency, and as an "affected party" under Section 6, their consent would have been required to waive ¶4(c)'s requirements. No basis for such an interpretation is found in the SPA.

Plaintiffs' suggestion also makes no sense from a practical standpoint.    Why, if this was so important, would Scott Krigel place the obligation upon ARY, which did not yet own Krigel's, Inc. to obtain DIP financing for Krigel's during the pendency of the bankruptcy?  Only Scott Krigel, not ARY, would be authorized to negotiate a DIP financing package during this time period. The fact ¶4(c) obligated <u>purchaser</u> to seek financing is the strongest possible evidence that "continued financing" referred to financing for purchaser's benefit – that is emergence, not DIP, financing.

Mr. Krigel's new assertion is also contrary to the facts.[5] DIP financing was handled on a separate track from the emergence financing. There is nothing in the December 15, 2000 correspondence from Foothill regarding DIP financing at all, much less any specific terms that would have satisfied Mr. Krigel. While Mr. Krigel now suggests that he was so happy with the emergence financing that he was satisfied that the as-yet-unseen DIP financing would be acceptable, his contemporaneous writings differ greatly.

---

[5]Plaintiffs' current suggestion, that ¶4(c) was intended to allay Scott Krigel's concerns that DIP financing be available for the company is creative, but clearly nothing more than an after the fact "spin." Mr. Krigel, of course, is a defendant in a declaratory judgment action pending in Kansas, and has a $1,450,000.00 interest in the outcome of this controversy.  It is clearly in his interest to see that the SPA is deemed to be enforceable.

In fact, he was highly critical of the December 15 proposal. *See* Ex. 18. In addition, at this same time, he was expressing his considerable frustration with, and disappointment in, Foothill's response. Ex. 18. In fact, it was three more weeks before a DIP proposal was made by Foothill, and Scott Krigel had major problems with it at that time. Ex. 19. Clearly, in light of his contemporaneous actions, it is hard to believe that it was only the DIP issue that inspired ¶4(c), or that Scott Krigel was so satisfied with the December 15, 2000 emergence proposal that he would assume that satisfactory DIP financing was forthcoming.

### 5. Notwithstanding Plaintiffs' Interpretation, Section 6 Requires ARY's Consent to Waive ¶4(c)

Even assuming plaintiffs are correct that ¶4(c) was for Debtor's benefit, their premise that only Scott Krigel had authority under Section 6 to waive compliance with its terms is incorrect. Section 6 does not say, "unless waived by the party to whom the representation, warranty or covenant was made," it says "unless waived by the *affected party*." Even under plaintiffs' novel construction, whereby ¶4(c) includes DIP financing, it clearly also includes emergence financing. Even under their interpretation, ARY was an "affected party" if emergence financing was not available. Thus, even if Scott Krigel were correct that his waiver was necessary, it was not sufficient. As an "affected party," ARY's waiver would have been required as well.

### 6. Plaintiffs' Construction Leads to the Absurd Result that Scott Krigel Had the Unilateral Power to Require ARY to Double its Cash Outlay by Buying out Foothill for $9,000,000

Finally, the interpretation plaintiffs suggest leads to an absurd result. Under their construction, Scott Krigel would have sole authority to determine whether ARY was obligated to assume the Foothill debt,

or to fund the transaction with an additional $9,000,000 to buy them out. It is beyond imagination to believe that any reasonable interpretation of the contract would cede to Mr. Krigel the unilateral right to such a fundamental term. ARY's entire cash outlay for the transaction as contemplated was only $7,500,000, and plaintiffs now suggest that a reasonable construction of the contract would have given Mr. Krigel to more than double it at his sole discretion by requiring a $9,000,000 cash payout. Contractual interpretations which involve such unreasonable results should be rejected. *See, State ex rel. Mo. Dam and Reservoir Safety Council v. Rocky Ridge Ranch Property Owners Ass'n*, 950 S.W.2d 925, 929 (Mo. App. 1997).

**B.      The Parties Intended ¶4(c) To Protect ARY, Not Scott Krigel**

The evidence concerning the drafting of the SPA, which is notably absent from plaintiffs' briefing, makes it perfectly clear that this language was intended to be more than just ARY's representation to Krigel's. Earlier drafts of the SPA explicitly required ARY to pay cash to buy out Foothill. That language even appeared in this section. Ex. 15(B) at 9. Obviously, the parties knew how to draft a provision requiring a cash purchase.

Significantly, the early language requiring immediate cash payoff of Foothill was removed from subsequent drafts. Because the original language requiring a cash payment had been placed in ¶4(c), the revised language was left in the same place, even though it included a much broader protection for ARY. Ex. 15. That is why the condition subsequent ended up in this particular section of the contract. *See* Ex. 15, (A)-(C).

ARY absolutely intended this clause to operate as a condition subsequent that would terminate the contract if financing was not available. *See* affidavits of Max Jevinsky and Ron Weiss (Exs. 15, 20), and declaration of Haji Abdul Razzak (Ex. 22). It was not the intention or understanding of ARY that this

14

provision be waivable by Scott Krigel. *Id.*

Furthermore, it is apparent that the Krigels understood throughout the negotiations and drafting of the SPA that the purpose of ¶4(c) was to protect ARY. Sandy Krigel, Scott's brother and the attorney responsible for Krigel's negotiation of the SPA, referred to this clause ARY's *"walk away"* clause. Their subsequent actions bear this out as well. During March of 2001, by far the most important and discussed issue vis a vis whether this transaction would close was whether Foothill would consent to financing. Erlene Krigel, in fact, attempted to represent to the Bankruptcy Court that financing had been obtained as part of the Krigel's effort to compel ARY to close. Of course, this representation was false. What no one did in the Bankruptcy Court, ever, was articulate the position that ARY was contractually obligated to buy out Foothill with cash. It was incorrectly represented by Scott Krigel on one occasion that ARY had subsequently agreed to do so, but no one ever contended – not until Mr. Krigel's recent affidavit – that the original SPA ever contemplated anything other than continued financing from Foothill.

## V.    NO DETRIMENTAL RELIANCE OR "NEW" CONTRACT

In addition to arguing that Scott Krigel had the authority to waive compliance with ¶4(c), the plaintiffs go on to suggest that ARY accepted his waiver, or alternatively, waived it itself by virtue of subsequent representations by Gohar Husain that ARY would simply fund the transaction with cash. Just as plaintiffs' theory that Scott Krigel could unilaterally waive ¶4(c) is unsupportable, it is equally clear, both legally and factually, ARY did not waive the protection that ¶4(c) afforded.

### A.    As a Condition Subsequent, Paragraph 4(c) Could Not Have Been Waived After December 19, 2000, Even If ARY Had Wanted To Do So

As explained above, the financing contingency is, as a matter of law, a condition subsequent. The effect of a condition subsequent is that on the failure of the condition, the contract is voided – automatically.

Legally, there cannot be a waiver <u>after</u> the date of the failure of the condition, because there is no longer a contract in existence. Missouri law is unanimous that a condition subsequent cannot be waived after the failure of the condition. *Fleischer v. McCarver*, 691 S.W.2d 930, 934 (Mo. App. 1985); *Errante v. Kadean Real Estate Service, Inc.*, 664 S.W.2d 27, 30 (Mo. App. 1984). As a matter of law, no subsequent act of ARY could have "waived" the condition.

There is no credible evidence of an ARY "waiver" of ¶4(c) prior to the termination date. In fact, the evidence shows that ARY not only did not waive ¶4(c), it offered to extend the date – and the offer was refused. No matter what Gohar Husain said in February or March of 200, it did not matter. The SPA was dead on December 19, 2000 and could not be revived.

### B.    ARY Did Not Waive ¶4(c)

As a factual matter, plaintiffs' claim fails as well. ARY does not deny there were conversations during which it expressed that it "could" fund the transaction with cash if financing was not available. This is not the same as a statement that it "will" do so, nor can it constitute a binding contract. There is simply insufficient evidence of a binding contractual commitment to justify the conclusion that plaintiffs are likely to succeed on the merits.

Notably, the affidavits filed by plaintiffs in connection with their supplemental suggestions stop well short of stating that Gohar Husain ever committed ARY to fund the transaction with cash. Needless to say, nothing was ever committed to writing, which is surprising given that there were apparently five lawyers present when what would seem to be a dramatic contractual modification was allegedly made. ARY attaches the affidavits of Max Jevinsky and Ron Weiss, who were also present at the March 4, 2001 meeting at which Mr. Husain allegedly made this comments. As these affidavits make clear, Mr. Husain did not make any secret of the fact that ARY's financial backers could, if they wished, pay cash to buy out

16

Foothill. This does not a contract make. Even if Mr. Husain had said that ARY would do this, there is no basis for the imposition of some new contract – no consideration, no evidence of agreement on other essential terms, no approval by the Court. The SPA was dead and gone at this point, and absent something more than "we could just do this" conversations about alternatives, there is no basis for imposing contractual liability.

Furthermore, it is clear that ARY had previously reserved its rights under ¶4(c). After the December 15, 2000 proposal from Foothill, two things happened. First, Scott Krigel attempted to waive ¶4(c). For the reasons described earlier, this is not something that he had the power to do. The second thing that happened was that *ARY sent Mr. Krigel a letter stating that it did not consider the proposal satisfactory, and offered to extend the ¶4(c) termination date so that financing could be obtained. This extension would have been effective had it been accepted, but Mr. Krigel never responded.* Accordingly, the agreement terminated on December 19. Had the proposal been accepted, it would have terminated a month later, as Foothill still had not consented. Either way, ARY made it quite clear that it did not intend to waive ¶4(c).

ARY made a number of other statements which indicated that it was not waiving ¶4(c). Among others, Gohar Husain wrote Tom Morgan in response to Foothill's unsatisfactory offer, stating that ARY did not intend to complete the transaction with cash, but instead required financing. Ex. 21. It is also undisputed that at every turn, ARY informed the bankruptcy court that it required additional time to obtain financing. On March 5, 15, and 29th ARY requested extensions. Twice, at the urging of Krigel's, ARY was told that it did not even have standing to object. The truth of the matter is that the effective date of the bankruptcy was forced upon ARY, over its objection that financing was not in place. The March 29 transcript makes clear that this was a failure of Krigel's and plaintiffs' own creation – they sought to force

17

ARY's hand, and the strategy failed.

The only person that ever told the bankruptcy court that ARY would consider a cash transaction is Scott Krigel. This statement appears in a two-line excerpt from the transcript of the March 5 confirmation hearing, at which, while represented by counsel, ARY did not have a corporate representative present. While ARY's counsel, Ron Weiss, later confirmed to the Bankruptcy Court that such a representation had been made that the deal would be done in cash, he was referring only to Scott Krigel's representation. Exhibit 20. Mr. Weiss explicitly told the Court and the parties that he had not been in recent communication on this topic with ARY, and was out of the financing loop. Exhibit K to Pls.' Suggestions at 6, ll. 15-21. He did not have instruction from ARY to contradict Mr. Krigel's representation, and at that point had no reason to distrust Mr. Krigel's statement. He also had just heard Erlene Krigel make the false representation that Foothill had, in fact, issued a commitment letter.

### C.    ARY Could Not Have Changed the SPA, or Agreed to a New Contract as Plaintiffs Argue

It is not entirely clear what effect the plaintiffs contend that Mr. Husain's alleged statements have. Clearly, as a matter of law they could not have operated as a waiver as there is no allegation that any of them occurred prior to December 15. In addition, it is clear that *none of these representations were made to the unsecured creditors*, nor, for that matter, is there any evidence that they were even aware of them. The only action that the plaintiffs in this case ever took was to vote in favor of the pre-approval of the plan in December of 2000 – long before even the earliest of the alleged representations. There is not the faintest suggestion of any action that the unsecured creditors took in reliance on these alleged representations, or what damages they have suffered. It is of course, incumbent upon them to establish what alternative transaction would have taken place in the absence of Mr. Husain's alleged representations.

They have made no attempt to do this.

What is clear is that no representation could have modified the SPA, or the Plan of Reorganization once it had been confirmed by the Bankruptcy Court. Thus it would have been absolutely unreasonable, absent some court-approved modification, to have relied upon them. Plaintiffs are now firmly ensconced on the horns of their own argument. In the Bankruptcy Court, and here, they assert that once the Bankruptcy Court had confirmed the Plan of Reorganization, which incorporated the SPA, the parties were powerless to change its terms, and it became the contract between the parties.[6]

Once enshrined in the Plan of Reorganization, the SPA could not be modified or amended without Court approval. *United States v. American Cynamid Co.*, 719 F.2d 558, 564-65 (2d Cir. 1983). It would have been equally impossible to simply scrap the SPA, and proceed under a new oral agreement calling for a cash buyout of Foothill's position, as the Plan is binding. *In re Wrenn Ins. Agency of Missouri, Inc.*, 178 B.R. 792, 796 (Bankr. W.D. Mo. 1995)("[o]nce a plan is confirmed, neither a debtor nor a creditor may assert rights that are inconsistent with its provisions," and the parties thereto "do[] not have the power unilaterally to change [their] treatment under the plan.")(citing *In re Omega Corp.*, 173 B.R. 830, 833 (Bankr. D. Conn. 1994)).[7] The creditors would have to contend that they are enforcing a new contract for the sale of the debtor in Chapter 11 proceedings without court approval. It goes without saying that no party has the ability to enter into such a new contract without court approval when the asset

---

[6]ARY refers the Court to the creditors' briefing in support of their motion for a temporary restraining order, where they cite cases for the following propositions: (1) that a confirmed plan is a "contract"; (2) that all parties to a confirmed plan are bound by its terms; (3) that the provisions of a confirmed plan bind the debtor, any entity acquiring property under the plan, and any creditor. *See* Memorandum in Support of Plaintiffs' Emergency Motion for Issuance of a Temporary Restraining Order and for Preliminary Injunction at 4.

[7]Numerous courts have noted that a confirmed plan functions as, or like, a form of consent decree. *In re Harvey*, 213 F.3d 318, 321 (7th Cir. 2000) ("a confirmed plan acts more or less like a court-approved contract or consent decree that binds both the debtor and all the creditors"); *Hillis Motors, Inc. v. Hawaii Automobile Dealers' Ass'n*, 997 F.2d 581, 588 (9th Cir. 1993) ("A reorganization plan resembles a consent decree"); *In re Stratford of Texas, Inc.*, 635 F.2d 365 (5th Cir. 1981) ("the [confirmed plan] is tantamount to a judgment of the bankruptcy court" but also "represents a kind of consent decree which has many attributes of a contract").

that is the subject of the contract is a debtor in Chapter 11 proceedings. Needless to say, no one sought

such approval for a transaction with all-cash financing. Ex. 7 (June 27, 2001 Affidavit of Ronald S. Weiss).

It is important to note that, while the confirmation of the Plan made it impossible to modify the SPA

without Court approval, it did not operate to compel the transaction to close. The SPA was incorporated

in its totality, including the condition subsequent financing clause. Judge Venters noted in his abstention

order that state law would determine whether or not the SPA had been breached. Order at 19. The SPA

could not be altered, but it could, if the condition subsequent was not satisfied, be voided by its own terms.

This theory also requires this Court to countenance an omission in statements made to the

Bankruptcy Court. If Scott Krigel had truly believed that ¶4(c) was no longer a condition to closing this

transaction because he had waived it, he would have fulfilled his duty of candor as the trustee of the debtor

by so advising the Court when he filed his chapter 11 petition and moved for confirmation of the plan of

reorganization on January 19, 2001. He did not do so. Had he so believed, he also would have advised

the Bankruptcy Court of this waiver at the confirmation hearing on March 5, 2001. Although he testified

at that hearing in favor of confirmation of the plan as written, including its incorporation of an unmodified

SPA, he nowhere advised the Court at that hearing about the purported waiver of the financing clause.

> **C.      Plaintiffs' Pleadings Do Not Support an Allegation of Detrimental Reliance on the Alleged Statements**

Despite its label, this claim also recasts the contract claim: *the only act plaintiffs allegedly relied upon was ARY's execution of the Agreement*. When the Agreement terminated by its own terms on December 19, ARY's obligations ceased; plaintiffs could not have legally relied thereon.

**VI.    PLAINTIFFS' UFTA CLAIM IS ALSO WITHOUT MERIT**

Plaintiffs' UFTA claim[8] depends entirely upon plaintiffs' breach of contract claims because the UFTA does not confer independent substantive rights, but instead is purely remedial in nature. *Deford v. Soo Line RR Co.*, 867 F.2d 1080, 1087 (8th Cir. 1989); *Central States, Southeast & Southwest Areas Pension Fund v. Marquette Bank, Minneapolis, N.A.,* 836 F. Supp. 673, 677 (D. Minn. 1993) (quoting *Deford*). As plaintiffs recognize, Missouri law requires them to prove their case by clear and convincing evidence. Pls.' Br. at 19-20. *See, e.g., Behr v. Bird Way, Inc.,* 923 S.W.2d 470 (Mo. App. 1996). Plaintiffs must not only prove their breach of contract claim to prevail on this claim, but they must prove it with an even greater degree of certainty.

Plaintiffs' UFTA claim is, at bottom, another procedural manipulation intended to enable them to avoid the import of an unambiguous holding by the Supreme Court in the *Grupo Mexicano* case. Although the UFTA authorizes prejudgment attachment, and other provisional remedies, see R.S.Mo. § 428.039.1(2), it requires compliance "with the procedure prescribed by the applicable laws" for such remedies. Because the UFTA directly incorporates the requirements of the prejudgment attachment laws, it should not be read to authorize injunctions that would render those same requirements meaningless. Taken together, plaintiffs' arguments would lead to just that result.

Without expressly distinguishing between them, plaintiffs focus on two different sets of alleged "fraudulent transfers" – (1) the completed transfer of most of the money ARY had deposited at the Bank of Blue Valley in Kansas as evidence of its ability to fulfill the Plan in the bankruptcy case to either Dubai, or the Habib American Bank in New York; and (2) the incomplete or threatened transfer of the remainder

---

[8]Without an articulated basis, plaintiffs assume Missouri law will govern Count III. To the extent plaintiffs seek to restrain transfers of moneys held at banks in New York or Kansas, it is at least equally plausible that the determination of whether transfers made from those bank accounts will be governed by statutes of those states, or even the states where the purportedly prohibited "transferees" reside. This problem is yet another reason that the Court should not attempt to enter a blanket injunction prohibiting all conceivable *prospective* transfers of these assets.

of the money. Despite plaintiffs' legal characterizations, neither set is a "fraudulent transfer" within the meaning of the UFTA.

Plaintiffs erroneously contend that ARY transferred all or part of the $525,000 remaining in the United States despite the fact that part of the $525,000 at issue still remains to this day in ARY's account at the Kansas bank, and the rest was moved only from one ARY bank account (at the Kansas bank) to another ARY bank account (at the New York bank). By definition, that $525,000 was never *transferred* within the meaning of the statute. The definition of a "transfer" under the UFTA clearly requires that another party – the transferee – must receive an interest in the transferred asset. Plaintiffs must establish a transferee before a "transfer" could have occurred. "Inherent in the [definition of 'transfer'] is a requirement that a 'transfer' include the acquisition of an interest by a third party." *In re Messia*, 184 B.R. 176, 177 (Bankr. D. Mass. 1995). Because there is no third party "transferee," a defendant's "transfer" of its money from one of its bank accounts to another "must be viewed simply as an internal bookkeeping arrangement." *B.W. Dyer & Co. v. Monitz, Wallack & Colodney*, 184 N.Y.S.2d 445, 453 (N.Y. Sup. 1959). ARY's movement of money from one of its accounts to another is simply not governed by the UFTA.

Based on the same definition, incomplete "transfers" are not within the scope of the UFTA, and likely never will be. The term "transfer" refers to "property, assets, or money *already conveyed from the debtor to a third party*." *Sands v. New Age Family Partnership*, 897 P.2d 917, 919 (Colo. App. 1995). Were the term construed to include every conceivable future transfer that might – or might not – occur, the Courts would be called on to render advisory opinions where the requirements of the UFTA could not be meaningfully applied. In this very case, for example, plaintiffs do not seek to enjoin specific transfers that might violate the UFTA, but instead seek an order prohibiting any disposition of money on

22

deposit for the account of ARY in either the Kansas or New York bank, without regard to whether the money is merely moved to another ARY account, withdrawn by ARY for cash, or transferred to a third party for "reasonably equivalent value" so as to be excluded from the scope of the UFTA. R.S.Mo. §428.044.1.

Plaintiffs also improperly focus upon alleged "fraudulent transfers" of money to the National Bank of Dubai. While those alleged "transfers" are complete, they cannot be a proper subject of this action because plaintiffs failed to join a necessary and indispensable party to their claim, the transferee. In an action under the Uniform Fraudulent Transfer Act, "the transferee is a necessary party to any action seeking to set aside the transfer." *Tanaka v. Nagata,* 868 P.2d 450, 454 (Haw. 1994). "Fundamental principles of due process require that transferees who claim an interest in [] property or its proceeds have a full and fair opportunity to contest claims of fraudulent transfer." *Id.* at 455. The *Tanaka* Court based its holding in part on the "decisions from other courts in other jurisdictions . . . have ruled that a grantee or transferee of property . . .is a necessary and indispensable party to the resolution of a claim of fraudulent transfer." *Id.* at 454 (collecting authority). Plaintiffs themselves allege that an "affiliate" of ARY, ARY Traders, was the recipient of those transfers. ARY Traders is entitled to prove whatever defenses it may have. Not having joined ARY Traders, plaintiffs cannot attack the completed transfers.

Plaintiffs seek to twist the UFTA to permit pre-judgment attachments without satisfying the statutory requirements therefor. "The purpose of the statute is to grant creditors additional enforcement possibilities when a debtor transfers [its] assets to a third party." *Central States*, 836 F. Supp. at 677; *Deford*, 867 F.2d at 1087. If the Court were to accept all of plaintiffs' arguments regarding the scope of the UFTA, however, UFTA would not only offer an additional remedy where property is held by third parties, it would supplant other remedies. If plaintiffs' arguments were correct, this Court could freeze every disposition of

every asset ever owned by ARY, whether the assets were transferred to a third-party or not, all before a judgment is entered against -- or for -- ARY. The separate remedy of attachment would be rendered superfluous. The UFTA's incorporation of the attachment remedy would thus be meaningless. Plaintiffs' construction of the UFTA must therefore be rejected.

## VII.   THE OTHER PRELIMINARY INJUNCTION FACTORS WEIGH AGAINST PLAINTIFFS

### A.   No Irreparable Injury

As a matter of law, plaintiffs cannot establish an irreparable injury. Federal case law makes it quite clear that the possible inability to collect a judgment is never an irreparable injury for the purposes of establishing entitlement to an injunction. As the Court noted in *Rosen v. Cascade Int'l, Inc.,* 21 F.3d 1520 (11th Cir. 1994):

> Bringing an action to recover money damages "does not entitle the claimant to equitable relief simply because the complaint alleges uncertainty of collectibility of a judgment if a fund of money is permitted to be disbursed. *The test of adequacy of a remedy at law is whether a judgment could be obtained, not whether, once obtained it will be collectible."*

*Rosen,* 21 F.3d at 1531 (emphasis added).   The basis for this rule is simple – the appropriate legal remedy is prejudgment attachment. Plaintiffs have never even suggested that it would have been inappropriate or impossible for them to pursue attachment. They simply chose not to do so they would not have to post an adequate bond to protect ARY. As a matter of law, the fact that a legal remedy was available, and they chose not to avail themselves of it, bars their right to an injunction.   B.

### Balance of

### Hardships

This injunction freezes 100% of ARY's U.S. assets. Furthermore, ARY cannot seek or acquire

additional capital without making new funds subject to the injunction. ARY cannot borrow money, and cannot invest money it has. In effect, the requested injunction would effectively prohibit ARY from doing business in the U.S. As ARY's sole asset is money currently frozen in Bank of Blue Valley and the Habib Bank, plaintiffs seek to have the Court freeze funds necessary for ARY to pay its legal expenses.

As a practical matter, the harm to ARY is real. The law also presumes that asset freezing injunctions involve serious hardships. "[T]he theory of taking away the control of a person's property by means of an injunction for the purpose of anticipating a judgment which may or may not thereafter be obtained by a litigant is abhorrent to the principles of equitable jurisdition." *Bowman v. Dixon Theatre Renovation, Inc.*, 581 N.E.2d 804, 807 (Ill. App. 1991). "If the property of an honest, struggling debtor could be tied up by injunctions upon mere unadjusted legal demands, he would be constantly exposed *to the greatest hardships* and grossest frauds, for which the law would afford no adequate remedy...[T]o prevent ruin to his business pending such litigation, he would be forced into unconscionable compromises involving losses he would be unable to bear." *Lewis v. Westside Trust & Sav. Bank*, 6 N.E.2d 481, 484 (Ill. App. 1937) (emphasis added).

Plaintiffs continue to confuse the issue by suggesting that ARY is nothing more than a shell corporation. This is simply improper. They have no pleadings or proof which would entitle them to disregard ARY's separate legal status as a corporation in good standing. ARY is therefore, entitled to the same recognition that any one of the plaintiffs' corporate entities are. When it suits their purposes, plaintiffs are perfectly happy to acknowledge ARY's independent status – as in when they claim justifiable reliance of Mr. Husain's ability to bind the company to an additional $9,000,000 cash contribution. They cannot now say on the other hand, that ARY is nothing more than a fictional company, and that it is not entitled to any presumption that it has a legitimate use for its capital. ARY respectfully suggests that none of the

Chief Financial Officers of any of the plaintiffs would agree passbook interest eliminates the hardships of having all of one's capital frozen.

There is no existing hardship to the unsecured creditors other than their concern about whether a money judgment would ultimately be collectible. ARY's funds, which are its only asset, need not be frozen in order to "secure the status quo" *vis-a-vis* the unsecured creditors. Whether the funds are frozen or not makes no difference to their operations between now and the time a final judgment is rendered, but it makes every difference to ARY.

### C.    Public Interest

There is absolutely no public interest factor that weighs in favor of the issuance of a preliminary injunction. A money judgment, if any, in this case would operate only in favor of the unsecured creditors. No party, let alone parties with a "public interest," has any stake in the controversy between plaintiffs and ARY other than ARY and the unsecured creditors.

### VIII. PLAINTIFFS ARE ATTEMPTING AN IMPROPER PREJUDGMENT ATTACHMENT THAT IS NOT SUPPORTED BY A SUFFICIENT BOND.

ARY has no desire to repeat the lengthy arguments it has advanced in its previous briefing. The fact of the matter is that this is nothing more than an attempted prejudgment attachment, and it impermissibly fails to comply with FED. R. CIV. PROC. 64 and the Supreme Court's dictates in *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bonding Fund, Inc.*, 527 U.S. 308 (1999).

Plaintiffs do not even make a real attempt to dispute the fact that, despite the label of equitable relief, what they are seeking is money damages, and as a matter of law concern about the collectibility of a judgment does not authorize a constructive trust. *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1518 (11th Cir. 1994); *Rosen,* 21 F.3d at 1531 (11th Cir. 1994). ARY established

in its initial suggestions in opposition to the temporary restraining order that simply labeling their relief "equitable" is insufficient to escape *Grupo*'s analysis.

Plaintiffs do, in fact, seek an attachment. Although they now claim to seek only an *"in personam"* injunction, the prayer to their motion for a preliminary injunction seeks not only an order prohibiting ARY Jeweler's, L.L.C. from removing the funds, it seeks to direct the Habib Bank and Bank of Blue Valley to freeze the assets. It is, thus, both *in personam* and *in rem*, even under plaintiffs' own analysis.

Furthermore, ARY would advise the Court that there are other signatories on the accounts in question, signatories that are not members or managers of ARY, and are not therefore bound by an *in personam* order directed to ARY. ARY brings this to everyone's attention because it is apparent that only an *in rem* attachment of the funds could accomplish what plaintiffs seek. The Habib Bank, the Bank of Blue Valley, and the other signatories on the account are not before the Court, and cannot be bound by an *in personam* order. Thus it is a pure fiction for plaintiffs to claim they seek only *in personam* relief. If this is the only type of relief to which they are legally entitled, the order should so reflect, and the consequence would be that it would not freeze the funds, as the other signatories would be free to withdraw the funds, and the banks would be free to distribute them.

Because what they seek is an attachment, two conclusions follow. First, as to any non-UFTA basis for an injunction, the plaintiffs must, by virtue of *Grupo* and F.R.C.P. 64, comply with the Missouri prejudgment attachment statute. At this point, having essentially given up on maintaining the fiction that they seek only equitable relief, there should not be much dispute about this. Second, while the plaintiffs are permitted to seek an attachment under the U.F.T.A., *they are also required to comply with the statutory attachment rules in Missouri.* The U.F.T.A. simply provides the remedy, but specifically requires that the plaintiffs must comply with other aspects of Missouri prejudgment attachment law. R.S.Mo. §428.039,

attachment can only be accomplished "against the asset transferred or other property of the transferee *in accordance with the procedure prescribed by applicable laws of this state*." The applicable laws of Missouri regarding attachment, are, of course, the attachment statutes.

To comply with the attachment statute, the plaintiffs must post a bond for double the amount. Plaintiffs suggest that Missouri law does not require a bond of double the amount. They cite only a rule of civil procedure, that is not binding on this Court, as authority. This Court is obligated to follow Missouri statutory law, which clearly provides for a bond in double the amount. See, R.S. Mo. §521.070. To the extent there is a conflict between the statute, which says "at least" double the amount, and the civil procedure rule, which says "not exceeding" double the amount, the only clearly proper course is to require a bond of "precisely" double the amount.

## IX.    CONCLUSION

In the end, the law should not countenance plaintiffs' attempt to obtain a prejudgment attachment, no matter what they call it. One consistent theme in every case is that a Court should look at the reality of the relief plaintiffs seek, and not be misled by the label attached. Here, they seek breach of contract damages. They cannot freeze ARY's assets without complying with the substantive law of prejudgment attachment, something they steadfastly refuse to do.

Further, it is apparent that even apart from the procedural defects, their claims fail as a matter of law. There is no factual dispute that financing was never obtained, despite everyone's best efforts. Plaintiffs only recourse is to suggest a strained and implausible interpretation of the contract that leads to the nonsensical conclusion that ARY simply handed Scott Krigel its proverbial wallet and agreed to let him decide whether to spend $9,000,000 of ARY's money. Their interpretation fails under Missouri law, and under the facts.

ARY respectfully requests that the Court deny plaintiffs motion for preliminary injunction, enter an order lifting the existing temporary restraining order, and for all other relief to which it may be entitled.

Respectfully submitted,

SPENCER FANE BRITT & BROWNE LLP
  /s/ Barry L. Pickens
Teresa A. Woody          MO #35358
Barry L. Pickens         MO #43379
1000 Walnut Street, Suite 1400
Kansas City, MO 64106
(816) 474-8100
(816) 474-3216– Fax

John B. Beckworth
Joseph G. Thompson, III
WATT, BECKWORTH & CARRIGAN, L.L.P.
1010 Lamar, Suite 1600
Houston, Texas 77002
(713) 650-8100
(713) 650-8141– Fax
ATTORNEYS FOR ARY JEWELERS, L.L.C.

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of August, 2001, the above and foregoing was electronically filed and served by hand delivery on:

Stephen B. Sutton, Esq.
Lathrop & Gage, L.C.
2345 Grand Boulevard, Suite 2800
Kansas City, MO 64108
816-292-2001– fax
ATTORNEYS FOR PLAINTIFFS

  /s/ Barry Pickens
Attorney for ARY Jewelers, L.L.C.