# In The Matter Of:

*ARY Jewelers, LLC   v.*
*IBJTC Business Credit Corp., et al.*

---

*David Molinario*
*Vol. 1, December 1, 2004*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA   02110*
*(617) 426-2432*

*Original File MOLINARI.V1, 207 Pages*
*Min-U-Script® File ID: 0070685075*

**Word Index included with this Min-U-Script®**



EXHIBIT
N

```
00001
                    Volume I
                  Pages 1 to 207
                    Exhibits 1
         IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF MISSOURI
                  WESTERN DIVISION
    ARY JEWELERS, LLC,         :
              Plaintiff,        :
         vs.                    : Civil Action No.
                                : 4:03-CV-00439
    IBJTC BUSINESS CREDIT CORP.,:
    and DAVID MOLINARIO,        :
              Defendants.       :
```

CONFIDENTIAL DEPOSITION OF DAVID MOLINARIO, a witness called on behalf of the Plaintiff, taken pursuant to the Federal Rules of Civil Procedure, before Ken A. DiFraia, Registered Professional Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Thomas & Associates, Federal Reserve Building, 600 Atlantic Avenue, Boston, Massachusetts, on Wednesday, December 1, 2004, commencing at 10:00 a.m.

PRESENT:
   The Carrigan Law Firm
      (by Stephen Carrigan, Esq.)
   1331 Lamar Street, Suite 1550,
   Houston, TX 77010, for the Plaintiff.
   Winston & Strawn LLP
      (by Robert S. Fischler, Esq.)
   200 Park Avenue, New York, NY 10166-4193,
      for the Defendants.

Page 2

                    INDEX
    EXAMINATIONS               PAGE
    David Molinario
    DIRECT EXAMINATION          3
      BY MR. CARRIGAN

                    EXHIBITS

    NO.   DESCRIPTION           PAGE
    1     Credit committee draft report    165

Page 3

PROCEEDINGS
DAVID MOLINARIO, a witness called for examination by counsel for the Plaintiff, having been satisfactorily identified by the production of his driver's license and being first duly sworn by the Notary Public, was examined and testified as follows:

DIRECT EXAMINATION
BY MR. CARRIGAN: (10:00 a.m.)
Q: Mr. Molinario, am I pronouncing that fairly correctly?
A: Fairly.
Q: I apologize for any mispronunciation. It's not intentional. I've never been good at names or the English language for that matter.
   Would you state your full name for the record, please, sir.
A: David Molinario.
Q: Where do you currently reside, Mr. Molinario?
A: Wrentham, Massachusetts.
Q: What is the name of that town again?
A: Wrentham.
Q: How is that spelled?

Page 4

A: W-r-e-n-t-h-a-m.
Q: I'm assuming that Wrentham, Massachusetts, is close to Boston?
A: About 30 miles away.
Q: How long have you lived in Wrentham, Massachusetts?
A: About 15 months.
Q: Do you have a mailing address there?
A: Yes.
Q: What is that?
A: 125 Pokanoket Path.
Q: Can you at least help me with that spelling.
A: P-o-k-a-n-o-k-e-t.
Q: Did you give me the zip?
A: 02093.
Q: Is that a house, an apartment? How would you describe that?
A: It's a house.
Q: Where are you currently employed?
A: Wells Fargo Retail Finance.
Q: How long have you been employed at Wells Fargo?
A: A little over two years.

IBJTC Business Credit Corp., et al.
Case 1:04-cv-10281-EFH   Document 38-15   Filed 08/11/2005   Page 3 of 6
Vol. 1, December 1, 2004

Page 17

[1] there likely have been some type of documentation
[2] indicating or evidencing his involvement?
[3]   A: There wouldn't have to be.
[4]   Q: There may or may not, okay.
[5] We had discussion of — and I appreciate
[6] it — the one deposition that you've been involved
[7] in prior to this morning; is that correct?
[8]   A: Correct.
[9]   Q: I hope not, and I mean that, but I will
[10] ask, have you ever been involved as a party in any
[11] other lawsuits?
[12]   A: Not that I'm aware of.
[13]   Q: Let me ask you, Mr. Molinario, what
[14] documents, and I use that in just about the broadest
[15] sense, and I mean agreements, papers, photographs,
[16] videos, E-mails, anything that you can review, what
[17] documents, what have you reviewed or viewed in
[18] preparation for your deposition this morning?
[19]   A: Mr. Fischler showed me a bunch of
[20] documents, and I'm sure I could point them out if I
[21] was showed them again.
[22]   Q: Let me ask you this. Give me a general
[23] description. What do you remember of those
[24] documents?

Page 18

[1]   A: One was the lawsuit.
[2]   Q: Let me ask you, had you seen that before?
[3]   A: Yes, I'm sure I have.
[4]   Q: Let me back up and ask you, and then I will
[5] let you finish the answer. When are you talking
[6] about reviewing these documents that we're
[7] discussing now? Was it this morning, yesterday,
[8] last week, months ago?
[9]   A: I think over the course of my involvement
[10] with my attorney.
[11]   Q: Okay, at different times?
[12]   MR. FISCHLER: Maybe to cut through this
[13] because of the limited time we have with two
[14] witnesses today, he has not seen anything that
[15] hasn't been produced to you.
[16]   MR. CARRIGAN: That cuts through very
[17] little, but thank you.
[18]   Q: Let me go back. Over this period of time,
[19] what documents do you remember reviewing? You
[20] mentioned the lawsuit.
[21]   A: An approval memo, IBJ term sheet, newspaper
[22] articles, and some other stuff that I can't think of
[23] off the top of my head.
[24]   Q: When was the last time that you reviewed

Page 19

[1] any documents?
[2]   A: I believe Monday.
[3]   Q: What documents do you recall reviewing on
[4] Monday?
[5]   A: The ones that I previously listed.
[6]   Q: The ones you specifically remember
[7] reviewing on Monday were the IBJ term sheet, an
[8] approval memo, newspaper articles, the lawsuit. Is
[9] there anything else?
[10]   A: My affidavit.
[11]   Q: Do you remember what your affidavit was
[12] attached to or the purpose of your affidavit?
[13]   A: Yes.
[14]   Q: What was it?
[15]   A: I believe the purpose was with respect to
[16] venue.
[17]   Q: Anything else you recollect on Monday
[18] reviewing, seeing, listening to, anything of that
[19] nature?
[20]   A: I believe term sheets from Foothill.
[21]   Q: Anything else?
[22]   A: I don't recall any specifically.
[23]   Q: Monday, where were you when this review
[24] took place?

Page 20

[1]   A: In this boardroom.
[2]   Q: About how long were you in these offices or
[3] this boardroom on Monday?
[4]   A: An hour and a half or so.
[5]   Q: The term sheets from Foothill, had you ever
[6] seen those documents, those term sheets prior to
[7] Monday?
[8]   A: Yes.
[9]   Q: Had you ever seen those term sheets or
[10] documents at any time that you can recollect prior
[11] to the commencement of this lawsuit?
[12]   A: No.
[13]   Q: When did you first go to work for the
[14] Whitehall entity?
[15]   A: I believe it was around March 2000.
[16]   Q: What would that position or entry position
[17] or title have been?
[18]   A: I believe my title was vice president.
[19]   Q: Sometimes I see vice president kind of
[20] accompanied by VP such and such. Did you have such
[21] a title, or was it basic vice president?
[22]   A: I don't recall.
[23]   Q: When did you leave Whitehall?
[24]   A: I believe it was February 2002.

Vol. 1, December 1, 2004
Case 1:04-cv-10281-EFH    Document 38-15    Filed 06/31/2005    Page 4 of 6
BJTC Business Credit Corp., et al.

Page 93

[1] Q: Do you know whether or not that was ever
[2] done?
[3] A: I do.
[4] Q: And was it done?
[5] A: Yes.
[6] Q: At that point in time, did he ask you or
[7] instruct you to do anything else with those
[8] articles?
[9] A: I don't believe so at that time.
[10] Q: At the time of this conversation,
[11] Mr. O'Connor had not as of that point in time
[12] instructed you to fax them anywhere; is that
[13] correct?
[14] A: Which conversation?
[15] Q: I thought we were talking about the initial
[16] conversation that you had with O'Connor about these
[17] articles where he said the content was concerning to
[18] him. He mentioned something about allegations in
[19] the articles of embezzlement of money and Interpol,
[20] and he advised you that he or someone was to reach
[21] out to ARY and discuss the articles with them. Is
[22] that all one in the initial conversation that you
[23] recall with Frank O'Connor about these?
[24] A: I can't say for sure if that was all one

Page 94

[1] conversation, but those are true statements.
[2] Q: Would all of those comments have been made
[3] prior to any instruction to you to fax the articles
[4] to anyone?
[5] A: I believe so.
[6] Q: Anything else from any pre-faxing
[7] conversations that you had with Frank O'Connor about
[8] these articles, other than that you what you just
[9] mentioned that you can recollect?
[10] A: I don't recall.
[11] Q: Were you two to reach out to ARY, or was he
[12] to do that, or what is your recollection?
[13] A: He believe he and Brian Kennedy reached
[14] out.
[15] Q: Do you know anything about the details of
[16] that?
[17] A: I don't know the specifics.
[18] Q: What generalities do you know of?
[19] A: Based on the call, it was Frank's
[20] determination we were not to go forward.
[21] Q: Is it your understanding then that there
[22] was some type of conference call with or between
[23] Brian Kennedy, Frank O'Connor and some
[24] representatives of ARY about these news articles?

Page 95

[1] A: That's my understanding.
[2] Q: Anyone else other than Brian Kennedy and
[3] Frank O'Connor that you have either a specific
[4] recollection or belief was involved in that
[5] conference call?
[6] A: Yes. I believe the gentleman's last name
[7] was Hussain.
[8] Q: He would be on the ARY side?
[9] A: That was my understanding.
[10] Q: Anyone else other than those three that you
[11] are aware of?
[12] A: Not that I'm aware of.
[13] Q: Really the only recollection you have at
[14] this point in time coming out of that apparent phone
[15] conference is that Frank O'Connor related to you
[16] that based on that call, you and Whitehall were not
[17] to move forward?
[18] A: That is my understanding.
[19] Q: Where did you get that understanding from?
[20] A: Frank O'Connor.
[21] Q: Did he give you any details, whether or not
[22] you recollect them now, as to the details of that
[23] phone call?
[24] A: No.

Page 96

[1] Q: Do you know why you were not invited to
[2] participate in that phone call?
[3] A: No, I don't know.
[4] Q: Does it strike you a little bit odd or
[5] unusual or perhaps illogical that you as the
[6] underwriter would not be involved in that phone
[7] call?
[8] A: No.
[9] Q: Why not?
[10] A: Frank is the chief credit officer. For
[11] whatever reason, I may not or may have been invited
[12] and was just unable to attend. Brian Kennedy had
[13] the relationship I believe with Mr. Hussain. I
[14] don't know if I ever actually spoke with
[15] Mr. Hussain.
[16] Q: Then as best as you can recollect, about
[17] how soon after Frank O'Connor advising you that
[18] Whitehall was not going forward did he instruct you
[19] to fax these articles?
[20] A: I don't know.
[21] Q: Within days or weeks? Can you pinpoint it
[22] at all?
[23] A: I believe days.
[24] Q: Tell me, who was it that Frank O'Connor

Page 101

[1] my understanding that our credit facility was a
[2] better credit facility than the one originally
[3] proposed by Foothill.
[4]   Q: Are you saying at the time you faxed it,
[5] you knew that Foothill had proposed a credit
[6] facility?
[7]   A: I don't know the answer to that.
[8]   Q: Sir, you just testified under oath that you
[9] were told by Frank O'Connor that they were awaiting,
[10] they being ARY, were awaiting your letter of
[11] commitment because your credit facility was better
[12] than Foothill's; didn't you just testify to that
[13] under oath?
[14]   A: I did say that.
[15]   Q: That means you and Frank O'Connor were
[16] aware at the time that, in fact, it was not only out
[17] of the range of impossible, not only within the
[18] range of possible, you and Frank O'Connor knew at
[19] the time you faxed this that they had an outstanding
[20] loan proposal, didn't you, sir?
[21]   MR. FISCHLER: I'll object to the form.
[22]   A: It was my understanding from Frank O'Connor
[23] that they elected to go with our term sheet.
[24]   Q: As opposed to Foothill's; is that correct,

Page 102

[1] sir?
[2]   A: In the beginning of the process.
[3]   Q: Again, the truth of the matter is that when
[4] you faxed this to Foothill, you and Frank O'Connor
[5] knew that Foothill had made a loan proposal to ARY
[6] to finance their purchase of Krigel's or their
[7] involvement with Krigel's on the go-forward,
[8] correct, sir?
[9]   MR. FISCHLER: Objection to form. You can
[10] answer.
[11]   A: At a point in time, they had made a
[12] proposal.
[13]   Q: Did you know what the status of the
[14] proposal was when you faxed this?
[15]   A: I was told by Frank O'Connor that our
[16] proposal was selected.
[17]   Q: Did you know the status of Foothill's
[18] proposal at the time you faxed these articles to
[19] them?
[20]   MR. FISCHLER: Objection to form. I
[21] thought he just answered that. Go ahead.
[22]   MR. CARRIGAN: I'll object to that comment.
[23] You know all you can do is say, "Objection, form."
[24]   A: I don't know for certain.

Page 103

[1]   Q: It certainly was within the realm of
[2] possibilities that that proposal was still on the
[3] table, correct, sir?
[4]   A: Anything is in the realm of possibilities.
[5]   Q: That specifically is in the realm of
[6] possibilities, correct?
[7]   A: I don't know that I can answer that
[8] specifically.
[9]   Q: Did you have any information that you can
[10] recollect when you faxed these articles to Foothill
[11] that told you that the loan, their previous loan
[12] proposal, which you were aware of, had been
[13] withdrawn?
[14]   A: I don't remember.
[15]   Q: You can't think of anything that would have
[16] told you that, correct, sir?
[17]   A: I don't believe so.
[18]   Q: You knew as you faxed this to Foothill,
[19] that you, being Whitehall, was either getting ready
[20] to reject this loan proposal or had already done it,
[21] correct?
[22]   A: I believe we had rejected it at that point
[23] in time.
[24]   Q: So you knew that a fallback, since you were

Page 104

[1] withdrawing or had withdrawn yours, might certainly
[2] have been the Foothill proposal, correct?
[3]   A: I don't know what the other drawbacks would
[4] have been.
[5]   Q: Did you think about it at all?
[6]   A: I was following the instruction of my
[7] supervisor.
[8]   Q: Did you think about it at all, sir, or did
[9] you just blindly follow the instructions of your
[10] supervisor?
[11]   MR. FISCHLER: Objection to the form.
[12]   A: As a, you know, subordinate to my
[13] supervisor, I followed his instructions.
[14]   Q: And didn't think about either what Foothill
[15] might have on the table with ARY or the consequences
[16] of faxing that to them; you didn't think about that,
[17] did you, sir?
[18]   MR. FISCHLER: Objection to the form.
[19]   A: I don't believe I did.
[20]   Q: Did you ever even think about whether or
[21] not the actions you were taking based on the
[22] instructions to you were perhaps inappropriate or in
[23] violation of confidentiality provisions or laws or
[24] privacy laws or banking rules and regulations? Did

Page 193

[1] you would be correct. Could you possibly rephrase
[2] that so I can properly answer the question.
[3]  Q: You actually already answered it. You
[4] already told me you would have expected, based on
[5] your nine years of experience, that due diligence
[6] would require doing something by way of looking into
[7] allegations made in some news related article
[8] against an individual or a company a number of years
[9] ago, correct? You already told me that, right?
[10]  MR. FISCHLER: Objection to the form.
[11]  A: I believe that is a correct statement.
[12]  Q: I'm not saying on all four points, but if
[13] someone did a Google search and saw David Molinario
[14] was sued in a lawsuit in Federal Court in Boston and
[15] was a defendant and some jerky lawyer from Texas
[16] came up and, you know, tried to pound on him for
[17] about five or six hours in a deposition and jump to
[18] the conclusion based on that alone that David
[19] Molinario was a bad guy or a crook or had done
[20] anything wrong whatsoever, that would not either be
[21] due diligence or the correct assumption, correct?
[22]  MR. FISCHLER: Objection to the form.
[23]  A: I believe based on your hypothetical of a
[24] factual example, that some people may consider that

Page 194

[1] sufficient due diligence and some wouldn't.
[2]  Q: You wouldn't, would you, sir?
[3]  MR. FISCHLER: Objection.
[4]  A: I don't believe I would.
[5]  Q: Especially when it's you that they are
[6] allegedly or supposedly doing the due diligence on,
[7] correct?
[8]  A: Yes.
[9]  Q: I hope someone publishes the fact that I'm
[10] going to recommend to my client that you be released
[11] from this lawsuit after this deposition and that
[12] Google erases any trace of your name as a defendant.
[13] We will deal with that later.
[14]  Quickly, let's talk about the other people
[15] you mentioned. Brian Kennedy, is he at Wells Fargo?
[16]  A: He's at Webster Retail Finance.
[17]  Q: What do you recollect Brian Kennedy said
[18] about these events, circumstances or the lawsuit?
[19]  A: Can we go off the record for a quick
[20] second.
[21]  Q: Sure.
[22]  (Witness and counsel exit to confer)
[23]  Q: Just tell me what Brian Kennedy or what you
[24] recollect Brian Kennedy told you in conversations

Page 195

[1] postlawsuit.
[2]  A: Upon my knowledge of the lawsuit, I
[3] contacted Brian Kennedy. Brian told me that they
[4] had already been subpoenaed for their information
[5] and that he spoke about this situation with Craig
[6] Thayler, who is their in-house counsel, and he
[7] confirmed that he remembered Frank asking me and he,
[8] because he was in the room at the time, to, you
[9] know, call up Foothill and inform them of what we
[10] uncovered.
[11]  Q: Do you recall, did Brian Kennedy or whether
[12] or not Brian Kennedy recollected that he also
[13] instructed you to fax the articles?
[14]  A: I don't know. I don't believe I asked him
[15] that.
[16]  Q: Anything else you recall either asking or
[17] being told from or by Brian Kennedy?
[18]  A: Only one other thing.
[19]  Q: What was that?
[20]  A: Probably three or four months ago after I
[21] was informed about the deposition, you know, and the
[22] continuing proceedings, I gave him a courtesy call
[23] to tell him he may be involved in this just because
[24] I thought he may.

Page 196

[1]  Q: Was it an actual conversation or you just
[2] left a message?
[3]  A: I think we spoke.
[4]  Q: What was his response?
[5]  A: Slightly las-au-fair, "I'll do whatever I
[6] need to do."
[7]  Q: Again, in the conversations, no notes, no
[8] memos, no tape recordings, no nothing documenting
[9] what was the discussed?
[10]  A: No, but do I remember two things now that I
[11] didn't include.
[12]  Q: Please.
[13]  A: One was that Brian told me that he actually
[14] went out there to meet with people at Krigel's/ARY,
[15] and I'm not sure which one, but he actually
[16] physically went to Missouri.
[17]  Q: Post obtaining this information?
[18]  A: Pre obtaining the information. During the
[19] initial due diligence, as I mentioned to before.
[20]  The second one was I believe Brian told me
[21] that it was his recollection that it may have been
[22] HillCo Capital declined doing this deal for ARY
[23] because of some other information that they had
[24] received.