```
 1
 2  UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF MASSACHUSETTS
 3
    ARY JEWELERS, LLC,            )
 4                                )
                Plaintiff,        )
 5                                )
          vs.                     ) No. C.A. No. 04
 6                                ) CV 10281EFG
    IBJTC BUSINESS CREDIT         )
 7  CORP. AND DAVID MOLINARO,     )
                                  )
 8              Defendant.        )
    ------------------------------
 9
10
11
12          DEPOSITION OF ABDUL RAZZAK
13               New York, New York
14             Tuesday, May 10, 2005
15
16
17
18
19
20
    Reported by:
21  NANCY SILBERGER
    JOB NO. 173087
22
23
24
25
```

EXHIBIT O

Page 2

```
 1
 2          May 10, 2005
 3          10:00 a.m.
 4
 5      Deposition of ABDUL RAZZAK, held at
 6  the offices of Ropes & Gray, 45
 7  Rockefeller Plaza, New York, New York,
 8  pursuant to Notice, before NANCY
 9  SILBERGER, a Notary Public of the State
10  of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2      IT IS HEREBY STIPULATED AND AGREED,
 3  by and between counsel for the
 4  respective parties hereto, that the
 5  filing, sealing and certification of the
 6  within deposition shall be and the same
 7  are hereby waived;
 8      IT IS FURTHER STIPULATED AND AGREED
 9  that all objections, except as to the
10  form of the question, shall be reserved
11  to the time of the trial;
12      IT IS FURTHER STIPULATED AND AGREED
13  that the within deposition may be signed
14  before any Notary Public with the same
15  force and effect as if signed and sworn
16  to before the Court.
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2 APPEARANCES:
 3
 4    THE CARRIGAN LAW FIRM, L.L.P.
 5    Attorneys for Plaintiff
 6        1331 Lamar, Suite 1550
 7        Houston, Texas 77010
 8    BY:  STEPHEN P. CARRIGAN, ESQ.
 9
10    ROPES & GRAY
11    Attorneys for Defendants
12        45 Rockefeller Plaza
13        New York, New York 10111
14    BY:  ROBERT S. FISCHLER, ESQ.
15
16 ALSO PRESENT:
17    Alyas Bhatti, Indian Translator
      Interspeak Translations
18    114 East 32nd Street, NY 10018
      (212) 679-5084
19
      Muhammad Jafed
20    Anwar Qadeer
21
22
23
24
25
```

Page 5

```
 1
 2  A L Y A S  B H A T T I, the Indian
 3  interpreter swears to translate from English
 4  to Indian and Indian to English to the best
 5  of his ability.
 6
 7  A B D U L  R A Z Z A K, called as a witness,
 8  having been duly sworn by a Notary Public,
 9  was examined and testified as follows:
10 EXAMINATION BY
11 MR. FISCHLER:
12      Q.  Please state your name for the
13 record.
14      A.  Abdul Razzak.
15      Q.  Please state your address for the
16 record.
17      A.  P.O. Box 1123, Dubai, U.A.E.
18      Q.  Good morning, Mr. Razzak.  Is that
19 the name that you go by, Mr. Razzak?
20      A.  Abdul Razzak.
21      Q.  May I call you Mr. Razzak; would
22 that be appropriate?
23      A.  I would agree if you call me Abdul
24 Razzak.
25      Q.  My name, as you know, is Robert
```

2 (Pages 2 to 5)

Page 6

```
 1
 2  Fischler, and I represent the defendants in
 3  the lawsuit, ARY Jewelers LLC versus IBJTC
 4  Business Credit Corp., and David Molinaro.
 5  I'm going to ask you some questions today
 6  about the case, and if anything I ask you is
 7  unclear, please ask me to repeat it and I'll
 8  be happy to do that.
 9      A.  Yes.
10      Q.  Is that okay?
11      A.  Yes.
12      Q.  Do you speak English at all?
13      A.  I can speak businessman's English,
14  but I am not well-educated in that.
15      Q.  Are you familiar with a business
16  known as the ARY Group?
17      A.  Yes, I am.
18      Q.  What is your position in the ARY
19  Group?
20      A.  Different places I have different
21  position.  Which place you are asking for?
22      Q.  Well, I have seen you described as
23  the chairman of the ARY Group; are you the
24  chairman?
25      A.  Yes.
```

Page 7

```
 1
 2      Q.  What is the ARY Group; what
 3  business is it in?
 4      A.  We deal in silver and gold and
 5  property, gold refinery, and we are also a
 6  television channel.
 7      Q.  Are there separate companies within
 8  the group for each of the businesses you just
 9  named?
10      A.  They are in different names.
11          MR. FISCHLER:  Different companies.
12          THE INTERPRETER:  Different
13      companies.
14      Q.  I have seen the ARY Group described
15  as a family-owned business; is that correct?
16      A.  Yes.
17      Q.  What is your ownership interest in
18  the ARY Group of companies?
19      A.  I am the main person, as I am the
20  chairman of the group.
21      Q.  Are you involved in the operations
22  of the companies within the group?
23      A.  Yes, I am.
24      Q.  I have seen materials on the
25  Internet that the ARY Group has sales in
```

Page 8

```
 1
 2  excess of 1.1 billion dollars U.S.; is that
 3  accurate?
 4      A.  They are different.  I cannot tell
 5  you the exact figure because it's -- there
 6  are variations in there.
 7      Q.  Has the ARY Group ever had annual
 8  revenues in excess of one billion dollars
 9  U.S.?
10      A.  Revenue has never been one billion
11  dollars.  Annual profit has never been one
12  billion.
13      Q.  I'm not asking about profit.  I'm
14  asking about revenue.
15      A.  It can be more than that because we
16  have in different countries, like in
17  Pakistan, in Dubai and England, and America,
18  also.
19      Q.  In 2004, approximately what were
20  the revenues of the ARY Group of companies?
21      A.  I can see the balance sheet and
22  then tell you.
23      Q.  As the chairman of the group, do
24  you know, approximately, the revenues or
25  sales of the company for 2004?
```

Page 9

```
 1
 2      A.  In 2004, we have done a lot of
 3  jobs, and after we finish the work, then I
 4  can say how much is worth.  Approximately,
 5  it's from 400 to 500 million profit, which is
 6  dirhams, D-I-R-H-A-M-S.
 7      Q.  Do you know, approximately, how
 8  much profit that translates into in U.S.
 9  dollars?
10      A.  Almost 150 million dollars.
11      Q.  How much of the ARY Group is owned
12  by you and your family members?
13      A.  Nobody is from outside.  Is hundred
14  percent family-owned.
15      Q.  Does the ARY Group have business
16  interests in the United States presently?
17      A.  Not right now.  It's small.  Not
18  particularly -- it's small, but not
19  significant, not big one.
20      Q.  What business is the ARY Group
21  conducting in the United States?
22      A.  It's gold -- I deal in gold.
23      Q.  Did the ARY Group attempt to
24  purchase a business in the United States
25  known as Krigel's Jewelers at some point in
```

Page 12

1
2 time?
3   A. No, we did buy it.
4   Q. Are you saying that the ARY Group
5 bought Krigel's?
6   A. Yes.
7   Q. When did that occur?
8   A. It was around 2001.
9   Q. When you say that the ARY Group
10 bought Krigel's, do you mean that it signed a
11 contract to buy the business?
12   A. Yes.
13   Q. My understanding is that ARY Group
14 did not actually purchase the business; am I
15 incorrect in that?
16   A. Not right.
17   Q. I'm not right?
18   A. Right.
19   Q. Does the ARY Group currently own
20 Krigel's?
21   A. No.
22   Q. Did it ever own Krigel's?
23   A. The deal was not finalized.
24   Q. Do you know a Mr. Gohar Hussein?
25   A. Yes.

Page 11

1
2   Q. Who is he?
3   A. In the beginning, he was a manager.
4   Q. Was he a manager of a company that
5 was set up by the ARY Group in the United
6 States?
7   A. Yes.
8   Q. And was that company set up for the
9 purpose of purchasing Krigel's?
10   A. Yes.
11   Q. Was Mr. Hussein employed by the ARY
12 Group?
13   A. It was just -- you can understand,
14 it's a simple kind of a negotiation. It
15 happened, but it was not finalized.
16   Q. Do you have a current relationship
17 with Mr. Hussein?
18   A. No.
19   Q. When is the last time you spoke
20 with him?
21   A. It was a year before, when he came
22 to Dubai.
23   Q. A year ago from now?
24   A. Yes.
25   Q. Is Mr. Hussein currently working on

Page 12

1
2 behalf of the ARY Group?
3   A. No.
4   Q. What did Mr. Hussein do concerning
5 the ARY Group's attempt to purchase Krigel's?
6   A. He was in between, as a bridge,
7 just to make that deal.
8   Q. Did he negotiate with Mr. Krigel?
9   A. Yes, he did arrange meeting him.
10   Q. Were you personally involved in
11 negotiating the contract that was signed?
12   A. Yes.
13   Q. With whom did you negotiate?
14   A. I don't remember the name of the
15 owner, but I dealt with him. His name is
16 kind of English. I don't remember that.
17   Q. Was it Scott Krigel?
18   A. Yes, Scott Krigel.
19   Q. Did you negotiate with Mr. Krigel
20 before the agreement was signed?
21   A. I did it before and after that,
22 also.
23   Q. Is it your recollection that
24 Mr. Hussein signed the agreement on behalf of
25 ARY?

Page 13

1
2   A. Yes.
3   Q. Did ARY put money into an escrow
4 account at the time the agreement was signed?
5   A. Yes.
6   Q. What was the source of that money?
7   A. From Dubai.
8   Q. Can you be more specific? What or
9 who from Dubai provided the money?
10   A. It was sent by ARY Group.
11   Q. Do you recall the price that ARY
12 agreed to pay to purchase Krigel's?
13   A. I can't remember right now, but
14 whatever the terms and conditions were, I
15 fulfilled it.
16   Q. Could ARY have paid cash to
17 purchase Krigel's if it wished to do so?
18   A. No. Everything came officially by
19 remittance from Dubai.
20     MR. QADEER: Bob, could we go off
21   the record for a second?
22     (Discussion held off the record.)
23   Q. Could we repeat the question? The
24 question is: If the ARY Group wished to pay
25 cash for Krigel's, could it have done that?

Page 14

 2   A.  As I said before -- now the
 3  question is clear.  Whatever we've done, the
 4  commitment, we completed that.
 5   Q.  I understand, but my question is
 6  something different.  What I'm trying to
 7  learn is, if ARY wished to pay, could --
 8   A.  The promise I made, I have
 9  fulfilled that, and now it was their duty to
10  follow the terms and conditions as it was in
11  there.
12   Q.  How much cash did the ARY Group
13  have in -- at the time the agreement with
14  Krigel's was signed?
15   A.  One point five million.  We have
16  sent it, and after that there was supposed to
17  be second repayment.  The leftover payment,
18  we have already sent there and it was laying
19  in Kansas City.
20   Q.  Okay.  I understand all that.
21  Again, my question is something different.
22      I'm trying to understand whether
23  ARY had the financial ability, if it wished,
24  to pay cash for the business?
25   A.  In business, it's always planning.

Page 15

 2  And with this -- in this planning, it was
 3  decided a portion of it was -- we'll give it
 4  to them, and the rest of the portion will be
 5  from the bank.
 6   Q.  If ARY wished to plan to pay in
 7  cash and not to obtain outside financing,
 8  could it have done that?
 9   A.  But he -- when it was the -- there
10  was terms and conditions.  We have complied
11  with that.
12   Q.  Was ARY in a position to pay cash
13  for the business if it wished to do so?
14   A.  It was in a position.  We didn't
15  have only one business.  It's in different
16  countries and there are different
17  commitments, and we have to fulfill all the
18  commitments.
19   Q.  Are you aware that Mr. Hussein told
20  others that ARY could have paid cash for
21  Krigel's if it wished to do so?
22   A.  No, I don't know.  I just want to
23  add one thing.  The person who's dealing in
24  gold anywhere in the world, it's verbally and
25  it's a promise which carries on the business.

Page 16

 2  I can pick up the phone right now, and if you
 3  want to buy ten million dollars worth of
 4  gold, I can lend.
 5   Q.  If I wish to buy 20 million dollars
 6  worth of gold, could you lend me the money
 7  for that?
 8   A.  Being it all happens with the
 9  person comes from the street, that cannot be
10  done.
11   Q.  If a person with an acceptable
12  background came to you, would the ARY Group
13  have the financial capability to do that?
14   A.  If there's a marginal profit in the
15  deal, then it can be done.
16   Q.  Was that true in 2001, as well?
17   A.  Yes, with the grace of God.
18   Q.  How did ARY determine how much it
19  was willing to pay for Krigel's?
20   A.  The main thing is that it was a
21  running business.  And any new person, if he
22  goes into the new business just to kill the
23  time, overlooking all the matters, then we
24  put the price.
25   Q.  I don't understand the reference to

Page 17

 2  killing time.  Could he explain that?
 3   A.  Like coming to this country, then
 4  I'll start from one, and if I have to reach
 5  to 20, how much time it will take.  Killing
 6  time means that.
 7   Q.  Do you mean that you would start
 8  with one jewelry business and build to 20; is
 9  that what you are saying?
10   A.  Yes.  What I meant was, it was both
11  a chain and if the chain was ready in that
12  case.
13   Q.  Who gave Mr. Hussein the authority
14  to sign the agreement on behalf of ARY?
15   A.  It happened on that very day.  I
16  had a fever and I was in Houston.  I had my
17  seat confirmed to leave there, but doctor
18  advised me not to travel, so I asked him to
19  sign.
20   Q.  So you authorized Mr. Hussein to
21  sign the agreement; is that true?
22   A.  Only for that occasion.
23   Q.  How did you determine that the
24  price in the agreement was acceptable?
25   A.  My life, I've been dealing in this

Page 18

1
2 business and I have spent my life in it. I
3 was born in gold. I was born in gold.
4    Q. Did you conduct any financial
5 analysis of the price?
6    A. You can well understand that God
7 has given us the eyes and understanding that
8 once I can see, than I can make a judgment
9 out of that.
10       For example, I tell you this: I
11 have done the business with the German and
12 exported six hundred tons of silver. And I
13 told them this is the purity by watching the
14 eye only. It was correct. My judgment was
15 correct, and they came and they gave me the
16 regard of about that. The purity which I
17 mentioned to them.
18    Q. Did you analyze how much profit ARY
19 would earn in the first year?
20    A. It's not a matter of one year, but
21 I worked out for two years and it was that
22 whatever I invest will come out of it. In
23 two years, profit is 20 million. I will get
24 the 20 million back, like ten million for
25 each year.

Page 19

1
2    Q. So you believed that you would
3 break even after two years; is that correct?
4    A. Breaking means there will be no
5 profit, but I meant there will be a profit.
6    Q. How much cash was the ARY Group
7 required to put into the business under the
8 agreement that was signed?
9    A. I have to see, but I have completed
10 my promise already.
11    Q. That's not the question.
12    A. Your question to me how much I was
13 going to invest in that?
14    Q. How much cash, yes.
15    A. It was about cash.
16    Q. I want to know if he remembers how
17 much cash ARY would be putting into the
18 business under the agreement that was signed.
19    A. I'm asking the same thing. That's
20 what I'm saying, that whatever I made, the
21 commitment, it was laying in the bank and
22 I've completed that.
23    Q. Do you remember that the agreement
24 had a provision concerning financing by
25 Krigel's lender?

Page 20

1
2    A. I don't remember right now.
3    Q. Do you recall the name Foothill
4 Capital in connection with the Krigel's
5 transaction?
6    A. They financed it. You want to
7 repeat the question?
8    Q. What do you remember of Foothill
9 Capital?
10    A. It was like that, the financer of
11 Krigel was the same. The way they had
12 financed the Krigel's, they were going to
13 finance ARY, also. It was between Krigel's
14 and ours.
15    Q. Did you ever meet with any
16 representative of Foothill Capital?
17    A. Yes, I remember.
18    Q. When was the first time that you
19 had --
20    A. I don't remember the first time.
21 The first time they came to Cincinnati to see
22 me, and later in Ohio.
23    Q. Were you aware that Mr. Hussein had
24 discussions with one of the defendants in
25 this case, IBJ, about providing financing for

Page 21

1
2 the Krigel's deal?
3    A. Yes. I was told by him there is
4 better terms which we can get from other
5 place, and I discussed with them.
6    Q. At some point, did the opportunity
7 to get better terms from the other place no
8 longer exist?
9    A. Yes.
10    Q. And was it before that or after
11 that, that you had your first meeting with
12 Foothill?
13    A. It was after that.
14    Q. Who did you meet with from
15 Foothill?
16    A. I don't remember the name. There
17 were two guys from the key posts, they are
18 the key posts. And then one came and met me
19 in Houston, and I went one time to Boston.
20    Q. Did you tell them that you wanted
21 Foothill to continue financing on the same
22 terms that had been provided previously?
23    A. Yes.
24    Q. Did they say that they would do
25 that?

1
2    A. They didn't say no, they didn't say
3 yes.
4    Q. Did they say yes or no at some
5 point?
6    A. Yes -- well, they did not tell me,
7 but they did tell Krigel, that Scott, because
8 for this very reason he took me to Boston.
9 That I can meet the party and see the
10 outcome.
11    Q. Did you meet with Foothill in
12 Boston?
13    A. Yes.
14    Q. And at that time were you told that
15 Foothill would not continue financing on the
16 same terms?
17    A. No, I was never told. Because
18 there was no direct terms and conditions with
19 them, because I had the dealing with the
20 other, as I have made the deal with them --
21 agreement.
22    Q. Did Mr. Krigel tell you that
23 Foothill would not continue financing on the
24 same terms?
25    A. Yes. And after that, the terms and

1
2 conditions they offered was not acceptable at
3 all.
4    Q. If Foothill had offered to continue
5 financing on the same terms, would that have
6 been acceptable to you?
7    A. Hundred percent why I come over
8 here.
9    Q. Did Mr. Hussein recommend to you to
10 accept the terms that Foothill was proposing?
11    A. No. He was not my boss. It was a
12 discussion and a decision we're going -- it
13 was me who was to accept it.
14    Q. I understand that. My question is:
15 Did Mr. Hussein suggest or recommend to you
16 that you accept it?
17    A. No. He was working person. He
18 cannot suggest to me.
19    Q. Do you recall him giving you advice
20 concerning the financing that was offered by
21 Foothill?
22    A. You're talking after or before?
23    Q. I'm talking about before you made
24 the decision to reject the Foothill terms.
25    A. All he said, that if these terms

1
2 are acceptable to you. That's what he said.
3    Q. Did Mr. Hussein tell you that he
4 was negotiating with other banks in addition
5 to Foothill?
6    A. Actually, he used to talk different
7 things at different times, so it was of no
8 use to rely on him.
9    Q. Did he tell you that if you
10 accepted Foothill's terms that a new lender
11 on more favorable terms could quickly be
12 substituted for Foothill?
13    A. It's not like this. Everybody has
14 their own planning. I am the beneficiary --
15 manufacturer myself. Why should I get from
16 somebody who have the high price?
17    Q. My understanding is that the
18 agreement with Krigel's was signed in
19 November of 2000; is that correct?
20    A. I cannot remember every date
21 exactly.
22    Q. Did Mr. Hussein report to you that
23 he spoke to Foothill, at that time,
24 concerning the willingness of Foothill to
25 continue financing on the same terms?

1
2    A. In the start it was. That's why
3 the agreement was done.
4    Q. Did he tell you, at that time, that
5 Foothill would not finance on the same terms?
6    A. At that time -- he said, at that
7 time, but he changed it around.
8    Q. So he told you, at the time that
9 the agreement was signed, that Foothill was
10 not willing to continue financing on the same
11 terms?
12    A. It's like that. We are sitting
13 today, we accept everything, agreement is
14 finalized. It's like next morning, a month
15 or so, one year or two years, the person says
16 there is no -- that we are not going to
17 provide it, then the terms and conditions are
18 harder.
19    Q. Do you remember that Foothill made
20 a proposal shortly after the agreement with
21 Krigel was signed?
22    A. I don't remember.
23    Q. Do you remember that Foothill made
24 a proposal, but that the terms were different
25 than the terms that had been provided to

Page 30

1
2   A.  If it follows the terms and
3 conditions, it was okay, but you cannot make
4 day to night and night to day.
5       MR. CARRIGAN:  Would you mind if I
6   took a quick break?
7       (A brief recess is taken.)
8       (Exhibit A, Letter to Krigel's,
9   marked for identification, as of this
10  date.)
11  Q.  Does ARY own any retail jewelry
12 businesses in the United States?
13  A.  When?
14  Q.  Presently.
15  A.  There is one.
16  Q.  What is the name of that business?
17  A.  ARY Jewelers.
18  Q.  Where are the stores?
19  A.  Store only.
20  Q.  Where is that located?
21  A.  In Houston.
22  Q.  How long has ARY owned that store?
23  A.  About two or three years.
24  Q.  And does that sell to the public;
25 it's a retail?

Page 31

1
2   A.  Yes.
3   Q.  What sort of items does it sell?
4   A.  It's jewelry.
5   Q.  Does it sell watches and rings?
6   A.  I cannot say anything because it's
7 more than a year.  I didn't go there as yet.
8   Q.  Where is ARY Jewelers based; is it
9 in Dubai?
10  A.  Yes.
11  Q.  What is the address of the store in
12 Houston; do you know?
13  A.  I don't remember the address.
14  Q.  And you have never been there?
15  A.  Yes, I went there.
16  Q.  And you are not familiar with the
17 merchandise that it sells?
18  A.  My daughter is the one who takes
19 care of that.
20  Q.  And what is her name?
21  A.  Farhana, F-A-R-H-A-N-A.
22  Q.  Do you see the financial results of
23 the store?
24  A.  No.
25  Q.  Is the store profitable?

Page 32

1
2   A.  I will go now and see.  It's not
3 like America.  We have son, a daughter, we
4 trust each other.  The business goes like
5 that.
6   Q.  Do you have a residence, a personal
7 residence in Texas?
8   A.  My daughter is there.
9   Q.  How about you personally?
10  A.  No.
11  Q.  Did you decide, at some point, that
12 Mr. Hussein had agreed to pay too high a
13 price for Krigel's?
14  A.  No, not at all.
15  Q.  Are you aware that after ARY
16 declined to proceed, Krigel's was sold to
17 another buyer?
18  A.  First of all, this word is not
19 right.  I have never denied for this deal.
20  Q.  You decided not to proceed with the
21 deal, correct?
22  A.  What was the reason?
23  Q.  Well, you tell me.
24  A.  The reason was this:  That they
25 were not honoring their own commitment.  That

Page 33

1
2 was the reason.
3   Q.  Who was not honoring their
4 commitment?
5   A.  It was Krigel, Scott Krigel.
6   Q.  In what way did Mr. Krigel not
7 honor his agreement?
8   A.  They were to provide financing from
9 the bank.  The way they were getting that.
10  Q.  Meaning on the same terms?
11  A.  Yes.
12  Q.  And because they did not do that,
13 you decided not to proceed?
14  A.  So who's the culprit now?
15  Q.  I'm trying to get a yes or no.
16  A.  That's the reason.
17  Q.  Have I correctly stated the reason?
18  A.  It's like that, if I use a curse to
19 you and you curse me back.
20  Q.  Let me see if I can understand what
21 you have said.  Are you saying that
22 Mr. Krigel's obligation was to arrange for
23 the bank to provide financing on the same
24 terms they had provided previously, and that
25 Mr. Krigel failed to arrange for that?

Page 34

1
2   A. Yes.
3   Q. And that was a failure to honor his
4 commitment?
5   A. Yes. Then we decided --
6   Q. And because of that you decided not
7 to proceed?
8   A. Yes.
9   Q. At some point in time, were you
10 charged with bribery in the courts of
11 Pakistan?
12   A. No.
13   Q. Were you ever charged with any
14 criminal offense by the authorities in
15 Pakistan?
16   A. No, never.
17   Q. Were you ever charged with any
18 offense by the authorities in Pakistan?
19   A. No.
20   Q. I have read that you were charged
21 with bribing the Bhutto government and
22 particularly the Prime Minister's husband.
23   A. I have an answer for this.
24   Q. I'm not asking whether there's
25 merit to the charges, I simply want to know

Page 35

1
2 if --
3   A. In third world countries like
4 Pakistan, these things don't matter at all.
5   Q. I didn't ask whether it mattered,
6 I'm simply asking if charges were brought.
7   A. I was sent as an ambassador from
8 the government of Pakistan. If they charge
9 me, why they send me? They gave me the honor
10 of that.
11   Q. I have read in many articles --
12   A. You are going by the newspapers?
13   Q. Let me pause for a moment to say
14 that it would be helpful if you would let me
15 finish my question before you begin to speak.
16 Thank you.
17       I have read in several newspaper
18 reports that you were charged with paying a
19 ten million dollar bribe in connection with
20 obtaining a contract to import gold, or to
21 obtain a license to import gold into
22 Pakistan. And my question is: Were charges
23 of that nature ever brought against you by
24 the authorities in Pakistan?
25   A. Nothing at all. I have been

Page 36

1
2 importing gold before. I have been importing
3 all the time, and even today I'm importing in
4 Pakistan.
5   Q. With respect, your obligation today
6 is to answer my questions, and my question
7 very simply is: Were you ever charged by the
8 authorities in Pakistan?
9   A. What is value of the newspaper?
10 It's all nonsense.
11       MR. CARRIGAN: Has he personally
12   ever had any charges brought? It's a
13   yes or no. By and far, these are just
14   questions and answers, no explanations.
15       THE WITNESS: Yes. Okay.
16   Q. Again, have you ever been charged
17 by the authorities in Pakistan?
18   A. What do you mean by "charged"?
19   Q. Have the authorities in Pakistan
20 initiated a proceeding --
21   A. Until now, nothing happened.
22 You're talking about seven years back.
23 Nothing happened. There is -- not a hearing
24 has been done.
25       MR. FISCHLER: I have, in my view,

Page 37

1
2   given the witness ample opportunity --
3       MR. CARRIGAN: Can I go talk to
4   him?
5       MR. FISCHLER: I was going to
6   suggest that maybe that would be
7   appropriate.
8       (A brief recess is taken at 12:15
9   p.m.)
10       (Back on the record at 12:20 p.m.)
11   Q. Having consulted with your counsel,
12 do you wish to respond to my earlier
13 question?
14   A. Yes, exactly. And my answer is
15 this: Whatever I was charged for over there,
16 I was never arrested, and I'm a resident of
17 Pakistan -- No, I'm not a resident of
18 Pakistan, I am a resident of UA. And that
19 company for which they filed the case, I am
20 nothing. I'm no director or anything. And
21 they filed the same case in Dubai, and I went
22 up to the Supreme Court. That is -- this is
23 the fact.
24   Q. What were you charged with in
25 Pakistan?

Page 42

1
2 bearing. I travel back and forth. I am not
3 on bail, not any kind of restriction on me.
4    Q. What is the nature of the case that
5 has no bearing?
6    A. Which you have read in the
7 newspaper, I also read in the newspapers.
8 Legally, I have never been given any kind of
9 document concerning this.
10    Q. So it's the case I've read about in
11 the newspaper that's pending?
12    A. It's pending in the newspaper only.
13    Q. Earlier in your testimony you
14 referred to lawsuits in which ARY has been
15 involved in the United States related to the
16 Krigel transaction.
17    A. Yes.
18    Q. Do you recall that you submitted
19 statements in the course of those lawsuits?
20    A. What do you mean by that?
21        MR. CARRIGAN: Are you referring to
22    afterwards?
23        MR. FISCHLER: I'll just show him
24    instead of trying to describe it.
25        (Defendant's Exhibit B, Declaration

Page 43

1
2    of Harvey Razzak, marked for
3    identification, as of this date.)
4    Q. I have shown you a document that
5 has been marked Exhibit B, which appears to
6 be a declaration that you submitted in one of
7 the lawsuits in Missouri relating to the
8 Krigel transaction; do you recognize this
9 document?
10        (Witness perusing document.)
11    A. If it's my signature, then it's
12 okay.
13    Q. Are the statements that you make in
14 this document true?
15    A. Yes.
16    Q. Let me show you another document
17 marked Exhibit A. This appears to be a letter
18 that you sent to Scott Krigel, dated April 5,
19 2001. Do you recognize it?
20        (Witness perusing document.)
21    A. Yes.
22    Q. Are the statements in that letter
23 true?
24    A. Yes.
25    Q. Are you familiar with an attorney

Page 44

1
2 in Kansas City named Max Jevinsky?
3    A. I went there. I can see the name
4 and then I can tell you.
5    Q. Do you recall that Mr. Jevinsky was
6 one of the attorneys for ARY in the lawsuit
7 in Kansas City?
8    A. Can I see the paper? Actually, I
9 don't remember, but if it's a paper, then
10 it's okay.
11    Q. After you decided not to proceed
12 with the Krigel transaction, did you attempt
13 to buy any other jewelry businesses in the
14 United States?
15    A. No.
16    Q. Why is that?
17    A. I was disheartened.
18    Q. Did you conclude that a business
19 similar to Krigel's would not be sufficiently
20 profitable for the ARY Group?
21    A. No -- it was not that matter, but
22 because these people went for litigation and
23 everything was just wasted.
24    Q. After you determined not to accept
25 financing from Foothill, did you attempt to

Page 45

1
2 obtain financing from any other institution?
3    A. Scott Krigel did try for that.
4    Q. And what institution did he attempt
5 to obtain financing from?
6    A. I don't remember the name.
7    Q. Was he able to obtain financing?
8    A. No.
9    Q. Do you know why not?
10    A. He didn't tell me about that.
11    Q. Did you ever speak with any
12 representative of the corporate defendant, in
13 this case, IBJ?
14    A. I never talk with them.
15        MR. FISCHLER: Can we break now for
16    a short lunch?
17        (A lunch recess is taken.)
18    AFTERNOON  SESSION
19        (Time noted: 2 p.m.)
20 A B D U L  R A Z Z A K, resumed and testified
21 as follows:
22 EXAMINATION BY (Cont'd.)
23 MR. FISCHLER:
24    Q. Have you had any discussions, that
25 you can recall, with representatives of