# STOCK PURCHASE AGREEMENT

This Stock Purchase Agreement ("Agreement") is made and entered into on this _21_ day of November, 2000, by and between Scott W. Krigel, Trustee of the Scott W. Krigel revocable trust created January 25, 1996 ("Seller") and ARY Jewelers, LLC, a Nevada limited liability company ("Purchaser").

## W I T N E S S E T H :

WHEREAS, the Seller owns 13,000 shares of the issued and outstanding common stock of Krigel's, Inc., a Kansas corporation (the "Company"); and

WHEREAS, the Seller desires to sell and the Purchaser desires to purchase all of the outstanding common stock owned by the Seller upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the parties hereto agree as follows:

1. <u>Sale and Purchase of Common Stock</u>.

   (a)  Subject to the terms and conditions hereinafter set forth, and in reliance upon the representations and warranties of Seller contained herein, the Seller agrees to sell all of their common stock ("Shares") and Purchaser agrees to purchase in aggregate all of the Shares, free and clear of all claims, liens, security interests, conditions, restrictions, or other encumbrances at the closing for the sale of the Shares, ("Closing") on the Closing Date (defined in Section 2 hereof). In consideration for the sale of the Shares by Seller to Purchaser, Purchaser shall pay and deliver to Seller the total purchase price of $50,000.00 ("Purchase Price"), which shall be paid as set forth in Section 1.(b).

   (b)  <u>Payment of the Purchase Price</u>. The Purchase Price, plus accrued interest, shall be paid in cash to Seller on the Closing Date. Payment shall be made from the shareholders' escrow account created pursuant to the terms of the Escrow Agreements, attached and incorporated collectively herein as Exhibit "A". At the time of the execution of this Agreement, the entire $50,000.00 shall be immediately paid into escrow by ARY, with said funds reaching the escrow agent no later than three (3) business days from the execution of this Agreement.

EXHIBIT

A

1

ARY - 02092

2.      Closing. The Closing for the sale of Shares as provided hereunder shall occur upon the effective date of confirmation of Company's bankruptcy plan and at the offices of Berman, DeLeve, Kuchan & Chapman, L.C. or such other place and date as the parties may agree (such date and place are referenced to herein as "Closing Date"), but in no event shall occur after April 30, 2001, unless the parties mutually agree otherwise. At the Closing, the Seller will deliver to the Purchaser certificates, duly issued in the name of the Purchaser evidencing the shares to be sold hereunder, endorsed in blank and accompanied by a stock power endorsed in blank, in proper form for transfer, and the Purchaser shall deliver to Seller from escrow, the Purchase Price as described above in Section 1.(b) above. Additionally, at Closing, Scott W. Krigel's covenant not to compete payment of $950,000.00, plus accrued interest, shall be paid from escrow, in accordance with the Escrow Agreement, and pursuant to Scott W. Krigel's Consulting and Noncompetition Agreement with Company and ARY. Also, at Closing, Scott W. Krigel's first payment under paragraph 4 of Scott W. Krigel's Consulting and Noncompetition Agreement with Company and ARY shall be paid from escrow, in accordance with the Escrow Agreement, and pursuant to Scott W. Krigel's Consulting and Noncompetition Agreement with Company and ARY.

3.      Representations, Warranties and Covenants of Seller. As a material inducement for Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby, the Seller, subject to the limitations set out in paragraph 7 of this Agreement, hereby represents, warrants and covenants to the Purchaser as of the date hereof, for a period of one (1) year, each of which is relied upon by Purchaser, regardless of any investigations made or information obtained by Purchaser (unless and to the extent specifically and expressly waived in writing by Purchaser on or before Closing Date) as follows:

(a)     Authority. Seller has good and marketable title to the Shares being sold pursuant to this Agreement with the absolute right to sell the same to Purchaser free and clear of all liens, pledges, security interests, claims, or encumbrances of any kind or character. The Seller has the right, authority, and capacity to execute and deliver this Agreement and to perform his obligations under this Agreement and under the ancillary documents. This Agreement constitutes the legal, valid, and binding obligations of the Seller, enforceable against the Seller in accordance with its terms.

(b)     Capitalization of the Shares. The designation, issuance, sale, and delivery of the Shares has been duly authorized by all requisite board of director action of Company and by Seller. There are no voting agreements, proxies, or other agreements or understandings with respect to voting the Shares. The currently issued and

ARY - 02093

outstanding common stock of the Company consists solely of 13,000 shares and the stock ownership set forth for the Seller in Exhibit "B", attached and incorporated herein, is correct as of the date of this Agreement. All of the 13,000 shares have been duly authorized and validly issued shares, and are fully paid and nonassessible.

(c)    <u>Options; Warrants</u>.  To Seller's knowledge, there is no outstanding agreements options, warrants, subscriptions, convertible securities, commitments, arrangements, understandings, or other right permitting or requiring any person or entity to purchase, issue, or convert any obligation into shares of the Company's stock.

(d)    <u>Title to Properties.</u>  Except for the cars, computers, and other property listed on Exhibit "C", attached and incorporated herein, the value of which shall not exceed $50,000 at fair market value, Seller represents and warrants that none of the assets used in the business of the Company are owned by the Seller or by persons other than the Company or entities controlled by the Company.

(e)    <u>Corporate Action</u>.  Seller agrees that he and all other officers and members of the Board of Directors will resign as officers and members of the Board of Directors of the Company as of Closing Date when Shares are transferred and payment from escrow is made, by executing a resignation similar to the attached Exhibit "D", and they shall surrender all assets and property of the Company in their possession other than items that are listed on Exhibit "C".

(f)    <u>Hiring of Employees</u>.  For a period of two (2) years from the date of this Agreement, the Seller shall not hire any employee currently working for the Company at closing, nor shall Seller assist any such employee to find employment or work elsewhere, except with the express written consent of the Purchaser.

(g)    <u>Encumbrances</u>.    To Seller's knowledge, the execution and performance of this Agreement and the ancillary documents contemplated hereby will not:

(i)    require any consent or notice under or result in a violation or breach of any agreement or other instrument under which the Seller or the Company is bound, or permit the acceleration of or the maturity of or any creation or imposition of any lien or other encumbrance on or prior to the Closing, other than the terms of the loan agreements with Foothill Capital, and the leases for the store locations of

ARY - 02094

the Company entered into by the Company which contain provisions which restrict the transfer of stock of the Company,

(ii)     result in the creation or imposition of any lien, charge or encumbrance upon any of the assets of the Company, or

(iii)    violate any applicable law or regulation or any judgment or order of any court or governmental agency.

(h)     <u>Financial Statements; Tax Returns.</u>  To Seller's knowledge, except as reflected or reserved against in the Company's most recent balance sheet, dated October 31, 2000, ("Balance Sheet") the Company as of the date thereof had no liabilities or obligations of any nature, whether accrued, absolute, contingent or otherwise, including, without limitation, tax liabilities due or to become due, and whether incurred in respect of or measured by the Company's income for any period prior to the date of said balance sheet or arising out of any transactions entered into, or any state of facts existing, prior thereto.   To Seller's knowledge, Company has provided true, correct, complete copies of all financials.  To Seller's knowledge, Company has filed all federal, state, and local income, property, employment, or other related returns and copies of returns furnished to Purchaser are true and correct.

(i)     <u>Adverse Affect</u>.   To Seller's knowledge, there are no facts or circumstances which are likely to have an adverse effect (either presently or in the future) on the Company, its business, assets, or operations, other than those disclosed by the Seller to the Purchaser in writing at the time of the execution of this Agreement.

(j)     <u>True and Correctness of Representations.</u>    The representations and warranties of Seller contained herein shall be true and correct as of the closing, as though such representations and warranties were made and as of such time.

(k)     <u>Organization; Standing.</u>   The Company is a corporation duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation.  The Company has the corporate power and authority to conduct its business as it is presently being conducted and to own, lease or use its properties and assets.  The Company is duly qualified to do business as a foreign corporation and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification.  True and correct copies of the

4

ARY - 02095

certificate of incorporation and bylaws of the Company and all amendments thereto, have been delivered to Purchaser.

(l)     Government Approval. To the Seller's knowledge, execution of this Agreement and sale of Shares will not violate any statute, law, judgment, decree, order, rule, injunction, or regulation of any court of governmental authority to which Company may be subject.

(m)     Real Property Leases. To Seller's knowledge, the Company has provided Purchaser true and complete copies of the leases for the stores where Company operates ("Leases"). To Seller's knowledge, the Company has not assigned, subleased, or conveyed any interest in any Lease or the premises converted thereby. To Seller's knowledge, each Lease has been duly and validly executed by the lessee and is in full force and effect and constitutes the valid and binding agreement of the parties thereto. To Seller's knowledge, neither the Company nor (to the knowledge of the Seller) any other party is in default under any Lease and no event or condition has occurred or exists which, with the passage of time, the giving of notice or both, would cause either the Seller or (to the knowledge of the Company) any other party to any Lease to be in default thereunder.

(n)     Company Title to Leaseholds and Other Assets. To Seller's knowledge, the Company holds good title to, or valid leasehold interests in, all properties and assets necessary to conduct the business in the manner carried on by the Company on the date hereof, including, without limitation, the properties and assets reflected in the Balance Sheet (except for inventory sold since the date of the Balance Sheet in the ordinary course of business). To Seller's knowledge, all material properties and assets reflected in the Balance Sheet are free and clear of all encumbrances, except for the encumbrances disclosed to Purchaser as follows: (1) AT&T computer lease, (2) Foothill Capital first priority security interest in all assets of the Company, (3) the Getz second priority security interest in the assets of the Company (the "Getz Obligation") and (4) any interest which a landlord of Company may have pursuant to a Company lease or by operation of law. To Seller's knowledge, none of the leaseholds' improvements, equipment or other assets is subject to any commitment or other arrangement for their sale or use by the Company or by any third parties, other than any permanent fixtures which are or may become the property of the landlords pursuant to the Leases and other than the rights of the lender to the Company.

5

(o)     <u>Litigation and Proceedings.</u>  To Seller's knowledge, there are no outstanding legal claims, actions, suits, arbitrations, or other legal, administrative, or governmental proceedings pending or, to the knowledge of the Seller, threatened against the Company or any properties, assets, or business thereof, or any person at any time employed, engaged, or otherwise associated by the Company with respect to services provided, goods sold or periods of any such employment, engagement or association except for the EEOC matters and threats set forth on "Exhibit E" attached and incorporated herein.  To Seller's knowledge the Company is not in default with respect to any judgment, order, or decree of any court or governmental authority.  To Seller's knowledge, except for normal collection efforts relating to accounts receivable, the Company is not engaged in any legal action to recover money due to or damages sustained by it.

(p)     <u>Compliance with Law and Instruments.</u>

(i)     To Seller's knowledge, the business and operations of the Company has been and are being conducted in compliance with all applicable laws, including but not limited to laws relating to Employment Retirement Income Security Act of 1974, as amended ("ERISA"), occupational safety, health care, zoning, employment, equal employment opportunity, immigration, wages, hours, benefits or collective bargaining, other than the failure to comply which would not have a material adverse effect.  To Seller's knowledge, neither the ownership nor the use or operation of the stores or other properties of the Company, nor the conduct of the business conflicts with, infringes or illegally interferes with the rights of any person, or violates, or with or without the giving of notice or the passage of time or both, will conflict with, violate or result in a default of, (i) any terms or provisions of the certificates of incorporation or by-laws of the Company as presently in effect, or (ii) any contract, agreement or any law to which the Company is a party or by which it or its property may be bound.  To Seller's knowledge, the Company is not now operating in violation of any laws and has never received any   notice from an governmental authority claiming any violation of any law (including without limitation those relating to zoning or condemnation), which violation has or could have a material adverse effect.  To Seller's knowledge, the Company has complied with all applicable federal and state securities laws in connection with the sale or resale of all equity interests therein.

ARY - 02097

(ii)    To Seller's knowledge, the Company holds all of the permits, licenses, approvals and authorizations necessary for the lawful conduct of the Company, except such permits, licenses, approvals and authorizations that would not have a material adverse effect if not held.

(q)    Insurance.  To Seller's knowledge, the Company has provided to Purchaser complete and accurate copies of all insurance policies or certificates of insurance under which the Company is insured, including the coverage limits and deductibles applicable thereto (the "Insurance Policies").  To Seller's knowledge, there are no claims under such insurance policies having an aggregate value in excess of $10,000.00.  To Seller's knowledge, the Company is not in default with respect to any provision contained in any of the Insurance Policies nor has failed to give any notice or present any claim under any of such Insurance Policies in a due and timely fashion.  To Seller's knowledge, the Company has not received any notification from any insurance carrier denying or disputing the coverage for any claim, denying or disputing the amount of any claim or regarding the possible cancellation of any policies.

(r)    Environmental Matters.

(i)    To Seller's knowledge, the Company is and at all times has been in compliance with all environmental laws which compliance includes, without limitation, the possession by the Company of all permits and other governmental authorizations required under applicable environmental laws to operate the business as currently operated, and the Company, as applicable, is and at all times has been in compliance in all material respects with the terms and conditions thereof;

(ii)    To Seller's knowledge, all of such permits and authorizations are in full force and effect and, to the knowledge of Seller, there is no state of facts or events or events which could reasonably be expected to form the basis for any revocation or non-renewal of any such permit or authorization;

(iii)    To Seller's knowledge, no Hazardous Substances have been generated or stored on or at the store property by the Company or, to the knowledge of Seller, by any person other than the Company, that (A) would be in violation of applicable environmental laws, or (B) could reasonable be expected to give rise to an action to compel an investigation and/or cleanup or to pay civil administrative fines, penalties,

7

ARY - 02098

or other damages.    For purpose of this Agreement, "Hazardous Substances" means any toxic or hazardous waste, pollutants, or substances, including without limitation, asbestos-containing materials or substances, any substance defined or listed as "hazardous substance", "toxic substance", "toxic pollutant", or similarly identified substances or mixture in or pursuant to any environmental law;

(iv)    To Seller's knowledge, no Hazardous Substances have been disposed of or released on or from the stores by the Company, or, to the knowledge of the Seller, by any person other than the Company, that (A) would be in violation of applicable environmental laws, or (B) could reasonably be expected to give rise to an action to compel an investigation and/or cleanup or to pay civil administrative fines, penalties or other damages;

(v)    To Seller's knowledge, the Company has not received any written communication, whether from a governmental authority, citizen's group, employee, consultant, or otherwise, that alleges that, any store is not in full compliance with environmental laws, and there is no environmental claim pending or, to the knowledge of the Seller, threatened against the Company.

(vi)    To Seller's knowledge, the Company has disclosed the chemicals used in the stores of Company.

(s)    Compensation and Benefits to Employees.

(i)    To Seller's knowledge, Exhibit G contains a complete and accurate list of the following information for each employee of the Company as of the date noted on such exhibit:  name; job title; date of employment; and current compensation and full benefits paid or payable.  To Seller's knowledge, the Company has not made any agreements or entered into any arrangements with any employees or independent contractors that would have the effect of depriving the Company of their services after the Closing.  To Seller's knowledge, there are no employment or severance agreements with employees or the Company.

(ii)    To Seller's knowledge, the Company has delivered to Purchaser true and complete copies of the Company's written employee policies and practices (including, without

8

ARY - 02099

limitation, any employee handbooks). To Seller's knowledge, the Company has no collective bargaining agreement with any labor union. To Seller's knowledge, no employee of the Company has petitioned for a representation election during the past five years.

(t)    Employee Benefit Plans.

(i)    To Seller's knowledge, Exhibit H sets forth a true and complete list of all written and oral employee benefit plans and other programs, commitments or funding arrangements maintained by the Company to which either is a party, or under which either has any obligations, present or future (other than obligations to pay current wages, salaries or sales commissions terminable on notice of 30 days or less) in respect of, or which otherwise cover or benefit, any employees or their beneficiaries. For purposes of this Agreement, "Employment Benefit Plans" shall include all pension, retirement, disability, medical, dental or other health insurance plans, life insurance plans, profit sharing, deferred compensation, stock options, bonus, or other incentive plans, vacation benefit plans, severance plans, whether funded or not, covering any employees to which the Company is a party or bound or makes any or has made any contribution or may have any liability to any employee. To Seller's knowledge, the Company has delivered or made available to Purchaser true and complete copies of all documents, as they may have been amended to the date hereof, embodying the terms of the Employee Benefit Plans.

(ii)    To Seller's knowledge, the Company has no liability, current, contingent or otherwise, under Title IV or ERISA or Section 302 of ERISA. To Seller's knowledge, none of the employee benefit plans in a "employee pension benefit plan" or "employee welfare benefit plan" within the meaning of Sections 3(1) and 3(2) of ERISA. To Seller's knowledge, no employee benefit plan is or was subject to Title IV or ERISA or Section 412 of the Internal Revenue Code.

(iii)    To Seller's knowledge, each Employee Benefit Plan described therein is in full force and effect in accordance with its terms and there are no material actions, suits or claims pending (other than routine claims for benefits), or, to the knowledge of the Seller, threatened, against any employee benefit plan or any fiduciary thereof. To Seller's knowledge, the Company and the administrators and

9

ARY - 02100

fiduciaries of each employee benefit plan (A) have performed all material obligations required to be performed by them under each employee benefit plan, (B) are not in default under, or in violation of, any employee benefit plan in any material respect, and (C) are in compliance in all material respects with the requirements prescribed by laws applicable to the employee benefit plans, including, without limitation, ERISA and the Internal Revenue Code.

(iv)    To Seller's knowledge, all contributions, premiums and other amounts accrued or due under each employee benefit plan for any period ending on or before the Closing Date have been paid in full by the Company, and there is otherwise no obligations or liability of the Company under or relating to any Employee Benefit Plan.

(u)    To Seller's knowledge, the Company owns all rights, title, and interest in and to the tradename "Krigel's Jewelers" and "Krigel's" which is all of the intellectual property rights necessary and material to the business of Company as currently conducted, and Seller acknowledges Purchaser shall have the rights to use tradenames for a period of up to two (2) years after Closing.

4.    Representations, Warranties and Covenants of Purchaser.    Purchaser hereby represents, warrants and covenants to the Seller that:

(a)    The execution and performance of this Agreement by the Purchaser and the agreements contemplated hereby will not violate any applicable law or regulation or any judgment or order of any Court or governmental agency to which Purchaser may be subject at or to which any of its properties is subject.

(b)    Purchaser is a limited liability company, duly organized and existing and in good standing under the laws of Nevada. Purchaser has the authority as a limited liability company to enter into this Agreement.

(c)    Within four weeks from the date hereof Purchaser shall provide Seller with evidence of Foothill Capital's consent to the continued financing of Company's obligations to Foothill Capital. In the event Foothill Capital does not consent within the foregoing time period this Stock Purchase Agreement and related agreements shall be void and of no further effect.

(d)    Purchaser shall deposit the funds necessary for the unsecured creditor payments, in a domestic federally insured banking

10

ARY - 02101

institution, prior to the filing of Company's chapter 11 plan and shall provide to the bankruptcy court and creditors satisfactory evidence of such deposit.

(e)    At Closing it will pay all of Company's unsecured creditors sixty percent (60%) of Company's debt to each creditor.

5.    Seller's and Purchaser's Conditions to Closing.

In addition to the conditions set forth in Section 6 below, Closing shall be subject to the following conditions:

(a)    Conditions to be satisfied by Purchaser:

(i)    All of the acts, terms, covenants, agreements and conditions of this Agreement to be performed, executed or complied with by Purchaser on or before the closing, shall have been fully complied with, executed and performed in all material respects.

(ii)    Purchaser's representations and warranties are true as of the Closing Date.

(b)    Conditions to be satisfied by Seller:

(i)    Company has adhered to the terms and conditions of the Operating Agreement between Company and Purchaser.

(ii)    Confirmation of Company's bankruptcy plan.

(iii)    Company shall pay the Getz Obligation within thirty (30) days after the Approval Period referred to in paragraph 10 of this Agreement.

(c)    If any of the these conditions have not occurred as of the Closing Date, this Agreement shall be null, void and of no further effect, unless any such unfulfilled conditions are waived by the affected party.

6.    Conditions to Closing.  The obligation of each party to proceed to closing is subject to the following conditions:

(a)    The parties shall not be in breach of the conditions specified in Section 5 above, unless waived by the affected party.

11                          ARY - 02102

(b)  No action or proceeding has occurred restricting or prohibiting transfer of Shares or governmental action is threatened which makes it so inadvisable for parties to proceed.

(c)  Company shall have filed a prepackaged Chapter 11 bankruptcy and the plan of reorganization for the Company shall have been confirmed.

(d)  No statute, rule, regulation, executive order, decree, ruling, injunction or other order has been enacted, entered, promulgated or enforced by any Court or governmental authority of competent jurisdiction within the United States which prohibits or makes illegal the transactions contemplated by this Agreement.

(e)  Resignation of board of directors and officers of the Company.

7.  <u>Indemnification of Purchaser.</u>   For a period of one year after Closing, the Seller shall indemnify and hold harmless Purchaser from any and all claims, actions, suits, assessments, levies, penalties, awards, costs, expenses, reasonable attorneys' fees, damages and/or losses ("Damages"), arising out of or in connection with:

(a)  Any representations, warranties or covenants herein which are not accurate or true in any respect;

(b)  Any sale, use, franchise, payroll, employee withholding, duties, property, or similar taxes in connection with the transactions contemplated by this Agreement.

(c)  Any award of the EEOC or any judgment, loss, claim, settlement, costs, and reasonable attorney's fees arising out of the EEOC complaints listed on Exhibit "E".

(d)  Notwithstanding any language to the contrary, Seller's liability under the Agreement, including but not limited to any liability set out in paragraphs 3, 7(a), 7(b) and 7(c) shall be limited to an aggregate amount of $100,000.

8.  <u>Miscellaneous</u>.

(a)  <u>Governing Law</u>.   This Agreement and any other agreements referenced herein shall be governed and construed in accordance with the laws of the State of Missouri.

ARY - 02103

(b)    Successors and Assigns.  Except as otherwise expressly provided in this Agreement, the provisions hereof shall inure to the benefit of, and be binding upon, the successors and assigns of the parties hereto.   All  representations,  warranties,  covenants,  and agreements of Seller and Purchaser made in this Agreement shall and attached Exhibits survive the Closing for a period of five (5) years.

(c)    Publicity.    Until  Closing, all press  releases and other public announcements  with  respect  to  this  Agreement  and  the transactions related thereto, shall be made jointly by Seller and Purchaser.  Nothing in this section shall be considered to prohibit any party from making any disclosure required by any law, including, without limitation, any federal or state securities law, rule or regulation, or any court order or to prohibit the Purchaser from making any disclosure to its stockholders, partners, members or other equity holders or any of its directors or officers regarding the transactions consummated by this Agreement.

(d)    Notices.    All  notices,  requests,  demands,  and  other communications required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given when received if delivered personally, given by prepaid telegram, mailed first class, postage prepaid, registered or certified mail, delivered by Federal Express or other courier service, or sent by facsimile or other on-line transmission system, with receipt acknowledged, addressed to the parties at the following addresses or at such other addresses as specified by the parties by like notice;

If to Purchaser:

Krigel's Inc.
Attn: Gohar Husain
119th & Metcalf
Overland Park, Kansas 66213
Telephone: (913) 451-4438
Facsimile: (913) 451-2515

With a copy to:

Abdul Razzak
c/o Gohar Husain
7455 France Avenue, South
Edina, Minnesota 55435

13

ARY - 02104

If to Seller:

> Scott Krigel
> 12112 Catalina
> Leawood, Kansas 66209
> Telephone: 913 226-8803

With a copy to:

> Krigel & Krigel, P.C.
> Attention: Sanford Krigel
> 4550 Belleview
> Kansas City, Missouri 64111
> Fax: 816 756-1999

(e)   _Entire Agreement._  This Agreement (including the Exhibits referred to herein ) sets forth the entire Agreement and understanding of the parties with respect to the transactions contemplated hereby and superseded all prior agreements, arrangements, and understandings, whether written or oral, related to the subject matter hereof.   No representation, promise, inducement or statement of intention has been made by any party hereto which is not embodied in the Agreement or in the Exhibits attached hereto or the written statements, certificates or other documents delivered pursuant hereto.

9.   _Default by ARY_.  To evidence its ability to pay sixty percent (60%) of Company's unsecured creditors' claims, Purchaser shall deposit the funds necessary for the unsecured creditor payments, in a domestic federally insured banking institution, prior to the filing of Company's chapter 11 plan and shall provide to the bankruptcy court and creditors satisfactory evidence of such deposit. If Purchaser fails to provide such evidence or if Purchaser fails to pay 60% of Company's unsecured creditors' claims on the effective date of Company's chapter 11 plan, Scott Krigel shall be immediately entitled to receive all funds escrowed pursuant to paragraphs 4 and 9 of the Consulting and Noncompetition Agreement and Seller shall be entitled to receive all funds escrowed pursuant to paragraph 1. (b) of this Agreement.

14

ARY - 02105

10.    <u>Approval of October 31, 2000 Balance Sheet</u>. Notwithstanding any provision in this Agreement to the contrary, Purchaser shall have four weeks (the Approval Period) from the execution of this Agreement to have Purchaser's accountant audit Company's October 31, 2000, balance sheet. If within the Approval Period Purchaser's accountant determines that Company's October 31, 2000, balance sheet contains substantial inaccuracies, then Purchaser may cancel this Agreement by providing Seller with written notice of its accountant's findings and of Purchaser's intent to cancel this Agreement.

ARY - 02106

IN WITNESS WHEREOF, the parties have hereunto caused this Agreement to be executed effective as of the date first written above.

*Seller:*

Scott W. Krigel, Trustee of the
Scott W. Krigel revocable trust
created January 25, 1996

*Purchaser:*

ARY JEWELERS, LLC.,
A Nevada Limited Liability Company

By: _____
Title: _____

O:\WPLET\Krigels Corp\ARY\FINAL DOCS\SPA - final.wpd

ARY - 02107

E

ARY - 02108

# CONSULTING AND NONCOMPETITION AGREEMENT
## FOR SCOTT KRIGEL

This Consulting and Noncompetition Agreement ("Agreement") is made and entered into as of this *21* day of November, 2000, by and between Krigel's, Inc. a Kansas corporation ("Company"), ARY Jewelers, LLC, a Nevada limited liability company ("ARY"), and Scott Krigel ("Krigel").

1.    <u>Engagement of Krigel</u>.  Upon the transfer of Company's stock to ARY, as contemplated in the Stock Purchase Agreement between Company's shareholders and ARY, the Company and ARY agree to engage Krigel to perform services for the Company, as set forth below. At that time, Krigel agrees to serve the Company and ARY upon the terms and conditions set forth herein.

2.    <u>Term of Engagement</u>.  The engagement of Krigel hereunder shall not take place until such time that Company's current shareholders transfer their stock to ARY and shall continue for a period not to exceed one (1) year thereafter. This Agreement may be terminated sooner by ARY or the Company, however, such termination shall not affect the compensation as herein described. All other provisions of this Agreement shall not be operative until such time that Company's current shareholders transfer their stock to ARY.

3.    <u>Description of Services</u>. It is agreed that Krigel shall serve as a consultant to ARY and Company. Krigel shall perform the services as contemplated and set forth in the Operating Agreement between Company and ARY, and shall be available to ARY and the Company at those times as the Company and ARY shall deem it necessary to consult with Krigel.

4.    <u>Performance of Services and Consideration</u>.  Krigel shall provide the services described in Section 3 personally.  Krigel shall receive the amount set forth herein to reflect the services rendered by Krigel pursuant to this Agreement.  ARY shall pay Krigel $500,000.00, in six (6) equal monthly installments.  The first payment shall be due upon the transfer of Company's shareholders' stock to ARY as provided in the Stock Purchase Agreement, with five (5) subsequent payments due on a monthly basis thereafter.  At the time of the final installment, Krigel may also withdraw all accrued interest on the $500,000.00.  All payments shall be made from escrow, pursuant to the escrow agreement among Krigel, ARY and Assured Quality Title. At the time of the execution of this Agreement, the entire $500,000.00 shall be immediately paid into escrow by ARY, with said funds reaching the escrow agent no later than three (3) business days from the execution of this Agreement.

1

ARY - 02109

5.  <u>Notice</u>. Any notices, consents, waivers and other communications pursuant to this Agreement, must be in writing and will be deemed to have been given when:

(a)  Delivered in person with written confirmation of receipt;

(b)  Sent by telecopier with confirmation of receipt, provided that a copy is mailed in the United States mail, via first-class, postage prepaid; or

(c)  When received by the addressee, if sent by a nationally-recognized overnight delivery service (return receipt requested), in each case to the appropriate addresses and telecopier numbers set forth below, or to such other addresses and telecopier numbers as a party may designate by written notice to the other parties;

*If to the Company:*

Krigel's, Inc.
Attention:    Gohar Husain
119th & Metcalf
Overland Park, Kansas 66213
Telephone:  (913) 451-4438
Facsimile:  (913) 451-2515

*If to Krigel:*

Scott Krigel
12112 Catalina
Leawood, Kansas 66209
Telephone: 913 226-8803

With a copy to:

Krigel & Krigel, P.C.
Attention: Sanford Krigel
4550 Belleview
Kansas City, Missouri 64111
Telephone: 816 756-5800
Fax: 816 756-1999

*If to ARY:*

2

ARY - 02110

Abdul Razzak
c/o Gohar Husain
7455 France Avenue, South
Edina, Minnesota 55435

7.  Unauthorized Disclosure of Information.  If it appears that Krigel has disclosed, or has threatened to disclose any confidential information, as defined below, in violation of this Agreement, the Company and ARY shall be entitled to an injunction to restrain Krigel from disclosing, in whole or in part, such information, or from providing services to any party to whom such information has been disclosed or may be disclosed. In addition to the foregoing remedy, the Company and ARY shall be free to pursue any and all further remedies available, including but not limited to, claims for losses and damages.

8.  Covenant Not to Compete.  Krigel expressly acknowledges:

   (a)  Critically important and essential assets of the Company, and ARY are as follows: the Company's businesses, the names and addresses of its suppliers and major customers, and the subsequent continued patronage and good will that it seeks to enjoy with its customers;

   (b)  The Company has expended and will continue to expend substantial time, money and effort in developing its workforce and business methods and developing good will;

   (c)  The business of the Company requires special skills, knowledge and services, and the knowledge and skills with respect to such processes and procedures involved in the business of the Company are valuable assets;

   (d)  Krigel already possesses and will continue to gain valuable knowledge regarding the Company and ARY, the names, addresses, and needs of suppliers and customers of the Company and ARY, and knowledge regarding the business of the Company and ARY;

   (e)  The services to be performed by Krigel under this Agreement are of a special, unique, unusual, extraordinary and intellectual character. For the foregoing reasons, Krigel expressly acknowledges and agrees that the provisions of this Section are reasonable and necessary to protect the business of the Company and ARY;

   (f)  In recognition of the facts set forth herein, for a period of two (2) years from the date of execution of this Agreement, within the geographical limitations

3

ARY - 02111

set out herein, and in consideration of the amounts to be paid, Krigel shall not, either directly or indirectly, in any capacity whatsoever, for himself or on behalf of or in conjunction with any other person, firm, corporation, association or entity do any of the following:

(i)    Solicit or assist any consultant, independent contractor or employee of the Company, ARY or their affiliates for the purpose of offering such consultant, independent contractor or employee an employment, consulting or other working relationship in a business, whether or not in competition with the Company or ARY;

(ii)   Contact any supplier or other person or entity with whom the Company has a business relationship, either previously, currently or in the future, for the purpose of supplying products to an entity competing with the Company or attempting to learn the then-existing business relationship between the Company and the supplier or other person or entity;

(iii)  Compete with the Company, or engage in any business activity directly or indirectly competitive with the business of the Company, as it existed in the past, or at present.

(g)   This covenant not to compete is effective within the a fifty (50) mile radius of each currently existing Company store.

(h)   In connection with this past and future association with the Company, Krigel will have access to certain confidential information of the Company and ARY. The Company, ARY and Krigel consider their relationship one of confidence with respect to such confidential information.  Krigel acknowledges that disclosure of the confidential information by him will cause the Company and ARY an inestimable and considerable harm, including loss of its confidential relationship with suppliers and the good standing that currently exists for the Company in the jewelry industry.

For purposes of this Agreement, "Confidential Information" shall mean any and all information, whether or not reduced to writing, provided to Krigel by the Company or ARY, or made known to Krigel or developed by him in his lifelong involvement with the Company and the jewelry industry, including income statements, balance sheets, pricing information and any other developments relating to the business, whether or not patentable; or other information relating to the business of any actual or demonstrable anticipated research or development of the Company, including, but not limited to, trade secrets, proprietary information, price lists, marketing programs or plans and computer programs and software, and including information conceived,

4

ARY - 02112

originated or developed by any employees of the Company.

Notwithstanding the foregoing, the term "Confidential Information" shall not include information which is readily obtainable by legal means by a third party, is generally known to the public or businesses providing services and products substantially similar to those to be provided by the Company, or known by Krigel by reason other than his association with the Company or the jewelry industry.

(i)     In recognition of the facts set forth in this Section:

    (i)     Krigel shall hold all Confidential Information in confidence and not discuss, communicate or transmit the information to others, or make any unauthorized copy or use of the Confidential Information in any capacity, position or business except with the specific prior written consent of the Company or except as otherwise expressly permitted by the terms of this Agreement; and

    (ii)    Krigel shall use the Confidential Information only in furtherance of completion of the services required hereunder, and only then to the extent that it is necessary that such information be disclosed or communicated.

(j)     Krigel agrees that during this Agreement, the Company and ARY may, if they have reasonable grounds to believe Krigel has or is violating any of the provisions of this Agreement, serve notice upon Krigel's new employer or other contracting party outlining Krigel's continuing obligations under the terms of this Agreement.

(k)     If any covenant of this Section is to be held unreasonable, arbitrary, or against public policy, such covenant will be considered to be divisible with respect to scope, time, and geographic area, and such lesser scope, time, or geographic area, or all of them as a court of competent jurisdiction may determine to be reasonable, not arbitrary and not against public policy, will be effective, binding and enforceable against Krigel. The period of time applicable to any covenant in this Section will be extended by the duration of any violation by Krigel of such covenant.

(l)     The Company, ARY and Krigel agree that, in the event of a breach of the covenants contained in this Section, in addition to such other rights and remedies as may be available, the Company and ARY shall be entitled to a temporary restraining order and preliminary and permanent injunctions restraining and enjoining Krigel from disclosing all or any part of the Confidential Information of the Company or ARY and from making any

ARY - 02113

solicitations, contacts or engaging in competition with the Company in violation of this Section.

9.    In consideration of the covenant not to compete set out in this Agreement, and in addition to the $500,000.00 provided for in paragraph 4 of this Agreement, ARY shall pay Krigel the sum of $950,000.00, plus all accrued interest, upon the transfer of Company's shareholders' stock to ARY as provided in the Stock Purchase Agreement. The payment shall be made from escrow, pursuant to the escrow agreement among Krigel, ARY and Assured Quality Title. At the time of the execution of this Agreement, in addition to the $500,000.00 provided for in paragraph 4 of this Agreement, $950,000.00 shall be immediately paid into escrow by ARY, with said funds reaching the escrow agent no later than three (3) business days from the execution of this Agreement.

10.    Return of Records. Upon termination of this Agreement at the Company's or ARY's option, Krigel shall deliver all records, notes, data, customer lists, and contact lists, customer information, price lists, brochures, catalogs, marketing materials, memoranda, equipment, software and any other property or materials of the Company or ARY which is in Krigel's possession or under his control, other than those items of a personal nature that he is entitled to keep pursuant to the terms of this Agreement.

11.    Funds due Krigel. The parties acknowledge that they are treating the amounts to be paid to Krigel or to be provided Krigel as consideration for income tax purposes, and this consideration is appropriate for the services rendered by Krigel to the Company. The amounts to be paid to Krigel or to be provided to Krigel hereunder are not subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, attachment or garnishment by the creditors of Krigel or of Krigel's successors or assigns.

12.    Binding Effect. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors or assigns.

13.    Entire Agreement. This Agreement contains the entire agreement of the parties hereto with respect to the matters set forth herein. The parties hereto acknowledge and agree that the terms and the provisions of the certain Stock Purchase Agreement shall furnish consideration for the covenants and agreements set forth herein.

14.    Assignment. Krigel's obligations under this Agreement may not be assigned or transferred to any other person, firm, corporation or other entity without prior written consent of the Company or ARY. The services described herein must be performed only by Krigel. However, in the event of Krigel's death or disability, all payments

6

provided for in this Agreement to Krigel, shall still be due Krigel or his heirs.

15. <u>Severability and Survival</u>. If any provision of this Agreement, as applied to either party or to any circumstances, shall be adjudged by a Court to be void or unenforceable, the same shall in no way affect the other provisions of this Agreement or the applicability of such provision to any other circumstances.

16. <u>Amendments</u>. This Agreement may be modified by mutual written agreement of Krigel, ARY and the Company at any time or from time-to-time, and no consent of any other person shall be required for modification or termination.

17. <u>Waiver of Breach</u>. The waiver of any party to this Agreement of a breach of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by any party.

18. <u>Governing Law</u>. This Agreement shall be construed in all respects under the laws of the State of Missouri, without regard to the dictates of conflicts of laws.

19. <u>Default by ARY</u>. To evidence its ability to pay sixty percent (60%) of Company's unsecured creditors' claims, Purchaser shall deposit the funds necessary for the unsecured creditor payments, in a domestic federally insured banking institution, prior to the filing of Company's chapter 11 plan and shall provide to the bankruptcy court and creditors satisfactory evidence of such deposit. If Purchaser fails to provide such evidence or if Purchaser fails to pay 60% of Company's unsecured creditors' claims on the effective date of Company's chapter 11 plan, Krigel shall be immediately entitled to receive all funds escrowed pursuant to paragraphs 4 and 9 of this Agreement and Scott W. Krigel, Trustee of the Scott W. Krigel revocable trust shall be entitled to receive all funds escrowed pursuant to paragraph 1. (b) of the Stock Purchase Agreement.

20. <u>Krigel's Name</u>. At such time ARY and Company no longer use the trade name "Krigel's" or "Krigel's Jewelers", but in no event for a period longer than two (2) years from the date of the execution of this Agreement, (the "Transfer Date") ARY and Company will transfer and assign to Krigel the exclusive right to the use of the name "Krigel's" or "Krigel's Jewelers". At the Transfer Date ARY and Company specifically agree to assign to Krigel all trademark rights which then exist to the name "Krigel's" or "Krigel's Jewelers".

ARY - 02115

IT WITNESS WHEREOF, the parties have executed this Agreement on the date set forth above.


**ARY:**

ARY JEWELERS, LLC,
*A Nevada Limited Liability Company*


By: _____

Title: _____


**COMPANY:**

KRIGEL'S, INC.

By: _____
   Scott Krigel, President


**KRIGEL:**

_____
Scott W. Krigel

8

# ESCROW AGREEMENT

THIS ESCROW AGREEMENT ("Escrow Agreement") made and entered into this
2| day of November, 2000, is by and among Scott W. Krigel, Trustee of the Scott W.
Krigel revocable trust created January 25, 1996 (hereinafter referred to as Shareholder);
ARY, LLC, a Nevada limited liability company, (Company); and Assured Quality Title, 1001
Walnut, Kansas City, Missouri 64106 ("Escrowee"). This Escrow Agreement is executed
contemporaneously with a Stock Purchase Agreement and a Consulting and
Noncompetition Agreement for Scott Krigel (collectively referred to as the "Related
Documents").

The parties hereto hereby agree as follows:

1.      Company shall deposit with Escrowee contemporaneously with the execution
of this Escrow Agreement and the Related Documents the sum of Fifty Thousand and
00/100 Dollars ($50,000.00) (the "Escrowed Funds").

2.      Escrowee shall hold the Escrowed Funds in accordance with the terms of this
Escrow Agreement, unless directed otherwise pursuant to a joint written direction by
Shareholder and Company.

3.      In the event Shareholder delivers to Escrowee (a) written notice that
Shareholder is entitled to receive all or a portion of the Escrowed Funds accompanied by
(b) a sworn certificate executed by Shareholder (which notice and accompanying
certificate are referred to herein as the "Shareholder Demand"), Escrowee shall
immediately notify Company thereof in writing and forward a copy of the Shareholder
Demand to Company. If Company does not, within five (5) business days of receipt of
Escrowee's notice to the Company, deliver to Escrowee a written notice contesting the

ARY - 02119

right of Shareholder to make the Shareholder Demand (the "Company Contest Notice"),
Escrowee shall deliver to Shareholder the Escrowed Funds made payable to Shareholder as
set forth in the Shareholder Demand. If Company delivers to Escrowee a timely Company's
Contest Notice, Escrowee shall promptly notify Shareholder thereof in writing and forward
a copy of Company's Contest Notice to Shareholder, and the provisions of Paragraph 4
hereof shall apply.

    4.    In the event Escrowee receives a Company's Contest Notice, Escrowee shall
take no further action with respect to the Escrowed Funds, except pursuant to a joint
written direction of the Company and Shareholder or pursuant to a certified copy of an
unstayed final court order issued by a court of competent jurisdiction permitting or
directing Escrowee to disburse all or a portion of the Escrowed Funds to Shareholder.

    5.    Escrowee shall invest and as necessary reinvest the Escrowed Funds in
interest bearing securities issued, guaranteed or secured by the United States or the
Federal Deposit Insurance Corporation as directed by Shareholder for the account of Scott
W. Krigel. Scott W. Krigel's social security number is 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.

    6.    Company and Shareholder shall indemnify and hold harmless Escrowee with
respect to all costs and expenses incurred by Escrowee including reasonable attorneys' fees
by reason of Escrowee being a party to this Escrow Agreement, except any such costs and
expenses incurred by Escrowee as a result of any failure by Escrowee to perform its
obligations hereunder.

    7.    All fees and expenses of Escrowee shall be equally split between Company
and Shareholder.

    8.    This Escrow Agreement shall terminate at such time as the entire balance of

ARY - 02120

3

the Escrowed Funds are disbursed.

9.     All Notices shall be sent to Company, Shareholder and Escrowee shall be by

certified mail at the addresses specified herein.

To Company:

Krigel's Inc.
Attn: Gohar Husain
119th & Metcalf
Overland Park, Kansas 66213
Telephone: (913) 451-4438
Facsimile: (913) 451-2515

To Shareholder:

Scott W. Krigel, Trustee
12112 Catalina
Leawood, Kansas 66209

with a copy to:

Krigel & Krigel, P.C.
Attention: Sanford Krigel
4550 Belleview
Kansas City, MO 64111

To Escrowee:

Assured Quality Title Company
Attention: Jose Evans
1001 Walnut
Kansas City, Missouri 64106

ARY - 02121

4

The parties hereto have executed this Agreement on the date first above written.

ARY, LLC  (Company)

By _____

Title: _____

Shareholder

Scott W. Krigel, Trustee of the Scott W. Krigel
revocable trust created January 25, 1996

Assured Quality Title Company (Escrowee)

By _____

Title: President

ARY - 02122