ORIGINAL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARY Jewelers, LLC., <br>       Plaintiff, <br><br> v. <br><br> IBJTC Business Credit Corp. and <br> David Molinario, <br>       Defendants. | ) <br> ) <br> ) <br> )    CIVIL ACTION NO. 04:-CV-10281 EFH <br> ) <br> ) <br> ) <br> ) |

STATEMENT OF MATERIAL FACTS
OF RECORD AS TO WHICH IT IS CONTENDED
THAT THERE EXISTS A GENUINE ISSUE TO BE TRIED

TO THE UNITED STATES DISTRICT COURT:

Pursuant to Locale Rule 56.1, Plaintiff ARY Jewelers, LLC. submit this statement of material facts of record as to which it is contended that there exists a genuine issue to be tried in support of its Response to Defendants' Motion for Summary Judgment. ARY incorporates all exhibits, deposition transcripts, and affidavits referenced herein.

**Factual Overview[1]**

Plaintiff, ARY Jewelers, LLC ("ARY") is a limited liability company with exists under the laws of the State of Nevada. ARY is part of the ARY Group, a multinational, billion dollar enterprise headquartered in the United Arab Emirates. Deposition of Haji Abdul Razzak ("Razzak Depo.") at 7:2-9:10(Affidavit of Jill Groff, Ex. 1). The Chairman of the ARY Group is Abdul

---

[1] ARY neither waives nor concedes its objections to Defendants' Summary Judgment Evidence by referring to Defendants' proffered, yet inadmissable evidence. In the event the Court overrules ARY's objections, ARY needs to refer to Defendants' evidence.

1

Razzak, who with other members of the Razzak family, owns the ARY group of companies. Razzak Depo. 6:18 - 7:20. The ARY Group has three primary areas of business interests, gold/jewelry, real estate, and media outlets, primarily cable television both abroad and now in the United States.

In early 2000, Chairman Razzak was seeking to enter the United States markets, specifically retail jewelry. The opportunity presented itself to purchase the stock of Krigel's Inc., a privately owned, family operated chain of retail jewelry stores located in the Midwestern United States, which in the year 2000 had begun experiencing serious financial difficulties leading Krigel's to seek the protection of the Bankruptcy Court. A Stock Purchase Agreement ("SPA") was entered into between ARY and Krigel's which would allow ARY to purchase the stock of Krigel's out of the bankruptcy court.

A key condition of the SPA was that Foothill Capital Corp. (which later became known as Wells Fargo Retail Finance), which had been financing Krigel's both pre-bankruptcy and in bankruptcy, continue financing Krigel's obligations post-bankruptcy on the same terms previously extended to Krigel's. Foothill is a competitor of Defendant, IBJ. After completing its due diligence, Foothill was unwilling to provide post-bankruptcy financing on the same terms it had previously extended to Krigel's, however, on December 15, 2000 Foothill presented ARY with a term sheet (the "December Proposal"). This December Proposal was, by its own terms, set to expire on February 28, 2001. Exhibit to Tom Morgan Affidavit. Although, admittedly not the same terms as currently in place for Krigel's; ARY and Chairman Razzak were definitely interested in Foothill's "December Proposal" and in fact, if a later proposal was not forthcoming, would have accepted these terms. Razzak Depo at 61:63:6. As a clear impression of ARY's interest in Foothills' December Proposal, ARY asked that the December Term Sheet be extended until April 1, 2001. Deposition of Thomas

Morgan, taken in the Krigel Litigation on May 21-22, 2001 (Supplemental Affidavit of Barry Pickens, Exhibit 1) at 128:6-129:7; 135:25-136:3. Thus, Foothills' December Proposal was on the table and viable when IBJ representatives Frank O'Connor and David Molinari took it upon themselves, without authorization or consent from ARY, and in fact without their knowledge, to inform Foothill not only that Defendant IBJ had decided not to do business with ARY, but the exact reasons why, and then volunteered to fax the news articles that formed the basis of Defendants' rejection to Foothill. Defendants' actions violated banking standards and practices. Affidavit of John Baerst ("Baerst Aff."); Affidavit of Thomas Bonville ("Bonville Aff.").

As a direct result fo the information conveyed to Foothill by Defendants, Foothill withdrew the terms contained within its still viable December Proposal. Morgan Depo. at 144:9-17. Foothill subsequently offered much less favorable replacement terms. Morgan Depo. at 144:9-17; Affidavit of Shirley Webster ("Webster Aff."). These less favorable terms made no business sense for ARY and thus were rejected. Morgan Depo. at 173:22-24; Webster Aff. Left with no options and no time, ARY "voided" the SPA as was its right pursuant to the terms of the SPA. As a result, Krigel's initiated litigation against ARY which spread to multiple states, venues and forums, and although ARY ultimately prevailed, the cost to ARY in legal fees and expenses was in excess of $1.2 Million. Affidavit of Barry Pickens ("Pickens Aff."). Additionally, ARY lost out on an excellent and profitable business opportunity, all of which was the direct result of the unauthorized, improper and tortious conveyance of client protected information from Defendant IBJ to a competitor.

1. **The Unadulterated Truth**

As a part of the discovery process in the Krigel's/ARY litigation, the deposition of Tom Morgan was taken on May 21 and 22, 2001. Mr. Morgan first started at Foothill in June of 1994.

Morgan Depo. at 19:13-15) At the time of the events made the basis of this lawsuit, Mr. Morgan was a senior account executive, Morgan Depo. at 25: 21-25 and importantly, became the Senior Account Executive with primary handling and day to day management responsibilities for the Foothill account in the Spring of 1999. Morgan Depo. at 35: 4-6. In fact, it was with Mr. Morgans' sworn testimony that for the first time, the true story as to how the ARY/Krigel's deal soured was told. Importantly, Mr. Morgan testified prior to any lawsuit between ARY and IBJ, prior to any knowledge of a dispute or issue between the two and, even more importantly, prior to the involvement of any attorneys or the twisting of "facts" to serve selfish interests. With this important distinction in mind, Mr. Morgan's sworn testimony on May 21 and 22, 2001, almost two years before any litigation existed between ARY and IBJ, is in pertinent part as follows:

- Krigel's, Inc., was a "long-time customer of Foothill," having first done business in 1997. Morgan Depo., at 37, lines 22 - 38, 4.

- The Krigel account was "transferred" to Tom Morgan in the Spring of 1997, having been previously handled by a Renee Lefelvre. Morgan Depo. at 34:23-25.

- Tom Morgan, on behalf of Foothill, issued to ARY on December 15, 2000 an emergence financing proposal letter or term sheet. Morgan Depo., at 117, lines 9-22.

- ARY requested from Foothill and received an extension on the closing date in Foothill's term sheet from February 28, 2001 to April 1, 2001, while ARY continued to consider Foothills' proposed terms, resulting in a revised proposal letter dated January 31, 2001 extending the date from February 28, 2001 to April 1, 2001 (there was no change in terms, in this January term sheet other than the

closing date and the date Krigel's was expected to file for bankruptcy). Morgan Depo., at 128:6 - 129:7;135:25-136:3.

- Foothill first became aware that ARY was talking to their competitors on February 28, 2001 when David Molinario with IBJ informed Tom Morgan of this in a telephone conversation initiated by David Molinario. Morgan Depo., at 144, lines 22-25.

- "I got a call from somebody at our competitor that used to work for Foothill Capital ....... David Molinario." Morgan Depo., at 145, lines 4-7.

- David Molinario called Tom Morgan, because David Molinario knew from his previous employment with Foothill that Krigel's was Tom Morgan's account. Morgan Depo., at 146, lines 7-8. And Morgan testified that IBJ was a competitor of Foothill's. Morgan Depo., at 144:11-13; 145:4-11.

- In that conversation initiated by David Molinario, he stated, "He had said he knew that Krigel's was my account. He said that they had been doing some due diligence because ARY was contemplating or was trying to get—well, shopping the deal, trying to get financing with them, seeing what kind of deal they would give them. They had gotten far enough down the point where they started doing some due diligence on ARY and he had come across some information through their credit checks and over the internet and etc., and basically said that, you know, he assumed that if Krigel's was my account, we would probably be doing the same, trying to retain the deal and he thought the information would be of interest to me." Morgan Depo., at 147:14 - 148:3.

- David Molinario also told Tom Morgan that he was going to fax the information to him and that Tom Morgan should take a look at it. Morgan Depo., at 148, lines 4-8.

- David Molinario inadvertently faxed over to Tom Morgan the information that was concerning IBJ.

- Solely based on the information provided to Tom Morgan by David Molinario, Foothill issued a new and different term sheet to AYR. "The reason we issued a different term sheet was because we had come across some information from a competitor of ours that was unfavorable and painted a picture of some activities that ARY may or may not have been involved in that made us nervous. That's why we issued the new term sheet." Morgan Depo., at 144, lines 9-17.

- It was the practice of Tom Morgan and Foothill not to disclose information about their borrowers without the borrowers' permission to disclose. Morgan Depo., at 146:25- 147:4.

- It is clear from Tom Morgan's testimony that Steve Cole first learned of IBJ's potential involvement from Tom Morgan on or shortly after February 28, 2001. It is also clear that Foothill's term sheet to ARY dated January 31, 2001 with a deadline of April 1, 2001 was still viable and outstanding to ARY at the time (February 28, 2001) that the information was conveyed from IBJ to Whitehall. Steve Cole's reaction was that Foothill "really needed to take a look and do some further due diligence as to who we might be doing business with," and depending on the additional information gathered, "we will revisit the proposal." Morgan Depo., at

153:9- 154:12.

- Prior to the conveyance of this information by Defendants to Foothill, a "fairly smooth road to close this deal" had been expected by all the parties." Morgan Depo., at 162, lines 2-8. Tom Morgan believed that a loan contract between Foothill and ARY was probable. Affidavit of Tom Morgan.

- Foothill subsequently revised the terms of its existing term sheet and offered ARY a substantially modified deal. Morgan Depo. at 165:18-173:24; 180:2-181:7; Webster Aff.

- "The information that we received from Molinario was the driving force behind changing the terms of the term sheet." Morgan Depo., at 169:25-170:2.

- Based on the information received from Defendants, Foothill issued a new revised term sheet to ARY, dated March 20, 2001. However, ARY's reaction to this new proposal was "negative". Morgan Depo. at 173: 22-24.

- ARY's representative had communicated to Tom Morgan prior to IBJ's conveyance of the information to Foothill's terms contained in their terms sheet of January 31, 2001 that it wanted to accept the terms. The information received by Foothill from IBJ caused Foothill to withdraw these terms before ARY could formally accept them. Morgan Depo. at 181:8-19.

- Sometime in the week prior to February 28th, ARY representative Gohar Husain called Foothill and communicated that ARY wanted to accept the extended date later in January 31, Proposal. Morgan Depo. at 181:8-182:2;183:16-20.

- The committee letter process undertaken by Foothills' senior credit committee to

formalize the loan with ARY had already been initiated prior to the relaying of the information from IBJ to Foothill. Morgan Depo. at 182:3-10.

– Foothill had done all the due diligence it was going to do vis a vis a background check on ARY as evidenced by the fact that there was no such requirement in the December Proposal; there was such a requirement in the March Proposal; and Morgan testified that Foothill added the requirement of a background check because of the information Foothill had received from Defendants. Morgan Depo. at 172:13-173:21.

– Morgan does not recall a meeting prior to February 28, 2001 between Steve Cole, Scott Krigel, and Gohar Husain where Cole was informed that Krigel's and ARY were negotiating with IBJ to provide the required financing. Affidavit of Thomas Morgan.

Additionally, Frank O'Connor acknowledged in his deposition that it was standard practice at financial institutions in general, and IBJ in particular, to keep nonpublic information confidential. Deposition of Frank O'Connor, taken June 16, 2005, ("O'Connor Depo.) at 62:1-17; 133:12-134-10 (Ex. 3 to Groff Aff.). Moreover, he testified that the information that IBJ was not going to fund the loan to ARY was nonpublic information. O'Connor Depo. at 110:12-111:4. O'Connor and Brian Kennedy, employed with IBJ during the relevant time period, both testified that they had never disclosed information to a competitor other than in this instance. O'Connor Depo.

Defendant IBJ and Foothill were competitors of one another. Deposition of David Molinario at 121:16-19 (Ex. 2 to Groff Aff.).

Based on the foregoing record references, the unlawyered truth is that: (1) Foothill had issued

a term sheet to ARY prior to the improper communication from Defendant IBJ to Foothill; (2) ARY had orally accepted the January 31, 2001 term sheet from Foothill prior the improper communication from Defendant IBJ to Foothill; (3) Foothill had already done any "due diligence" it intended on ARY and anticipated smooth sailing and no obstacles to close the deal with ARY, prior to the improper communication from Defendant IBJ to Foothill; (4) Based on ARY's oral acceptance of the Foothill term sheet, the ARY deal was in the process of being finalized at the Senior Credit Committee level at Foothill, prior to the improper communication from Defendant IBJ to Foothill; (5) On February 28, 2001, Defendant IBJ came across the allegations made in a Third World Country, loosely implicating ARY principals. Ont his same day, without prior notice to ARY or authorization, Defendant, IBJ improperly communicated to Foothill, orally and by fax IBJ's decision not to deal with ARY, the exact reasons behind their rejection of the ARY deal and then faxed to Foothill news articles about <u>charges</u> made in a third-world country that loosely implicated ARY principals. (6) As a direct result of this improper communication from Defendant IBJ to Foothill, Foothill withdrew its term sheet that had been orally accepted by Ary, and reissued a new, significantly different and less favorable term sheet that made no business sense for ARY and was rejected.

In summary, as the foregoing demonstrates (and is more fully argued in ARY' Response), Plaintiff contest the factual allegations in Defendants statement of facts, including, but not limited to:

- Foothill was unwilling to finance on the same terms because of Krigel's distressed condition.
- ARY was in a position and it made sense for ARY to pay cash for Krigel's.

9

- That Husain and Krigel advised Foothill that IBJ would be refinancing Krigel's and the refinancing would be used to pay off Krigel's debt to Foothill.

- That Frank O'Connor acted out of "professional courtesy" in conveying the adverse information to Foothill.

- That Foothill requested copies of the articles and that Molinario agreed to fax the information only after Foothill requested the same.

- That ARY turned back to Foothill to resume negotiations after IBJ rejected the loan.

- The change in the terms from Foothill was due to Krigel's business information showing a decline.

- That ARY would only agree to same terms financing throughout the entire relevant time period.

- That ARY's position in the Krigel's Litigation is factually and legally inconsistent with the position asserted in this action.

Dated: September 14, 2005          Respectfully submitted,

                                                         THE CARRIGAN LAW FIRM, L.L.P.

By: _____
Stephen P. Carrigan (Admitted Pro Hac Vice)
2 Houston Center
909 Fannin, Suite 1575
Houston, Texas 77010
(713) 739-0810 (telephone)
(713) 739-0821 (telefax)
*Attorney-in-Charge for Plaintiff*

OF COUNSEL:

**THE CARRIGAN LAW FIRM, L.L.P.**
Jill L. Groff (Admitted Pro Hac Vice)
2 Houston Center
909 Fannin, Suite 1575
Houston, Texas 77010
(713) 739-0810 (telephone)
(713) 739-0821 (telefax)
*Of Counsel for Plaintiff*

**MAHENDRU, P.C.**
Ashish Mahendru BBO#647661
1111 Bagby, Suite 2000
Houston, Texas 77002
(713) 571-1519 (telephone)
(713) 651-0776 (telefax)
*Of counsel for Plaintiff*

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing instrument was forwarded as indicated below by certified mail, facsimile and/or hand delivery, return receipt requested in accordance with the Federal Rules of Civil Procedure on this 14th day of September, 2005.

Robert S. Fischler
ROPES & GRAY, L.L.P.
45 Rockefeller Plaza
New York, NY 10111
Tel: (212)841-0444

                                                     _____
                                                     Jill L. Groff