UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| ARY JEWELERS, LLC, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) Civil Action No. 04-10281-EFH |
| IBJTC BUSINESS CREDIT CORPORATION and DAVID MOLINARIO, | ) ) ) ) |
| Defendants. | ) ) ) |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED**

Pursuant to Local Rule 56.1, defendants IBJTC Business Credit Corporation ("IBJ") and David Molinario ("Molinario") submit this statement of material facts as to which there is no genuine issue to be tried in support of their Motion for Summary Judgment.

**The Parties**

1.  Plaintiff ARY Jewelers, LLC ("ARY") is a limited liability company which exists under the laws of Nevada. Am. Compl. ¶1. ARY was formed in 2000 for the purpose of purchasing the outstanding stock of Krigel's, which was a privately owned company that operated a chain of retail jewelry stores in the midwestern United States. *Id.*

2.  ARY is part of the ARY Group, a multinational, billion-dollar enterprise headquartered in Dubai in the United Arab Emirates. Razzak dep. at 7:2-9:10 (Cimini Aff. Ex. O); Cimini Aff. Ex. K. The Chairman of the ARY Group is Abdul Razzak, who, with other members of the Razzak family, owns the ARY group of companies. Razzak dep. at 6:18-7:20 (Cimini Aff. Ex. O).

-2-

3. Defendant IBJ ceased operating as a going concern in 2002, when its assets were sold. O'Connor Aff. ¶2. During the relevant period, IBJ operated in Braintree, Massachusetts as a finance company specializing in secured lending to middle market companies. *Id.*

4. Defendant Molinario was employed as a vice president at IBJ during the relevant period. Molinario dep. at 20:16-18 (Cimini Aff. Ex. N).

**Prior Proceedings in This Action**

5. ARY commenced this action in the United States District Court for the Western District of Missouri in 2003. Defendants moved to dismiss for lack of personal jurisdiction or, alternatively, to transfer to this Court pursuant to 28 U.S.C. §1404(a). The motion to transfer was granted, and on February 10, 2004, the case was transferred to this Court.

6. Prior to transfer, defendants filed an answer denying the material allegations of the First Amended Complaint. *See* Defs.' Answer to Am. Compl., filed February 3, 2004.

7. At a scheduling conference on May 12, 2004, the Court approved the parties' Joint Statement pursuant to Local Rule 16.1(D), and set a fact discovery cutoff date of March 14, 2005. The cutoff date was later extended on consent to June 14, 2005. Fact discovery is now complete.

**Prior Related Action**

8. As discussed below, this action involves a Stock Purchase Agreement between ARY and Scott Krigel. The Stock Purchase Agreement was the subject of prior litigation between ARY and Mr. Krigel. That litigation (the "Krigel Litigation") resulted in an opinion by the Supreme Court of Kansas, which is reported at 82 P.3d 460 (Kan. 2003). *ARY Jewelers, LLC v. Krigel*, 82 P.3d 460 (Kan. 2003). The Supreme Court's opinion sets forth many of the

background facts relevant here and is cited below where appropriate. A copy of the opinion is attached as Exhibit A to the Affidavit of Kate Cimini, Esq.

**The Stock Purchase Agreement**

9. As of November 2000, Scott Krigel beneficially owned all of the outstanding stock of Krigel's Inc. ("Krigel's"), which operated a chain of jewelry stores in the Midwestern United States. On November 21, 2000, Mr. Krigel entered into a Stock Purchase Agreement (the "SPA") with ARY. Am. Compl. ¶8; Krigel Litigation, 82 P.3d at 462 (Cimini Aff. Ex. A); O'Connor Aff. Ex. A.

10. The SPA contemplated that ARY would buy all of Krigel's stock, and that Krigel's would file for Chapter 11 bankruptcy (which it did in January 2001), and later emerge from bankruptcy under the ownership of ARY. *Id.*; Cimini Aff. Ex. B, ¶¶ 10-11.

11. The SPA was negotiated and signed on behalf of ARY by Gohar Husain of ARY. Razzak dep. at 10:24-13:2 (Cimini Aff. Ex. O); O'Connor Aff. Ex. A.

12. Pursuant to the SPA and related agreements, ARY was to pay 60% of Krigel's debts to its unsecured creditors (totaling approximately $6 million), and "to assume responsibility for or pay off all debt Krigel's, Inc. owed to its only secured creditor, Foothill Capital". Krigel Litigation, 82 P.3d at 462 (Cimini Aff. Ex. A). The Foothill debt at the time was approximately $8 million. *Id.*; Cole Aff. ¶3.

13. In addition, ARY agreed to pay $1.5 million to Scott Krigel, consisting of $50,000 for Mr. Krigel's stock and an additional $1,450,000 under a related consulting and non-competition agreement. Krigel Litigation, 82 P.3d at 462-3 (Cimini Aff. Ex. A). Thus, the total purchase price under the SPA was approximately $15.5 million. ARY had the ability to pay the entire amount in cash. Razzak dep. at 15:12-18 (Cimini Aff. Ex. O).

14.     Under paragraph 4(c) of the SPA, ARY's obligation to purchase Krigel's was subject to the condition that Foothill agree by December 19, 2000 to continue financing Krigel's obligations to Foothill on the same terms previously extended to Krigel's. Am. Compl. ¶8; O'Connor Aff. Ex. A ¶4(c). Under paragraph 4(c), if Foothill did not consent by December 19, 2000 to continue its financing, the SPA and the related agreements were to be "void." *Id.*

**Foothill Refuses to Continue Financing on the Same Terms for Reasons Unrelated to IBJ**

15.     Steven Cole was the senior officer at Foothill responsible for the Krigel's account. Cole Aff. ¶¶1-2. At the time the SPA was signed, Scott Krigel and Mr. Husain (of ARY) approached Foothill and asked whether Foothill would continue the Krigel's financing on the same terms in the Foothill-Krigel's credit facility then in place if Krigel's emerged from bankruptcy under ARY's ownership. Cole Aff. ¶4.

16.     Because of Krigel's "distressed financial condition and uncertain prospects," Foothill was unwilling to provide post-bankruptcy financing on the same terms it had previously extended to Krigel's. Cole Aff. ¶5. However, Foothill was willing to consider financing on *different* terms. Cole Aff. ¶5. Thus, on December 15, 2000, it presented ARY with a "term sheet" setting forth the basic terms of a potential new credit facility (the "December Proposal"). Cole Aff. ¶5, Ex. A; Krigel Litigation, 82 P.3d at 464 (Cimini Aff. Ex. A).

17.     The December Proposal was not a commitment to lend. As expressly stated therein, it was subject, among other things, to approval by Foothill's credit committee. Cole Aff. ¶6, Ex. A; Cimini Aff. Ex. B, ¶15.

18.     In the Krigel Litigation, ARY described the December Proposal as "markedly different" than the then-existing Foothill credit facility. Cimini Aff. Ex. B, ¶15.

19. ARY could have waived the "same terms" financing condition in the SPA, and could have consummated the purchase of Krigel's either by paying cash for the company or by accepting the December Proposal. Krigel Litigation, 82 P.3d at 466 (noting that unfulfilled conditions may be "waived by the affected party")(Cimini Aff. Ex. A). Instead, ARY decided to seek more favorable financing from other lenders.

**IBJ Declines to Finance ARY/Krigel's**

20. One lender with which ARY and Scott Krigel discussed potential financing was IBJ. Under the auspices of its senior vice president, Francis D. O'Connor, Jr., IBJ provided a term sheet for post-bankruptcy financing to ARY/Krigel's on January 24, 2001. O'Connor Aff. ¶6.

21. The IBJ term sheet was accepted, and the parties sought in the next weeks to conclude a financing agreement pursuant to which IBJ would provide financing to Krigel's after its emergence from bankruptcy under ARY's ownership. O'Connor Aff. ¶7.

22. In or about early February 2001, Mr. Husain and Scott Krigel advised Foothill that IBJ would be refinancing Krigel's, and that the refinancing would be used, among other things, to pay off Krigel's $8 million debt to Foothill. Cole Aff. ¶8.

23. As part of its standard due diligence process, IBJ ordered a background check on ARY from an outside vendor, LCF Associates, which is located in Braintree, MA. O'Connor Aff. ¶ 7. In fact, the IBJ term sheet expressly disclosed that IBJ's due diligence would include, among other things, "background checks." O'Connor Aff. Ex. B, p.2.

24. LCF located and sent to IBJ two news articles published by Dow Jones Newswire on the Internet. O'Connor Aff. ¶ 8. The articles revealed that ARY's Chairman, Mr. Razzak, and others associated with ARY, had been charged by Pakistani authorities with paying a $10

million bribe to the former Pakistani prime minister in connection with a lucrative gold importation contract that Pakistan had awarded to ARY.  *Id.*[1]

25.    ARY had not previously disclosed this matter to IBJ.  O'Connor Aff. ¶ 8.  After learning of the charges, Mr. O'Connor discussed them with Mr. Husain.  Because that conversation did not allay Mr. O'Connor's concerns, he decided that IBJ would not proceed with the financing for ARY/Krigel's.  O'Connor Aff. ¶ 9.

26.    IBJ advised ARY of its decision on February 28, 2001.  *Id.*

**IBJ Sends the Dow Jones Article to Foothill**

27.    Mr. O'Connor correctly understood that Foothill was expecting its outstanding loan to Krigel's to be repaid with proceeds from the anticipated IBJ credit facility.  O'Connor Aff. ¶ 5; Cole Aff. ¶ 7.  Under the circumstances, he concluded that IBJ should give Foothill the professional courtesy of letting it know that IBJ would not be financing ARY.  O'Connor Aff. ¶ 10.

28.    Accordingly, he instructed one of IBJ's junior loan officers, David Molinario, to contact Foothill.  O'Connor Aff. ¶ 10; Molinario Dep. at 96:16-23 (Cimini Aff. Ex. N).

29.    On or about February 28, 2001, Mr. Molinario telephoned Foothill and advised it of IBJ's decision and the reason why IBJ was not proceeding.  After Foothill requested copies of the articles, Mr. O'Connor authorized Mr. Molinario to fax them to Foothill.  O'Connor Aff. ¶ 10.

---

[1] As reported in *The New York Times*: In January 1994, ARY deposited $10 million in a Citibank account controlled by Asif Zardiri, the husband of the then prime minister of Pakistan, Benazir Bhutto.  In November 1994, ARY was granted a license by Pakistan which made it Pakistan's sole authorized gold importer.  Mr. Razzak of ARY acknowledged in an interview that he had used the license to import more than $500 million in gold into Pakistan and that he had met several times with Bhutto and Zardiri.  As for the deposits to the Citibank account, Razzak suggested to the *Times* that someone who wished to destroy Razzak's reputation had contrived to have ARY identified as the depositor.  "Bhutto Clan Leaves Trail of Corruption in Pakistan", *The New York Times*, January 9,

**ARY Turns Back to Foothill**

30.     Shortly after IBJ declined to finance ARY, ARY turned back to Foothill as a potential financing source.  As Mr. Razzak conceded at his deposition, ARY again sought continued financing from Foothill on the same terms Foothill had previously provided to Krigel's.  Razzak Dep. at 20:23-21:23 (Cimini Aff. Ex. O).

31.     In connection with ARY's renewed request for financing, Foothill reviewed updated sales and revenue results for Krigel's, as well as an updated Krigel's business plan.  Cole Aff. ¶ 9.  These items revealed that, in the period since Foothill had made its December Proposal, Krigel's business had experienced continued deterioration, and that future sales almost certainly would be lower than previously forecast.  *Id.*

32.     As a result, Foothill issued a revised proposal to ARY dated March 20, 2001.  Cole Aff. ¶ 10.  Mr. Husain of ARY requested certain changes to this proposal, to which Foothill agreed, resulting in another proposal dated March 27, 2001 (the "March 27 Proposal").  *Id.* ¶ 11.  Like the December Proposal, neither of Foothill's proposals in March was a commitment to lend; rather, each was subject, <u>inter alia</u>, to approval by the Foothill credit committee.  Cole Aff. Exs. B, C.

33.     After securing Foothill's agreement on his requested revisions to the March 20 proposal, Mr. Husain sent a fax to ARY's Chairman, Mr. Razzak, telling him:  "My point of view is that we accept the revised terms."  Cimini Aff. Ex. G, ¶ 5.  Mr. Husain explained that he had prevailed upon Foothill to change various terms in ARY's favor, and that he was "already working on" getting more attractive terms from another bank.  He further advised Mr. Razzak

---

1998, pgs. 1-2, 8 (Cimini Aff. Ex. J).

that once this other financing was lined up, ARY could "get rid of" Foothill without incurring a "prepayment penalty." *Id.* ¶8.

34. Despite Foothill's concessions, Mr. Husain's recommendation, and the prospect of quickly getting even better terms from another lender, Mr. Razzak rejected the March 27 Proposal. Instead, he continued to insist that Foothill continue to finance on the same terms as its existing credit facility. Thus, on March 28, 2001, Mr. Razzak advised Mr. Krigel by letter that ARY would not consummate the SPA unless Foothill agreed to provide financing to ARY "upon the same terms and conditions as were in effect at the time the [SPA] was entered into." Cimini Aff. Ex. H.

35. In a letter to Mr. Krigel one week later, Mr. Razzak advised that ARY was "left with little option but to declare that the [SPA] and related agreements are null and void pursuant to Section 4(c) of the [SPA] since Foothill Capital has not given its consent to the continued financing …." Cimini Aff. . Ex. I.

**ARY Sues to Recover Its Escrow Deposit; Krigel's Unsecured Creditors Sue ARY**

36. After declaring the SPA "null and void," ARY sought the return of money it had placed in escrow pursuant to the SPA. Mr. Krigel would not agree to release the escrow, claiming that ARY breached the SPA by refusing to consummate the transaction. In April 2001, ARY commenced the Krigel Litigation, in which it sought a declaration that, because of Foothill's refusal to continue financing on the same terms previously provided to Krigel's from Foothill in December 2000, ARY had no obligation to consummate the SPA. Cimini Aff. Ex. B, ¶¶ 35-40; Krigel Litigation, 82 P.3d at 465 (Cimini Aff. Ex. A).

37. ARY prevailed in the Krigel Litigation. Both the trial court and, on appeal, the Supreme Court of Kansas, held that under paragraph 4(c) of the SPA, ARY's inability to obtain

continued, "same terms" financing from Foothill relieved ARY of any obligation to purchase Krigel's. Krigel Litigation, 82 P.3d 460 (Cimini Aff. Ex. A).

38.  On June 25, 2001, Krigel's unsecured creditors, who were to receive partial payment from the money to be paid by ARY under the SPA, sued ARY in the United States District Court for the Western District of Missouri (the "Fabrikant Litigation"). Brief of Appellee ARY Jewelers, LLC at 10 (Cimini Aff. Ex. C). The creditors claimed that ARY breached the SPA, and they sought a preliminary injunction freezing ARY's domestic assets. *Id.* After the court denied the injunction, the creditors dismissed the action. *Id.*

**ARY Commences This Action**

39.  In March 2003, ARY commenced this case, claiming that defendants tortiously interfered with prospective financing between ARY and Foothill. In Count I, for tortious interference with prospective contract,[2] the First Amended Complaint alleges that ARY sought to negotiate "more favorable terms" from Foothill after ARY rejected the December Proposal. Am. Compl. It further alleges that ARY would have eventually agreed to the December Proposal, but that Foothill "changed" that proposal based on the Dow Jones articles it received from IBJ. Am. Compl. ¶¶ 13-14.

40.  In Count II, ARY alleges that in sending Foothill the Dow Jones articles, defendants breached a fiduciary or confidential relationship with ARY.

---

[2] It is not clear from the face of the pleading that the claim in Count I is for tortious interference with *prospective* contract. However, ARY has acknowledged elsewhere that that is the claim it asserts.

41.    For the reasons set forth in the accompanying memorandum of law, summary judgment should be entered for defendants on both counts of the First Amended Complaint.

        IBJTC BUSINESS CREDIT CORPORATION
        and DAVID MOLINARIO
        By their attorneys,

        /s/ Kate Cimini
        Kate Cimini (BBO No. 654336)
        Ropes & Gray LLP
        One International Place
        Boston, Massachusetts 02110-2624
        (617) 951-7000

        Robert S. Fischler (Admitted Pro Hac Vice)
        Ropes & Gray LLP
        45 Rockefeller Plaza
        New York, NY 10111
        (212) 841-5700

Dated:  August 11, 2005