UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARY Jewelers, LLC., <br>                Plaintiff, <br><br> v. <br><br> IBJTC Business Credit Corp. and <br> David Molinario, <br>                Defendants. | ) <br> ) <br> ) <br> ) <br> )    CIVIL ACTION NO. 04:-CV-10281 EFH <br> ) <br> )    AFFIDAVIT OF THOMAS BONVILLE <br> ) <br> ) |

THOMAS BONVILLE, being sworn, deposes and states as follows:

1. I submit this affidavit at the request of Plaintiff's attorney in support of Plaintiff's respo[nse] to Defendants' Motion for Summary Judgment.

2. I have been retained as an expert witness in the case of plaintiff, ARY Jewelers, L[LC] ("ARY") against defendants, IBJTC Business Credit Corp. ("IBJ") (formerly IBJ Whitehall) [and] David Molinario (collectively "Defendants") by the Carrigan Law Firm, L.L.P. I was asked [to] review documents provide to me as listed in the attached Exhibit 1 and based on my thirty year[s'] experience, training, and education to opine about the actions and inactions of IBJ in [the] communication of ARY information to competitors. I also reviewed and opine about whet[her] employees of IBJ acted in accordance with generally-accepted banking standards.

3. I have an MBA degree with a major in financial management from Pace University awar[ded] in 1983 and a BBA degree with a major in accounting from Pace University awarded in 197[6. I] began my career in the banking industry in December 1976; and for a period of twenty years, I w[as] employed by two financial institutions. I have held various positions, including vice presid[ent,] executive director and senior vice president. I had responsibility for branch networks as wel[l]

1

systems and operations and had responsibility for customer contact and supervisory responsib[ility] for back-office processing of both business and consumer accounts. A more detailed Curricu[lum] Vitae is attached as Exhibit 2.

4. My opinion expressed herein is based on the following considerations:

(a) In November 2000, ARY entered into a Stock Purchase Agreement with Scott W. Kri[gel], Trustee of the Scott W. Krigel Revocable Trust, for the purchase of the common stock of Krigel, ("Krigel's"), a Kansas corporation that operated a chain of jewelry stores. Krigel's was in bankrup[tcy] and the intention was for Krigel's to emerge from bankruptcy through the infusion of fresh cap[ital] from ARY and the obtaining of new credit facilities on the strength of ARY's financial suppor[t.] was in fact a condition of ARY's obligation to purchase Krigel's stock that Foothill Cap[ital] Corporation ("Foothill"), Krigel's principal lender, consent to continue its financing of Krigel's a[s] it emerged from bankruptcy, since continuation of financing by Foothill or another lender [was] critical to the business plan worked out by ARY and Krigel's. At the end of December 2000 or [the] beginning of January 2001 ARY, through its agent Gohar Hussein, approached IBJ Whitehal[l to] investigate the possibility of alternate financing. IBJ Whitehall did in fact propose tenta[tive] financing terms in a term sheet dated January 24, 2001 and subsequently prepared an extensive d[raft] of an internal credit proposal dated February 28, 2001. In the course of its due diligence, howe[ver,] IBJ Whitehall obtained copies of news articles from a third party investigator that repo[rted] allegations of misconduct in Pakistan by an ARY affiliate. Solely on the basis of these articles, [IBJ] Whitehall declined to provide the financing requested by ARY and Krigel's. IBJ Whitehall, o[n its] own initiative and without the knowledge or consent of ARY, then proceeded to voluntee[r to] Foothill, with whom it had had no previous contact on this matter, that it had denied the financ[ing]

2

requested by ARY and Krigel's and indicated that it had done so based on allegations of misconc[uct]
by an ARY affiliate. It then furnished Foothill with copies of the damaging documents. Foo[thill]
subsequently, because of the damaging information forwarded by IBJ Whitehall, altered the te[rms]
of its proposed financing of Krigel's in such ways that the Stock Purchase Agreement was frustr[ated]
and ARY's acquisition of Krigel's collapsed.

5. In preparing this affidavit and my report, which has been previously provided, I reviewed [the]
depositions of various witnesses, and exhibits pertaining to the relationship between ARY and [IBJ]
Whitehall as well as pleadings in this case. These materials are listed in Exhibit 2. I have also re[lied]
on my general knowledge, experience, training, and expertise in the areas of finance, ban[king]
practice, and lending. I reserve the right to amend and supplement this affidavit in the event t[hat I]
receive and review additional documents or information that I have not received or reviewed a[s of the]
date of this affidavit.

6. Molinario testified as follows:

> Q: Is it your understanding that for you guys in this industry, it's part of your professional courtesy to one another that you as competitors in the loan bidding process share information with each other as professional courtesy about potential clients?
>
> A: That was the first time I recall that happening.

Deposition of David Molinario ("Molinario Depo.") page 107, lines 11 - 18. And Thoma[s]
Morgan (the Foothill employee to whom IBJ conveyed the information) testified:

> Q: Do you have any duty to protect the information of your borrowers of an account at a lending institution?
>
> A: Do I have a confidentiality agreement with each of my borrowers? No, I don't. But it is my practice and the practice of my firm not to disclose information about my

>   > borrower that my borrower does not give me permission to disclose.

Deposition of Thomas F. Morgan ("Morgan Depo."), page 147 line 15 - 25. Frank O'Con ,

Molinario's supervisor at IBJ testified:

>   Q:   But just so I understand your testimony Mr. O'Connor, it would be that on an everyday basis, or . . . which are your words, I think my words, the general practice would not be to disclose to your competitors whether or not a loan application has been accepted or rejected. And it would not be an everyday basis or the general practice to disclose reasons or parts of reasons for a declination.
>
>   A:   It think that's fair.

Frank O'Connor Deposition ("O'Connor Depo."), page 133, line 12 - 21. David Molinario and

demonstrated improper conduct by breaching their confidentiality responsibilities to loan reque

ARY. Whatever IBJ's decisions on the loan may have been, their responsibilities are to the pote

client, not competitors. It is an industry standard to protect the confidentiality of clients

potential clients. The client and potential clients expect the employees of financial institution

adhere to confidentiality of their business transactions at all times. It is not a generally acce

banking practice or industry standard for one financial institution to communicate confide

information about a client or potential client with a competitor. Financial institutions should fol

generally accepted banking practices by communicating with clients or potential clients the st

of their loan requests. They should not communicate such matters to competitors.

communicating with competitors, financial institutions risk damaging their reputation but also

client's or potential client's trust.

7.   Further testimony shows that Molinario and IBJ breached their confidentiality responsibil

to their potential client (ARY). Molinario stated that his supervisor instructed him to do so. .

vice president of IBJ, Molinario should have known his responsibilities are to protect the right f

potential clients (e.g., ARY) and by sharing information with competitors, he is not protec

potential clients.

> Q: Do you agree with that, sir, that that is part of the professional courtesy that you owe y r
> competitors in this, your industry, to share information with one another about pote l
> clients?
>
> A: I don't know if I have an opinion on it. I was doing what I was ed to do. If asked to c t
> again, I would do what I was instructed to do.

Molinario Depo., page 107, line 23 - page 108, line 5.

8. If Molinario and IBJ followed acceptable banking policies, they would have notified

potential client of their decision (whatever it was), not their competitor. The potential client ha

expectation to be treated in a confidential and professional manner when dealing with an offi l

representative of a financial institution. As vice-president, Molinario has the responsibilit

demonstrate better judgment by communicating his decision with his potential client not competit .

As a senior representative of a financial institution, Molinario must adhere to good banking pract

when communicating with his potential clients. Molinario testified:

> Q: He [Molinario's supervisor, Frank O'Connor] told you that the purpose for doing this, this being at least the telephone call, if not the faxing the news articles for Foothill, was because Foothill was awaiting a commitment letter from Whitehall and let me back up, that's what I'm trying to understand. Tell me one more time, based on your understanding what Mr. O'Connor told you, your understanding as to why Foothill was either being called and/or faxed with this information.
>
> A: Frank told me that it was a professional courtesy to call them and make them aware that either Foothill or ARY or Krigel's, I'm not sure who the proper entity would be, would not be receiving a commitment letter solidifying our ability to move forward with the transaction.

Molinario Depo., page 117, lines 11 - 20. It is a reasonable expectation on the part of potential cl that if a lending institution decides to reject a potential client's loan application that the lender not disseminate that information to anyone without the potential client's specific authorization. T expectation is reasonable because when potential clients put their trust in the representative financial institutions, they know that their business will be held in the strictest confidence. Th an expectation that clients and potential clients have of their financial institutions. Molin testified as follows:

> Q: Is it also a reasonable expectation on the part of a potential client that if you decide, your private decision which you are entitled to, to reject my loan application or withdraw it, for that matter that you are not going to disseminate it to anyone without my specific authorization: is that reasonable?
>
> A: I believe that would be reasonable.

Molinario Depo., page 142, lines 12 - 20.

9.    Financial institutions have written policies and procedures to communicate effectively their employees. Policies and procedures must be followed when dealing with clients and poten clients. As a vice president, Molinario should have been aware and understood all of these poli and procedures. It is an industry standard for financial institutions to have policies and proced in place and all employees must adhere to them. Molinario testified as follows:

> Q: In fact, I think you said these same written policies and procedures are in place and in effect at Whitehall, correct?
>
> A: I don't know if I actually have ever been provided with policies and procedures book.

Molinario Depo., page 189, lines 17 - 23.

10. Molinario, as a representative of his financial institution, did not demonstrate proper conduct when he faxed information about his potential client to his competitor:

> Q: Tell me, who was it that Frank O'Connor told you to fax these articles to?
>
> A: Foothill Capital

Molinario Depo., page 96, line 24 - page 97, line 2. David Molinario did not demonstrate proper conduct as a representative of his financial institution when he faxed information about his potential client to his competitor.

11. Molinario faxed information about a potential client to a competitor. By doing so demonstrated improper conduct. Such action is not a standard practice in the banking industry. Molinario breached his confidential responsibility and as vice president of his organization should have understood and followed acceptable banking policies and conducted himself a professional manner.

12. Additionally, the financial institution and its employees have responsibilities to clients potential clients. This trust was violated when Molinario communicated information about potential client to a competitor. The financial institution's responsibility should have been to potential client not to their competitors.

13. Additionally, Molinario does not know if he ever actually received a company policy procedure book. As a vice president, Molinario must understand all of the company's policies procedures, which becomes a more challenging task if the materials have not been provided.

14. Professionals that are following generally accepted banking practices would protect the client or potential client by not sharing information about the client. Molinario faxed his potential client information to a competitor.

15. All of the documents and information I relied upon are of the type reasonably relied up— y experts in my particular field (banking) in forming opinions or inferences upon the subjects/opi— s expressed herein. All exhibits attached hereto are true and correct copies.

_____
Thomas Bonville

Sworn to before me on this the __12__ day of __September__, 2005.

_____

Notary seal:

STEPHEN MALLOY
Notary Public, State Of New York
No. 01MA6068277
Qualified in Westchester County
My Commission Expires 12/31/__05__