UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARY Jewelers, LLC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 04:-CV-10281 EFH |
| | ) | |
| IBJTC Business Credit Corp. and | ) | AFFIDAVIT OF JOHN S. BAERST |
| David Molinario, | ) | |
| Defendants. | ) | |

JOHN S. BAERST, being sworn, deposes and states as follows:

1. I submit this affidavit at the request of Plaintiff's attorney in support of Plainti response to Defendants' Motion for Summary Judgment.

2. I have been retained by ARY Jewelers, LLC, a Nevada limited liability company and Plaintiff in this matter ("ARY"), to research and provide informed and expert testimony w respect to the following matters:

   (a) the nature of the relationship between ARY and Defendant IBJTC Busin Credit Corp. ("IBJ Whitehall") and the dealings between the parties during the period in quest in this litigation;

   (c) The varieties and types of communication and contact that lenders would h; generally with clients and how the communications and contacts between ARY and I Whitehall compared to this general pattern;

   (d) the practices between banks and non-banks during the period in question this litigation with respect to the sharing of credit and other information about customers, mutu or not; and

   (e) my opinion that it was the reasonable expectation of ARY, based on lendi

practices generally and ARY's customer relationship with IBJ Whitehall, that IBJ White
would not have gratuitously transmitted damaging information in IBJ Whitehall's possess
along with word of its negative credit decision, to another lending institution, and that s
action by IBJ Whitehall was a breach of its duty to ARY.

3. Since July 1, 1996 I have served as Director of the Morin Center for Banking
Financial Law at Boston University School of Law. The Morin Center administers a grad
program leading to a Master of Laws degree in Banking and Financial Law that aw
approximately 70 LL. M. degrees annually to lawyers from the United States and abroad.
Morin Center also sponsors educational programs, including programs jointly undertaken
the Boston Bar Association and the American Bar Association. In addition to my dutie:
Director of the Morin Center, I am a full-time faculty member of Boston University Schoo
Law, with the title Professor of Banking Law. I have held this position since January 1, 1996
recent years I have taught courses in banking regulation, investment company regulation,
international arbitration and litigation. Our curriculum, which I supervise, includes course
lending and documentation of credit transactions. I also serve as Faculty Advisor to the <u>Anr</u>
<u>Review of Banking and Financial Law</u>, a law review staffed by JD and LLM students, and te
as a member of the faculty of the American Bar Association/Morin Center National Institute
Banking Law Basics, a three day program which is offered twice each year to lawyers fi
around the country.

4. In addition to my teaching and administrative duties, I served in 1996 and 1997
Special Counsel to the Banking Department of the State of Connecticut, advising on the draft
of banking legislation that provided the legislative framework for foreign bank activities
Connecticut. I have also served as the Banking Expert for the Committee for Commercia L

Reform in Ukraine, which is a private sector initiative receiving support from the American  
Association and the United State Agency for International Development.

5. Prior to joining the faculty of Boston University School of Law I was employed  
Barclays Bank PLC, an English bank, for approximately fifteen years, initially as Gen  
Counsel for United States operations and then as President and Chief Executive Office  
Barclays Bank of New York, N. A., a nationally-chartered bank subsidiary. Before joi  
Barclays I practiced corporate and securities law with Simpson Thacher & Bartlett in New Y  
representing banks and securities firms in debt and equity financings. A more deta  
Curriculum Vitae is attached as Exhibit 1.

6. In my fifteen years with Barclays Bank PLC, I worked closely with the officers  
personnel responsible for Barclays' lending relationships, advising on the proper conduc  
relationships with clients and other lenders. In these matters I acted on behalf of ban  
entities, divisions of banks, and non-bank lending subsidiaries.

7. My opinion expressed herein is based on the following considerations:

(a) Under date of November 21, 2000, ARY entered into a Stock Purchase Agreen  
with Scott W. Krigel, Trustee of the Scott W. Krigel Revocable Trust, for the purchase of  
common stock of Krigel, Inc. ("Krigel's"), a Kansas corporation that operated a chain of jew  
stores. Krigel's was in bankruptcy and the intention was for Krigel's to emerge from bankru  
through the infusion of fresh capital from ARY and the obtaining of new credit facilities on  
strength of ARY's financial support. It was in fact a condition of ARY's obligation to purcl  
Krigel's stock that Foothill Capital Corporation ("Foothill"), Krigel's principal lender, conser  
continue its financing of Krigel's after it emerged from bankruptcy, since continuation  
financing by Foothill or another lender was critical to the business plan worked out by ARY

Krigel's. [ARY 01171]. At the end of December 2000 or the beginning of January 2001 [A 00944] ARY, through its agent Gohar Hussein, approached IBJ Whitehall to investigate possibility of alternate financing. IBJ Whitehall did in fact propose tentative financing terms term sheet dated January 24, 2001 [ARY 02017-02019] and subsequently prepared an exten: draft of an internal credit proposal dated February 28, 2001 [D 00246-00261]. In the cours its due diligence, however, IBJ Whitehall obtained copies of news articles from a third p investigator that reported allegations of misconduct in Pakistan by an ARY affiliate. [A 01999-02000; 02032] Solely on the basis of these articles, IBJ Whitehall declined to provide financing requested by ARY and Krigel's [ARY 01744]. IBJ Whitehall, on its own initia and without the knowledge or consent of ARY, then proceeded to volunteer to Foothill. v whom it had had no previous contact on this matter, that it had denied the financing requestec ARY and Krigel's and indicated that it had done so based on allegations of misconduct by ARY affiliate. It then furnished Foothill with copies of the damaging documents. Foot subsequently, because of the damaging information forwarded by IBJ Whitehall [ARY 001 130], altered the terms of its proposed financing of Krigel's in such ways that the Stock Purch Agreement was frustrated and ARY's acquisition of Krigel's collapsed. [ARY 00923-C09 01061-01065; 01982-01986].

(b) ARY had entered into a customer relationship with IBJ Whitehall when it applied financing for a post-bankruptcy Krigel's. Loan customers, whether their relationship is wit bank or a non-bank financial institution, have a reasonable expectation that information about customer-lender relationship will be treated confidentially, and ARY was entitled to expect t of IBJ Whitehall. The practice of lenders in handling customer information has evolved o recent years in its specific restrictions, but there has always been recognition in the industry t

customer information is sensitive and must be handled carefully. In my experience, the t[rend] over the past twenty or more years has been for lenders to have become much more caut[ious] about sharing information about customers, whether public or not. Title V of the Gramm-Le[ach-]Bliley Financial Services Modernization Act of 1999 imposed stringent privacy requirement[s on] all lenders, requiring lenders to develop policies and procedures for the protection of custo[mer] information. "It is the policy of the Congress that each financial institution has an affirma[tive] and continuing obligation to respect the privacy of its customers and to protect the security [and] confidentiality of those customers' nonpublic personal information." [15 USC 6801(a)] Wh[ile I] do not argue that the privacy restrictions of this statute are directly application to the facts of [this] case, I would argue that this act reflected the recognition both within and outside the lenc[ing] community that customers were entitled to their expectations of privacy and that previ[ous] practices among lenders with respect to the sharing of customer information would no lon[ger] pass muster under the law.

(c) The facts of this case are egregious in their particulars. The allegations in the n[ews] articles had not been verified or checked beyond downloading the information from the inter[net] and the denials of their veracity by Gohar Hussein, as ARY's representative, were [not,] apparently, taken seriously, as evidenced by IBJ Whitehall's on-the-spot decision to deny cr[edit] facilities in the course of its conversation with Mr. Hussein. [Deposition of O'Connor, June 2005, 83:2-21] I am not suggesting that IBJ Whitehall was not within its rights to deny credi[t to] ARY and Krigel's on the basis of these news reports, as precipitous as that decision seem[s to] have been. The error, in my opinion, was that IBJ Whitehall initiated contact with Footh[ill,] whom it had reason to know was a creditor of Krigel's, to convey not only its negative cr[edit] decision but the specific reason for its decision, which happened to be the unsubstantiated ne[ws]

reports. The combination of these disclosures could not have but undermined the confidenc[e ?] another lender, and in my opinion IBJ Whitehall was acting unreasonably and negligentl[y] gratuitously making these disclosures to Foothill. IBJ Whitehall claims that it acted ou[t of] "professional courtesy" [Deposition of O'Connor, May 12, 2005, 101:12-18], but in my opi[nion] it neglected its duty to its customer in doing so. The point is made in deposition testimony the information was on the public record and therefore there was no duty of confidenti[ality] [Ibid., 103: 6-11], but I do not think that the distinction of public versus non-publi[c is] particularly relevant to an understanding of a lender's obligation in circumstances in which the information is by its nature potentially damaging and unsubstantiated and (2) the .e[nder] gratuitously volunteers the information to a third party lender in the context of distinctly [non-]public information, namely its decision to deny credit. IBJ Whitehall's actions were inconsis[tent] with good lending practice and inconsistent with its duties to its customer.

8. In preparing my Expert Report dated July 27, 2005, which has been previously provi[ded] and this affidavit, I have reviewed materials on banking practices, particularly in the area[s of] sharing of customer information and privacy expectations, and treatises on banking, finance market practice. I have also reviewed briefs and court orders in this case, the deposition[s of] various witnesses, and exhibits pertaining to the relationship between ARY and IBJ Whiteh[all]. These materials are listed in Exhibit 2. I have also relied on my general knowledge, experie[nce] and expertise in the areas of finance, banking practice and lending. I reserve the right to am[end] and supplement this affidavit in the event that I receive and review additional document[s or] information that I have not received or reviewed at the date of this affidavit. A list of publications is attached as Exhibit 3.

9. All of the documents and information I relied upon are of the type reasonably relied u[pon]

by experts in my particular field (banking) in forming opinions or inferences upon subjects/opinions expressed herein. All exhibits attached hereto are true and correct copies.

_____
John S. Baerst

Sworn to before me on this the 13th day of September, 2005.

Notary seal:

