

December 15, 2000

Mr. Gohar Husain
ARY Jewelers, LLC

# Foothill.

Re: Emergence Financing Proposal Letter

Dear Mr. Husain:

In accordance with Foothill Capital's discussions with Stuart Fetter and Scott Krigel, President of Krigels Jewelers it is Foothill's understanding that ARY, LLC's intends to purchase 100% of the stock of Krigel's Jewelers. This is further evidenced by the execution of that certain "Stock Purchase Agreement" dated November 21, 2000. It is Foothill's understanding that Krigel's Jewelers anticipates filing for Chapter 11 protection on or about January 15, 2001 and will exit shortly thereafter under the ownership of ARY, LLC. Please let this letter serve as an expression of Foothill Capital's interest in reviewing the opportunity to provide the emergence financing for Krigel's Jewelers under ARY, LLC's ownership, but should not be considered a commitment to lend. Any commitment to lend would be subject to, among other things, Foothil Capital's Credit Committee approval. The proposed financing arrangement would be as follows:

1.    **Maximum Credit Facility**: *$12,000,000*

    (a)    **Working Capital Revolving Line (the "Line")**: An amount up to the Maximum Credit Facility (less the amounts outstanding under the Accounts Receivable Sub-Line and L/C Sub-Line) subject to the inventory-borrowing base as outlined below.

    (b)    **Inventory Borrowing Base**: The lesser of; i) 70% of the cost of eligible inventory net of customary reserves or ii) 90% of the Net Retail Liquidation Value ("NRLV") as updated periodically by an appraiser acceptable to Foothill. The borrower may (with 10 days written prior written notice) request an increase of the inventory advance to 75% (not to exceed 95% of Net Retail Liquidation Value) rate for one consecutive 90 day period in each calendar year.

    (c)    **Accounts Receivable Sub-Line**: Advances on 80% of eligible accounts receivable (not to exceed $5,000,000 under the maximum credit facility) less 1% for each percentage point in which dilution exceeds 10%. At no time shall the loan outstanding on the accounts exceed A/R collections for the previous 90-day period.

Foothill Capital Corporation
617-624-4400

One Boston Place, 18th Floor, Boston, MA 02108

# 269444.v0; 5/11/01 5:42 PM Srwk021.DOC

A **WELLS FARGO** Company

F 00357    1989.019

ARY - 00328

December 15, 2000
Page 2

      (d)  **Letter of Credit Subline**: Up to *$3,000,000* would be available for the issuance and/or guaranty of Letters of Credit. All such Letters of Credit issued will be reserved on a 100% basis.

      (e)  **Minimum Availability Requirement:** $1,000,000 at all times.

2.  **Purpose**:

Loan proceeds would be used for the re-payment of the existing DIP facility and for post emergence general corporate purposes, including the financing of working capital needs and payment of amounts due under the Borrower's Plan of Re-organization.

3.  **Interest Rate**:

The rate of interest charged on the Line would be one and one-quarter percent (1.25%) above the present and future Reference Rate publicly announced from time to time by Wells Fargo Bank. Interest would be calculated on the basis of a three hundred sixty (360) day year on actual days elapsed and would be payable monthly in arrears. At no time would interest charged on the Line be less than seven percent (7.00%). The default rate of interest would be 3.0% above the applicable rate at the time of default.

4.  **Facility/Maintenance Fees**:

      (a)  **Emergence Financing Fee**: A fee of $120,000 shall be earned in full and payable at the date of closing.

      (b)  **Unused Line Fee**: A fee of 0.375% per annum, payable monthly would be charged for the average daily-unused portion of the Line.

      (c)  **Letter of Credit Guaranty Fee**: A fee equal to one and three quarters percent (1.75%) per annum of the actual amount of guaranties issued, plus issuing bank charges, would be payable monthly in arrears.

      (d)  **Servicing Fee**: A monthly Collateral Management fee of $2,000 would be earned and payable monthly, in arrears.

5.  **Collections / Receipts**:

Collections would be remitted to one or more lockboxes that would be assigned to and in form satisfactory to Lender all collections would be subject to a one (1)-business day clearance charge. Such clearance charge would be for interest

December 15, 2000
Page 3

> calculation purposes only and there would be no delay in the crediting of such collections for the purpose of calculating borrowing availability.

6.  **Loan Maturity and Prepayment**:

    The Credit Facility would mature three (3) years ("Maturity") from the emergence loan closing date. Termination of the loan prior to Maturity would result in a prepayment fee equal to a percentage of the Maximum Credit Line ($12MM) as follows; year one (3.00%), year two (2.00%) and year three (1.00%), plus 102% of all undrawn Letters of Credit.

7.  **Security**:

    As collateral for this financing agreement, Lender would have a first priority perfected security interest in all of Borrower's assets including, but not limited to: accounts receivable; inventory; trademarks and trade names; fixed assets; easehold interests and real property and such other assets, tangible or ntangible, real or personal as Lender designates.

8.  **Covenants**:

    Borrower would be required to maintain financial and collateral covenants that are typically used by Lender in similar retail transactions and may include, Minimum and Maximum Inventory levels, Gross Margin test, Purchases test, Maximum Capital Expenditures, EBITDA as well as other such tests. The covenants would be developed as a result of Lenders due diligence process and will be based off a discount of Borrower's, historic and projected operating performance.

9.  **Closing Date**:

    If the transaction contemplated by this letter is not consummated on or before February 28, 2001, then the terms and conditions set forth herein shall expire, without further notice or act of any kind by Lender or any other party.

10. **Conditions Precedent**:

    The following are some, but obviously not all, of the conditions precedent to any loan approval by Lender to Borrower:

    (a)  Borrower and any subsidiaries and affiliates shall be qualified to do business in any states where they have collateral.

Foothill Capital Corporation
617-624-4400
One Boston Place, 18th Floor, Boston, MA 02108

**F 00359**

A **WELLS FARGO** Company

**ARY - 00330**

December 15, 2000
Page 4

(b)    The UCC financing statements, fixture filings, deeds of trust or mortgages and related documents regarding the collateral (as applicable) shall have been recorded in all appropriate jurisdictions. Lender shall have received written notification reflecting same.

(c)    Loan origination costs including, but not limited to, audit fees, attorneys' fees, search fees, appraisals, documentation and filings, shall be paid by Borrower.

(d)    Completion of an updated field survey by Lender's examiners as well as an updated appraisal, which results are to be acceptable to Lender.

(e)    Borrower shall have executed and delivered such documents, instruments, security agreements, insurance, financing statements, corporate guarantees, verifications, non-offset letters, tax lien and litigation searches, good standing certificates, copies of building leases, landlord's waivers, trust deeds or mortgages, opinions of counsel and done such other acts a Lender may request in order to obtain Lender's legal approval to effect the completion of the financing arrangements herein contemplated. All of the foregoing must be in a form satisfactory to Lender and Lender's counsel, all loans and advances shall be made pursuant to, and subject to, the terms of financing documents executed at the closing.

(f)    Approval of Foothill Capital's Sr. Credit Committee.

(g)    Satisfactory review of ARY, LLC's business plan as it relates to the purchase of 100% of the stock of Krigel's Jewelers.

(h)    No material adverse change in the business, operations, profits or prospects of Borrower shall have occurred since the date of the Commitment.

(i)    Borrower shall, at loan closing, have minimum unused loan availability of $2,000,000.

(j)    Borrower's Plan of Re-organization shall be on terms acceptable to Lender. The Plan of Reorganization shall have been confirmed by a final order entered by the Bankruptcy Court (the "Confirmation Order"), in form and substance acceptable to Lender in its sole discretion, and which has not been stayed by the Bankruptcy Court or by any other court having jurisdiction to issue any such stay. The Confirmation Order shall have been entered upon proper notice to all parties to be bound by the Plan of Reorganization, all as may be required by the Bankruptcy Code, the

617-624-4400
One Boston Place, 18th Floor, Boston, MA 02108

A **WELLS FARGO** Company

F 00360

ARY - 00331

December 15, 2000
Page 5

> Federal Rules of Bankruptcy Procedure, and any applicable local
> bankruptcy rules. Moreover, the time to appeal the Confirmation Order or
> to seek review, rehearing, or certiorari with respect to the Confirmation
> Order must have expired, no appeal or petition for review, rehearing, or
> certiorari with respect to the Confirmation Order may be pending, and the
> Confirmation Order must otherwise be in full force and effect.

11.   **Periodic Loan Maintenance Charges:**

Borrower would be periodically charged for due diligence, loan maintenance,
audit and appraisal costs.

12.   **Loan Origination Costs:**

In connection with the request for financing, Borrower understands that it will be
necessary for Lender to make certain financial, legal and collateral investigations
and determinations.  Borrower agrees to pay for all of Lender's reasonably
incurred costs and expenses incurred in connection with the proposed financing
transaction including costs and expenses incurred by auditors and appraisers in
verifying Borrower's records, Lender's reasonable legal expenses for advice in
preparing documents in connection with the proposed loan, and any filing and
search fees and Borrower shall obtain bankruptcy court approval for such costs
and expenses which shall be entitled to priority as an administrative expense
claim under Section 503(b)(1) of the Bankruptcy Code.

This discussion letter is for your benefit only and shall not create rights in favor of any
other person or entity.

Sincerely,

FOOTHILL CAPITAL CORPORATION

Thomas F. Morgan
Vice President

FEB-01-2001 THU 02:35 PM FOOTHILL CAPITAL          FAX NO. 6175235839                P. 02/06

January 31, 2001

Mr. Gohar Husain
ARY Jewelers, LLC

# Foothill.

Re: Emergence Financing Proposal Letter

Dear Mr. Husain:

In accordance with Foothill Capital's discussions with Stuart Fetter and Scott Krigel, President of Krigels Jewelers it is Foothill's understanding that ARY, LLC's intends to purchase 100% of the stock of Krigel's Jewelers. This is further evidenced by the execution of that certain "Stock Purchase Agreement" dated November 21, 2000. It is Foothill's understanding that Krigel's Jewelers anticipates filing for Chapter 11 protection on January 19, 2001 and will exit shortly thereafter under the ownership of ARY, LLC. Please let this letter serve as an expression of Foothill Capital's interest in reviewing the opportunity to provide the emergence financing for Krigel's Jewelers under ARY, LLC's ownership, but should not be considered a commitment to lend. Any commitment to lend would be subject to, among other things, Foothill Capital's Credit Committee approval. The proposed financing arrangement would be as follows:

1.     **Maximum Credit Facility**: *$12,000,000*

    (a)     **Working Capital Revolving Line (the "Line")**: An amount up to the Maximum Credit Facility (less the amounts outstanding under the Accounts Receivable Sub-Line and L/C Sub-Line) subject to the inventory-borrowing base as outlined below.

    (b)     **Inventory Borrowing Base**: The lesser of; i) 70% of the cost of eligible inventory net of customary reserves or ii) 90% of the Net Retail Liquidation Value ("NRLV") as updated periodically by an appraiser acceptable to Foothill. The borrower may (with 10 days written prior written notice) request an increase of the inventory advance to 75% (not to exceed 95% of Net Retail Liquidation Value) rate for one consecutive 90 day period in each calendar year.

    (c)     **Accounts Receivable Sub-Line**: Advances on 80% of eligible accounts receivable (not to exceed $5,000,000 under the maximum credit facility) less 1% for each percentage point in which dilution exceeds 10%. At no time shall the loan outstanding on the accounts exceed A/R collections for the previous 90-day period.

Foothill Capital Corporation
617-624-4400 / Fax 617-722-9493
60 State Street, Suite 1150, Boston, MA 02109

# 269444 v02 1/31/01 3:05 PM Srwk02!.DOC                                              1989.019

A **WELLS FARGO** Company

000240

ARY - 01055

Janua·y 31, 2001
Page 2

- (d) **Letter of Credit Subline**: Up to $3,000,000 would be available for the issuance and/or guaranty of Letters of Credit. All such Letters of Credit issued will be reserved on a 100% basis.

- (e) **Minimum Availability Requirement**: $1,000,000 at all times.

## 2. Purpose:

Loan proceeds would be used for the re-payment of the existing DIP facility and for post emergence general corporate purposes, including the financing of working capital needs and payment of amounts due under the Borrower's Plan of Re-organization.

## 3. Interest Rate:

The rate of interest charged on the Line would be one and one-quarter percent (1.25%) above the present and future Reference Rate publicly announced from time to time by Wells Fargo Bank. Interest would be calculated on the basis of a three hundred sixty (360) day year on actual days elapsed and would be payable monthly in arrears. At no time would interest charged on the Line be less than seven percent (7.00%). The default rate of interest would be 3.0% above the applicable rate at the time of default.

## 4. Facility/Maintenance Fees:

- (a) **Emergence Financing Fee**: A fee of $120,000 shall be earned in full and payable at the date of closing.

- (b) **Unused Line Fee**: A fee of 0.375% per annum, payable monthly would be charged for the average daily-unused portion of the Line.

- (c) **Letter of Credit Guaranty Fee**: A fee equal to one and three quarters percent (1.75%) per annum of the actual amount of guaranties issued, plus issuing bank charges, would be payable monthly in arrears.

- (d) **Servicing Fee**: A monthly Collateral Management fee of $2,000 would be earned and payable monthly, in arrears.

## 5. Collections / Receipts:

Collections would be remitted to one or more lockboxes that would be assigned to and in form satisfactory to Lender. All collections would be subject to a one (1)-business day clearance charge. Such clearance charge would be for interest

000241

ARY - 01056

January 31, 2001
Page 3

calculation purposes only and there would be no delay in the crediting of such collections for the purpose of calculating borrowing availability.

6.   **Loan Maturity and Prepayment:**

The Credit Facility would mature three (3) years ("Maturity") from the emergence loan closing date. Termination of the loan prior to Maturity would result in a prepayment fee equal to a percentage of the Maximum Credit Line ($12MM) as follows; year one (2.00%), year two (1.00%) and year three (0.50%), plus 102% of all undrawn Letters of Credit.

7.   **Security:**

As collateral for this financing agreement, Lender would have a first priority perfected security interest in all of Borrower's assets including, but not limited to: accounts receivable; inventory; trademarks and trade names; fixed assets; leasehold interests and real property and such other assets, tangible or intangible, real or personal as Lender designates.

8.   **Covenants:**

Borrower would be required to maintain financial and collateral covenants that are typically used by Lender in similar retail transactions and may include, Minimum and Maximum Inventory levels, Gross Margin test, Purchases test, Maximum Capital Expenditures, EBITDA as well as other such tests. The covenants would be developed as a result of Lenders due diligence process and will be based off a discount of Borrower's, historic and projected operating performance.

9.   **Closing Date:**

If the transaction contemplated by this letter is not consummated on or before April 1, 2001, then the terms and conditions set forth herein shall expire, without further notice or act of any kind by Lender or any other party.

10.   **Conditions Precedent:**

The following are some, but obviously not all, of the conditions precedent to any loan approval by Lender to Borrower:

(a)   Borrower and any subsidiaries and affiliates shall be qualified to do business in any states where they have collateral.

Foothill Capital Corporation
617-624-4400 / Fax 617-722-9493
60 State Street, Suite 1150, Boston, MA 02109

A WELLS FARGO Company

ARY - 01057

000242

January 31, 2001
Page 4

    (b)    The UCC financing statements, fixture filings, deeds of trust or mortgages and related documents regarding the collateral (as applicable) shall have been recorded in all appropriate jurisdictions. Lender shall have received written notification reflecting same.

    (c)    Loan origination costs including, but not limited to, audit fees, attorneys' fees, search fees, appraisals, documentation and filings, shall be paid by Borrower.

    (d)    Completion of an updated field survey by Lender's examiners as well as an updated appraisal, which results are to be acceptable to Lender.

    (e)    Borrower shall have executed and delivered such documents, instruments, security agreements, insurance, financing statements, corporate guarantees, verifications, non-offset letters, tax lien and litigation searches, good standing certificates, copies of building leases, landlord's waivers, trust deeds or mortgages, opinions of counsel and done such other acts a Lender may request in order to obtain Lender's legal approval to effect the completion of the financing arrangements herein contemplated. All of the foregoing must be in a form satisfactory to Lender and Lender's counsel, all loans and advances shall be made pursuant to, and subject to, the terms of financing documents executed at the closing.

    (f)    Approval of Foothill Capital's Sr. Credit Committee.

    (g)    Satisfactory review of ARY, LLC's business plan as it relates to the purchase of 100% of the stock of Krigel's Jewelers.

    (h)    No material adverse change in the business, operations, profits or prospects of Borrower shall have occurred since the date of the Commitment.

    (i)    Borrower shall, at loan closing, have minimum unused loan availability of $2,000,000.

    (j)    Borrower's Plan of Re-organization shall be on terms acceptable to Lender. The Plan of Reorganization shall have been confirmed by a final order entered by the Bankruptcy Court (the "Confirmation Order"), in form and substance acceptable to Lender in its sole discretion, and which has not been stayed by the Bankruptcy Court or by any other court having jurisdiction to issue any such stay. The Confirmation Order shall have been entered upon proper notice to all parties to be bound by the Plan of Reorganization, all as may be required by the Bankruptcy Code, the

617-624-4400 / Fax 617-722 9493

60 State Street, Suite 1150, Boston, MA 02109

**ARY - 01058**

A WELLS FARGO Company

000243

January 31, 2001
Page 5.

Federal Rules of Bankruptcy Procedure, and any applicable local bankruptcy rules. Moreover, the time to appeal the Confirmation Order or to seek review, rehearing, or certiorari with respect to the Confirmation Order must have expired, no appeal or petition for review, rehearing, or certiorari with respect to the Confirmation Order may be pending, and the Confirmation Order must otherwise be in full force and effect.

11.    **Periodic Loan Maintenance Charges**:

Borrower would be periodically charged for due diligence, loan maintenance, audit and appraisal costs.

12.    **Loan Origination Costs**:

In connection with the request for financing, Borrower understands that it will be necessary for Lender to make certain financial, legal and collateral investigations and determinations. Borrower agrees to pay for all of Lender's reasonably incurred costs and expenses incurred in connection with the proposed financing transaction including costs and expenses incurred by auditors and appraisers in verifying Borrower's records, Lender's reasonable legal expenses for advice in preparing documents in connection with the proposed loan, and any filing and search fees and Borrower shall obtain bankruptcy court approval for such costs and expenses which shall be entitled to priority as an administrative expense claim under Section 503(b)(1) of the Bankruptcy Code.

This discussion letter is for your benefit only and shall not create rights in favor of any other person or entity.

Sincerely,

FOOTHILL CAPITAL CORPORATION

Thomas F. Morgan
Vice President

Foothill Capital Corporation
617-624-4400 / Fax 617-722-9493
60 State Street, Suite 1150, Boston, MA 02109

A WELLS FARGO Company

ARY - 01059

000244



Wells Fargo Retail Finance
One Boston Place, 18th Floor
Boston, MA 02108
617 854-7215
617 523-4012 Fax

March 27, 2001

Mr. Gohar Husain
ARY Jewelers, LLC

Re: **Krigel's Jeweler's - Emergence Financing Proposal Letter**

Dear Mr. Husain:

In accordance with our prior and recent discussions and after review of your updated emergence business plan, Wells Fargo Retail Finance, LLC ("WFRF") issues this letter as an expression of our interest in reviewing the opportunity to provide the emergence financing for Krigel's Jewelers under ARY, LLC's ownership. Please understand that this letter should not be construed as a commitment to lend. Any commitment to lend would be subject to, among other conditions precedent, WFRF's Credit Committee approval. The proposed financing arrangement would be as follows:

1. **Maximum Credit Facility**: *$12,000,000*

    (a) **Working Capital Revolving Line (the "Line")**:  An amount up to the Maximum Credit Facility (less the amounts outstanding under the Accounts Receivable Sub-Line and L/C Sub-Line) subject to the inventory-borrowing base as outlined below.

    (b) **Inventory Borrowing Base**: Initially, 70% of the Net Retail Liquidation Value at <u>cost</u> ("NRLV") as updated periodically by WFRF or an appraiser acceptable to WFRF.   The borrower may (with 10 days prior written notice) request an increase of the inventory advance rate to 75% of NRLV for one consecutive 90 day period in each calendar year.

    (c) **Accounts Receivable Sub-Line**: Advances on 80% of eligible accounts receivable (not to exceed $5,000,000 under the maximum credit facility) less 1% for each percentage point in which dilution exceeds 10%.  At no time shall the loan outstanding on the accounts exceed A/R collections for the previous 90-day period.

    (d) **Letter of Credit Subline**: Up to *$3,000,000* would be available for the issuance and/or guaranty of Letters of Credit.  All such Letters of Credit issued will be reserved on a 100% basis.

    (e) **Minimum Availability Requirement:** $2,000,000 at all times.

000246

March 27, 2001
Page 2

2.   <u>Purpose</u>:

Loan proceeds would be used for the re-payment of the existing DIP facility and for post emergence general corporate purposes, including the financing of working capital needs and payment of amounts due under the Borrower's Plan of Re-organization.

3.   <u>Interest Rate</u>:

The rate of interest charged on the Line would be one and one-quarter percent (1.25%) above the present and future Reference Rate publicly announced from time to time by Wells Fargo Bank. Interest would be calculated on the basis of a three hundred sixty (360) day year on actual days elapsed and would be payable monthly in arrears. At no time would interest charged on the Line be less than seven percent (7.00%). The default rate of interest would be 3.0% above the applicable rate at the time of default.

4.   <u>Facility/Maintenance Fees</u>:

(a)   <u>Emergence Financing Fee</u>:  A fee of $80,000 shall be earned in full and payable at the date of closing.

(b)   <u>Unused Line Fee</u>:  A fee of 0.375% per annum, payable monthly would be charged for the average daily-unused portion of the Line.

(c)   <u>Letter of Credit Guaranty Fee</u>:  A fee equal to one and three quarters percent (1.75%) per annum of the actual amount of guaranties issued, plus issuing bank charges, would be payable monthly in arrears.

(c)   <u>Servicing Fee</u>:  A monthly Collateral Management fee of $2,000 would be earned and payable monthly, in arrears.

5.   <u>Collections / Receipts</u>:

Collections would be remitted to one or more lockboxes that would be assigned to and in form satisfactory to Lender. All collections would be subject to a one (1)-business day clearance charge. Such clearance charge would be for interest calculation purposes only and there would be no delay in the crediting of such collections for the purpose of calculating borrowing availability.

6.   <u>Loan Maturity and Prepayment</u>:

The Credit Facility would mature one (1) year ("Maturity") from the emergence loan closing date. There will be no Early Termination Premium.

ARY - 01062          000247

March 27, 2001
Page 3

7. **Security**:

   As collateral for this financing agreement, Lender would have a first priority perfected security interest in all of Borrower's assets including, but not limited to: accounts receivable; inventory; trademarks and trade names; fixed assets; leasehold interests and real property and such other assets, tangible or intangible, real or personal as Lender designates.

8. **Covenants**:

   Borrower would be required to maintain financial and collateral covenants that are typically used by Lender in similar retail transactions and may include, Minimum and Maximum Inventory levels, Gross Margin test, Purchase's test, Maximum Capital Expenditures, EBITDA as well as other such tests. The covenants would be developed as a result of Lenders due diligence process and will be based off a discount of Borrower's, historic and projected operating performance.

9. **Closing Date**:

   If the transaction contemplated by this letter is not consummated on or before April 30, 2001, then the terms and conditions set forth herein shall expire, without further notice or act of any kind by Lender or any other party.

10. **Conditions Precedent**:

    The following are some, but obviously not all, of the conditions precedent to any loan approval by Lender to Borrower:

    (a) Borrower and any subsidiaries and affiliates shall be qualified to do business in any states where they have collateral.

    (b) The UCC financing statements, fixture filings, deeds of trust or mortgages and related documents regarding the collateral (as applicable) shall have been recorded in all appropriate jurisdictions. Lender shall have received written notification reflecting same.

    (c) Loan origination costs including, but not limited to, audit fees, attorneys' fees, search fees, appraisals, documentation and filings, shall be paid by Borrower.

    (d) Completion of an updated field survey by Lender's examiners as well as an updated appraisal, which results are to be acceptable to Lender.

**ARY - 01063**     000248

March 27, 2001
Page 4

(e)  Borrower shall have executed and delivered such documents, instruments, security agreements, insurance, financing statements, corporate guarantees, verifications, non-offset letters, tax lien and litigation searches, good standing certificates, copies of building leases, landlord's waivers, trust deeds or mortgages, opinions of counsel and done such other acts a Lender may request in order to obtain Lender's legal approval to effect the completion of the financing arrangements herein contemplated. All of the foregoing must be in a form satisfactory to Lender and Lender's counsel, all loans and advances shall be made pursuant to, and subject to, the terms of financing documents executed at the closing.

(f)  Approval of WFRF's Sr. Credit Committee.

(g)  Satisfactory review of ARY, LLC's business plan as it relates to the purchase of 100% of the stock of Krigel's Jewelers.

(h)  No material adverse change in the business, operations, profits or prospects of Borrower shall have occurred since the date of the Commitment.

( )  Borrower shall, at loan closing, have minimum unused loan availability of $2,000,000.

( )  Borrower's Plan of Re-organization shall be on terms acceptable to Lender. The Plan of Reorganization shall have been confirmed by a final order entered by the Bankruptcy Court (the "Confirmation Order"), in form and substance acceptable to Lender in its sole discretion, and which has not been stayed by the Bankruptcy Court or by any other court having jurisdiction to issue any such stay. The Confirmation Order shall have been entered upon proper notice to all parties to be bound by the Plan of Reorganization, all as may be required by the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and any applicable local bankruptcy rules. Moreover, the time to appeal the Confirmation Order or to seek review, rehearing, or certiorari with respect to the Confirmation Order must have expired, no appeal or petition for review, rehearing, or certiorari with respect to the Confirmation Order may be pending, and the Confirmation Order must otherwise be in full force and effect.

(k)  Background evaluations satisfactory to WFRF, of ARY, LLC's owner's and management.

ARY - 01064

000249

March 27, 2001
Page 5

11.    **Periodic Loan Maintenance Charges**:

Borrower would be periodically charged for due diligence, loan maintenance, audit and appraisal costs.

12.    **Loan Origination Costs**:

In connection with the request for financing, Borrower understands that it will be necessary for Lender to make certain financial, legal and collateral investigations and determinations. Borrower agrees to pay for all of Lender's reasonably incurred costs and expenses incurred in connection with the proposed financing transaction including costs and expenses incurred by auditors and appraisers in verifying Borrower's records, Lender's reasonable legal expenses for advice in preparing documents in connection with the proposed loan, and any filing and search fees and Borrower shall obtain bankruptcy court approval for such costs and expenses which shall be entitled to priority as an administrative expense claim under Section 503(b)(1) of the Bankruptcy Code.

13.    **Additional Security**:

To further secure the debt, WFRF will require a $500M secured guarantee in the form of a Letter of Credit issued by a financial institution acceptable to WFRF, designating WFRF as the beneficiary.

This discussion letter is for your benefit only and shall not create rights in favor of any other person or entity.

Sincerely,

WELLS FARGO RETAIL FINANCE, LLC

Thomas F. Morgan
Vice President

ARY - 01065

000250

<u>VIA FACSIMILE (843) 881-3387</u>

November 7, 2000

**Foothill.**

Mr. Stuart Fetter, CEO
Silverman's, Inc.
503 Wando Park Blvd.
Suite 200
Mt. Pleasant, South Carolina 29464

Re: Krigel's Jewelers, Inc.

Dea· Stuart,

I enjoyed speaking with you yesterday regarding Krigel's Jewelers, and hearing about your plan to facilitate the purchase of Krigel's on behalf of your client. Foothill Capital is very interested in exploring the opportunity of providing DIP financing to the Buyer. Foothill has enjoyed a very good relationship with Krigel's since funding the facility in July 1998 and would like the opportunity to possibly continue the relationship with new ownership. As I am sure you are aware, Foothill not only provides asset based financing to manufacturers and wholesalers but also provides financing to a large and diverse retail portfolio as well. We have a great deal of experience in the jewelry industry both in retail and manufacturing which will give us the ability to provide your client with the highest level of quality customer service.

Pursuant to our conversation yesterday, I have detailed below a priority list of items I will need to obtain in order to prepare and provide to you a DIP Financing Proposal Letter. Additional items may be needed, however these are the most important at this time. Also of note, as part of Foothill's ongoing monitoring of the current facility, we are currently in the process of performing an update audit of the company and are contracting Gordon Brothers to update the appraisal of the inventory. If you could please provide the following, it would be greatly appreciated:

- **Background of the Buyer:**

    1 ) Information detailing the type of business the Buyer is currently operating.
    2 ) Current financial information.
    3 ) General background information of the Buyer and its Principal's.

- **Pro-Forma Information:**

    1.) Sources and Uses analysis reflecting the New Company's projected liquidity position on day one of a DIP financing. The analysis should include all anticipated sources and uses of cash including, any cash injections on the part of new ownership, payments to creditors etc., to arrive at the projected liquidity position at the end of day one. For analysis purposes, assume the current advance rates of the existing facility apply, realizing however that these may change.

Foothill Capital Corporation
617-624-4400 / Fax 617-722-9493
60 State Street, Suite 1150, Boston, MA 02109

**F 00411**

A **WELLS FARGO** Company

ARY - 01160

2.) DIP Projections (Balance Sheet, Income Statement and Cash Flow), rolling out a minimum of one full fiscal year.

Please call me if you have any questions at (617) 624-4428. I look forward to working with you.

Sincerely,

Tom Morgan
Vice President

Foothill Capital Corporation
617-624-4400 / Fax 617-722-9493
60 State Street. Suite 1150. Boston. MA 02109

A WELLS FARGO Company

F 00412

ARY - 01161