UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ARY JEWELERS, LLC | x : : | |
| Plaintiff | : : : | |
| vs | : : : | C.A. No. 04 CV 10281EFH |
| IBJTC BUSINESS CREDIT CORP. AND DAVID MOLINARIO | : : : : | AFFIDAVIT OF SHIRLEY WEBSTER |
| Defendants | : : x | |

SHIRLEY WEBSTER, being sworn, deposes and states as follows:

1. I submit this affidavit at the request of Plaintiff's attorney in support of Plaintiff's response to Defendants' Motion for Summary Judgment

2. I have been asked by The Carrigan Law Firm, counsel for ARY Jewelers, LLC ("ARY") to evaluate the economic damages, if any, resulting from the alleged wrongful acts of IBJTC Business Credit Corp. ("IBJTC") and David Molinario ("Mr. Molinario" or collectively, "Defendants"). It is my understanding that Defendants are alleged to have interfered with ARY's ability to obtain reasonable financing for ARY's planned acquisition of the Krigel's, Inc. ("Krigel's") chain of retail jewelry stores and to have breached Defendants' fiduciary duty to ARY. For purposes of this affidavit, I have assumed that Defendants are found to have performed the wrongful acts as alleged, and I have calculated economic damages to ARY based, in part, on that assumption.

3. I am a Vice President of CRA International, Inc. ("CRA"). I have consulted on a variety of commercial disputes over the past twenty years. I have also lectured on the determination of economic damages to law firms and conferences. A true and correct copy

of my resume, including my current and past employment and professional affiliations, a list of my testimony experience for the past four years, and a list of my publications in the past ten years, is included as Exhibit 1 to this affidavit.

4.   Based on my review of the information available to me at this time, and on my education, training and experience, it is my opinion that ARY's economic damages resulting from the change in Foothill's financing terms for emergence financing for Krigel's (which is allegedly due to the wrongful acts of Defendants) can be reasonably determined by comparing the present value of the profits projected for Krigel's under the December 15, 2000 financing terms proposed by Foothill and the March 27, 2001 financing terms proposed by Foothill.  It is my opinion that ARY's economic damages under this lost profits methodology is approximately $3.1 million, excluding prejudgment interest.

5.   I, and professionals working under my direction and supervision, reviewed and analyzed certain documents in connection with my work in this matter and have conducted independent research, including interviews.  The information I obtained and considered in preparing my report, which has been previously provided, and in preparing this affidavit is presented in Exhibit 2.

6.   This affidavit presents my analyses and opinions regarding ARY's economic damages resulting from the alleged wrongful acts of Defendants based on the information available to me as of the date of this affidavit.  It is my understanding that discovery in this matter is ongoing.  As additional documents, data, information, or testimony become available, I reserve the right to consider this information and to modify or supplement this affidavit or the opinions contained in this affidavit if I find it appropriate to do so in light of any additional information made available to me.  I understand that I may be asked to review the reports, affidavits or testimony of experts engaged by Defendants.  This may result in additional opinions that I may offer.

7.   In reaching my opinion, in addition to my education, training, experience, and the documents previously referred to herein, I relied on the following background information:

   a.   ARY, and its owner, Haji Abdul Razzak, operate a gold bullion investment

business and also operate several retail jewelry stores in Dubai. ARY has profitably operated these jewelry stores since approximately 1997. Part of the inventory for its jewelry stores, such as gold jewelry, gold chains and jewelry with semi-precious stones, is made in ARY's manufacturing and fabrication facilities in Dubai. ARY also has strong relationships with other suppliers, such as a watch-maker in Italy and diamond jewelry manufacturers and suppliers in India. The supply of inventory from its own manufacturing facilities and strong relationships with other suppliers assists ARY in reducing the cost of its inventory.

   b.   In 2000, ARY determined that an expansion of its retail jewelry business into the United States would be an advantageous business decision. ARY worked with a business broker and Gohar Husain to identify an appropriate acquisition target to use as an entry into the United States retail jewelry market. Mr. Husain had previously been with Service Merchandise, and therefore had experience with the retail jewelry business in the United States. ARY planned to use an initial acquisition to enter the United States market and to serve as a base from which to expand to 200 or more stores. ARY had evaluated the United States jewelry market and understood that most of the gold jewelry sold in the United States is 10k or 14k gold rather than the 18k or 21k gold demanded by its customers in Dubai. The cost of producing 10k and 14k gold jewelry is much lower than the cost to produce 18k and 21k gold jewelry because of the reduced gold content, and the achievable margins on 18k and 21k gold are lower than for 10k and 14k gold jewelry. Therefore, ARY's analysis indicated that its margins in retail jewelry in the United States would be higher than its margins in Dubai.

   c.   Krigel's was identified as a potential acquisition target for ARY. Krigel's owned and operated a chain of 21 retail jewelry stores in Kansas, Missouri and Ohio. Krigel's was family-owned and had been operated by the Krigel family since the business was established in 1910. In 1999 and 2000, Krigel's suffered financial setbacks and substantial losses.

   d.   In November 2000, ARY and Krigel's signed a Stock Purchase Agreement providing the terms under which ARY would acquire the stock of Krigel's. One of the

provisions in the Stock Purchase Agreement was that:

> Within four weeks from the date hereof Purchaser shall provide Seller with evidence of Foothill Capital's consent to the continued financing of Company's obligations to Foothill Capital. In the event Foothill Capital does not consent within the foregoing time period, this Stock Purchase Agreement and related agreements shall be void and of no further effect.

e. ARY and Krigel's planned to have Krigel's file a "pre-packaged" bankruptcy in which the terms with Krigel's creditors would be agreed to prior to the filing and the emergence financing would be arranged prior to the bankruptcy filing.

f. On December 15, 2000, Foothill Capital ("Foothill") provided a letter to Mr. Husain outlining proposed terms for emergence financing for the Krigel jewelry chain after being discharged from bankruptcy with Krigel's stock owned by ARY. ARY and Scott Krigel, President of Krigel's, found the terms offered acceptable, but not as attractive as desired. Therefore, financing terms were sought from additional financial institutions, including IBJ Whitehall. ARY received a proposal with favorable terms for emergence financing from IBJ Whitehall; however, on February 28, 2001, IBJ Whitehall notified Krigel's and ARY that it could not provide the discussed financing due to information obtained in IBJ Whitehall's background check on ARY Traders.

g. On March 19 and 20, 2001, Foothill revised the Krigel's proposal, shortening the term to one year from three years, decreasing the amount that could be financed with inventory to 70 percent of net retail liquidation value, increasing the minimum availability requirement and adding a $500,000 secured guarantee. Internal Foothill emails stated that "We are going to do this deal for one reason only - it is a clean exit (with fees) from Krigal's (sic). The cleaner we keep it - the easier that will be to sell [to the credit committee]."

h. On March 20, 2001, Foothill provided ARY with a draft revised proposal for emergence financing, with greater restrictions on financing against Krigel's inventory and larger requirements for available balances. ARY alleges in this litigation that the change in terms was due to Defendants contacting Foothill, knowing that Foothill was negotiating

financing for ARY, and accusing ARY of being involved in "embezzling, bribery for contracts to mint gold coins for the Olympic games being help in Sydney, Australia, and other illegal conduct." Mr. Husain responded to Foothill that the March 20 term sheet would make it "almost impossible for us to come up with the fund" and included terms that were like "breaking the camel's back."

    i.    Krigel's also responded to the "dramatic changes" in Foothill's proposed emergence financing. Krigel's specifically objected to:

- Decreasing the inventory advance rate from 90 percent of net retail liquidation value to 70 percent of net retail liquidation value;

- Increasing the unused loan availability to $5 million, causing the opening loan balance to decrease to only $1.2 million; and

- Requiring a one percent loan origination fee on a one year facility, especially when under the terms offered by Foothill, Krigel's would only be able to use a fraction of the stated $12 million line.

    j.    Although Foothill modified some of the revised terms, such as reducing the unused loan availability from $5 million to $2 million, when it issued its proposed financing terms on March 27, other disadvantageous terms remained, including the reduction in the percentage advanced against inventory to 70 percent of net retail liquidation value. An additional condition was also added to the Conditions Precedent section of the March 27, 2001 emergence finance proposal letter from Foothill. Condition (k) required "background evaluations satisfactory to [Foothill] of ARY, LLC's owners and management."

    k.    According to Krigel's analysis, under the revised terms, Krigel's would be able to obtain a loan balance of only $4.8 million at closing for the emergence financing after reducing the loan capacity under the revised terms of $6.8 million by the required $2 million excess loan availability, or more than $3 million less than Krigel's loan balance with Foothill as of March 31, 2001.

    l.    ARY held additional meetings with Foothill regarding the change in financing

terms; however, Foothill refused to offer the terms available at the date the Stock Purchase Agreement was signed. Therefore, on April 5, 2001, ARY informed Mr. Krigel that ARY would not proceed with its acquisition of Krigel's since Foothill had not provided the required consent for continued financing.

8. I have been asked to determine the economic impact on ARY of the change in financing terms offered by Foothill allegedly as a result of the information provided to Foothill by Defendants. It is my understanding that due to the change in financing terms, the business judgment of ARY was that it had to withdraw from its planned acquisition of Krigel's. ARY informed me that it was unable to obtain alternative financing from another institution because of the timing required to obtain financing for Krigel's to exit bankruptcy. After the failed acquisition of Krigel's by ARY, lawsuits were filed against ARY by Krigel's and Krigel's creditors. Due to the litigation, ARY informed me that $1.5 million of its funds were frozen for years and an additional $0.5 million for several months. As a result, ARY was reluctant to bid for Krigel's when it was sold at auction. In addition, ARY informed me that there was concern that more lawsuits would be filed against ARY if it bid for Krigel's at auction or if it pursued other acquisition opportunities. Therefore, I have determined ARY's economic damages due to the change in Foothill's financing terms, allegedly caused by the acts of Defendants, by calculating the difference in the projected profits of Krigel's under the December 15, 2000 financing terms from Foothill and the projected profits under the March 27, 2001 financing terms from Foothill.

9. The projected profits under each financing alternative are based on financial projections prepared by Krigel's. For the December 15, 2000 financing terms, Krigel's prepared a monthly financial projection for its fiscal year ended February 28, 2002 and an annual projection for three years. The assumptions used in the three year projection have been continued for the remainder of the projection period in the lost profits analysis. For the March 27, 2001 financing terms, Krigel's prepared a monthly financial projection for its fiscal year ended February 28, 2002. The differences in the two annual projections were primarily related to the change in financing terms; however, certain expense categories appear to have been adjusted for reasons other than the change in financing terms. I have

modified these changed expenses to be consistent with the December 2000 projections so that the differences in the two projections reflect the change in financing terms and not other changes in expenses.

10. Profits under the two financing alternatives are considered from March 1, 2001 through February 28, 2006. The analysis of lost profits is terminated as of February 28, 2006 assuming the current dispute is resolved to a judgment by that date and there would no longer be any obstacle to ARY entering the United States retail jewelry market, if it so chose.

11. The present value of the lost profits of ARY as of March 27, 2001 under the December 15, 2000 financing terms are calculated using a discount rate of 10.9 percent, or the calculated weighted average cost of capital of ARY under the December 15, 2000 financing terms. The present value of the lost profits of ARY as of March 27, 2001 under the March 27, 2001 financing terms are calculated using a discount rate of 12.5 percent, with the higher discount rate reflecting the weighted average cost of capital under the March 27, 2001 financing terms and the greater risk of the one year financing period in these terms, as compared with the three year loan term under the December 15 financing terms.

12. The present value of ARY's projected profits under the March 27, 2001 financing terms is approximately $3.1 million less than the present value of ARY's projected profits under the December 15, 2000 financing terms. It is my opinion that the $3.1 million decrease in present value of ARY's projected profits reflects economic damages to ARY from the change in financing terms. The calculation of lost profits is shown on Exhibit 3.

13. The calculation of economic damages is based only on the decrease in profits due to the change in financing terms and does not reflect the dollar amount of the higher capital infusion by ARY required under the March 27, 2001 financing terms as compared to the December 15, 2000 financing terms. Under the terms of the March 27 financing terms, the inventory borrowing base was restricted to 70 percent of the net retail liquidation value of inventory. The appraisal by Ozer Valuation Services determined the net retail liquidation value of Krigel's inventory to be approximately 80 percent of inventory at cost. As a result the inventory borrowing base would be 56 percent of inventory levels, or approximately $6.2

million. Adding the accounts receivable borrowing base of approximately $0.6 million results in an estimate loan capacity of $6.8 million, or $1.4 million less than the estimated loan balance as of March 31, 2001. That difference would be additional required capital from ARY. This calculation of additional capital requirement from ARY at loan closing is also reflected in the changes in the weekly cash flow projections from March 10 to projections from March 24. Weekly cash flow projections and an accompanying memo also reflect the need for additional capital infusions from ARY of at least $1 million.

14. I have evaluated the reasonableness of the projected revenues and profits using data from other retail jewelry businesses and based on the opportunity for ARY to reduce Krigel's cost of goods sold. According to the appraisal of Krigel's prepared by Ozer Valuation Services, Krigel's financial condition caused it to accept higher prices for its inventory from its suppliers in exchange for longer financing terms. By improving Krigel's financial condition, ARY could have been expected to obtain lower prices for its inventory in return for more rapid payment to its suppliers. In addition, as discussed above, ARY manufactures much of its own gold jewelry and also had established relationships with jewelry suppliers from operating its jewelry stores in Dubai. I understand from ARY that many of the same suppliers could have provided inventory to the Krigel's stores. Increased purchases from suppliers with which ARY had strong relationships and supplying inventory from its own gold jewelry manufacturing would offer ARY further opportunities to decrease the cost of goods sold at Krigel's, thereby improving the profitability of Krigel's. The projected increase in gross profits at Krigel's from 48.6 percent to 55 percent is reasonable in comparison to the gross profits achieved by other retail jewelry chains in the United States.

15. Prejudgment interest is calculated in order to make the plaintiff whole for the period the plaintiff was deprived of the amount of recovery determined to be due the plaintiff. It is my understanding that the Court may determine that it is appropriate to award prejudgment interest in this matter. If appropriate, I will provide calculations of prejudgment interest to assist the court with this issue.

16  All of the documents and information I relied upon are of the type reasonably relied

upon by experts in my particular field (economics and damage analysis) in forming opinions or inferences upon the subjects/opinions expressed herein. All exhibits attached hereto are true and correct copies.

_____
Shirley Webster

Sworn to before me on this the ___9___ day of September, 2005.

Notary seal:

A.W. HAWKINS
Notary Public, State of Texas
My Commission Expires
May 18, 2006