# In The Matter Of:

*ARY Jewelers, LLC  v.*
*IBJTC Business Credit Corp., et al.*

*David Molinario*
*Vol. 1, December 1, 2004*

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File MOLINARI.V1, 207 Pages*
*Min-U-Script® File ID: 0070685075*

**Word Index included with this Min-U-Script®**


EXHIBIT 1

Page 61

[1] this lawsuit.
[2] Q: This is after he already had the contact
[3] information about Bob, correct?
[4] A: They are two separate situations.
[5] Q: Oh, I'm sorry. The second one he was
[6] calling you again in response to a phone call that
[7] Bob had made to him?
[8] A: I believe that's correct.
[9] Q: Did ya'll actually talk?
[10] A: Yes.
[11] Q: Tell me the generalities of that
[12] conversation.
[13] A: He gave me very general recollections of
[14] his experience with this company and told me that he
[15] was going to reach out and talk to Bob.
[16] Q: Do you know whether or not he had already
[17] talked to Bob once that several months ago?
[18] A: I don't know if they actually spoke. I
[19] believe they exchanged voice mails.
[20] Q: Do you recall at least generally what
[21] recollections he was relating to you about his
[22] experience with this company? And when we say "this
[23] company," who are you referring to?
[24] A: ARY.

Page 62

[1] Q: Do you remember what he said generally?
[2] A: Yes.
[3] Q: What would that be?
[4] A: He indicated that they wanted to move
[5] forward with the transaction. ARY did not want to
[6] move forward with them. He also indicated that the
[7] articles they had received from Whitehall didn't
[8] really matter to him. There was a deterioration in
[9] the company's operating performance.
[10] Q: Anything else that you can recall?
[11] A: Yes.
[12] Q: You are doing good. Keep going.
[13] A: He indicated, again, that the articles
[14] played no impact in his decision and it would have
[15] been identified during normal course.
[16] Q: Let me kind of hopefully understand. What
[17] you just told me is important. I appreciate it.
[18] Let me kind of summarize, list and summarize what
[19] you recollect Mr. Cole was telling you about ARY or
[20] this potential ARY loan, and that is in no necessary
[21] order.
[22] One, the articles, and we're talking about
[23] some Internet or news articles and I guess maybe
[24] news articles taken off the Internet pertaining to

Page 63

[1] ARY or certain individuals that may have some
[2] relationship with ARY, it's my understanding that
[3] you provided or faxed to the folks at Foothill while
[4] you were at Whitehall.
[5] Is that a fair recap of what you just
[6] described as news articles?
[7] A: News articles in the public domain, yes.
[8] Q: Let me ask you, I don't know of any news
[9] articles that are not in the public domain, but you
[10] offered that as though it's important to you.
[11] Am I hearing from you that there's some
[12] distinction or difference that the news articles —
[13] let me back up. If I need to repeat this, I will.
[14] Was everything else said in that statement defining
[15] the news articles, correct?
[16] A: I believe so.
[17] Q: Is there some important distinction in your
[18] mind as it pertains to this lawsuit that these news
[19] articles as you say were "in the public domain"?
[20] A: No. I believe your statement was correct,
[21] all news articles are in the public domain.
[22] Q: Again, Mr. Cole related to you news
[23] articles, as you recall, he said he played no role
[24] or an insignificant role in Foothill's decision

Page 64

[1] to — well, let, me back up.
[2] Let me ask you tell me what you understand
[3] he was saying on that point. It made no difference?
[4] I'm not trying to put words in your mouth.
[5] A: I don't recall nor understand completely
[6] because I don't understand the entire situation
[7] between ARY and Foothill.
[8] Q: That's fair enough. Something about news
[9] articles made no difference or played no role,
[10] something to that effect?
[11] A: Something to that effect.
[12] Q: Then something to the effect in the
[13] standard course of operating at Foothill, they would
[14] have come across these news articles anyway?
[15] A: I believe that was said, yes.
[16] Q: And then thirdly, something to the effect
[17] that you took from this conversation —
[18] MR. CARRIGAN: And we can get through this
[19] area and then take a break.
[20] MR. FISCHLER: Off the record.
[21] (Discussion off the record)
[22] Q: Thirdly, something to the effect that
[23] Foothill wanted to go forward with this loan or the
[24] transaction, but ARY did not want to go forward,

Page 105

[1] anything even remotely close to that ever cross your
[2] mind?
[3]    MR. FISCHLER: Objection to form. Go
[4] ahead.
[5]    A: The information was public information.
[6] Therefore, I did not believe that there was any
[7] confidentiality associated with it.
[8]    Q: Sir, that was not my question. The
[9] question was did it ever cross your mind that what
[10] you were doing by faxing those articles to a
[11] competitor that had at least previously a loan
[12] proposal on the table to ARY that may still be on
[13] the table, did it ever cross your mind that that may
[14] be inappropriate based on whatever?
[15]    A: I don't believe so. I don't know.
[16]    Q: Did it bother you or even ring a little
[17] bitty alarm bell in your own personal business
[18] ethics that that may be inappropriate?
[19]    MR. FISCHLER: Objection to the form.
[20]    A: Again, I was just following the direction
[21] of my supervisor. I did not have an opinion on it
[22] one way or the other. I was doing what I was
[23] instructed.
[24]    Q: That is not my question, sir. As you were

Page 106

[1] instructed to do this and at the time you did this,
[2] did you have even the slightest bit of concern or
[3] worry or thought or little bitty alarm bell in your
[4] mind go off that this may not be appropriate?
[5]    A: I don't recall.
[6]    Q: Last question before we break for lunch.
[7] Were you ever told by Frank O'Connor why it was that
[8] you were faxing these articles to a competitor that
[9] at least at one point in time you were aware had a
[10] competing proposal on the table to ARY?
[11]    A: Yes.
[12]    Q: What did Mr. O'Connor tell you?
[13]    A: He told me it was a professional courtesy,
[14] that Foothill was awaiting our commitment letter,
[15] and he was concerned about litigious action on
[16] Foothill against us.
[17]    Q: Did that all ring true and make sense to
[18] you?
[19]    A: I believe it made sense.
[20]    Q: Is it typical that you guys in your
[21] industry when you are competing for a loan, as a
[22] professional courtesy you share information with
[23] each other about your potential client?
[24]    MR. FISCHLER: I object to the form of the

Page 107

[1] question. It mischaracterizes the record.
[2]    MR. CARRIGAN: Objection form, period.
[3]    MR. FISCHLER: That mischaracterizes the
[4] record.
[5]    A: I lost track of the question now.
[6]    Q: The question to you is, sir, how long have
[7] you been in this industry?
[8]    A: Now?
[9]    Q: Yes.
[10]    A: Nine years.
[11]    Q: Is it your understanding that for you guys
[12] in this industry, it's part of your professional
[13] courtesy to one another that you as competitors in
[14] the loan bidding process share information with each
[15] other as professional courtesy about potential
[16] clients?
[17]    MR. FISCHLER: Objection to the form.
[18]    A: That was the first time I can recall it
[19] happening. I can recall similar situations.
[20]    MR. FISCHLER: You said last question a
[21] couple of questions ago, Steve. We have to break
[22] for lunch.
[23]    Q: Last question. Do you agree with that,
[24] sir, that that is part of the professional courtesy

Page 108

[1] that you owe your competitors in this, your
[2] industry, to share information with one other about
[3] potential clients?
[4]    MR. FISCHLER: Objection to the form.
[5]    A: I don't know if I have an opinion on it. I
[6] was doing what I was instructed to do. If asked to
[7] do it again, I would do what I was instructed to do.
[8]    Q: Would you ever do that on your own?
[9]    MR. FISCHLER: Objection to the form.
[10]    A: I would ask someone.
[11]    Q: Because you have concerns over whether or
[12] not that is appropriate, don't you, sir?
[13]    MR. FISCHLER: Objection to form.
[14]    A: I don't know if it's concerns over what is
[15] appropriate or not. I would just seek additional
[16] counsel, as I do on many situations.
[17]    Q: Why would you seek additional counsel?
[18]    MR. FISCHLER: We have to cut this off.
[19]    MR. CARRIGAN: I don't have to cut anything
[20] off.
[21]    MR. FISCHLER: Well, I'm going to cut it
[22] off. The court reporter asked for a break. The
[23] witness is tired. We need to break for lunch.
[24] You've taken half hour breaks to use the phone.

Page 117

[1]  Q: Which was in a sense as you pointed out —
[2]  I mean, telling them why was the articles. Whether
[3]  or not you had actually forwarded it to them, even
[4]  if Frank O'Connor's recollection is clear, the why
[5]  was the news articles. I'll strike all that.
[6]    One way or the other, it's both of ya'll's
[7]  recollection that he instructed you to inform
[8]  Foothill why the letter of commitment was not being
[9]  issued?
[10] A: Correct.
[11] Q: He told you that the purpose for doing
[12] this, this being at least the telephone call, if not
[13] also the faxing of the news articles to Foothill,
[14] was because Foothill was awaiting a commitment
[15] letter from Whitehall and — let me back up. That's
[16] what I'm trying to understand.
[17]   Tell me one more time, based on what
[18] Mr. O'Connor told you, your understanding as to why
[19] Foothill was either being called and/or faxed with
[20] this information.
[21] A: Frank told me that it was a professional
[22] courtesy to call them and make them aware that
[23] either Foothill or ARY or Krigel's, I'm not sure who
[24] the proper entity would be, would not be receiving a

Page 118

[1]  commitment letter solidifying our ability to move
[2]  forward with the transaction.
[3]  Q: You earlier told me that that made sense to
[4]  you at least at the time. Help me. Why would
[5]  Foothill need to know whether or not Whitehall was
[6]  going to issue a letter of commitment to Krigel's
[7]  and ARY?
[8]  A: I don't think I can speak to why
[9]  Foothill — I'm not sure if I understand the
[10] question. I think you are asking me to speak for
[11] Foothill. I'm not sure what you are asking.
[12] MR. FISCHLER: You want him to read the
[13] question back?
[15] Q: You told me that Mr. O'Connor informed you
[16] that the purpose of your calling and/or faxing
[17] Foothill with the information was that Foothill or
[18] now you say somebody was awaiting a commitment
[19] letter from Whitehall, and as a professional
[20] courtesy, Mr. O'Connor wanted you to make Foothill
[21] aware that they would not be receiving this letter
[22] of commitment, correct?
[23] A: Correct.
[24] Q: It was under the category of a professional

Page 119

[1]  courtesy?
[2]  A: Correct.
[3]  Q: I think you told me earlier — well, I
[4]  asked you does that make sense to you,
[5]  Mr. Molinario. I thought you said yes, it made
[6]  sense to you. Do you recall that testimony?
[7]  A: I'm unclear as to the questioning and
[8]  answering.
[9]  Q: My questioning and answering?
[10] A: I am a little confused now.
[11] Q: Let me ask you, your knowledge of the
[12] industry now, does that make sense that as a
[13] professional courtesy, Foothill, who at least at one
[14] time had its own loan proposal out on the table to
[15] Krigel/ARY, would be informed of Whitehall's
[16] decision not to go forward with their term sheet?
[17] A: I think the ARY situation is a unique
[18] situation. I can recall a couple of other
[19] situations where information was communicated
[20] between lenders that would be — I don't want to say
[21] somewhat consistent, but was communicated.
[22] Q: I guess you and I can agree that as a
[23] professional courtesy, or whatever you want to label
[24] it as, it is not common for potential lenders to

Page 120

[1]  share information about their mutual potential
[2]  clients; is that correct?
[3]  A: I don't know how you define "common."
[4]  There are situations where you do communicate.
[5]  Q: You told me, one, ARY was a unique
[6]  situation which allowed it and that you could think
[7]  of a couple of other somewhat consistent situations
[8]  where it also had been done under somewhat similar
[9]  conditions or circumstances, correct?
[10] A: Correct.
[11] Q: It sounds to me like in your — how many
[12] years have you been in the industry again?
[13] A: Nine or so.
[14] Q: In almost nine or so years, you can only
[15] think of less than a handful of times where this has
[16] ever been done?
[17] A: That is correct. However, I've only been
[18] in a situation where I would be privy to this
[19] information for probably four years.
[20] Q: So in four years, you've only seen it less
[21] than a handful of times?
[22] A: That's probably a correct statement.
[23] Q: I mean, by anybody's definition, that
[24] sounds to me like the converse of that is it's

Page 133

[1] be a reasonable expectation on their part that
[2] whatever you uncover is kept with you?
[3] MR. FISCHLER: Objection.
[4] Q: Or your bank?
[5] MR. FISCHLER: The witness is not here as
[6] an expert witness.
[7] THE WITNESS: Do I answer?
[8] MR. FISCHLER: Go ahead. My objection is
[9] noted. If you have an opinion, you can go ahead and
[10] answer.
[11] A: My understanding of all that privacy
[12] information that you discussed is regarding
[13] confidential and private information that isn't in
[14] the general public domain.
[15] Q: Are you saying it would be an unreasonable
[16] expectation for one of your potential clients
[17] that — you think The Children's — who is your
[18] contact with The Children's Palace?
[19] A: It's The Children's Place.
[20] Q: Who is your contact with The Children's
[21] Place?
[22] A: Seth Udasin.
[23] Q: Would you spell the last name.
[24] A: U-d-a-s-i-n, I believe.

Page 134

[1] Q: U-d-i —
[2] A: U-d-a-s-i-n.
[3] Q: What is his ethnic background?
[4] A: I believe Jewish, but I'm not sure.
[5] Q: Where is he located?
[6] A: The company is located in Secaucus, New
[7] Jersey.
[8] Q: Do you think that Mr. Udasin knows that you
[9] think it's okay if it's in the "public domain" to
[10] share any information that you might have on him and
[11] The Children's Place with other financial
[12] institutions?
[13] MR. FISCHLER: Objection to form.
[14] A: I don't know the answer to that. It's a
[15] public company. They do have public information
[16] that's out there.
[17] Q: That's not what I asked. Do you think he
[18] think it would be okay — as long as David Molinario
[19] deems it to be in the public domain, he doesn't mind
[20] you faxing news articles, picking up the phone and
[21] calling them, so on and so forth? Do you think he
[22] thinks that's okay?
[23] A: I don't know what his opinion would be.
[24] Q: Do you mind if I call him and ask him?

Page 135

[1] A: You can call him.
[2] Q: What's his telephone number?
[3] A: I don't know.
[4] MR. FISCHLER: I would object to you doing
[5] that. I would ask you to give me prior notice
[6] before any such call.
[7] MR. CARRIGAN: No.
[8] MR. FISCHLER: My request is on the record.
[9] If you don't want to honor it, that's your choice.
[10] You are on notice that I asked you not to do that.
[11] If you decide to do that, I ask you for prior
[12] notice.
[13] MR. CARRIGAN: That would be denied. You
[14] have not noticed me of any conversation with Cole or
[15] O'Connor or any of these individuals.
[16] MR. FISCHLER: You are suggesting I can't
[17] interview third-party witnesses without prior notice
[18] to you?
[19] MR. CARRIGAN: Are you suggesting I can't?
[20] MR. FISCHLER: I'm not suggesting you
[21] can't, but what you are proposing, if I understand
[22] you correctly, is not an interview with a third-
[23] party witness. It would be, in my view, an
[24] inappropriate and arbitrary contact with someone

Page 136

[1] that has nothing to do with this case.
[2] MR. CARRIGAN: Oh, you don't think so?
[3] MR. FISCHLER: We can talk about it at some
[4] future date if you so choose to do it. Let's just
[5] move forward.
[6] MR. CARRIGAN: Just so you know, I'm doing
[7] it, and I'm not contacting you beforehand. You
[8] didn't contact me when you contacted any of the
[9] witnesses you contacted.
[10] Q: Is that where The Children's Place is
[11] headquartered, Secaucus, New Jersey?
[12] A: Yes.
[13] Q: What is Mr. Udasin's position there?
[14] A: He's the CFO.
[15] Q: You knew there were some other bidders or
[16] loan proposals in the ARY mix, correct?
[17] A: I'm not 100 percent certain of how many or
[18] what proposals were out there.
[19] Q: You were aware of at least yours and one
[20] other?
[21] A: I was told that Foothill had made a
[22] proposal.
[23] Q: You certainly knew there may have been
[24] others, correct?

ARY Jewelers, LLC v.
IBJTC Business Credit Corp., et al.
Case 1:04-cv-10281-EFH   Document 65-2   Filed 09/29/2005   Page 6 of 7
David Molinario
Vol. 1, December 1, 2004

Page 153

[1] perfectly appropriate, correct, proper actions to
[2] take?
[3]  A: Yes.
[4]  Q: What has he said about that?
[5]  A: He has said he feels as though we did not
[6] do anything wrong.
[7]  Q: You mentioned these couple of other
[8] examples where some facts were kind of similar and
[9] analogous to the ARY situation. Was he involved in
[10] those other couple of situations?
[11]  A: One out of the two.
[12]  Q: I guess it just sounds to me like based on
[13] what he's telling you, if he was confronted with
[14] whatever uniqueness there was in this situation, it
[15] sounds like he wouldn't hesitate to do this type of
[16] thing again.
[17]  MR. FISCHLER: Is that a question?
[18]  MR. CARRIGAN: Yes.
[19]  Q: Is that the impression you got?
[20]  MR. FISCHLER: Objection to form.
[21]  A: I can't answer for Frank.
[22]  Q: Tell me about the one other somewhat
[23] analogous situation where some information along
[24] these lines was also communicated that Frank

Page 154

[1] O'Connor was involved in.
[2]  A: There was a deep discount department store
[3] in I believe Missouri, Gibson's, where we were
[4] looking to take I believe at the time Fleet Retail
[5] Finance out of the credit facility, refinance them
[6] out. Part of our structure included I believe
[7] lending on real estate.
[8]   During due diligence, we had determined
[9] that the real estate had previously been gas
[10] stations where there were environmental concerns.
[11] As a result of that, we were not able to do the
[12] deal.
[13]   I believe Frank O'Connor called Fleet
[14] Retail and informed them of what we had determined,
[15] and accordingly, we were not able to move forward.
[16]  Q: Again, the potential client was who?
[17]  A: Gibson's.
[18]  Q: Are they still in business?
[19]  A: They have subsequently been liquidated.
[20]  Q: Fleet Retail would have been in the same
[21] situation as Foothill was in our situation? They
[22] were the existing financier, lender?
[23]  A: Correct.
[24]  Q: Do you know whether or not they also had a

Page 155

[1] term sheet at any time out to Gibson's to continue
[2] financing them?
[3]  A: I don't know.
[4]  Q: Do you know whether or not Fleet in that
[5] situation, Gibson's had given permission to Fleet —
[6] given permission to Frank O'Connor to pass that
[7] information on to Fleet Retail?
[8]  A: I don't know.
[9]  Q: You are not aware of any authorization from
[10] anyone at ARY to release or distribute the
[11] information that was distributed from Whitehall to
[12] Foothill, correct?
[13]  A: I'm unaware of any of that.
[14]  Q: And at no time either at the time of this
[15] incident or since this lawsuit or any time in
[16] between has Frank O'Connor taken the position with
[17] you that he had ARY's permission or authority to
[18] release this information, correct?
[19]  A: That's correct, I'm not aware of that.
[20]  MR. FISCHLER: This information being the
[21] articles?
[22]  Q: The articles, the fact that the decision,
[23] private decision had been made to reject the loan
[24] application, withdraw it, and the reasons why it was

Page 156

[1] rejected or withdrawn.
[2]  A: I don't believe he had the authority. I
[3] don't know that.
[4]  Q: He never took that position with you?
[5]  A: No.
[6]  Q: You are not aware of anything that would
[7] indicate he had that authority?
[8]  A: That's correct.
[9]  Q: Would you tell me real quickly, with
[10] appreciation, about the one other situation. I
[11] understand and agree with you that the Fleet Retail
[12] and Gibson's was certainly somewhat analogous. What
[13] was the one other one that came to mind? Let me
[14] back up. Fleet Retail/Gibson's, was that after ARY?
[15]  A: Yes.
[16]  Q: Were ya'll with Whitehall at the time?
[17]  A: We were with LaSalle.
[18]  Q: Do you know whether or not those
[19] environmental reports were actually faxed over or
[20] forwarded or distributed to Fleet Retail?
[21]  A: I don't know.
[22]  Q: Tell me about the one other situation.
[23]  A: Probably about six to nine months ago, I
[24] think it was, we were looking at a credit facility

Page 157

[1] U.S.A. Drug in Arkansas. We were taking out I think
[2] Fleet Capital, and we were competing on a parallel
[3] basis with another financial institution. I believe
[4] it was led by GE, General Electric.
[5]     At some point in time, we elected not to
[6] move forward with the credit facility, and I believe
[7] that was communicated to GE.
[8]     Q: I appreciate that. The potential borrower
[9] was U.S.A. Drug?
[10]    A: That's correct.
[11]    Q: They are based out of?
[12]    A: Arkansas, I believe.
[13]    Q: You are aware, and were aware, that there
[14] were at least two competing financial institutions,
[15] if I have it right. Who were you with at the time?
[16]    A: Wells Fargo Retail Finance.
[17]    Q: Who else was involved from Wells Fargo
[18] other than yourself?
[19]    A: Tim Tobin.
[20]    Q: Wells Fargo had a term sheet on the table
[21] as did you believe GE Capital, or GE?
[22]    A: GE definitely did.
[23]    Q: And Wells Fargo did?
[24]    A: Yes.

Page 158

[1]    Q: I got lost. Fleet Capital was the existing
[2] lender?
[3]    A: Correct.
[4]    Q: What did you mean "parallel," meaning just
[5] competing?
[6]    A: Usually when there's a process where you
[7] compete against someone else, it makes sense to do
[8] everything parallel so you don't expend extra money
[9] during the due diligence process, and we were
[10] competing with GE.
[11]    Q: It sounds like at least one potential
[12] difference, if I'm understanding you, is it was more
[13] out in the open who was also looking at the
[14] possibility of loaning the money to U.S.A. Drug?
[15]    A: Yes.
[16]    Q: And, in fact, ya'll were at least sharing
[17] some of the expenses of the due diligence?
[18]    A: Correct.
[19]    Q: Which that is a difference from the ARY
[20] situation as you understand it, correct?
[21]    A: I believe that is different.
[22]    Q: LEF and the due diligence that you were all
[23] doing, expense or otherwise, until the faxing of
[24] this information was not shared?

Page 159

[1]    A: I don't believe so.
[2]    Q: At some point in time, Wells Fargo made the
[3] decision that ya'll were not going forward, and that
[4] was communicated to GE?
[5]    A: Correct.
[6]    Q: Do you know whether or not that was done
[7] with or without U.S.A. Drug's permission?
[8]    A: I don't know the answer to that. However,
[9] U.S.A. Drug was aware of it.
[10]    Q: Was aware that it was being done?
[11]    A: Yes.
[12]    Q: Let me ask you, are you aware of any notice
[13] either before or after this information, as you and
[14] I have been kind of defining it and putting it in
[15] parameters, was forwarded to or communicated to
[16] Foothill that anyone at Whitehall put ARY on notice
[17] that this was either going to be forwarded or had
[18] been forwarded?
[19]    A: I don't understand the question.
[20]    Q: Sorry. Are you aware of any notice either
[21] pre-faxing or post-faxing that was given to ARY that
[22] this information either was going to be or had been
[23] forwarded to Foothill?
[24]    A: I'm not aware of anything.

Page 160

[1]    Q: You have not heard at any time either back
[2] at that time or postlawsuit or at any time in
[3] between Frank O'Connor take the position that he put
[4] ARY on notice of the distribution of this
[5] information either pre-faxing or post-faxing?
[6]    A: I don't believe Frank has ever mentioned
[7] that to me.
[8]    Q: Do you remember who the contact was with
[9] U.S.A. Drug?
[10]    A: I don't.
[11]    Q: How about at GE, were who were ya'll
[12] dealing with?
[13]    A: I don't know. That I could probably get
[14] more easily than the other one.
[15]    Q: If you come across it, would you mind
[16] passing it on to Bob, and Bob and I can decide
[17] whether or not I can get that.
[18]    Quickly, how about with Fleet Capital, do
[19] you remember the contacts or anyone?
[20]    A: I never spoke to Fleet Capital.
[21]    Q: Where are they located?
[22]    A: I don't know.
[23]    Q: How about to go into the Gibson's example
[24] real quick, do you have any recollection?