Thomas F. Morgan
6/15/2005

Page 1

1        UNITED STATES DISTRICT COURT

      FOR THE DISTRICT OF MASSACHUSETTS

2

                          VOL. I

3                         PGS. 1-220

                    EXHIBITS 1-6

4

5    ARY JEWELERS, LLC,                    )

                                           )

6                        Plaintiff,        )

                                           )Civil Action

7        vs                                )04: CV-10281 EFH

                                           )

8    IBJTC BUSINESS CREDIT CORP., and      )

     DAVID MOLINARIO,                      )

9                                          )

                         Defendants.       )

10                                         )

11

12     DEPOSITION OF THOMAS F. MORGAN, a witness in

13   the above-entitled cause, taken before

14   Lori J. Atkinson, Professional Court

15   Reporter and Notary Public in and for the

16   Commonwealth of Massachusetts at the Westin

17   Hotel, Copley Place, 10 Huntington Avenue,

18   Boston, MA, on the 15th of June, 2005,

19   commencing at 10:00 a.m. pursuant to the Federal

20   Rules of Civil Procedure.

21

22

23

24

25

EXHIBIT
3

Thomas F. Morgan
6/15/2005

Page 6

```
 1        Morgan.  The fine lawyer your left is Mr.
 2        Gayer.  Have you ever met or talked to Mr.
 3        Gayer before?
 4    A.  I don't have any recollection of speaking to him,
 5        no.
 6    Q.  All right.  Mr. Gayer is also working with
 7        an outstanding lawyer in his same firm by the
 8        name of Robert Fischler.  To your knowledge,
 9        have you talked to Mr. Fischler, or to your
10        knowledge, anyone with Mr. Gayer's or
11        Mr. Fischler's law firm?
12    A.  I don't recall having spoken to anyone.  Although
13        I can't be a hundred percent sure.
14    Q.  Let me just -- to your recollection and I'm
15        talking -- let me ask you this way:  You are here
16        subpoenaed in a lawsuit that is styled ARY
17        Jewelers LLC versus IBJTC Business Credit
18        Corporation and David Molinario, correct?
19    A.  Correct.
20    Q.  And you are not party to that lawsuit.  I'm sure
21        you never will be a party to that lawsuit;
22        you understand that?
23    A.  Yes.
24    Q.  Have you ever talked to anyone that you can think
25        of, I guess, I would focus especially more
```

Thomas F. Morgan
6/15/2005

1    recently, Mr. Morgan, about anything related to

2    this particular lawsuit, ARY Jewelers LLC

3    versus IBJTC Business Credit Corporation and

4    David Molinario?

5  A.  I can say for certain that I have had no

6    conversations regarding this case with anyone for

7    at least the last 24 months.

8  Q.  Fair enough, sir.  Were you, if you can

9    recollect, were you even aware that such a

10    lawsuit had been filed and existed prior to

11    either -- I guess prior to shortly before you

12    being served with a subpoena to commanding your

13    appearance to give your deposition or your

14    testimony?

15  A.  I was aware that there was a lawsuit or one that

16    was potentially being filed.  I did not know the

17    status where it stood, until being served the

18    subpoena.

19  Q.  All right, sir.  I'm just curious.  You will

20    find, Mr. Morgan, some of my questions,

21    especially I don't know your industry that

22    well are just dumb questions, so I will

23    apologize.  Some of them are just curiosity

24    questions.  This is a curiosity question:

25    Do you recollect how you found out that such a

Thomas F. Morgan
6/15/2005

Page 29

```
 1          accepted banking practice, maybe not an accepted
 2          banking practice at all, based on your years
 3          in the banking industry?
 4                    MR. GAYER:  Note my objection.
 5     Q.   Or you did you not do enough traditional --
 6     A.   It depends on what you mean by sharing
 7          information.  Information can be shared for a
 8          variety of reasons.  One bank, you know, may
 9          send a potential borrower to another even
10          though they can't do the loan.  So when
11          you say "sharing information," I need to
12          understand more what you mean by sharing
13          information.
14     Q.   In that one sending to another, that would
15          probably be in a permissive context, would
16          it not, if you want to share information from one
17          bank to another because you are referring
18          a customer, potential customer, and you shared
19          information you probably had information to do
20          so?
21                    MR. GAYER:  Objection to form.
22     A.   Permission from?
23     Q.   From the customer, potential customer?
24     A.   I wouldn't say that that is, for example, one
25          institution for whatever couldn't do a deal would
```

Thomas F. Morgan
6/15/2005

Page 30

1    they necessarily ask the customer's permission to

2    forward the information to someone that might do

3    the deal?  I don't think that is always the case

4    that they would.  I think an assumption is

5    made that it would be done as a means of

6    trying to help the customer, would they obtain

7    permission specifically in writing; possibly,

8    possibly not.  Depends on what the procedures

9    are.

10  Q.   Okay.  Can you think of a situation that

11       you're familiar with where two institutions were

12       competing for some loan business where they were

13       sharing what might be considered private

14       confidential information about the customer and

15       prospective customer without permission to do so?

16             MR. GAYER:  Note my objection to the

17       form.

18  A.   If I was competing for business with a potential

19       lender, I don't believe I would share information

20       with that potential lender.

21  Q.   Let me switch back to the asset-based lending.

22       What year, approximately, were you up to

23       now, Mr. Morgan, that you switched from again the

24       more traditional side of banking, as you have

25       just described it very well, the asset-based

Thomas F. Morgan
6/15/2005

| | | |
|---|---|---|
| 1 | | lending side of banking? |
| 2 | A. | That would be 1992. |
| 3 | Q. | Do you remember your official position or title |
| 4 | | when you made that switch to asset-based lending |
| 5 | | in 1992? |
| 6 | A. | Yes.  It was asset-based auditor. |
| 7 | Q. | I probably have some idea, but if you wouldn't |
| 8 | | mind telling us kind of generally what you |
| 9 | | did as an asset-based lending auditor? |
| 10 | A. | Primary responsibilities of the auditor was to |
| 11 | | perform periodic audits on not only existing |
| 12 | | clients, but also potential new clients that |
| 13 | | involved carrying out certain due diligence |
| 14 | | procedures that the bank required.  Auditors go |
| 15 | | out on the site, to the clients and perform those |
| 16 | | procedures and compile them in the form of |
| 17 | | a report that the account officers would review. |
| 18 | Q. | And how long did you remain in that position, I |
| 19 | | think we are still with Shawmut Bank? |
| 20 | A. | That's correct. |
| 21 | Q. | As an asset-based lending auditor? |
| 22 | A. | Approximately three years. |
| 23 | Q. | And the asset-based lending that Shawmut Bank |
| 24 | | was doing at that time and that you were doing |
| 25 | | the auditing of those clients or those accounts, |

Thomas F. Morgan
6/15/2005

```
 1          from us.  You know, in effect it is a

 2          new transaction.  The same company but a different

 3          relationship, different owners.

 4                    There would be an fair amount of

 5          due diligence going into it, making a credit

 6          determination and whether it's one to

 7          continue the new buyers.

 8     Q.   Is that something that Foothill was in the

 9          business of doing?

10     A.   Yes.

11     Q.   Evaluating lending opportunities or loan

12          potentials, correct?

13     A.   Correct.

14     Q.   How did Foothill go about doing its due

15          diligence on an potential lendee --  an potential

16          customers?  Did y'all do it internally or

17          externally or combination; how did that work?

18     A.   Combination.

19                    MR. GAYER:  Note my objection to the

20          form.

21          BY MR. CARRIGAN (CONT'D):

22     Q.   Did you consider that Foothill utilizing this

23          combination that the due diligence and

24          in-house and out-house was fully competent

25          to performed equate, even more than adequate, due
```

Thomas F. Morgan
6/15/2005

Page 50

1     diligence on a prospective customer?

2  A.  Yes.

3  Q.  In your observations and your experience with

4     Foothill, did they do a good job at it?

5  A.  I believe so, yes.

6  Q.  Did Foothill need, in your mind, the help from

7     its competitors -- from its competition in order to

8     do, perform adequate due diligence on a

9     prospective customer or client?

10          MR. GAYER:  Note my objection to the

11     form.

12  A.  Foothill has its own policies and procedures.

13     They wouldn't rely on its competitors to do it

14     for them.

15  Q.  Was it ever a part of Foothill's due diligence to

16     contact without permission competitors to find

17     out what they knew or what they thought of

18     a potential customer or client?

19          MR. GAYER:  Note my objection to the

20     form.

21  A.  Could you repeat the question.

22  Q.  Was it ever part, to your knowledge, of

23     Foothill's due diligence to without authority

24     contact a competitor to see what, if anything,

25     they knew about this prospective customer;

Thomas F. Morgan
6/15/2005

Page 51

```
 1        what information they had on them, whether
 2        or not they would consider loaning money to
 3        this prospective customer?  Anything like that?
 4                MR. GAYER:  Object to the form.
 5   A.   I can't speak to any specific instance.
 6        It is reasonable to think that it occurred, yes.
 7   Q.   Without the customer's permission?
 8   A.   I can't say that it's never happened.
 9   Q.   Well, let me rephrase the question and ask you:
10        In your mind, would that would have been
11        standard practice within the industry to
12        as part of some -- someone's due diligence to
13        contact without permission from the client, or
14        prospective client, and competitor to find
15        out what they knew about that prospective client?
16                MR. GAYER:  Note my objection to the
17        form.
18   A.   I don't know if it was standard practice.  I do
19        not think it would be unusual.
20   Q.   In your years you can't think of any instance
21        where you did that at Foothill?
22                MR. GAYER:  Objection.
23   Q.   Or anyone did at it Foothill?
24   A.   I can't speak for anybody else.  I can speak for
25        myself.
```

Thomas F. Morgan
6/15/2005

Page 52

1    Q.    You are not aware of anyone that did it, correct?

2    A.    I don't have any recollection.

3    Q.    Now, would you -- if you in fact in your sworn

4          testimony back when you gave your deposition

5          back on May 21st and 22, over that two day

6          period 2001, testified that that was not your

7          practice to do that and you would never

8          do that.  In fact it was clearly and specifically

9          against Foothill's policy to do something

10         like that.  You wouldn't back down or take

11         away from that sworn testimony that you

12         gave back May 21st and 22nd of 2001, would

13         you?

14              MR. GAYER:  Note my objection.  Steve,

15         obviously, I can't correct the witness not to

16         answer.  In fairness though, if you are

17         referring to specific testimony, I think it

18         might be helpful to refer the witness to the

19         testimony rather than characterizing the

20         testimony.  That's a suggestion.  I object

21         for the record.  But you can proceed as you deem

22         fit.

23         BY MR. CARRIGAN (CONT'D):

24    Q.    If you testified to that May 21 and 22, you

25         wouldn't back down to that now?

Thomas F. Morgan
6/15/2005

Page 94

```
 1       was my account."
 2                  Question:   "How did he know about
 3       ARY's request for a proposal from Whitehall?
 4       Was he working on the account?"
 5                  Answer: "I don't know if he was
 6       specifically working on the account, but he
 7       obviously knew that ARY was shopping the
 8       deal with IBJ."
 9                  Does that sworn testimony given under
10       oath back in May of 2001 refresh your
11       recollection today?
12  A.   Yes.
13                  MR. GAYER:  Note my objection to the
14       form.
15  BY MR. CARRIGAN (CONT'D):
16  Q.   Now, would it have been the practice of both you
17       and Foothill not to disclose information about
18       one of your clients or one of your borrowers, any
19       information about one of your borrowers, one of
20       your clients that your client does not give you
21       permission to disclose?
22                  MR. GAYER:  Note my objection to form.
23  A.   If it is information that is proprietary and
24       confidential, it's not Foothill's policy
25       to disclose it without customer's permission.
```

Thomas F. Morgan
6/15/2005

Page 129

```
 1        but I believe they were internet printed pages;
 2        stuff that was pulled off that you bring up on
 3        the internet and print it out.
 4   Q.   Do you recall that it was information from the
 5        Dow Jones news service wire; does that refresh
 6        your recollection?
 7   A.   No, I don't recall.
 8   Q.   It was the kind of information that someone
 9        with a computer could obtain off the internet?
10   A.   It appears to be information that was obtainable
11        to whoever.
12   Q.   It wasn't confidential, customer information;
13        isn't that right?
14   A.   I don't believe it was information that was
15        provided by the customer, no.
16   Q.   I think you testified earlier about what
17        Foothill's policy was as far as handling
18        confidential information; do you recall that?
19   A.   Yes.
20   Q.   Is it fair to say your policy was not to
21        disclose proprietary and confidential
22        information; isn't that right?
23              MR. CARRIGAN:  Objection.  You are
24        misleading him intentionally, Lee.  The answer
25        in his deposition testimony, which is the good
```

Thomas F. Morgan
6/15/2005

Page 130

1           answer is information, period.

2                   MR. GAYER:  Let me ask my questions.

3                   MR. CARRIGAN:  Why are you trying to

4           trick or mislead this witness.  You certainly

5           are and you know you are.  I can't believe you

6           are doing that.

7           BY MR. GAYER (CONT'D):

8     Q.    Mr. Morgan, what was the policy while you were

9           you at Foothill?

10    A.    Not disclose proprietary information unless

11          instructed by some legal entity or kept

12          proprietary.

13    Q.    Proprietary information, right?

14    A.    Yes.

15                  MR. CARRIGAN:  Objection.  That's not

16          what he testified.

17    Q.    Mr. Carrigan I think referred you to a page of

18          your deposition transcript, bear with me

19          while I look at that.

20                  Mr. Carrigan referred you to testimony

21          that you had given at your prior deposition.

22          And I think he referred to you to page 146 at

23          the bottom of that page.  It was a question that

24          began at line 15 and then carries over to page

25          147.  Can you take a look at that for me,

Thomas F. Morgan
6/15/2005

Page 131

```
 1        please?
 2                    MR. CARRIGAN:  What page?
 3                    MR. GAYER:  Page 146 to 147 of the
 4        prior deposition.
 5        BY MR. GAYER (CONT'D):
 6   Q.   Let me know when you have had a chance to look
 7        that over?
 8   A.   Yes.
 9   Q.   Sir, is there anything in that answer --
10        that question and answer that goes over from page
11        146 to 147 that you view as inconsistent
12        with your testimony today meaning that the
13        policy was not to disclose or disseminated
14        proprietary information?
15   A.   Well, let me say by defining what my definition
16        of the proprietary information is, information
17        provided to me directly by my borrower as opposed
18        to information that may be obtained through some
19        public source.  When I say "proprietary"
20        the borrower gives me a business plan that is
21        confidential information and then for my eyes
22        only.  I'm not going to share that with anybody.
23                    It is information that, you know, is
24        publically available.  You might call that
25        proprietary, no.
```

Thomas F. Morgan
6/15/2005

Page 135

1          agreed upon by that point due diligence probably

2          would have already started.  But the due

3          diligence process would need to be completed.

4          That would include appraisal, if necessary.  Field

5          examinations.  Examinations of books and records

6          of potential borrower.  Once those results were

7          in and reviewed, if everything looked okay,

8          it would go to the commitment letter stage.

9     Q.   Would it be the normal procedure during

10         the course of due diligence from Foothill to do

11         some type of background check on the potential

12         lender?

13    A.   Yes.

14    Q.   I think you may have mentioned this

15         earlier -- withdrawn.

16              Would that be done internally by

17         Foothill or would you normally contact an

18         outside vendor to do that?

19    A.   We would have contacted -- we have a couple of

20         outside vendors that we would use to do

21         background checks that used to be handled by our

22         underwriting department.

23    Q.   Is it correct that a background check would

24         normally include a search of media reports

25         and things of that nature regarding the

Thomas F. Morgan
6/15/2005

1        borrower?

2    A.   It could.

3    Q.   And an internet search including that, right?

4    A.   Yes.

5    Q.   If you take an look at what has been marked as

6         Exhibit 3.  I would like to kind of fast forward

7         to the end.  Actually it is page three, paragraph

8         ten.  And the heading of that paragraph is

9         conditions precedent; do you see that?

10   A.   Yes.

11   Q.   Is it fair to say conditions precedent refers to

12        things that have to happen or things that need to

13        be accomplished before a commitment letter

14        would ever be issued?

15   A.   Yes.

16   Q.   Just take a look at, if you would, at

17        subparagraph C, which refers to loan origination

18        cost including but the not limited to audit fees,

19        attorney's fees, search fees, appraisal

20        documentation and filings shall be paid by

21        borrower; do you see that?

22   A.   Yes.

23   Q.   Do these fees or other items mentioned here, are

24        those what you are talking about as part of the

25        due diligence process?

Thomas F. Morgan
6/15/2005

Page 142

1    about halfway down a little bit more than

2    halfway down in the paragraph it says, it

3    refers to an order to obtain the lender's legal

4    approval to effect completion of the financing

5    arrangement herein contemplated; do you see that

6    language.  Right before the second sentence.

7              It says "In order to obtain lender's

8    legal approval to effect the completion of

9    the financing arrangements herein contemplated"?

10             Let me if you don't mind, I will

11   come around.

12  A.   Sure.

13  Q.   Okay.  My question to you is:  Would that suggest

14   to you that these are things that need to

15   be done or accomplished prior to the issuance of

16   the commitment i.e., approval as opposed to loan

17   closing?

18  A.   Well, again, a commitment letter dose not

19   constitute as a closed loan from the commitment

20   stage to the closing the stage there are some

21   things that have to happen.  Because we offer a

22   commitment doesn't guarantee we are going to

23   close.

24  Q.   Let me refer you to phrase litigation

25   searches.  Do you see that in subparagraph B?

Thomas F. Morgan
6/15/2005

Page 143

1    A.    Yes.

2    Q.    Does that mean that before a commitment or

3          closing on the loan the borrower would need

4          to disclose litigation that it's involved in?

5    A.    Yes.

6    Q.    This is a standard provision in these type of

7          proposal letters?

8    A.    Yes.

9    Q.    And would it be correct that it would require

10         litigation information concerning parent

11         companies and affiliate?

12   A.    Yes.

13   Q.    That's standard operating procedure, is it

14         not?

15   A.    Yes.

16   Q.    Is it your understanding that ARY Jewelers

17         LLC was a subsidiary of the ARY Group or

18         ARY Trading, which is a foreign company?

19   A.    My understanding was that ARY Trading was the

20         parent company and that ARY LLC was setup

21         for purposes of doing business in the states.

22         That was the best of my recollection and

23         my understanding.

24   Q.    ARY Trading or the ARY Group was some type of

25         parent entity?

Thomas F. Morgan
6/15/2005

Page 144

1   A.   Related entity or parent.

2   Q.   Would it be fair to say that ARY would have to

3        disclose litigation involving ARY Trading

4        pursuant to this subparagraph E of this document?

5   A.   Yes.

6             MR. CARRIGAN:   Objection.   That calls

7        for a legal conclusion.   There is no predicate

8        laid for expertise in answering that.

9   BY MR. GAYER (CONT'D):

10  Q.   In any event, you have already testified that

11       Foothill had done its background check to search

12       for that kind of information; is that right?

13            MR. CARRIGAN:   Objection.   Leading.

14  A.   Yes.

15  Q.   When you spoke to Mr. Molinario on or about

16       February 28, 2001, is it correct that he told you

17       that IBJ had determined not to issue a loan to

18       ARY?

19  A.   I don't recall.   I would have to go through my

20       testimony back in May.

21            MR. GAYER:   Let's go off the record

22       for a second.

23            (Discussion off the record.)

24  BY MR. GAYER (CONT'D):

25  Q.   At the time that you received the call from

Thomas F. Morgan
6/15/2005

Page 184

1         point in time is the information that was

2         provided to you by, Mr. Molinario; correct, sir?

3              MR. GAYER:  Note my objection.

4              Objection to the form.

5    A.   Again, my interpretation and how I believe

6         I meant this when I stated it is information that

7         that borrower provides me.

8    Q.   Again, my question to you is:  He asks you

9         about do you have any duties to protect

10        the information of your borrowers; correct?

11   A.   Yes.

12   Q.   He didn't define specifically what information?

13              MR. GAYER:  Objection to the form.  It

14        says what it says.

15   A.   No.

16   Q.   He certainly didn't qualify it by saying

17        proprietary or confidential information, did he,

18        sir?

19              MR. GAYER:  Objection to the form.

20   A.   No.

21   Q.   The information when y'all had used that word

22        previously in this deposition and immediately

23        before this question, the information or the type

24        of information you have been talking about is

25        what was transmitted to you by Mr. Molinario,

Thomas F. Morgan
6/15/2005

Page 187

```
 1        y'all have been discussing was the information
 2        that you received about ARY and you state
 3        here, do you not, sir, "But it is my practice
 4        and the practice of my firm not to disclose
 5        information about my borrower that my borrower
 6        does not give me permission to disclose."
 7        Is that your answer?
 8              MR. GAYER:  Objection to the form.
 9   A.   I don't understand the correlation between
10        the question on line one and the question
11        on line 15.  How do the two relate.  One is
12        talking about information that was sent to
13        me.  The question on 15 is related a totally
14        different question where he is asking me
15        is it my practice to protect the information of
16        my borrower?  I don't know what correlation that
17        has with the information that I received
18        from Mr. Molinario.
19   Q.   Because he is asking you to put yourself in the
20        situation of Mr. Molinario and the information
21        that he received about one of his borrowers or
22        potential borrowers.  He is asking you, sir,
23        what do you think your duties are to your
24        borrowers and you say, "It is my practice
25        and the practice of my firm not to
```

Thomas F. Morgan
6/15/2005

Page 188

1       disclose information about my borrower that my

2       borrower does not give me permission to

3       disclose."  Correct, sir?

4                   MR. GAYER:  Objection to form.

5   A.  This is information my borrower provides

6       to me; financial statements, business plans,

7       confidential information related to their

8       business.  When I answered this question that was

9       my mind set.

10  Q.  Let me go back to the allegation against you for

11      you being a liar and cheat and criminal?

12                  MR. GAYER:  Objection.

13  Q.  Again, sir.  I will ask you, is it okay --

14                  MR. GAYER:  You know, Steve.

15  Q.  -- if another banker doesn't get that from you,

16      the client, but he gets it from an internet

17      source, that's okay to pass on to another banker

18      without your permission?

19                  MR. GAYER:  Objection to form.

20  A.  If it is done with malicious intent, no.

21      Do I like what Mr. Molinario said to me in

22      his deposition?  No. Because it is untrue and it

23      is unfounded.  But you know what, it is a -- keep

24      it in perspective of how it relates to May 21 and

25      22 of 2001, which was four years ago.