Page 1

1      UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF MASSACHUSETTS
2
                              VOL. I
3                             PGS. 1-156
                         EXHIBITS None
4
5   ARY JEWELERS, LLC,                )
                                      )
6                    Plaintiff,       )
                                      )Civil Action
7        vs                           )4:03-CV-00439
                                      )
8   IBJTC BUSINESS CREDIT CORP., and  )
    DAVID MOLINARO,                   )
9                                     )
                         Defendants.  )
10                                    )
11
12      VIDEOTAPED DEPOSITION OF FRANCIS O'CONNOR, a
13   witness in the above-entitled cause, taken
14   before Lori J. Atkinson, Professional Court
15   Reporter and Notary Public in and for the
16   Commonwealth of Massachusetts at Ropes & Gray,
17   One International Place, Boston, MA, on the 12th
18   of May, 2005, commencing at 10:04 a.m. pursuant
19   to the Federal Rules of Civil Procedure.
20
21
22       HUDSON REPORTING & VIDEO, INC.
23          124 WEST 30TH STREET
24         NEW YORK, NEW YORK 10001


EXHIBIT 4

Page 94

1 nonresponsive.
2 BY MR. CARRIGAN (CONT'D):
3 Q. But, I think you had just described it. I want
4 to make sure. Let me get the last words you
5 used.
6 What you had was -- at that time was
7 based on again your experience and your
8 understanding of what you at least thought were
9 the bankruptcy court's circumstances you had in
10 your mind a general conclusion that Foothill
11 must have known that Whitehall was considering
12 loaning this asset based -- these asset based
13 funds to Krigel/ARY?
14 A. You know, I cannot remember specifically whether
15 there was additional information that led me to
16 that conclusion. As you pointed out reviewing
17 specific bankruptcy court documents, I just don't
18 remember. As I have said, my general
19 recollection is that Foothill was totally aware
20 of this situation, and that was the general basis
21 as why we communicated with them.
22 Q. Okay. But again, as best you can do now, and as best
23 you can testify to under oath is what
24 you can say is and you can't point a finger --

Page 95

1 put your finger on anything more specific. What
2 you say is based on your experience and your
3 understanding of the circumstances, it was your
4 general conclusion that Foothill must have
5 known that y'all were looking at getting involved
6 in the ARY/Krigel's business transaction?
7 A. I think that's fair.
8 Q. Is it fair to say that if this matter had not
9 been in the bankruptcy court you would never have
10 had authorized communications to be made from
11 Whitehall to Foothill without authorization from
12 either Krigel's and/or ARY?
13 A. Not necessarily.
14 Q. Earlier you told me that was the special
15 circumstance that you had, this general
16 conclusion, although you said it was 100 percent
17 general conclusion that Foothill, because
18 of the bankruptcy special situation was
19 knowledgeable about y'all's potential involvement
20 like sitting by the phone awaiting your phone
21 call?
22 MR. FISCHLER: Objection to form.
23 A. Can you rephrase that, I guess; I'm sorry.
24 Q. What other special circumstance allowed you or

Page 96

1 made you feel like it was okay and within good
2 sound business practices and business ethics and
3 not illegal violative of any banking rules or
4 regulations to authorize the transmittal of the
5 information that was passed on from Whitehall to
6 Foothill?
7 MR. FISCHLER: Objection to form.
8 A. Just in general, when one bank hangs off another
9 bank, there always is some level of communication
10 between the two parties; that is common
11 practice. And, you know, common practice
12 doesn't necessarily dictate that you are going to
13 get a written or verbal approval to communicate
14 with the other lender, you need to make
15 arrangements with them. You know, but I
16 definitely say that the reason why we contacted
17 Foothill had to do, in part, with the fact that
18 the company was in bankruptcy and they were -- it
19 was a public situation. And my general
20 expectation was that Foothill was relying on us
21 as a source of funds to pay out the loans to
22 their bankrupt borrower.
23 Q. All right, sir. Just so the jury understands
24 and to give you in my opinion an opportunity to be

Page 97

1 completely candid with the jury, you guys were a
2 long way from quote, unquote from paying off any
3 loans to anybody.
4 Number one, it hadn't come anywhere
5 close to being approved by the credit committee.
6 In fact, a formal recommendation to the credit
7 committee had never -- you hadn't even gotten
8 that far; in fact, never did get that far,
9 correct?
10 MR. FISCHLER: Objection to form.
11 A. I don't recall specifically where the process
12 was with the courts and the creditors' committee.
13 However, we were very close to getting a loan
14 approved. We had, you know, my general
15 recollection is we had -- we were within a week
16 of going to our credit committee for approval for
17 the loan. And the only issue that held up
18 going to that creditor's committee for approval
19 for the loan was the background check.
20 I would just have to look at documents,
21 legal documents, to have a better understanding
22 of where it was in the whole exact bankruptcy
23 stage process.
24 Q. I'm just talking about internally where it

25 (Pages 94 to 97)

Page 110

1  Q. Now, where was it publicly made known or
2     published that Whitehall had denied the ARY
3     Krigel's loan application?
4  A. You know, I know that what we did is we verbally
5     told Mr. Hussein. We sent him a letter, is my
6     general recollection, telling him the loan was
7     being declined. But where it goes beyond that
8     with respect to the bankruptcy courts, or
9     et cetera, I have no idea. Because I just moved
10    on to do different things within the organization
11    and I didn't follow the case.
12 Q. All right, sir. So you agree with me and admit
13    that at the time that you passed on, without
14    authority, the information to Foothill that
15    Whitehall was declining the loan proposal or the
16    loan request, that was not public information as
17    best you knew; correct, sir?
18    MR. FISCHLER: Objection to form.
19 A. I personally --
20 Q. Yes or no?
21 A. I'm very uncomfortable with the way that you
22    phrased the question. So I will say to you that
23    at the time I told Foothill or had David Molinaro
24    tell Foothill that we were declining the loan,

Page 111

1     the only parties that knew of that declination
2     were Whitehall people and the Krigel's/ARY
3     people. It was not public information at that
4     time.
5  Q. So what you have already told me, sir, that there
6     was this dig distinction between private and
7     public information and you've already
8     conceded to me under oath on this camera that you
9     did not have the right, even by your own sense of
10    good business practices and good business ethics,
11    to pass onto Foothill non-public information; did
12    you or did you not testify to that under oath?
13    MR. FISCHLER: Objection to the
14    mischaracterization of the witness's testimony.
15 A. You are totally attempting to twist my words.
16    Private information, does not include things like
17    our declination of the loan. I consider private
18    information to be things like ARY gave me a copy
19    of their audited financial statements. Krigel's gave
20    me copy of their business plans. The fact
21    that we declined the loan, I don't consider to be
22    private and confidential information that
23    I should not disclose.
24 Q. I just want to understand that. That is your

Page 112

1     sense of good business banking practices
2     and your good sense of business banking ethics
3     that you are perfectly comfortable if a
4     loan is disseminated -- you know, four or five
5     groups to offer proposals, you find out who those
6     other ones are, you think it is perfectly
7     acceptable once you guys decide not to approve
8     it or accept it, to pick up the phone and
9     call your competitors, call the other big three,
10    call the second tier, call Webster down in that
11    third tier where ever they are and tell them
12    about your private decision not to approve the
13    loan?
14    MR. FISCHLER: Object to the form of
15    the question and tell the witness to only answer
16    it if you can; if you are able to. In my view,
17    that was a hopefully compound question.
18 A. I think that, you know, it is a complex
19    situation. As I have said before on the record,
20    it involved someone that I felt was relying on the
21    loan as a payoff in a bankruptcy. There
22    was information that, you know, was very
23    disconcerting and involved alleged illegal
24    activity and potential fraud. And I felt under

Page 113

1     those special circumstances, it was okay to
2     authorize David Molinaro to call up Foothill
3     under those special circumstances.
4     MR. CARRIGAN: Objection. Nonresponsive.
5  Q. So it is true, it is not generally accepted.
6     In fact, it is against generally good banking
7     practices and banking ethics to make -- call your
8     competitors and make private decisions that you
9     are not going to accept a loan proposal to tell
10    your competitors about that; that is not
11    generally accepted; is it, sir?
12    MR. FISCHLER: Objection to form.
13 Q. Yes or no?
14 A. It would depend on the circumstances. But in a
15    perfect world, nonbankruptcy world, in a world
16    the existing lender did not know that the future
17    lender was paying them off, I would not have
18    called them.
19 Q. Generally, without special circumstances, that is
20    not generally accepted banking practices,
21    business practices or ethics; correct, sir?
22 A. Generally that is correct.
23 Q. Again, so I understand the special circumstances,
24    it seems like you have added one. I want to

29 (Pages 110 to 113)

Page 138

1    Krigel's, is it your testimony that you would not
2    have authorized the passing of this information
3    or you would have still done it or you just don't
4    know?
5        MR. FISCHLER: Objection to the
6    hypothetical form of the question.
7  A. I think a few seconds ago I answered that.
8    I said, I just wasn't sure what I would have done.
9    In similar circumstances if I had absolute
10   knowledge that Foothill was not relying on us as
11   a source of repayment, I would have to give that
12   a lot of thought and I'm not sure.
13 Q. What if, let me crank up my hypothetical a little
14   bit. What if Foothill was not only not expecting
15   Whitehall to payoff their existing loans, but
16   Foothill wasn't even aware of Whitehall's
17   potential involvement, would that tip the scale
18   towards you have not authorizing the forwarding
19   of this information?
20       MR. FISCHLER: Objection to the
21   hypothetical form of the question.
22 A. You know, to be honest with you, that
23   seems like the exact same question as the last
24   one. And I just don't know what I would do.

Page 139

1  Q. Let me crank my hypothetical up one more notch.
2    That is, what if, rather than not expecting
3    Whitehall to payoff the Foothill existing loans
4    to Krigel's, Foothill itself had an expectancy
5    that they would refinance the purchaser, the new
6    purchaser, out of bankruptcy. And, in fact, had
7    on the table an existing viable proposal?
8        MR. FISCHLER: Objection to the form
9    of the question.
10   BY MR. CARRIGAN (CONT'D):
11 Q. Would you have then under those hypothetical
12   conditions still have authorized the
13   dissemination of this information?
14       MR. FISCHLER: Same objection.
15 A. Well, you know, I can testify today that I had no
16   knowledge that Foothill had a proposal on the
17   table and was still a viable candidate to
18   refinance Krigel's. So I really haven't
19   considered that one, because I definitely didn't
20   know that if it is true. I'm not sure. Again,
21   I would have to think about it. You know, I'm
22   just not sure what the answer would be. But
23   there would be definitely something more to think
24   about in those circumstances.

Page 140

1  Q. Let me, if I can, if you can't go any further;
2    that's fine. What would be the justification
3    -- if those circumstances existed, how would you
4    justify disclosing to a competitor, who
5    has a proposal to a client that now is a
6    prospective client of yours that you are
7    rejecting their loan application and "Oh, by the
8    way, here is the reasons why we rejected it."
9    And those reasons are negative. How would you
10   in a good business practice sense and good
11   business ethics sense; how would you ever
12   justify that?
13       MR. FISCHLER: Objection to the form
14   of the question.
15 A. I'm not sure. But I can absolutely give you a
16   certainty the fact if Foothill was actually going
17   to consider making the loan to the new company
18   Krigel's/ARY, they would have done their own
19   background check, and they would come to the same
20   information, and would have been in a position to
21   make their own decision at that time. And so,
22   you know, I don't think that the fact that
23   we disclosed the bad background check would have
24   had any impact on them making their decision.

Page 141

1    And so, you know, it really was kind of
2    a, you know, I don't think there would be
3    any injury there. But that is for you and the
4    attorneys and the jury to determine, I guess.
5        MR. CARRIGAN: I object. Nonresponsive.
6    BY MR. CARRIGAN (CONT'D):
7  Q. Let me understand -- not your response, they
8    would have found it anyway, so it is moot.
9    As they say in the MBA, No harm, no foul.
10   What I'm asking you is purely from good
11   business practices and good business ethics
12   sense, how could you justify the passing
13   of that type of communications that you did pass
14   to a competitor that has a viable open proposal
15   on the table to their client or their prospective
16   client that is also a prospective client of
17   yours?
18       MR. FISCHLER: Objection to the form
19   of the question.
20 A. If I believed that Foothill and -- I had
21   knowledge that Foothill was moving forward, I
22   probably would have given some additional thought
23   to it. I don't know what the outcome would have
24   been, but it would definitely have been thought

36 (Pages 138 to 141)