Brian Kennedy
6/16/2005

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------

ARY JEWELERS, LLC,

    Plaintiff,

VS.                              CA No. 04CV10281EFH

IBJTC BUSINESS CREDIT CORP.

and DAVID MOLINARIO,

their individual capacities,

    Defendants.

------------------------------

    Deposition of BRIAN KENNEDY, a witness called on behalf of the Plaintiff, taken pursuant to notice before Cindy M. Falcon, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Ropes & Gray LLP, One International Place, Boston, Massachusetts, on Thursday, June 16, 2005, commencing at 3:05 p.m.

EXHIBIT 5

Brian Kennedy
6/16/2005

Page 34

1  you're asking?
2  Q  Sir, it was brought out in -- conversations was
3     one of them.
4  A  Correct.
5  Q  We will start with conversations.
6  A  Not that I recall, no.
7  Q  Have you ever had internally maybe a conversation
8     with yourself -- maybe you don't speak with
9     yourself --
10 A  Yes. Do I decide on --
11       MR. FISCHLER: Let him finish the
12    question and then you you need to pause to give me
13    a chance to object.
14 Q  Have you ever thought about it, been faced with a
15    circumstance that you internally had to address
16    that issue?
17       MR. FISCHLER: Objection.
18 Q  Or think about it?
19 A  Sure.
20 Q  Give me an example. What comes to mind?
21 A  It's pretty simple. Public information is public
22    information. Nonpublic information is nonpublic
23    information, and you use your best judgment under
24    the circumstances.

Page 35

1  Q  Okay. Public information is public information?
2  A  Public information that's readily available. You
3     want an example? If someone is calling me looking
4     for a credit reference, if the information is
5     public, we feel much more comfortable speaking
6     about it.
7        If it's not public information, we don't
8     speak about it. It's pretty simple.
9  Q  Okay. So if I understand you, it's your practice
10    and position and I take it your belief that
11    Webster Bank's policy is that it's okay to
12    disseminate information about a customer or client
13    to individuals or entities outside of the bank as
14    long as it is public information?
15       MR. FISCHLER: Objection to the compound
16    nature and the fact it calls for an opinion.
17 A  I'm not speaking to what the policy manual says.
18 Q  I'm sorry.
19 A  You made a comment about what I think, what my
20    opinion is of the credit policy manual.
21       I don't know what the manual says. I already
22    answered that question, that I didn't know what
23    the manual said about that specific topic.
24 Q  So did I just recite your own individual policy?

Page 36

1        MR. FISCHLER: Objection.
2  A  Correct.
3        MR. FISCHLER: Brian, you have to pause
4     for a second to let me object. If you answer,
5     it's difficult for me to object.
6  Q  You don't know what your employer's policy is on
7     this issue, but your own individual policy is that
8     it's okay to disseminate information about a
9     customer or client to an individual or entity
10    outside of the bank as long as it is public
11    information?
12 A  My judgment in making decisions on whether it's
13    appropriate or not to share information about a
14    client or a potential client, if faced with the
15    circumstances of having to make a decision, would
16    be whether it's public information or nonpublic
17    information would be probably the deciding factor,
18    yes.
19 Q  What do you consider to be public information?
20       MR. FISCHLER: Objection.
21 A  Anything you or I could read, if it's not
22    privileged, if you can go on-line, for example,
23    and print out an article, that's public
24    information to me.

Page 37

1  Q  Okay. I didn't ask anything about articles. I'm
2     just -- do you have a general definition or
3     explanation as to what you think public means?
4  A  Anything that the general public like could access
5     that you don't have to be privileged to see.
6  Q  What do you mean, privileged to see?
7  A  For example, if I'm looking through a transaction
8     and part of it is for the CFO to give me his
9     personal financial statements, that wouldn't be
10    public information necessarily.
11       But if in doing a background check an article
12    pops up that my next-door neighbor, if he wanted
13    to could go on-line and see, to me that's public.
14    I don't know how else to answer it.
15 Q  Okay. You gave some examples. Let me give --
16    first let me understand about your position on the
17    news articles you're talking about.
18       By your own individual policy, would it be
19    okay if you had a customer that you were going to
20    potentially provide financing to and you came
21    across some news articles about some allegations,
22    let's say in a Third World country that something
23    about some charges had been made against them, and
24    you knew that a competitor of yours was actually

10 (Pages 34 to 37)

Page 38

1  currently providing financing to them, would it be
2  okay for you, without permission from the client,
3  to pick up the phone and call your competing bank
4  officer and fax those news articles that came
5  across your desk to him?
6       MR. FISCHLER: Objection on virtually
7  every ground that there is. I'd also like to say,
8  given the limited time we have here today, it
9  seems to me -- I guess I want to say to counsel
10 that you know you're asking these hypothetical
11 questions that are appropriate perhaps for an
12 expert witness but not for Mr. Kennedy, who is
13 here as a non-expert witness. He is here as a
14 fact witness to tell you what he knows about the
15 facts of this case.
16      Those kinds of questions of a hypothetical
17 and otherwise inappropriate nature I think are
18 just using up whatever time would be available to
19 ask any knowledge of any facts that he might have
20 knowledge of.
21 Q Go ahead. You can answer.
22      MR. FISCHLER: With that objection.
23      MR. CARRIGAN: I'll remind counsel that
24 I think he should be limited to objection, form.

Page 39

1       MR. FISCHLER: The reason I'm saying is
2  we clearly have a time issue.
3       MR. CARRIGAN: I told you I'd work with
4  you, Bob, I'll come back --
5       MR. FISCHLER: I'm not agreeing to
6  anything. I think this could be done by the time
7  we break today at 4:45 if you limited yourself to
8  asking legitimate, appropriate questions.
9       That's my position. Let's not debate it.
10 Just continue. You ask the questions you want
11 to. I said what I need to say.
12 A That's a pretty -- you asked my opinion. I don't
13 know if I have an opinion. I don't know where
14 you're going with this. But I haven't been put in
15 a position where I've had to make that decision.
16 Q What would you do if you had to, if you were --
17 well, I'm just asking you, sir, would you think,
18 according to your own individual policies, as to
19 what appropriate, what is appropriate or
20 inappropriate banking, would that be appropriate
21 for you to pick up the phone and call a competing
22 bank officer and inform him about some negative
23 newspaper articles?
24      MR. FISCHLER: Objection.

Page 40

1  A As a non-expert, I don't see anything wrong with
2  that.
3  Q Okay. Just so you understood the question, you
4  don't see anything wrong with that even without
5  getting the client's permission to do so?
6       MR. FISCHLER: Objection.
7  A Why would you need the client's permission? It's
8  public information.
9  Q Let me give you another example. There is a
10 deposition -- do you know Mr. -- I'll give you a
11 real-life example.
12      Do you know Mr. Tom Morgan?
13 A I don't.
14 Q Well, you know Mr. David Molinario?
15 A Yes, because I worked with him.
16 Q Mr. Molinario in a deposition like we're giving
17 here, accused Mr. Morgan --
18      MR. FISCHLER: I object. First of all,
19 I think the transcript may be confidential, so I
20 think you ought to be careful before making
21 representations about what other witnesses
22 testified to. I object to it because it will
23 inevitably lead to mischaracterization of the
24 testimony.

Page 41

1       MR. CARRIGAN: I'm glad you're
2  clairvoyent today.
3  Q I'll give you hypothetical names. Let's say
4  somebody deposed in this case -- let's say
5  hypothetically Mr. Molinario accused another
6  witness in this case in a deposition of criminal
7  conduct or activity. Are you with me so far?
8       MR. FISCHLER: Objection.
9  A Not really, no.
10 Q You can't follow that?
11      MR. FISCHLER: Objection.
12 A Do you have -- can you ask a question?
13 Q Do you have any idea, sir, what the industry
14 standard or industry practice is insofar as what
15 can be provided or disseminated or passed on about
16 a client or customer of the bank outside of the
17 bank?
18      MR. FISCHLER: Objection.
19 A I'm not an expert in what industry standards are,
20 no.
21 Q Have you ever, being in this retail finance
22 industry, ever passed on information about a
23 customer or client to an entity or individual
24 outside the bank without the client's

Brian Kennedy
6/16/2005

### Page 82

1   involvement in this deal was?
2  A   No.
3  Q   Did you learn at any time subsequent to that?
4  A   No.
5  Q   Do you know whether -- did you ever find out
6       whether or not Mr. Molinario followed up on the
7       phone conversation with Mr. O'Connor and did call
8       them?
9  A   I have no idea. I was not involved after that
10      conversation.
11 Q   That was your last involvement, period, end of
12      story, with anything having to do with Krigel/ARY?
13 A   Until this lawsuit popped up, yes.
14 Q   And so would you even have any understanding what
15      the allegations in this lawsuit are all about?
16 A   Do I understand what the allegations are?
17 Q   Yes.
18         MR. FISCHLER: Just say yes or no.
19 A   Yes.
20 Q   Who gave that understanding?
21 A   Bob.
22 Q   Before Bob informed you that, would it be fair to
23      say you did not know what the allegations in this
24      lawsuit were?

### Page 83

1  A   No.
2         MR. FISCHLER: I think you mean yes, it
3       is fair to say that.
4  A   Oh, yes, it is fair to say. Yes, it is fair to
5       say. I was very much confused on what the
6       allegations were prior to speaking to Bob.
7  Q   Okay. Did you ever see these news articles again?
8  A   No.
9  Q   Do you recall whether or not you received any
10      other due diligence related information or
11      documents from LCF?
12 A   I don't recall that we received anything else from
13      LCF.
14 Q   Are you aware what became of those news articles?
15 A   No, I have no idea what happened to them.
16 Q   Were you instructed to send them or tell anyone
17      outside the bank about it?
18 A   No, I was not. I wasn't involved.
19 Q   Up until this lawsuit being involved, being filed,
20      after that conversation with Mr. O'Connor and Dave
21      Molinario about you might want to call someone at
22      Foothill and tell them, you had no further
23      conversations with either of those two gentlemen
24      about the Krigel/ARY matter?

### Page 84

1  A   Can you repeat that?
2  Q   Yeah. After this phone conversation with the
3       three of y'all --
4  A   Correct.
5  Q   -- that was the last conversation you remember
6       with anyone up until the lawsuit being filed
7       having anything to do with the Krigel/ARY matter?
8  A   Yes, for all intents and purposes, yes. Did we --
9       yes.
10 Q   I can't say for all intents and purposes, if you
11      recall anything else --
12 A   In any bank?
13         MR. FISCHLER: The question is this
14      deal, do you recall anything else, any other
15      conversations other than what he asked you about.
16 A   There were conversations subsequent to walking
17      away from this deal that were of the
18      disappointment nature in not being able to move
19      forward to do a deal, and there were subsequent
20      conversations like that, talking about your
21      business, not anything specific about the
22      decision.
23         Just generally, yes, I'd be incorrect to say
24      that we never talked about ever again. That's my

### Page 85

1       point.
2  Q   But that's as specific as you can recollect as to
3       those conversations, if any?
4  A   Yes, yes, yes.
5  Q   Did you ever learn prior to this lawsuit being
6       filed that those news articles had been faxed over
7       to an individual at Foothill?
8  A   I did not know that they had been faxed over to an
9       individual at Foothill. I didn't know that until
10      you just told me that.
11 Q   Do you know, did you know at any time prior to
12      this lawsuit being filed that Dave Molinario not
13      only faxed those news articles over to an
14      individual at Foothill, but I also called and
15      discussed the news articles and y'all's decision
16      not to go forward with the loan with someone at
17      Foothill?
18 A   I was not aware of that.
19 Q   Let me ask you, sir, and it may be my last
20      question, and just reserve, Bob, if there's
21      anything further we can do a quick telephone so I
22      can get you both out the door.
23         Have you ever done, that you can think of,
24      anything like that in your time in the retail

22 (Pages 82 to 85)

Brian Kennedy
6/16/2005

Page 86

1  lending industry where you have called somebody at
2  another -- at a competitor and passed on
3  information that you had received or obtained
4  about a client and/or informed them of your
5  decision not to go forward with a potential deal
6  without the authority of a client?
7       MR. FISCHLER: Objection to form.
8  A  Those very special circumstances, no.
9  Q  Last question. Do you know of anyone else -- have
10     you ever heard of anything like that ever being
11     done in your time in the industry?
12       MR. FISCHLER: Objection to form.
13 A  Yes. Banks talk, yes. The only example I can
14    give you, and it's very different circumstances,
15    if I'm -- if I have a client who is struggling and
16    we are having to make decisions about how to
17    manage our credit with them, and one of the
18    options is for another bank to refinance us out,
19    and another bank is dragging their feet or can't
20    make a decision or what have you, it's in my
21    opinion very commonplace to have an open dialogue
22    to find out where they stand in the process.
23       I've only been refinanced out of a few deals,
24    but the one deal that was straggling and we were

Page 87

1  relying on a re-fi as opposed to liquidation or
2  whatever other exit strategy, the other lender,
3  what we call radio silent, the communication
4  ceased, and so we were sitting trying to
5  accommodate our borrower to allow them to be
6  refinanced.
7       And so along the way I placed several phone
8  calls and several phone calls were returned and
9  placed to me to talk about where we were and what
10    the status was because to the extent they weren't
11    going to be able to move forward, it's possible in
12    this instance we were going to have to take other
13    actions.
14       And so there had to be communication, there
15    had to be, about where they stood in the process.
16 Q  What deal would you call that?
17 A  This was a deal called Bonus Stores.
18 Q  That was how long ago?
19 A  Probably about two years ago, I'd say.
20 Q  You were where at the time?
21 A  I was at --
22 Q  Webster?
23 A  I don't know if it was IBJ or Webster.
24 Q  What was your position on that deal?

Page 88

1  A  Account executive.
2  Q  But as best you know in that triangle, everybody
3     knew about the potential involvement of everyone
4     else, fair?
5  A  Yeah.
6       MR. FISCHLER: I want to designate the
7  transcript confidential because he was talking
8  about internal policies and practices at Webster,
9  so I hereby designate it confidential.
10 Q  Last question. Is that the only kind of analagous
11    example you can think of, the one you just
12    represented?
13 A  Yeah.
14       MR. CARRIGAN: I am reserving my right,
15    and I think Mr. Fischler's okay if I need any
16    relatively brief additional time, we will work it
17    out.
18       MR. FISCHLER: My understanding is we
19    will talk about doing it by phone, and we have
20    agreed to make Mr. Molinario available if
21    necessary for the remainder of his deposition,
22    which is 40 minutes also by phone.
23       (Whereupon, the deposition was suspended at
24    4:55 p.m.)

Page 89

1  COMMONWEALTH OF MASSACHUSETTS
2  MIDDLESEX, SS
3
4       I, Cindy M. Falcon, a Notary Public duly
5  commissioned and qualified in and for the
6  Commonwealth of Massachusetts, do hereby certify
7  that there came before me the person hereinbefore
8  named and was by me duly sworn to testify to the
9  truth of his knowledge concerning the matters in
10    controversy in this cause; that he was thereupon
11    carefully examined upon his oath and his
12    examination reduced to typewriting under my
13    direction; and that the deposition is a true and
14    accurate record of the testimony given by the
15    witness.
16       I further certify that I am not
17    interested in the cause of this action.
18       IN WITNESS WHEREOF, I have hereunto set
19    my hand this        day of July 2005.
20
21
22       Notary Public
23    My Commission Expires:
24    June 25, 2010

23 (Pages 86 to 89)