# In The Matter Of:

## *ARY Jewelers, LLC   v.*
## *IBJTC Business Credit Corp., et al.*

---

## *David Molinario*
## *Vol. 1, December 1, 2004*

---

*Doris O. Wong Associates, Inc.*
*Professional Court Reporters*
*50 Franklin Street*
*Boston, MA  02110*
*(617) 426-2432*

*Original File MOLINARI.V1, 207 Pages*
*Min-U-Script® File ID: 0070685075*

**Word Index included with this Min-U-Script®**



EXHIBIT

Page 17

[1] there likely have been some type of documentation
[2] indicating or evidencing his involvement?
[3] A: There wouldn't have to be.
[4] Q: There may or may not, okay.
[5] We had discussion of — and I appreciate
[6] it — the one deposition that you've been involved
[7] in prior to this morning; is that correct?
[8] A: Correct.
[9] Q: I hope not, and I mean that, but I will
[10] ask, have you ever been involved as a party in any
[11] other lawsuits?
[12] A: Not that I'm aware of.
[13] Q: Let me ask you, Mr. Molinario, what
[14] documents, and I use that in just about the broadest
[15] sense, and I mean agreements, papers, photographs,
[16] videos, E-mails, anything that you can review, what
[17] documents, what have you reviewed or viewed in
[18] preparation for your deposition this morning?
[19] A: Mr. Fischler showed me a bunch of
[20] documents, and I'm sure I could point them out if I
[21] was showed them again.
[22] Q: Let me ask you this. Give me a general
[23] description. What do you remember of those
[24] documents?

Page 18

[1] A: One was the lawsuit.
[2] Q: Let me ask you, had you seen that before?
[3] A: Yes, I'm sure I have.
[4] Q: Let me back up and ask you, and then I will
[5] let you finish the answer. When are you talking
[6] about reviewing these documents that we're
[7] discussing now? Was it this morning, yesterday,
[8] last week, months ago?
[9] A: I think over the course of my involvement
[10] with my attorney.
[11] Q: Okay, at different times?
[12] MR. FISCHLER: Maybe to cut through this
[13] because of the limited time we have with two
[14] witnesses today, he has not seen anything that
[15] hasn't been produced to you.
[16] MR. CARRIGAN: That cuts through very
[17] little, but thank you.
[18] Q: Let me go back. Over this period of time,
[19] what documents do you remember reviewing? You
[20] mentioned the lawsuit.
[21] A: An approval memo, IBJ term sheet, newspaper
[22] articles, and some other stuff that I can't think of
[23] off the top of my head.
[24] Q: When was the last time that you reviewed

Page 19

[1] any documents?
[2] A: I believe Monday.
[3] Q: What documents do you recall reviewing on
[4] Monday?
[5] A: The ones that I previously listed.
[6] Q: The ones you specifically remember
[7] reviewing on Monday were the IBJ term sheet, an
[8] approval memo, newspaper articles, the lawsuit. Is
[9] there anything else?
[10] A: My affidavit.
[11] Q: Do you remember what your affidavit was
[12] attached to or the purpose of your affidavit?
[13] A: Yes.
[14] Q: What was it?
[15] A: I believe the purpose was with respect to
[16] venue.
[17] Q: Anything else you recollect on Monday
[18] reviewing, seeing, listening to, anything of that
[19] nature?
[20] A: I believe term sheets from Foothill.
[21] Q: Anything else?
[22] A: I don't recall any specifically.
[23] Q: Monday, where were you when this review
[24] took place?

Page 20

[1] A: In this boardroom.
[2] Q: About how long were you in these offices or
[3] this boardroom on Monday?
[4] A: An hour and a half or so.
[5] Q: The term sheets from Foothill, had you ever
[6] seen those documents, those term sheets prior to
[7] Monday?
[8] A: Yes.
[9] Q: Had you ever seen those term sheets or
[10] documents at any time that you can recollect prior
[11] to the commencement of this lawsuit?
[12] A: No.
[13] Q: When did you first go to work for the
[14] Whitehall entity?
[15] A: I believe it was around March 2000.
[16] Q: What would that position or entry position
[17] or title have been?
[18] A: I believe my title was vice president.
[19] Q: Sometimes I see vice president kind of
[20] accompanied by VP such and such. Did you have such
[21] a title, or was it basic vice president?
[22] A: I don't recall.
[23] Q: When did you leave Whitehall?
[24] A: I believe it was February 2002.

Page 101

[1] my understanding that our credit facility was a
[2] better credit facility than the one originally
[3] proposed by Foothill.
[4]    Q: Are you saying at the time you faxed it,
[5] you knew that Foothill had proposed a credit
[6] facility?
[7]    A: I don't know the answer to that.
[8]    Q: Sir, you just testified under oath that you
[9] were told by Frank O'Connor that they were awaiting,
[10] they being ARY, were awaiting your letter of
[11] commitment because your credit facility was better
[12] than Foothill's; didn't you just testify to that
[13] under oath?
[14]    A: I did say that.
[15]    Q: That means you and Frank O'Connor were
[16] aware at the time that, in fact, it was not only out
[17] of the range of impossible, not only within the
[18] range of possible, you and Frank O'Connor knew at
[19] the time you faxed this that they had an outstanding
[20] loan proposal, didn't you, sir?
[21]    MR. FISCHLER: I'll object to the form.
[22]    A: It was my understanding from Frank O'Connor
[23] that they elected to go with our term sheet.
[24]    Q: As opposed to Foothill's; is that correct,

Page 102

[1] sir?
[2]    A: In the beginning of the process.
[3]    Q: Again, the truth of the matter is that when
[4] you faxed this to Foothill, you and Frank O'Connor
[5] knew that Foothill had made a loan proposal to ARY
[6] to finance their purchase of Krigel's or their
[7] involvement with Krigel's on the go-forward,
[8] correct, sir?
[9]    MR. FISCHLER: Objection to form. You can
[10] answer.
[11]    A: At a point in time, they had made a
[12] proposal.
[13]    Q: Did you know what the status of the
[14] proposal was when you faxed this?
[15]    A: I was told by Frank O'Connor that our
[16] proposal was selected.
[17]    Q: Did you know the status of Foothill's
[18] proposal at the time you faxed these articles to
[19] them?
[20]    MR. FISCHLER: Objection to form. I
[21] thought he just answered that. Go ahead.
[22]    MR. CARRIGAN: I'll object to that comment.
[23] You know all you can do is say, "Objection, form."
[24]    A: I don't know for certain.

Page 103

[1]    Q: It certainly was within the realm of
[2] possibilities that that proposal was still on the
[3] table, correct, sir?
[4]    A: Anything is in the realm of possibilities.
[5]    Q: That specifically is in the realm of
[6] possibilities, correct?
[7]    A: I don't know that I can answer that
[8] specifically.
[9]    Q: Did you have any information that you can
[10] recollect when you faxed these articles to Foothill
[11] that told you that the loan, their previous loan
[12] proposal, which you were aware of, had been
[13] withdrawn?
[14]    A: I don't remember.
[15]    Q: You can't think of anything that would have
[16] told you that, correct, sir?
[17]    A: I don't believe so.
[18]    Q: You knew as you faxed this to Foothill,
[19] that you, being Whitehall, was either getting ready
[20] to reject this loan proposal or had already done it,
[21] correct?
[22]    A: I believe we had rejected it at that point
[23] in time.
[24]    Q: So you knew that a fallback, since you were

Page 104

[1] withdrawing or had withdrawn yours, might certainly
[2] have been the Foothill proposal, correct?
[3]    A: I don't know what the other drawbacks would
[4] have been.
[5]    Q: Did you think about it at all?
[6]    A: I was following the instruction of my
[7] supervisor.
[8]    Q: Did you think about it at all, sir, or did
[9] you just blindly follow the instructions of your
[10] supervisor?
[11]    MR. FISCHLER: Objection to the form.
[12]    A: As a, you know, subordinate to my
[13] supervisor, I followed his instructions.
[14]    Q: And didn't you think about either what Foothill
[15] might have on the table with ARY or the consequences
[16] of faxing that to them; you didn't think about that,
[17] did you, sir?
[18]    MR. FISCHLER: Objection to the form.
[19]    A: I don't believe I did.
[20]    Q: Did you ever even think about whether or
[21] not the actions you were taking based on the
[22] instructions to you were perhaps inappropriate or in
[23] violation of confidentiality provisions or laws or
[24] privacy laws or banking rules and regulations? Did

Page 109

Q: Just answer this question.

MR. CARRIGAN: I didn't ask for a break. I want this question answered.

MR. FISCHLER: This is the last question. Answer the question, and then we're breaking.

Q: Why would you seek counsel if this situation ever came up again?

A: Because of this situation that we're in right now.

MR. FISCHLER: I think we should break.

(Recessed for lunch at 1:32 p.m.)

---

Page 110

[1]     AFTERNOON SESSION (2:24 p.m.)
[2]     DAVID MOLINARIO, Resumed
[3] BY MR. CARRIGAN:
[4]     Q: Mr. Molinario, I have a better
[5] understanding as to your role at least in the
[6] forwarding or faxing of the news articles from
[7] Whitehall to Foothill, and let me just kind of
[8] summarize what took me a while to get to.
[9]     As I understand it, this action, being the
[10] faxing of these news articles, was not an, if you
[11] will, independent action on your part, but rather
[12] you were following instructions that had been
[13] specifically given to you by your supervisor,
[14] superior at the time, Mr. Frank O'Connor; is that
[15] correct
[16]     A: That's correct.
[17]     Q: You did not at that time, and perhaps
[18] appropriately so, question the advisability or
[19] appropriateness of his instructions. You did, I
[20] imagine as most would, you followed the instructions
[21] you had been given by your boss; is that fair?
[22]     A: That is correct.
[23]     Q: I take it that you didn't then, nor do you
[24] have now, an opinion as to whether or not the

---

Page 111

[1] forwarding or faxing of those news articles was
[2] either appropriate or inappropriate on any basis,
[3] again, no opinion then, and you are not here
[4] expressing an opinion one way or the other?
[5]     A: Correct.
[6]     Q: Just so I understand and the ladies and
[7] gentlemen of the jury understand, you are not here
[8] saying that there was nothing wrong with that...
[9] Again, you don't know yourself, and therefore, you
[10] don't have an opinion, and you are not expressing an
[11] opinion?
[12]     A: Correct.
[13]     Q: That is also true as to whether or not
[14] those types of actions — strike that — the faxing
[15] of these news articles was in violation of any
[16] policies and procedures in place or banking codes or
[17] rules and regulations or privacy laws or
[18] confidentiality agreements or provisions. Again,
[19] you didn't know the answer then, and you don't know
[20] the answer now, and you are not expressing opinions
[21] one way or the other, correct?
[22]     A: Correct.
[23]     Q: With that, let me see if I can go through
[24] as quickly as possible the kind of detail you've

---

Page 112

[1] been giving me, Mr. Molinario, which I appreciate.
[2]     I'm looking for the list of people that you
[3] had some conversations with. I think since this
[4] lawsuit, Frank O'Connor was one, and that is an
[5] individual who is, once again, working with you at
[6] the same place, being Wells Fargo, and he's not in
[7] the same division or group as you are?
[8]     A: Frank is in the same division and group. I
[9] don't report into Frank per se.
[10]     Q: Thank you for that clarification. Tell me
[11] what conversations you have had with Mr. O'Connor
[12] pertaining to the lawsuit.
[13]     A: Frank is the one that informed me of
[14] the lawsuit. I believe that day or shortly
[15] thereafter, he gave me his recollection of the
[16] accounts as to how it happened.
[17]     Q: On the day he informed you of the lawsuit?
[18]     A: Yes.
[19]     Q: What is your recollection of his
[20] recollection of the events?
[21]     A: Frank told me that his recollection was we
[22] got some negative background searches. He spoke to
[23] the people at ARY and told them we were
[24] uncomfortable moving forward. The people at ARY

---

[1] you would be correct. Could you possibly rephrase
[2] that so I can properly answer the question.
[3]    Q: You actually already answered it. You
[4] already told me you would have expected, based on
[5] your nine years of experience, that due diligence
[6] would require doing something by way of looking into
[7] allegations made in some news related article
[8] against an individual or a company a number of years
[9] ago, correct? You already told me that, right?
[10]    MR. FISCHLER: Objection to the form.
[11]    A: I believe that is a correct statement.
[12]    Q: I'm not saying on all four points, but if
[13] someone did a Google search and saw David Molinario
[14] was sued in a lawsuit in Federal Court in Boston and
[15] was a defendant and some jerky lawyer from Texas
[16] came up and, you know, tried to pound on him for
[17] about five or six hours in a deposition and jump to
[18] the conclusion based on that alone that David
[19] Molinario was a bad guy or a crook or had done
[20] anything wrong whatsoever, that would not either be
[21] due diligence or the correct assumption, correct?
[22]    MR. FISCHLER: Objection to the form.
[23]    A: I believe based on your hypothetical of a
[24] factual example, that some people may consider that

[1] sufficient due diligence and some wouldn't.
[2]    Q: You wouldn't, would you, sir?
[3]    MR. FISCHLER: Objection.
[4]    A: I don't believe I would.
[5]    Q: Especially when it's you that they are
[6] allegedly or supposedly doing the due diligence on,
[7] correct?
[8]    A: Yes.
[9]    Q: I hope someone publishes the fact that I'm
[10] going to recommend to my client that you be released
[11] from this lawsuit after this deposition and that
[12] Google erases any trace of your name as a defendant.
[13] We will deal with that later.
[14]    Quickly, let's talk about the other people
[15] you mentioned. Brian Kennedy, is he at Wells Fargo?
[16]    A: He's at Webster Retail Finance.
[17]    Q: What do you recollect Brian Kennedy said
[18] about these events, circumstances or the lawsuit?
[19]    A: Can we go off the record for a quick
[20] second.
[21]    Q: Sure.
[22]    (Witness and counsel exit to confer)
[23]    Q: Just tell me what Brian Kennedy or what you
[24] recollect Brian Kennedy told you in conversations

[1] postlawsuit.
[2]    A: Upon my knowledge of the lawsuit, I
[3] contacted Brian Kennedy. Brian told me that they
[4] had already been subpoenaed for their information
[5] and that he spoke about this situation with Craig
[6] Thayler, who is their in-house counsel, and he
[7] confirmed that he remembered Frank asking me and he,
[8] because he was in the room at the time, to, you
[9] know, call up Foothill and inform them of what we
[10] uncovered.
[11]    Q: Do you recall, did Brian Kennedy or whether
[12] or not Brian Kennedy recollected that he also
[13] instructed you to fax the articles?
[14]    A: I don't know. I don't believe I asked him
[15] that.
[16]    Q: Anything else you recall either asking or
[17] being told from or by Brian Kennedy?
[18]    A: Only one other thing.
[19]    Q: What was that?
[20]    A: Probably three or four months ago after I
[21] was informed about the deposition, you know, and the
[22] continuing proceedings, I gave him a courtesy call
[23] to tell him he may be involved in this just because
[24] I thought he may.

[1]    Q: Was it an actual conversation or you just
[2] left a message?
[3]    A: I think we spoke.
[4]    Q: What was his response?
[5]    A: Slightly las-au-fair, "I'll do whatever I
[6] need to do."
[7]    Q: Again, in the conversations, no notes, no
[8] memos, no tape recordings, no nothing documenting
[9] what was discussed?
[10]    A: No, but do I remember two things now that I
[11] didn't include.
[12]    Q: Please.
[13]    A: One was that Brian told me that he actually
[14] went out there to meet with people at Krigel's/ARY,
[15] and I'm not sure which one, but he actually
[16] physically went to Missouri.
[17]    Q: Post obtaining this information?
[18]    A: Pre obtaining the information. During the
[19] initial due diligence, as I mentioned to before.
[20]    The second one was I believe Brian told me
[21] that it was his recollection that it may have been
[22] HillCo Capital declined doing this deal for ARY
[23] because of some other information that they had
[24] received.