IBJ Whitehall Retail Finance
January 29, 2001
Page 1 of 3



# TERM SHEET
January 24, 2001
Krigel's, Inc.

**BORROWER:** Krigel's, Inc. and its subsidiaries and affiliates (collectively, the "Borrower" or the "Company").

**LENDER:** IBJ Whitehall Retail Finance, Inc., a division of IBJ Whitehall Bank & Trust Company.

**CREDIT FACILITY:** A senior revolving line of credit (the Line) of up to $12,000,000 with a $3,000,000 sub-limit for the issuance of letters of credit. The Credit Facility may be increased up to $18,000,000 in increments of not less than $3,000,000 provided that the Borrower gives the Lender 45 days notice and that the Lender agrees to the increase within 15 days of the request. At the time that the increase becomes effective, the Borrower shall pay .75% on the full amount of the increase in the Credit Facility. Borrowings under the Line will be subject to a borrowing base described below.

**PURPOSE:** Borrowing under the Line will be used to fund the working capital needs of the Borrower upon Emergence from Chapter 11, including capital expenditures, and for general corporate purposes.

**MATURITY:** Three years from the date of closing. The Line may be renewed with the mutual consent of the Company, and the Lender.

**SECURITY:** The Credit Facility will be secured by a first security interest in all assets the Borrower.

**COMMITMENT FEE:** Three quarters of one percent of the amount of the Line (.75%) payable at Closing.

**INTEREST RATE:** IBJ Whitehall's base rate (Prime), or at the Borrower's option, LIBOR + 2.75%. In light of future equity contributions to be made, a pricing grid will be determined during due diligence that could reduce the interest rate to LIBOR + 2.25% based upon financial hurdles to be met based upon excess availability levels.

**LETTER OF CREDIT:** 1.75% per annum, plus applicable bank charges for documentary letters of credit. 2.5% per annum plus applicable bank charges for stand-by letters of credit.

**UNUSED FEE:** 3/8 of one percent (.375%) on the average unused portion of the Line, payable monthly in arrears.

**BORROWING BASE:** The borrowing base will be established as a percentage of the Company's net eligible and acceptable inventory at cost plus a percentage of eligible and acceptable accounts receivable subject to due diligence. The advance rates will govern the daily borrowing availability under the Line and will be finalized during due diligence. The advance rates will be set at 85% (on average) of the net liquidation

EXHIBIT B

IBJ Whitehall Retail Finance
January 29, 2001
Page 2 of 3



value of inventory at cost as determined by appraisal and will be adjusted on a monthly basis. Advance rates immediately prior to season may be as high as 90% of the net liquidation value of inventory as determined by appraisal. It is anticipated that the advance rates on eligible inventory will range between 65% and 75%. Advance rates on eligible accounts receivable will be approximately 80% based upon review of historic dilution, delinquency and charge-off statistics.

**MONITORING FEE:** $1,000 per month.

**DUE DILIGENCE DEPOSIT:** There will be a due diligence deposit required of $30,000 to cover the cost of a field exam, background checks, inventory appraisal and other expenses associated with the underwriting of the Credit Facility. Any out of pocket expenses in excess of the deposits described herein will be due and payable whether or not the Closing occurs. Any remaining funds will be returned to the Company.

**CASH CONCENTRATION:** The Company will establish a concentration bank account and lockbox with the Lender or other acceptable financial institution at the discretion of the Lender. The Company's local operating accounts will be swept at least twice per week and used to pay down borrowings under the Line and are subject to a two business day clearance charge.

**PREPAYMENT FEE:** If the Line is terminated either by the Company or the Lender, prior to maturity, the Company will pay an early termination fee of 3% if repaid on or prior to the first anniversary, 1% if repaid on or prior to the second anniversary and .5% if repaid any time thereafter.

**COVENANTS:** To be determined during due diligence based upon projections provided by Borrower. Financial Covenants will be tested on a monthly basis and will most likely include a capital expenditures limitation and a minimum EBITDA test.

**REPORTING:** Required reporting will include monthly financial statements and other retail reports that are normally produced by the Company.

**AGREEMENTS:** It is understood that this proposal is subject to the execution of satisfactory agreements between the Company, the new owners and the Lender. Parent company will be prohibited from taking money out of the Company in the form of management fees, dividends, loans and other forms of distributions without the express prior consent of Lender. The costs of the Lender's counsel for the preparation of the agreements, including an initial deposit at the time of loan documentation shall be for the account of the Company.

**OTHER:** Annual expenses in connection with the monitoring of the loan and collateral are highlighted in our loan agreement and will include but are not limited to costs of periodic audits and appraisals as deemed necessary by the Agent. A mutually agreeable cap on audit and appraisal expenses will be determined during due diligence.

IBJ Whitehall Retail Finance
January 29, 2001
Page 3 of 3



The Company must be able to demonstrate a reasonable level of excess availability in its business plan for the next 12 months after giving affect to payment of all fees and expenses associated with Chapter 11 filing and emergence, settlement with all creditors, bank refinancing fees and any expenses associated with the purchase by ARY Traders.

Cash equity infusion of $7.5MM or more by ARY Traders will be required during the first six months of the Credit Facility. It is understood that $6MM will be paid to creditors as part of the emergence from Chapter 11.

The proposed terms and conditions summarized herein are provided for discussion purposes only and do not constitute a proposal, agreement or commitment to lend. The actual terms and conditions upon which IBJ Whitehall Retail Finance might extend credit to the Borrower are subject to satisfactory completion of due diligence, credit committee approval, satisfactory review of documentation and such other terms and conditions as are determined by IBJ Whitehall Retail Finance.

The above referenced terms are mutually accepted by the Lender and the Company as a basis by which the Lender will initiate and endeavor to provide the Company with a commitment. This term sheet will expire on January 25, 2001 if not accepted in writing prior to that time.

Agreed and accepted:
Krigel's, Inc.

By: Scott Krigel, President

IBJ Whitehall Retail Finance

By: Barbara Anderson, Executive Vice President

FROM :MBE #2965          952 236 6772          2001,01-31   15:53   #623 P.06/12

*PAGE SEVEN*

IBJ Whitehall Retail Finance
January 24, 2001
Page 1 of 3



### TERM SHEET
### January 24, 2001
### Krigel's, Inc.

**BORROWER:** Krigel's, Inc. and its subsidiaries and affiliates (collectively, the "Borrower" or the "Company").

**LENDER:** IBJ Whitehall Retail Finance, Inc., a division of IBJ Whitehall Bank & Trust Company.

**CREDIT FACILITY:** A senior revolving line of credit (the Line) of up to $12,000,000 with a $3,000,000 sub-limit for the issuance of letters of credit. The Credit Facility may be increased up to $18,000,000 in increments of not less than $3,000,000 provided that the Borrower gives the Lender 45 days notice and that the Lender agrees to the increase within 15 days of the request. At the time that the increase becomes effective, the Borrower shall pay .75% on the full amount of the increase in the Credit Facility. Borrowings under the Line will be subject to a borrowing base described below.

**PURPOSE:** Borrowing under the Line will be used to fund the working capital needs of the Borrower upon Emergence from Chapter 11, including capital expenditures, and for general corporate purposes.

**MATURITY:** Three years from the date of closing. The Line may be renewed with the mutual consent of the Company, and the Lender.

**SECURITY:** The Credit Facility will be secured by a first security interest in all assets the Borrower.

**COMMITMENT FEE:** Three quarters of one percent of the amount of the Line (.75%) payable at Closing.

**INTEREST RATE:** IBJ Whitehall's base rate (Prime), or at the Borrower's option, LIBOR + 2.75%. In light of future equity contributions to be made, a pricing grid will be determined during due diligence that could reduce the interest rate to LIBOR + 2.25% based upon financial hurdles to be met based upon excess availability levels.

**LETTER OF CREDIT:** 1.75% per annum, plus applicable bank charges for documentary letters of credit. 2.5% per annum plus applicable bank charges for stand-by letters of credit.

**UNUSED FEE:** 3/8 of one percent (.375%) on the average unused portion of the Line, payable monthly in arrears.

**BORROWING BASE:** The borrowing base will be established as a percentage of the Company's net eligible and acceptable inventory at cost plus a percentage of eligible and acceptable accounts receivable subject to due diligence. The advance rates will govern the daily borrowing availability under the Line and will be finalized during due diligence. The advance rates will be set at 85% (on average) of the net liquidation

FROM : MBE #2965                9E2 636 6772                2001.01-31    19:54    #623 P.09/12

PAGE EIGHT

IBJ Whitehall Retail Finance
January 24, 2001
Page 2 of 3

value of inventory at cost as determined by appraisal and will be adjusted on a monthly basis. Advance rates immediately prior to season may be as high as 90% of the net liquidation value of inventory as determined by appraisal. It is anticipated that the advance rates on eligible inventory will range between 65% and 75%. Advance rates on eligible accounts receivable will be approximately 80% based upon review of historic dilution, delinquency and charge-off statistics.

**MONITORING FEE:** $1,000 per month.

**DUE DILIGENCE DEPOSIT:** There will be a due diligence deposit required of $30,000 to cover the cost of a field exam, background checks, inventory appraisal and other expenses associated with the underwriting of the Credit Facility. Any out of pocket expenses in excess of the deposits described herein will be due and payable whether or not the Closing occurs. Any remaining funds will be returned to the Company.

**CASH CONCENTRATION:** The Company will establish a concentration bank account and lockbox with the Lender or other acceptable financial institution at the discretion of the Lender. The Company's local operating accounts will be swept at least twice per week and used to pay down borrowings under the Line and are subject to a two business day clearance charge.

**PREPAYMENT FEE:** If the Line is terminated either by the Company or the Lender, prior to maturity, the Company will pay an early termination fee of 3% if repaid on or prior to the first anniversary, 1% if repaid on or prior to the second anniversary and .5% if repaid any time thereafter.

**COVENANTS:** To be determined during due diligence based upon projections provided by Borrower. Financial Covenants will be tested on a monthly basis and will most likely include a capital expenditures limitation and a minimum EBITDA test.

**REPORTING:** Required reporting will include monthly financial statements and other retail reports that are normally produced by the Company.

**AGREEMENTS:** It is understood that this proposal is subject to the execution of satisfactory agreements between the Company, the new owners and the Lender. Parent company will be prohibited from taking money out of the Company in the form of management fees, dividends, loans and other forms of distributions without the express prior consent of Lender. The costs of the Lender's counsel for the preparation of the agreements, including an initial deposit at the time of loan documentation shall be for the account of the Company.

**OTHER:** Annual expenses in connection with the monitoring of the loan and collateral are highlighted in our loan agreement and will include but are not limited to costs of periodic audits and appraisals as deemed necessary by the Agent. A mutually agreeable cap on audit and appraisal expenses will be determined during due diligence.

Sent By: IBJ WHITEHALL;    703 453 6888;    Jan-24-01 4:50PM;    Page 3/4

ARY - 02018

FROM :MBE #296E                   962 636 6772            2001.01-31   19:55    #523 P.10/12

PAGE NINE

IBJ Whitehall Retail Finance
January 24, 2001
Page 3 of 3



    The Company must be able to demonstrate a reasonable level of excess availability in its business plan for the next 12 months after giving affect to payment of all fees and expenses associated with Chapter 11 filing and emergence, settlement with all creditors, bank refinancing fees and any expenses associated with the purchase by ARY Traders.

    Cash equity infusion of $7.5MM or more by ARY Traders will be required during the first six months of the Credit Facility. It is understood that $6MM will be paid to creditors as part of the emergence from Chapter 11.

The proposed terms and conditions summarized herein are provided for discussion purposes only and do not constitute a proposal, agreement or commitment to lend. The actual terms and conditions upon which IBJ Whitehall Retail Finance might extend credit to the Borrower are subject to satisfactory completion of due diligence, credit committee approval, satisfactory review of documentation and such other terms and conditions as are determined by IBJ Whitehall Retail Finance.

The above referenced terms are mutually accepted by the Lender and the Company as a basis by which the Lender will initiate and endeavor to provide the Company with a commitment. This term sheet will expire on January 25, 2001 if not accepted in writing prior to that time.

Agreed and accepted:
Krigel's, Inc.

By: Scott Krigel, President

IBJ Whitehall Retail Finance

By: Barbara Anderson, Executive Vice President

ARY - 02019