UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------x
ARY JEWELERS, LLC,           :
                             :
            Plaintiff,       :   CV: 04-10281-EFH
                             :
IBJTC BUSINESS CREDIT CORPORATION :
and DAVID MOLINARIO,         :   AFFIDAVIT OF STEVEN COLE
                             :
            Defendants.      :
---------------------------------------------x

STEVEN COLE, being duly sworn, deposes and says:

1. I am employed as a Senior Credit Officer at Wachovia Capital Finance, a specialty finance company based in Charlotte, N.C. From September 1995 through November 2001, I was a Senior Vice President in the Boston, Massachusetts office of Foothill Capital Corporation ("Foothill"), also a specialty finance company.

2. At Foothill, I had responsibility for existing relationships with borrowers and for negotiating credit facilities with new borrowers. One of the existing accounts for which I had responsibility was Krigel's, Inc. ("Krigel's"), which operated a chain of jewelry stores. Foothill initially provided a secured credit facility to Krigel's in 1998, and was Krigel's principal lender from that time through approximately mid 2001.

3. In November 2000, I learned that Scott Krigel had entered into a Stock Purchase Agreement (the "SPA") to sell Krigel's to ARY Jewelers, LLC ("ARY"), the plaintiff in this action. At the time the SPA was signed, Krigel's owed approximately $8.5 million to Foothill.

4. Shortly after the SPA was signed, Mr. Gohar Husain of ARY and Scott Krigel asked whether Foothill would continue to finance Krigel's after it was acquired by ARY. Because of Krigel's poor financial condition and uncertain prospects, (Krigel's filed for

bankruptcy in January 2001), I decided that Foothill would not finance ARY/Krigel's under the same terms Foothill had previously provided to Krigel's. However, Foothill proposed new financing in a term sheet dated December 15, 2000 (the "December Proposal"). The terms were not accepted by ARY.

5. In late January or early February 2001, I was advised by Mr. Husain and Mr. Krigel that ARY had accepted a term sheet presented by IBJ Whitehall, the name by which I knew the corporate defendant in this action. Mr. Husain said that IBJ Whitehall had made a proposal which ARY viewed as more favorable than Foothill's, and that IBJ Whitehall would be refinancing Krigel's and replacing Foothill as Krigel's secured lender. I was told that the refinancing would include funds that would be used to repay Foothill's outstanding loan to Krigel's.

6. In early March 2001, I was advised by Tom Morgan, a junior loan officer at Foothill who worked with me on the Krigel's account, that IBJ Whitehall would not be providing financing to ARY/Krigel's. Mr. Morgan said that IBJ Whitehall had advised him that it declined to proceed because a routine background check had uncovered two news articles concerning criminal charges that had been brought against ARY's chairman and owner, Abdul Razzak. Mr. Morgan provided me with copies of the articles. They reported on bribery charges that had been brought against Mr. Razzak and an affiliate of ARY.

7. At the time Foothill received the articles from IBJ, there were no ongoing negotiations between ARY and Foothill, as discussions had ended after ARY did not accept Foothill's December Proposal, and instead decided to pursue financing with IBJ.

8. At some point after I saw the articles concerning the bribery charges, ARY contacted Foothill to renew discussions about possible financing for Krigel's. Thereafter, I met

with Mr. Husain and Mr. Razzak and discussed with them the criminal charges discussed in the news articles Foothill had received. I decided that the charges would not foreclose an agreement between ARY and Foothill for continued financing of Krigel's. I also reviewed an updated business plan for Krigel's, as well as updated sales and revenue figures for the company. This updated information showed continued deterioration in Krigel's business, and that its future sales would be lower than previously projected.

9. As a result of the updated business information, I decided that Foothill should revise some of the terms of the December Proposal we had previously given to ARY. Accordingly, on March 20, 2001, Foothill presented a revised proposal to ARY (the "March 20 Proposal"). After receiving the March 20 Proposal, Mr. Husain requested certain changes to it, to which I agreed. Foothill then presented ARY with a revised proposal, dated March 27, 2001 (the "March 27 Proposal").

10. Soon thereafter, I was advised that ARY had decided not to buy Krigel's, and therefore that it would not be proceeding to finalize a financing agreement with Foothill.

11. Each of Foothill's proposals referred to above was presented in a standard form letter which set forth several conditions that had to be satisfied before Foothill would finally agree to provide financing. One condition was that the borrower execute a "litigation search". This required the disclosure of any litigation involving the borrower, its affiliates, or principals. Therefore ARY would have been required to disclose to Foothill the existence of the bribery charges prior to the closing of any financing agreement.

12. Consistent with its customary practice, and the practice of lenders generally, before committing to any lending facility for ARY, Foothill would have performed its own background check of ARY and its principals. The background check would have included,

among other things, a search of media databases. I have no doubt that this background check would either have revealed the very same news articles that IBJ Whitehall had sent to Foothill, and/or other news reports about the criminal charges filed against Mr. Razzak.

_____
STEVEN COLE

Sworn before me
this 20 day of October, 2005.

Leslyn L Fisher
My Commission expires
7-28-2009