UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ARY JEWELERS, LLC, ET AL.,
                Plaintiffs

v.

IBJTC BUSINESS CREDIT CORP. and
DAVID MOLINARIO,
                Defendants.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

CIVIL ACTION NO.:
04-10281-EFH

## MEMORANDUM AND ORDER

February 7, 2006

HARRINGTON, S.D.J.

## INTRODUCTION

This matter is before the Court on Defendants'[1] Motion for Summary Judgment as to the claims of Plaintiff ARY Jewelers, LLC ("ARY"). ARY's cause of action initially included claims for tortious interference with contract and business expectancies (Count I), breach of confidential or fiduciary relationship (Count II), violation of MASS. GEN. LAWS ch. 93A (Count III), and breach of implied contract of confidentiality (Count IV). After hearing oral argument, the Court granted defendants' summary judgment with respect to Counts II, III, and IV, and indicated that it would take the parties' arguments with respect to Count I under further advisement. For the reasons set forth in more detail below, the Court must deny Defendants' Motion for Summary Judgment as to Count I.

---

[1] The Defendants in this case, IBJTC Business Credit Corp. and David Molinario, are hereinafter collectively referred to as "IBJ."

## FACTUAL BACKGROUND

The genesis of this case is a botched financing deal between the Plaintiff ARY and a commercial lender named Foothill Capital Corp. ("Foothill"). ARY is a limited liability company that exists as part of the ARY Group, a multinational, billion-dollar enterprise headquartered in the United Arab Emirates. The ARY Group, which is chaired by Abdul Razzak, conducts its business in several industries, including gold and jewelry, foreign exchange, media, and real estate. Foothill, during the relevant time period, was in the business of providing financing to middle market companies. In early 2000, ARY was seeking to enter the United States retail jewelry market. ARY came across an opportunity to purchase the stock of Krigel's Inc. ("Krigel's"), a privately owned, family-operated chain of retail jewelry stores located in the Midwestern United States. Krigel's had fallen on hard times and filed for bankruptcy in 2000. ARY and Krigel's entered into a stock purchase agreement which would have allowed ARY to purchase the stock of Krigel's out of the bankruptcy court.

Foothill provided financing for Krigel's, both before and after Krigel's filed for bankruptcy. ARY's initial willingness to purchase the Krigel's stock was based, in part, on hopes that Foothill would provide them financing on the same terms after the stock purchase was consummated. Foothill instead made ARY a less favorable offer on December 15, 2000 ("the December offer").[2] As a result, ARY began shopping the ARY/Krigel's deal to other lenders. One such lender was IBJ, the defendant in this case. After initial discussions between the two,

---

[2] Though the terms of the December offer were less favorable than the previous arrangement between Foothill and Krigel's, ARY was open to accepting the offer up to and after February 28, 2001. By its terms, the December offer was set to expire on February 28, 2001. However, ARY asked for and Foothill granted a deadline extension to April 1, 2001. (Deposition of Tom Morgan 128:6-129:7; 135:25-136:3, May 21-22, 2001) ("Morgan Dep.").

IBJ provided ARY a term sheet for post-bankruptcy financing on January 24, 2001. ARY accepted the IBJ term sheet, and the parties sought to finalize a financing agreement during the next few weeks. ARY and IBJ never finalized an agreement, however, because on February 28, 2001 IBJ rescinded its financing offer. The reason IBJ rescinded its offer is that a background check of ARY conducted as a part of IBJ's due diligence uncovered two troubling news articles. The articles revealed that ARY's Chairman, Mr. Razzak, had been charged by Pakistani authorities with paying a $10 million bribe to the former Pakistani prime minister in connection with a multi-million dollar gold importation contract that Pakistan awarded to ARY.[3] Both parties concede that IBJ, confronted with this new information, was well within its rights to repudiate the initial offer. IBJ did more than simply withdraw, though, and it is the actions IBJ took immediately following its decision not to extend financing to ARY that form the heart of this case.

On February 28, 2001—the same day IBJ informed ARY of its decision to refuse financing on the ARY/Krigel's deal—IBJ contacted Foothill and advised Foothill of its decision to decline ARY financing, including the reason therefor. Specifically, IBJ's David Molinario, a co-defendant in this case and former Foothill employee, telephoned Foothill's Tom Morgan[4] and informed him that (1) ARY and IBJ had been in discussions regarding financing for the Krigel's purchase; (2) IBJ ultimately declined ARY's request for financing; and (3) the reason IBJ declined financing was the Pakistani bribery charge. Mr. Molinario also faxed Mr. Morgan copies of the

---

[3] During oral argument, neither counsel for the parties was able to provide the current status of this charge.

[4] From late 2000 through the Spring of 2001, Mr. Morgan held the position of Vice President in Foothill's Boston, Massachusetts office and was in charge of the day-to-day management of the Krigel's account. (Docket No. 59, Morgan Aff. at ¶ 2).

articles in question. With IBJ now out of the picture, ARY went back to the bargaining table with Foothill. Foothill, having been appraised by IBJ of Mr. Razzak's legal troubles, was no longer willing to honor its December offer. Foothill revoked the December offer and presented ARY with less favorable term sheets on March 20 and March 27, 2001 (collectively "the March offer"). In addition to containing financing terms less attractive to ARY, the March offer also included a condition requiring disclosure of any litigation involving ARY, its affiliates, or principals. ARY ultimately declined the terms of Foothill's March offer, and their bid to purchase Krigel's was effectively finished. The gravamen of plaintiff's claim, therefore, is that were it not for the defendants' February 28, 2001 communications, Foothill's December offer would have remained on the table and the Krigel's stock purchase could have gone forward.

## DISCUSSION

### I. Summary Judgment Standard

A motion for summary judgment can only be allowed if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). An issue of fact is "genuine" if it may reasonably be resolved in favor of either party. Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997). "Material" facts are those which possess the capacity to sway the outcome of the litigation under the applicable law. Okmyansky v. Herbalife Intern. of America, Inc., 415 F.3d 154, 158 (1st Cir. 2005). In ruling on the motion, the Court must view the facts in the light most favorable to the non-moving party, here the plaintiff, drawing all reasonable inferences in that party's favor. Bienkowski v. Northeastern University, 285 F.3d 138, 140 (1st Cir. 2002).

## II. Plaintiff's Claim for Tortious Interference

The sole issue facing the court is whether summary judgment is appropriate with respect to ARY's claim for tortious interference with an existing or prospective business relationship. Under Massachusetts law, the elements of this tort are: (1) a business relationship or contemplated contract of economic benefit; (2) the defendant's knowledge of such relationship; (3) the defendant's interference with it through improper motive or improper means; and (4) the plaintiff's loss of advantage directly resulting from the defendant's conduct. Boyle v. Douglas Dynamics, LLC, 292 F. Supp. 2d 198, 213 (D. Mass. 2003). The Court finds that ARY has presented competent evidence to enable a factfinder to decide that all four elements are satisfied. Before concluding this matter, however, the third and fourth elements deserve further attention.

### A. Improper Means

ARY has adduced no facts suggesting that IBJ acted through an improper motive, i.e., out of enmity or with the purpose of hurting ARY. See Adcom Products, Inc. v. Konica Business Machines USA, Inc., 41 Mass. App. Ct. 101, 105 (1996). The question thus becomes whether IBJ acted through *improper means*. ARY maintains that IBJ acted through improper means when it shared confidential information with Foothill. Specifically, ARY contends that IBJ violated banking industry confidentiality standards when it disclosed to Foothill that (1) ARY and IBJ had been in discussions regarding financing for the Krigel's purchase; (2) IBJ declined ARY's request for financing; and (3) the reason IBJ declined financing was a Pakistani bribery charge pending against ARY's chairman. Violating well-established industry standards, ARY maintains, constitutes improper means for the purposes of tortious interference. The very narrow question before the Court, therefore, is whether a violation of established standards in a trade or profession rises to the level of improper means for the purposes of tortious interference.

Because no Massachusetts court has explicitly addressed the issue of improper means vis-à-vis industry standards, this Court must take "a predictive approach." F.D.I.C. v. Ogden Corp., 202 F.3d 454, 460 (1st Cir. 2000). That is, the Court must "seek guidance in analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law." Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1151 (1st Cir.1996) (citations omitted). Put another way, the Court's task is to ascertain the rule a Massachusetts court would most likely follow under the circumstances. St. Paul Fire and Marine Ins. Co. v. Birch, Stewart, Kolasch & Birch, LLP., 379 F. Supp. 2d 183, 190 (D. Mass. 2005). Having surveyed analogous Massachusetts decisions, adjudications from sister states, and the Restatement (Second) of Torts, this Court is confident that the position most likely to be adopted by the Massachusetts courts is that a violation of well-established industry standards may indeed satisfy the improper means element of tortious interference.

The Supreme Judicial Court of Massachusetts' most thorough evaluation of the improper means element for tortious interference occurred in United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 817 (1990). In Geltman, the Court included within the ambit of "improper means" violations of a statute or a rule of common law, threats, misrepresentation, defamation, *or any other improper means*. Id. (emphasis added). The inclusion of the phrase "any other improper means," makes this Court reluctant to paint its interpretation of improper means with too fine a brush, particularly in light of the fact that the Geltman Court cited favorably to the Restatement (Second) of Torts § 767. Id. at 817 n.10. Comment c to that section states, in pertinent part, that:

> Violation of recognized ethical codes for a particular area of business activity or of established customs or practices regarding disapproved actions or methods may also be significant in evaluating the nature of

>  the actor's conduct as a factor in determining whether his interference
>  with the plaintiff's contractual relations was improper or not.

Restatement (Second) of Torts § 767 cmt. c (1979). Sister state courts are in accord. See, e.g., Toney v. Casey's General Stores, Inc., 460 N.W.2d 849, 853 (Iowa 1990) (holding that with respect to tortious interference recognized standards of business ethics and business customs and practices are pertinent); Top Service Body Shop, Inc. v. Allstate Ins., Co., 582 P.2d 1365, 1371 (Or. 1978) (holding that improper means "may be wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession.")[5]; Adler, Barish, Daniels, Levin and Creskoff v. Epstein, 393 A.2d 1175, 1184 n.19 (Pa. 1978) (customs or practices in an industry may be significant in determining whether an actor's interference was improper); Volt Services Group, Div. of Volt Management Corp. v. Adecco Employment Services, Inc., 35 P.3d 329, 336 (Or. Ct. App. 2001) (evidence of industry standards "may assist the trier of fact in deciding whether defendant's conduct was improper under the circumstances."); cf. C.R. Bard, Inc. v. Wordtronics Corp., 561 A.2d 694, 698 (N.J. Super Ct. Law Div. 1989) (summary judgment granted where tortious interference plaintiff showed no facts indicating that the defendant acted contrary to "recognized ethical business codes" or "established customs or practices.").

In sum, the Geltman Court's open-ended characterization of improper means, Restatement (Second) of Torts § 767 cmt. c, and caselaw from sister states directly addressing this issue convince this Court that the rule a Massachusetts court would most likely follow under the circumstances is as follows: a violation of established standards in a trade or profession may

---

[5] It bears mentioning here that the Geltman Court cited favorably to this Oregon decision, though not explicitly with respect to the language pertaining to industry standards. See Geltman, 406 Mass. at 816.

satisfy the "improper means" element of tortious interference with an existing or prospective business relationship. Such a proposition is axiomatic and, where logic leads, the law should strive to follow. Based on the affidavits of plaintiff's expert witnesses, Thomas Bonville (Docket No. 57) and John Baerst (Docket No. 58), the Court finds that there exists a genuine issue as to whether IBJ's actions constituted a violation of established standards in the banking industry.

### B. Causation

ARY has also shown that a genuine issue exists with respect to whether its damages were directly caused by IBJ. The gravamen of ARY's claim is that IBJ's February 28, 2001 disclosures to Foothill caused Foothill to rescind its December 2000 offer and ultimately replace it with a less favorable offer in March 2001. This contention finds support in the May 2001 deposition of Tom Morgan, wherein he stated:

> The reason we issued a different term sheet was because we had come across some information from a competitor [IBJ] that was unfavorable and painted a picture of some activities that ARY may or may not have been involved in that made us nervous. That's why we issued the new [March 2001] term sheet.
>
> . . .
>
> The information we received from Mr. Molinario was the driving force behind changing the terms of the sheet.

(Morgan Dep. 144:11–17; 169:19–170:11).[6] These facts provide a sufficient basis upon which a reasonable factfinder could conclude that IBJ directly caused ARY to lose the prospective business relationship embodied in Foothill's December offer, and consequently, the Krigel's stock

---

[6] IBJ attacks ARY's use of the May 2001 deposition of Tom Morgan because it was taken in a separate, albeit related, action. This fact does not preclude considering the Morgan deposition here. See, e.g., Burbank v. Davis, 227 F. Supp. 2d 176, 179 (D. Me. 2002) (deposition taken in separate but related case may be used to oppose motion for summary judgment; depositions of this sort are treated like an affidavit).

purchase. Summary judgment is therefore inappropriate.

Nevertheless, certain arguments advanced by IBJ warrant brief discussion before concluding this matter. In sum, IBJ contends that their February 28, 2001 communication could not have directly caused ARY's alleged losses because (1) Foothill knew prior to February 28, 2001 that ARY and IBJ were in discussions, and therefore would have known IBJ walked away from the deal once ARY returned to the bargaining table; and (2) Foothill's own due diligence would have eventually uncovered the Pakistani bribery charge. With respect to the latter contention, IBJ cites the affidavit of Stephen Cole[7] wherein Mr. Cole states that "before committing to any lending facility for ARY, Foothill would have performed its own background check of ARY and its principals," and "I have no doubt that this background check would have revealed the very same news articles that IBJ sent to Foothill, and/or other [similar information]." (Cole Aff. at ¶ 12). ARY, on the other hand, claims that Foothill had completed its due diligence by February 28, 2001 and that any interest in conducting further investigation arose only *after* Foothill was contacted by IBJ. On this score, the affidavit and deposition of Tom Morgan provide support adequate to preclude summary judgment. (Morgan Aff. at ¶ 4); (Morgan Dep. 153:9–15). So too with the former issue, whether Foothill knew (prior to hearing it from IBJ) that ARY and IBJ were in negotiations for financing on the Krigel's purchase. Mr. Cole suggested in his affidavit that he, and therefore Foothill, was made aware of ARY/IBJ talks in late January or early February 2001, weeks before IBJ's February 28, 2001 communication. (Cole Aff. at ¶ 5). Mr. Morgan, on the other hand, has stated that he is not aware of any meeting prior

---

[7] From September 1995 through November 2001, Mr. Cole served as a Senior Vice President in Foothill's Boston, Massachusetts office. Mr. Cole was responsible for existing relationships with borrowers and for negotiating credit facilities with new borrowers. Krigel's was among the accounts for which Mr. Cole was responsible. (Docket No. 78, Cole Aff. at ¶¶ 1–2).

to February 28, 2001 where Mr. Cole was informed of ARY/IBJ negotiations. (Morgan Aff. at ¶ 5). These conflicting accounts reveal that there exists here a genuine issue of fact as to how much and when Foothill knew about ARY's negotiations with IBJ. This and any other causation-related issues are best decided by a factfinder.

## CONCLUSION

For the reasons discussed above, the Defendants' Motion for Summary Judgment is denied with respect to Plaintiff's Count I, tortious interference with contract and business expectancies.

SO ORDERED.

/s/ Edward F. Harrington
EDWARD F. HARRINGTON
United States Senior District Judge