# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARY JEWELERS, LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> IBJTC BUSINESS CREDIT CORPORATION, ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. 04-10281-EFH |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO STRIKE EXPERT REPORT AND TO ENTER JUDGMENT DISMISSING THE SOLE REMAINING COUNT OF THE SECOND AMENDED COMPLAINT**

Defendant IBJTC Business Credit Corp. ("IBJ") respectfully submits this memorandum in support of its motion to strike the expert report of Shirley Webster, a witness designated by plaintiff to give expert testimony on damages, and to enter judgment on Count I dismissing the sole remaining count of the Second Amended Complaint.[1]

Count I alleges that IBJ tortiously interfered with a prospective loan agreement between plaintiff ARY Jewelers, LLC ("ARY") and Foothill Capital Corporation ("Foothill"). As set forth below, Ms. Webster's report applies the wrong legal standard for measuring damages and confirms that ARY cannot prove the damages element of its tortious interference claim. If this motion is granted it would dispose of the case; thus, IBJ requests that the Court address this issue now, in advance of the December 4, 2006, bench trial.

---

[1] David Molinario has been dismissed as a defendant in this action.

A.  **Background**

The background facts are set forth in the Court's Memorandum and Order, dated February 7, 2006, denying summary judgment as to Count I (the "February Order")[2] and are briefly summarized below.

In November 2000, plaintiff ARY signed an agreement to purchase out of bankruptcy the stock of Krigel's Inc., which was in the retail jewelry business. The agreement was subject to a financing condition. Krigel's lender, Foothill, offered financing to ARY in a term sheet dated December 15, 2000 (the "December Terms"). ARY rejected the December Terms and sought financing elsewhere, including from IBJ.

IBJ presented a term sheet to ARY in January 2001, which ARY accepted. However, no financing agreement was finalized because a routine background check disclosed to IBJ for the first time that ARY and its owner, Abdul Razzak, had been indicted on criminal bribery charges. As a result, IBJ advised ARY in February 2001 that IBJ would not provide financing to ARY. IBJ also advised Foothill, which had been expecting to be repaid $8.5 million from the proceeds of IBJ's financing, of IBJ's decision and the reason for that decision.

ARY then turned back to Foothill, which presented ARY with a new term sheet dated March 20, 2001, and a second term sheet dated March 27, 2001 (the "March Terms"). The March Terms allegedly were less favorable to ARY than the December Terms previously proposed by Foothill. Although Gohar Husain of ARY, who negotiated the Krigel's transaction, recommended that ARY accept the March Terms, Mr. Razzak rejected the proposal and terminated ARY's agreement to buy Krigel's.

---

[2]  The February Order is attached as Exhibit A to the accompanying Affirmation of Christopher R. Dillon (cited herein as "Dillon Aff.").

10200544_2

Count I asserts that IBJ's communications with Foothill caused Foothill to withdraw the December Terms, and to offer ARY the less favorable March Terms. ARY claims that IBJ's conduct constituted tortious interference, and that IBJ is liable for ARY's alleged damages due to its failure to obtain the December Terms. IBJ maintains that its communications with Foothill were lawful, and that in all events, ARY has suffered no compensable damages.

### B. ARY's Expert Report on Damages

Subsequent to the Court's issuance of the February Order, ARY served an expert report on damages authored by Shirley Webster, a vice president of CRA International, Inc.[3] In her report, Ms. Webster states that she has

> determined ARY's economic damages due to the change in Foothill's financing terms, allegedly caused by the acts of Defendants, by calculating the difference in the projected profits of Krigel's under the [December Terms] from Foothill and the projected profits under the [March Terms] from Foothill.

Report ¶ 19 (emphasis supplied). According to Ms. Webster, "ARY's economic damages under this lost profits methodology is approximately $3.1 million, excluding prejudgment interest." Report ¶ 4.

As discussed further below, Ms. Webster's "lost profits methodology" and ARY's damages claim are fatally flawed because, among other reasons, (i) they apply the wrong legal standard for measuring damages – ARY seeks consequential "lost profits" damages, whereas the law allows only the incremental cost of obtaining alternative financing; and (ii) even if consequential damages were allowed, only *actual* consequential damages would be recoverable – Ms Webster's calculation, based on two sets of "projected profits," yields hypothetical damages

---

[3] A copy of Ms. Webster's report is annexed as Exhibit B to the Dillon Affirmation.

which ARY never in fact incurred. For both these reasons, Ms. Webster's report should be stricken, and judgment should be entered for IBJ on Count I.

**ARGUMENT**

**I.  THE REPORT IGNORES THE APPLICABLE MEASURE OF DAMAGES, UNDER WHICH ARY CANNOT PROVE COMPENSABLE DAMAGES**

The gravamen of ARY's tortious interference claim is that, due to IBJ's contact with Foothill, ARY was wrongfully denied the December Terms that had previously been offered by Foothill. Where, as here, a prospective borrower alleges that it was wrongfully denied financing, the measure of damages is well established: it is the "expense of getting another loan, consisting principally of the difference between the interest that the borrower contracted to pay and what he or she was compelled to pay to procure a replacement loan ...." 25 Williston on Contracts, §66:100 (4th ed.). "The borrower's basic recovery is limited, at best, to nominal damages where no actual damages of this nature are proved." Id. See Restatement (Second) of Contracts §351 (1981), comment e ("In most cases, then, the lender's liability will be limited to the relatively small additional amount that it would ordinarily cost to get a similar loan from another lender.").

In other words, if liability is proven, the disappointed prospective borrower is limited to damages equal to the cost of obtaining alternative financing. The rationale for this rule was articulated by the Supreme Court of Vermont in Stacy v. Merchant Bank:

> Where a contract involves a promise to lend money, the law presumes that alternative financing is always available on the open market; therefore, recovery for a breach will often be limited to the cost of obtaining the promised amount elsewhere.

482 A.2d 61, 64 (Vt. 1984). Consequential damages beyond the cost of alternative financing may be recovered only where, among other things, "substitute financing is unavailable." U.S. Funding, Inc. of America v. Bank of Boston Corp., 28 Mass. App. Ct. 404, 407 (1990), citing Harsha v. State Savings Bank, 346 N.W.2d 791, 796-97 (Iowa 1984) (lender may be liable for

4

consequential damages where, among other things, "the borrower is unable to get money elsewhere"); Stacy, 482 A.2d at 64 (damages are limited to the cost of substitute financing, except "if the borrower is unable to obtain alternative funds," the lender may be liable for damages that were reasonably foreseeable); 25 Williston on Contracts, §66: 101 (4th ed.) (borrower may be allowed to recover consequential or special damages where it "is unable to procure a substitute loan from another lender."). See Rayman v. American Charter Federal Savings and Loan Ass'n, 75 F.3d 349, 355-56 (8th Cir. 1996) (reversing consequential damage award to borrower that had the ability to invest more or to borrow from another source, and holding that that measure of damages was the "fair market cost of alternative financing").[4]

ARY may not recover consequential damages, including the hypothetical "lost profits" calculated by Ms. Webster in her report. Even assuming that ARY was unlawfully denied the December Terms, its compensable damages would be limited to the incremental costs of obtaining alternative financing. Indeed, it is undisputed that such financing was not only available, but was offered by Foothill in the form of the March Terms. ARY's representative who negotiated the Krigel's transaction recommended that ARY accept the March Terms,[5] but

---

[4] The facts in Sun First Nat'l Bank of Lake Wales v. Stegall, 395 So.2d 1248 (Fla. Dist. Ct. App. 1981), are analogous to those here. In Sun First, counterclaim-plaintiff had a financing relationship with both Sun First and American Bank. Id. at 1248. He alleged that Sun First breached a "duty of secrecy" when it disclosed to American Bank that Sun First was foreclosing its loan facility. Id. At trial, the counterclaim-plaintiff testified that, subsequent to this disclosure, American Bank declined to extend its credit limits, as had been requested. Id. at 1249. After a bench trial, the trial court found for the counterclaim-plaintiff on his claims. Id. at 1248. The appeals court reversed. Id. at 1249. Among other things, it held that counterclaim-plaintiff could not recover for American Bank's failure to extend its credit limits because the counterclaim-plaintiff "did not seek further floor plan financing with any other bank." 395 So.2d at 1249. This holding illustrates that a prospective borrower generally may recover only the cost of obtaining substitute financing; and that where such financing is not sought, or, as in the case at bar, it is offered and refused, no damages may be recovered.

[5] After Foothill had agreed to changes in their proposal of March 20, 2001, Gohar Husain, ARY's representative responsible for the Krigel's transaction, faxed a handwritten note to ARY's owner, Abdul Razzak, stating: "My point of view is that we accept the revised terms." Dillon Aff. Ex. C, ¶5. Husain explained in the note that he was in the process of negotiating financing with another bank and that if ARY could strike a better deal with that bank, ARY could "get rid of" Foothill without paying any prepayment penalty. Id. ¶8.

ARY's owner chose to reject them. *See* February Order at 4 ("ARY ultimately declined the terms of Foothill's March offer . . ."). As a result, ARY incurred no additional financing costs, and therefore cannot prove any compensable damages.

Additionally, ARY can prove no compensable damages because it had the ability to pay cash for Krigel's. In his deposition in this case, Mr. Razzak admitted that ARY, which has global business interests and recorded profits of $150 million dollars in 2004, was "in a position" to pay cash for Krigel's. Dillon Aff. Ex. D at 15. And in an affidavit filed by ARY in a lawsuit in federal court in Missouri, it acknowledged that "because of the wealth of its financial backers, ARY was capable of paying cash [to buy Krigel's out of bankruptcy] if it could not obtain acceptable financing ....," and that "ARY could [have] close[d] the [Krigel's] deal even without Foothill's consent or other financing." Dillon Aff. Ex. E ¶¶9, 10. In other words, even if substitute financing from Foothill had not been available (which it was), ARY could have consummated the Krigel's transaction, and thus have avoided the "lost profits" calculated by its expert, by paying cash for Krigel's. For this reason as well, ARY may not recover lost profits or other consequential damages. See American Charter, 75 F.3d at 355-56 (damages limited to cost of alternative financing where plaintiff "had the financial ability" to invest more of its own funds in order to maintain the investment opportunity).

In sum, given ARY's ability to consummate the Krigel's transaction with alternative financing or cash, its damages are limited to the costs of alternative financing, of which there are none.[6] Ms. Webster's report addressing hypothetical "lost profits" should be stricken, and judgment should be entered dismissing Count I.

---

[6] One reaches the same conclusion if the issue is viewed in terms of the requirement that a plaintiff claiming tortious interference prove that its loss of advantage "directly resulted" from the defendant's conduct. Boyle v. Douglas Dynamics, 292 F. Supp. 2d 198, 213 (D. Mass., Stearns, J. 2003). ARY did not lose the opportunity to buy Krigel's as a direct result of IBJ's conduct, or for any other reason. Rather, ARY chose not to buy Krigel's.

10200544_2

## II. ARY'S DAMAGES THEORY AND MS. WEBSTER'S REPORT ARE DEFICIENT BECAUSE THEY DO NOT MEASURE ACTUAL DAMAGES

In addition to applying the wrong legal standard for measuring damages, Ms. Webster's report should be stricken because it purports to calculate consequential damages that ARY did not in fact incur. Under Massachusetts law, a plaintiff must prove *actual* damages directly caused by the defendant's conduct in order to sustain a claim for tortious interference with a contract or prospective contract. See Mass Cash Register, Inc. v. Comtrex Systems Corp., 901 F. Supp. 404, 422 (D. Mass., Saris, J. 1995); Skenderian v. Data Technology, 2001 WL 34038573 at *4 (Mass. Super. Ct. May 23, 2001). Yet Ms. Webster has calculated *hypothetical* damages based on projected profits ARY supposedly *would have earned* under the March Terms if it had accepted those terms.

More specifically, Ms. Webster projects that ARY would have earned profits equal to "X" if it operated Krigel's under the December Terms, and lower profits equal to "Y" if it operated Krigel's under the March Terms. She then identifies the difference between X and Y as "lost profits." Report ¶ 23 and Ex. 3. In fact, however, as ARY never operated Krigel's under the March Terms, it never realized the "loss" calculated by Ms. Webster. Thus, her "lost profits" number, on its face, represents hypothetical, not actual damages. Accordingly, the opinion is inadmissible, and the report should be stricken.

Ms. Webster's novel approach is an attempt to avoid the fact that this is not an appropriate case for "lost profits" damages". As ARY and Ms. Webster plainly recognize, any damages must be keyed to the difference between the December Terms, with which IBJ allegedly interfered, and the March Terms offered by Foothill but rejected by ARY. Under these circumstances, as discussed in Point I above, actual damages, equal to the incremental financing

7

costs, might have been incurred if ARY had accepted the March Terms. But it failed to do so, and the hypothetical "lost profits" proffered by Ms. Webster are inadequate as a matter of law.

## CONCLUSION

For the foregoing reasons, defendant IBJ respectfully requests that the Court strike Ms. Webster's report and enter judgment dismissing Count I of the Second Amended Complaint.

Dated: September 15, 2006

>                ROPES & GRAY LLP
>
>
>                By: /s/ Christopher Dillon
>                    Robert S. Fischler (Admitted Pro Hac Vice)
>                    Christopher R. Dillon (BBO No. 640896)
>
>                    One International Place
>                    Boston, Massachusetts 02110-2624
>                    (617) 951-7000
>
>                    *Attorneys for Defendant IBJTC*
>                    *Business Credit Corp.*

8