CONFIDENTIAL

IN THE UNITED STATES
DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

|  |  |  |
|---|---|---|
| ARY JEWELERS, LLC. | § § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 4:03-CV-00439 |
| IBJTC BUSINESS CREDIT CORP. AND DAVID MOLINARIO, | § § § | |
| Defendants. | § § § | |

## EXPERT REPORT OF SHIRLEY WEBSTER

### July 27, 2005

Respectfully Submitted,

_(signature)_

Shirley Webster

EXHIBIT
B

CONFIDENTIAL

IN THE UNITED STATES
DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| ARY JEWELERS, LLC. | § § § |
| Plaintiff, | § § |
| v. | § CIVIL ACTION NO. 4:03-CV-00439 § |
| IBJTC BUSINESS CREDIT CORP. AND DAVID MOLINARIO, | § § § |
| Defendants. | § § § |

## ASSIGNMENT

1.    I have been asked by The Carrigan Law Firm, counsel for ARY Jewelers, LLC ("ARY") to evaluate the economic damages, if any, resulting from the alleged wrongful acts of IBJTC Business Credit Corp. ("IBJTC") and David Molinario ("Mr. Molinario" or collectively, "Defendants"). It is my understanding that Defendants are alleged to have interfered with ARY's ability to obtain reasonable financing for ARY's planned acquisition of the Krigel's, Inc. ("Krigel's") chain of retail jewelry stores and to have breached Defendants' fiduciary duty to ARY. For purposes of my report, I have assumed that Defendants are found to have performed the wrongful acts as alleged, and I have calculated economic damages to ARY based, in part, on that assumption.

CONFIDENTIAL

## QUALIFICATIONS

2.    I am a Vice President of CRA International, Inc. ("CRA"). I have consulted on a variety of commercial disputes over the past twenty years. I have also lectured on the determination of economic damages to law firms and conferences. A copy of my resume, including my current and past employment and professional affiliations, a list of my testimony experience for the past four years, and a list of my publications in the past ten years, is included as Exhibit 1 to this report.

3.    CRA is being compensated at my standard rate of $385 per hour for my work performed in connection with this matter. CRA's compensation is not contingent upon the outcome of this litigation or the opinions I develop with regard to economic damages in this matter.

## SUMMARY OF OPINIONS

4.    Based on my review of the information available to me at this time, and on my education, training and experience, it is my opinion that ARY's economic damages resulting from the change in Foothill's financing terms for emergence financing for Krigel's (which is allegedly due to the wrongful acts of Defendants) can be reasonably determined by comparing the present value of the profits projected for Krigel's under the December 15, 2000 financing terms proposed by Foothill and the March 27, 2001 financing terms proposed by Foothill. It is my opinion that ARY's economic damages under this lost profits methodology is approximately $3.1 million, excluding prejudgment interest.

## INFORMATION REVIEWED

5.    I, and professionals working under my direction and supervision, reviewed and analyzed certain documents in connection with my work in this matter and have conducted independent research, including interviews. The information I obtained and considered in preparing this report is presented in Exhibit 2.

CONFIDENTIAL

6.    This report presents my analyses and opinions regarding ARY's economic damages resulting from the alleged wrongful acts of Defendants based on the information available to me as of the date of this report. It is my understanding that discovery in this matter is ongoing. As additional documents, data, information, or testimony become available, I reserve the right to consider this information and to modify or supplement this report or the opinions contained in this report if I find it appropriate to do so in light of any additional information made available to me. I understand that I may be asked to review the reports or testimony of experts engaged by Defendants. This may result in additional opinions that I may offer. Also, I may develop exhibits related to my analyses and conclusions for use at trial as an aid to the trier of fact.

## BACKGROUND

7.    ARY, and its owner, Haji Abdul Razzak, operate a gold bullion investment business and also operate several retail jewelry stores in Dubai.[1] ARY has profitably operated these jewelry stores since approximately 1997.[2] Part of the inventory for its jewelry stores, such as gold jewelry, gold chains and jewelry with semi-precious stones, is made in ARY's manufacturing and fabrication facilities in Dubai.[3] ARY also has strong relationships with other suppliers, such as a watch-maker in Italy and diamond jewelry manufacturers and suppliers in India.[4] The supply of inventory from its own manufacturing facilities and strong relationships with other suppliers assists ARY in reducing the cost of its inventory.[5]

8.    In 2000, ARY determined that an expansion of its retail jewelry business into the United States would be an advantageous business decision.[6] ARY worked with a business broker and Gohar Husain to identify an appropriate acquisition target to use as an entry into the United States retail jewelry market. Mr. Husain had previously been

[1] Interview of Ayman Shahin, June 14, 2005
[2] ARY Jewelry Profitability Summary
[3] Interview of Ayman Shahin, June 14, 2005
[4] Interview of Haji Abdul Razzak and Shabana Razzak, May 13, 2005, Interview of Ayman Shahin, June 14, 2005
[5] Interview of Haji Abdul Razzak and Shabana Razzak, May 13, 2005, Interview of Ayman Shahin, June 14, 2005
[6] Interview of Ayman Shahin, June 14, 2005

CONFIDENTIAL

with Service Merchandise, and therefore had experience with the retail jewelry business in the United States.[7] ARY planned to use an initial acquisition to enter the United States market and to serve as a base from which to expand to 200 or more stores.[8] ARY had evaluated the United States jewelry market and understood that most of the gold jewelry sold in the United States is 10k or 14k gold rather than the 18k or 21k gold demanded by its customers in Dubai. The cost of producing 10k and 14k gold jewelry is much lower than the cost to produce 18k and 21k gold jewelry because of the reduced gold content, and the achievable margins on 18k and 21k gold are lower than for 10k and 14k gold jewelry.[9] Therefore, ARY's analysis indicated that its margins in retail jewelry in the United States would be higher than its margins in Dubai.[10]

9.    Krigel's was identified as a potential acquisition target for ARY.[11] Krigel's owned and operated a chain of 21 retail jewelry stores in Kansas, Missouri and Ohio.[12] Krigel's was family-owned and had been operated by the Krigel family since the business was established in 1910.[13] In 1999 and 2000, Krigel's suffered financial setbacks and substantial losses.[14]

10.   In November 2000, ARY and Krigel's signed a Stock Purchase Agreement providing the terms under which ARY would acquire the stock of Krigel's.[15] One of the provisions in the Stock Purchase Agreement was that:

> Within four weeks from the date hereof Purchaser shall provide Seller
> with evidence of Foothill Capital's consent to the continued financing of
> Company's obligations to Foothill Capital. In the event Foothill Capital

---

[7] Interview of Haji Abdul Razzak and Shabana Razzak, May 13, 2005
[8] Jennifer Heebner, "Middle East Meets Midwest" *High-Volume Jeweler*, March 2001, ARY 01006
[9] Interview of Ayman Shahin, June 14, 2005
[10] Interview of Haji Abdul Razzak and Shabana Razzak, May 13, 2005, Interview of Ayman Shahin, June 14, 2005
[11] Interview of Haji Abdul Razzak and Shabana Razzak, May 13, 2005
[12] ARY 00939
[13] Sherry Graham, "Retail Jewelry Business Booming in Wichita" *Wichita Business Journal*, October 22, 1999
[14] Jennifer Heebner, "Middle East Meets Midwest" *High-Volume Jeweler*, March 2001, ARY 01006; ARY 01114
[15] Stock Purchase Agreement dated November 21, 2000, ARY 01162-77

CONFIDENTIAL

does not consent within the foregoing time period, this Stock Purchase Agreement and related agreements shall be void and of no further effect.[16]

11.   ARY and Krigel's planned to have Krigel's file a "pre-packaged" bankruptcy in which the terms with Krigel's creditors would be agreed to prior to the filing and the emergence financing would be arranged prior to the bankruptcy filing.[17]

12.   On December 15, 2000, Foothill Capital ("Foothill") provided a letter to Mr. Husain outlining proposed terms for emergence financing for the Krigel jewelry chain after being discharged from bankruptcy with Krigel's stock owned by ARY.[18]  ARY and Scott Krigel, President of Krigel's, found the terms offered acceptable, but not as attractive as desired.[19]  Therefore, financing terms were sought from additional financial institutions, including IBJ Whitehall.[20]  ARY received a proposal with favorable terms for emergence financing from IBJ Whitehall;[21] however, on February 28, 2001, IBJ Whitehall notified Krigel's and ARY that it could not provide the discussed financing due to information obtained in IBJ Whitehall's background check on ARY Traders.[22]

13.   On March 19 and 20, 2001, Foothill revised the Krigel's proposal, shortening the term to one year from three years, decreasing the amount that could be financed with inventory to 70 percent of net retail liquidation value, increasing the minimum availability requirement and adding a $500,000 secured guarantee.[23]  Internal Foothill emails stated that "We are going to do this deal for one reason only – it is a clean exit (with fees) from Krigal's (sic).  The cleaner we keep it – the easier that will be to sell [to the credit committee]."[24]

14.   On March 20, 2001, Foothill provided ARY with a draft revised proposal for emergence financing, with greater restrictions on financing against Krigel's inventory

---

[16] Stock Purchase Agreement dated November 21, 2000, ARY 01171
[17] Stock Purchase Agreement dated November 21, 2000, ARY 01171-72
[18] F 00357-61
[19] ARY 00677, ARY 00891
[20] ARY 00944
[21] ARY 02028
[22] ARY 01744
[23] ARY 00354, ARY 00347-51, ARY 00352
[24] ARY 00354

07/27/2005  15:21    713-739-0821              THE CARRIGAN LAWFIRM              PAGE  10/43

CONFIDENTIAL

and larger requirements for available balances.[25] ARY alleges in this litigation that the change in terms was due to Defendants contacting Foothill, knowing that Foothill was negotiating financing for ARY, and accusing ARY of being involved in "embezzling, bribery for contracts to mint gold coins for the Olympic games being help in Sydney, Australia, and other illegal conduct."[26] Mr. Husain responded to Foothill that the March 20 term sheet would make it "almost impossible for us to come up with the fund" and included terms that were like "breaking the camel's back."[27]

15.  Krigel's also responded to the "dramatic changes" in Foothill's proposed emergence financing.[28] Krigel's specifically objected to:

- Decreasing the inventory advance rate from 90 percent of net retail liquidation value to 70 percent of net retail liquidation value;

- Increasing the unused loan availability to $5 million, causing the opening loan balance to decrease to only $1.2 million; and

- Requiring a one percent loan origination fee on a one year facility, especially when under the terms offered by Foothill, Krigel's would only be able to use a fraction of the stated $12 million line.[29]

16.  Although Foothill modified some of the revised terms, such as reducing the unused loan availability from $5 million to $2 million, when it issued its proposed financing terms on March 27, other disadvantageous terms remained, including the reduction in the percentage advanced against inventory to 70 percent of net retail liquidation value.[30] An additional condition was also added to the Conditions Precedent section of the March 27, 2001 emergence finance proposal letter from Foothill.    Condition (k) required

---

[25] ARY 00347-51
[26] First Amended Complaint, paragraph 33532
[27] ARY 00352
[28] ARY 00355-6
[29] ARY 00355-6
[30] ARY 01061-65

CONFIDENTIAL

"background evaluations satisfactory to [Foothill] of ARY, LLC's owners and management."[31]

17.    According to Krigel's analysis, under the revised terms, Krigel's would be able to obtain a loan balance of only $4.8 million at closing for the emergence financing after reducing the loan capacity under the revised terms of $6.8 million by the required $2 million excess loan availability, or more than $3 million less than Krigel's loan balance with Foothill as of March 31, 2001.[32]

18.    ARY held additional meetings with Foothill regarding the change in financing terms; however, Foothill refused to offer the terms available at the date the Stock Purchase Agreement was signed. Therefore, on April 5, 2001, ARY informed Mr. Krigel that ARY would not proceed with its acquisition of Krigel's since Foothill had not provided the required consent for continued financing.[33]

ANALYSIS

19.    I have been asked to determine the economic impact on ARY of the change in financing terms offered by Foothill allegedly as a result of the information provided to Foothill by Defendants. It is my understanding that due to the change in financing terms, the business judgment of ARY was that it had to withdraw from its planned acquisition of Krigel's. ARY informed me that it was unable to obtain alternative financing from another institution because of the timing required to obtain financing for Krigel's to exit bankruptcy. After the failed acquisition of Krigel's by ARY, lawsuits were filed against ARY by Krigel's and Krigel's creditors. Due to the litigation, ARY informed me that $1.5 million of its funds were frozen for years and an additional $0.5 million for several months. As a result, ARY was reluctant to bid for Krigel's when it was sold at auction. In addition, ARY informed me that there was concern that more lawsuits would be filed against ARY if it bid for Krigel's at auction or if it pursued other acquisition opportunities.[34]    Therefore, I have determined ARY's economic damages due to the

---

[31] ARY 01064
[32] ARY 01075
[33] ARY 01982-6
[34] Interview of Haji Abdul Razzak and Shabana Razzak, May 13, 2005

CONFIDENTIAL

change in Foothill's financing terms, allegedly caused by the acts of Defendants, by calculating the difference in the projected profits of Krigel's under the December 15, 2000 financing terms from Foothill and the projected profits under the March 27, 2001 financing terms from Foothill.

20. The projected profits under each financing alternative are based on financial projections prepared by Krigel's. For the December 15, 2000 financing terms, Krigel's prepared a monthly financial projection for its fiscal year ended February 28, 2002[35] and an annual projection for three years.[36] The assumptions used in the three year projection have been continued for the remainder of the projection period in the lost profits analysis. For the March 27, 2001 financing terms, Krigel's prepared a monthly financial projection for its fiscal year ended February 28, 2002.[37] The differences in the two annual projections were primarily related to the change in financing terms; however, certain expense categories appear to have been adjusted for reasons other than the change in financing terms. I have modified these changed expenses to be consistent with the December 2000 projections so that the differences in the two projections reflect the change in financing terms and not other changes in expenses.

21. Profits under the two financing alternatives are considered from March 1, 2001 through February 28, 2006. The analysis of lost profits is terminated as of February 28, 2006 assuming the current dispute is resolved to a judgment by that date and there would no longer be any obstacle to ARY entering the United States retail jewelry market, if it so chose.

22. The present value of the lost profits of ARY as of March 27, 2001 under the December 15 financing terms are calculated using a discount rate of 10.9 percent, or the calculated weighted average cost of capital of ARY under the December 15 financing terms.[38] The present value of the lost profits of ARY as of March 27, 2001 under the March 27 financing terms are calculated using a discount rate of 12.5 percent,[39] with the

---

[35] ARY 00387-8
[36] ARY 00995
[37] ARY 01129
[38] see Exhibit 6
[39] see Exhibit 6

CONFIDENTIAL

higher discount rate reflecting the weighted average cost of capital under the March 27 financing terms and the greater risk of the one year financing period in these terms, as compared with the three year loan term under the December 15 financing terms.

23.    The present value of ARY's projected profits under the March 27, 2001 financing terms is approximately $3.1 million less than the present value of ARY's projected profits under the December 15, 2000 financing terms.  It is my opinion that the $3.1 million decrease in present value of ARY's projected profits reflects economic damages to ARY from the change in financing terms.  The calculation of lost profits is shown on Exhibit 3.

24.    The calculation of economic damages is based only on the decrease in profits due to the change in financing terms and does not reflect the dollar amount of the higher capital infusion by ARY required under the March 27, 2001 financing terms as compared to the December 15, 2000 financing terms.  Under the terms of the March 27 financing terms, the inventory borrowing base was restricted to 70 percent of the net retail liquidation value of inventory.[40]  The appraisal by Ozer Valuation Services determined the net retail liquidation value of Krigel's inventory to be approximately 80 percent of inventory at cost.[41]  As a result the inventory borrowing base would be 56 percent of inventory levels, or approximately $6.2 million.   Adding the accounts receivable borrowing base of approximately $0.6 million results in an estimate loan capacity of $6.8 million, or $1.4 million less than the estimated loan balance as of March 31, 2001.[42]  That difference would be additional required capital from ARY.  This calculation of additional capital requirement from ARY at loan closing is also reflected in the changes in the weekly cash flow projections from March 10 to projections from March 24.[43]  Weekly cash flow projections and an accompanying memo also reflect the need for additional capital infusions from ARY of at least $1 million.[44]

---

[40] ARY 00357
[41] ARY 01626
[42] ARY 01075
[43] ARY 01003, ARY 01078
[44] ARY 01082-7

CONFIDENTIAL

25.   I have evaluated the reasonableness of the projected revenues and profits using data from other retail jewelry businesses and based on the opportunity for ARY to reduce Krigel's cost of goods sold.  According to the appraisal of Krigel's prepared by Ozer Valuation Services, Krigel's financial condition caused it to accept higher prices for its inventory from its suppliers in exchange for longer financing terms.[45]  By improving Krigel's financial condition, ARY could have been expected to obtain lower prices for its inventory in return for more rapid payment to its suppliers.  In addition, as discussed above, ARY manufactures much of its own gold jewelry and also had established relationships with jewelry suppliers from operating its jewelry stores in Dubai.  I understand from ARY that many of the same suppliers could have provided inventory to the Krigel's stores.[46]  Increased purchases from suppliers with which ARY had strong relationships and supplying inventory from its own gold jewelry manufacturing would offer ARY further opportunities to decrease the cost of goods sold at Krigel's, thereby improving the profitability of Krigel's.  The projected increase in gross profits at Krigel's from 48.6 percent to 55 percent[47] is reasonable in comparison to the gross profits achieved by other retail jewelry chains in the United States.[48]

**PREJUDGMENT INTEREST**

26.   Prejudgment interest is calculated in order to make the plaintiff whole for the period the plaintiff was deprived of the amount of recovery determined to be due the plaintiff.  It is my understanding that the Court may determine that it is appropriate to award prejudgment interest in this matter.   If appropriate, I will provide calculations of prejudgment interest to assist the court with this issue.

---

[45] ARY 01631
[46] Interview of Ayman Shahin, June 14, 2005
[47] ARY 01114, ARY 00995
[48] see Exhibit 7.

page 10

07/27/2005  15:21    713-739-0821              THE CARRIGAN LAWFIRM              PAGE  15/43

# Exhibit 1



**INTERNATIONAL**

**SHIRLEY WEBSTER**
1600 Smith Street, Suite 4900
Houston, Texas 77002
713.332.0650; fax 713.332.0660

| | |
|---|---|
| **POSITION** | Vice President, CRA International, Inc., Houston Office. |
| **EDUCATION** | B.A. in Economics from the University of Texas at Austin in 1975 |
| | A.B.D. in economics, including coursework and exams for a Ph.D., at the University of North Carolina at Chapel Hill, 1977 |
| | M.B.A. from Houston Baptist University in 1982 |
| **RANGE OF EXPERIENCE** | Antitrust, patent infringement, use of trade secrets, trademark infringement, intellectual property and business valuation, product liability, fraud/misappropriations, lender liability, breach of contract, franchisor/ franchisee disputes, breach of fiduciary duty, personal injury/wrongful death/wrongful termination and dissident shareholder actions |
| **PROFESSIONAL AND BUSINESS HISTORY** | CRA International, Inc. (formerly InteCap, Inc. and TDRC, Inc.) 1999 - present |

> PricewaterhouseCoopers LLP (and predecessor, Coopers & Lybrand LLP)
>> Financial Advisory Services (Dispute Analysis Group), 1994 – 1999

> KPMG Peat Marwick L.L.P
>> Corporate Transactions Consultant (Litigation Group)
>>> Managing Director:  1993 – 1994
>>> Senior Manager:  1988 - 1993

> Price Waterhouse LLP
>> Dispute Analysis & Corporate Recovery Group, 1984 - 1988
>>> Manager:  1985 - 1988
>>> Senior Consultant:  1984 - 1985

> Turner Collie & Braden (Consulting Engineers)
>> Financial Analyst, Rate Consultant and Airport Planner 1978 – 1984

> Stewart Research (Real Estate Consulting)
>> Economist 1977 - 1978

> University of North Carolina at Chapel Hill
>> Teaching Assistant / Research Assistant
>> Department of Economics  1975 – 1977



**SHIRLEY WEBSTER**
page 2

**EXAMPLES OF PROFESSIONAL AND BUSINESS EXPERIENCE**

## Antitrust Cases

Prepared a model calculating cash flows for a coal slurry pipeline for a thirty-year contract period for a joint venture whose development of the pipeline was prevented due to alleged antitrust violations.

Calculated lost profits for a construction company in multiple market areas relating to a predatory pricing action. Model development required reconstruction of financial records of both plaintiff and defendant, research into sources for relevant national and local market data and use of a variety of analytical methods including regression analysis and ratio analysis.

Determined product market and geographic market in which a type of offshore oilfield equipment competed. Evaluated if there were any competitive impact in the product or geographic markets in which the equipment competed from the use of patented technology and the inclusion of the patented technology as one alternative in various standards.

Determined if geographic restrictions included in a license agreement resulted in a reduction of competition in the market. The current value of the licensed technology was assessed. Various products were analyzed to determine the competitors in each industry and the competitive concentration in each relevant industry.

## Breach of Contract Cases

Calculated lost profits of a software developer and consulting firm using a financial model based on the company's past financial performance and on the market potential for new products under development at the time of a contract breach by a significant customer.

Critiqued calculations of lost profits for various small businesses claiming lost profits due to a municipality failing to fulfill terms of agreement for assisting small and minority businesses relating to Community Block Grant Funds. Testified as to the economic conditions which were impacted the ability of the companies to achieve the desired level of profitability.



**SHIRLEY WEBSTER**
page 3

| | |
|---|---|
| **EXAMPLES OF PROFESSIONAL AND BUSINESS EXPERIENCE (continued)** | Served as arbitrator in a multi-million dollar contract dispute regarding performance by a service contractor providing warranty service for computer warranty claims. Claims of several types were included in this dispute. Specific claims under each category were sampled and tested, data from the records of both parties were assessed and processes of both companies were examined in order to determine an appropriate settlement amount. The proposed settlement amount was accepted by both parties. |

**Fraud/Misappropriation Cases**

Conducted an inquiry into misappropriations from an energy company by a company executive. Prepared a report documenting findings which was accepted by the SEC.

Conducted an inquiry into misappropriations by an employee in the accounting department of an energy company, including conducting interviews with the subject of the inquiry.

Conducted an inquiry into misappropriations by a senior officer of an investment company, including analyzing the books and records of the company, tracing of funds through multiple investments and analyzing the personal financial position of the officer

Conducted inquiry into a misappropriation involving approximately $8 million taken from the U.S. subsidiary of a Japanese company by two officers of the U.S. subsidiary. The engagement included tracing the funds through several bank accounts and brokerage accounts with transfers of funds using checks and wires, both from the company and from customers. In addition, the books and records of the company were analyzed to determine the methods of concealment of the fraud which included misleading and altered accounting entries. This analysis used the accounting records as printed out over time as well as computer files.

**Patent Infringement - Lost Profits**

Evaluated losses due to patent infringement, determining based on a market share analysis, the losses for which lost profits were the appropriate measure of damages and the share on which a reasonable royalty should be recovered. Calculated lost profits and reasonable royalty damages. Critiqued damage analysis prepared by plaintiffs.



**SHIRLEY WEBSTER**
page 4

---

**EXAMPLES OF PROFESSIONAL AND BUSINESS EXPERIENCE (continued)**

Determined lost profits resulting from infringement of a patent relating to rehabilitation of concrete. Analyzed company records to determine manufacturing and marketing capability to make lost sales and to determine the incremental margin on the lost sales.

Calculated lost profits due to patent infringement related to a process for rehabilitating underground pipe. Evaluated market competitors to ascertain basis to claim lost profits. Analyze past contracts to calculate incremental margins. Critiqued damage assessment prepared by defendants.

Evaluated lost profits due to patent infringement in the medical products industry using market share analysis and determination of incremental profits. Determined appropriate royalty base and royalty rate for sales on which lost profits could not be claimed. Critiqued damage analysis prepared by plaintiff.

**Patent Infringement - Reasonable Royalty**

Determined the reasonable royalty for alleged patent infringement in the semiconductor industry, as well as the appropriate base to which the royalty should be applied.

Calculated the reasonable royalty appropriate for the one time infringement of a patent in the energy industry. Consideration was given to industry practice, other licenses and the benefits derived from the use of the patent.

Determined the reasonable royalty necessary to adequately compensate a major chemical company for damages resulting from infringement of a patent related to motor oil additives. Analyzed the cost savings of the infringer and the savings of research and development costs as part of the basis for the calculation of the infringement.

Determined the reasonable royalty for patent infringement suit involving a design patent as well as a utility patent for a fishing reel. Evaluated royalties paid by the defendant on other licensing agreements and the contribution of those patents to the commercial success of various products as compared to the patent at issue.

Determined the reasonable royalty for a patent infringement suit brought by a university against a major pet food company relating to dog food.



SHIRLEY WEBSTER
page 5

**EXAMPLES OF PROFESSIONAL AND BUSINESS EXPERIENCE (continued)**

## Use of Trade Secrets

Testified in an arbitration on the economic damages resulting from the misappropriation of trade secrets incorporated in software used in automobile dealership management. Assessed the benefits to the defendant from its alleged use of the trade secrets, including determination of unjust enrichment and considered the value of the trade secrets.

Testified in an arbitration regarding the economic damages resulting from the alleged misappropriation of trade secrets in the oil and gas equipment industry. Evaluated the amount of unjust enrichment resulting from the alleged misappropriation, the cost of development of the trade secret and the value of the trade secrets.

Consulted with a chemical company to determine the value of trade secrets licensed under a cross-licensing agreement.

Developed a lost profits claim resulting from the misappropriation of trade secrets by the foreign competitor of a U.S. company in a semiconductor equipment industry. Analyzed market conditions and competitors, specific lost contracts and the price erosion impact resulting from the misappropriation of the trade secrets. Analyzed the appropriate allocation of overhead to determine lost profits.

Critiqued a lost profits claim based on alleged misappropriation of trade secrets by a company in the energy services industry, including assessment of market trends, market share analysis, convoyed sales claims and price erosion claims.

## Trademark Infringement

Analyzed a major railroad's damages of resulting from the unauthorized use of its trademark in a music video to promote a recording.

Analyzed damages resulting from the use unauthorized use of a well known trademark by a company selling software, personal computers and electronics.

Assessed damages resulting from the unauthorized use of a trademark of a national affiliation of retail stores.

Analyzed value of the trademark of a software company.



SHIRLEY WEBSTER
page 6

**EXAMPLES OF
PROFESSIONAL
AND BUSINESS
EXPERIENCE
(continued)**

### Copyright Infringement

Analyzed the damages of a major business software company resulting from copyright infringement of its software.

Analyzed damages of a toy inventor from the copyright infringement of a line of dolls by a major manufacturer.

### Lender Liability/Destruction of Business

Analyzed the damages of an oil trading company that went out of business after a bank withdrew a line of credit.

Analyzed impact on an insurance agency of a withdrawal of rights by an insurance company.

### Energy

Calculated the reservation fee due to a producer from a pipeline company under a gas purchase contract.

Calculated imbalances for six parties in a dispute regarding more than twenty wells over a period of more than fifteen years.

Assessed pricing and determined correct royalty payments in numerous royalty disputes.

Evaluated refinery operations and costs to determine value of refinery by-product.

Evaluated volumes and pricing related to gas pipeline dispute.

Analyzed pricing issues related to dispute between various energy companies and governmental entities regarding the pricing of oil used as the basis for payments to the governmental entities.

### ERISA

Testified regarding the excess amounts withheld from paychecks of employees for various categories of employee benefits and not paid to the designated recipient in an ERISA claim against the employer.



**SHIRLEY WEBSTER**
page 7

**EXAMPLES OF PROFESSIONAL AND BUSINESS EXPERIENCE (continued)**

<u>Franchise and Distributor Disputes</u>

Testified critiquing the damage claim of an auto repair/tire sales franchisee relating to the losses incurred by the franchise. Analysis of expenses charged to the franchise store by the franchisee revealed significant personal expenses charged to the business.

Prepared a damage calculation for a franchise with an area franchise agreement based on the lost profits from the planned multi-unit development of franchise operations in the area.

Calculated the value of a distributorship that was terminated by a heavy equipment manufacturer. Analyzed past operations of the distributorship and market conditions to develop reasonable projections of the business had it continued. Identified and evaluated several comparable public companies to assist in the determination of the market value of the distributorship.

<u>Breach of Fiduciary Duty</u>

Evaluated the assets and liabilities of an estate over time in supporting an action questioning the management of the estate by an independent executor. Determined the estate value at various points in time using multiple 149A filings, documents relating to a corporation owned by the deceased, insurance policies, tax filings and records of estate transactions.

Analyzed management of investment accounts by various broker/dealers with regard to evaluating allegations of churning and other inappropriate activities in managing the funds in the accounts.

<u>Dissident Shareholder Actions</u>

Prepared a valuation of stock as a court-appointed appraiser in a dissident shareholder action. Evaluated the company's assets and liabilities using financial statements, tax records and lease records. Determined impact of related party transactions on company assets and liabilities. Evaluated appropriate adjustment for controlling and minority interest shares.



**SHIRLEY WEBSTER**
page 8

**EXAMPLES OF PROFESSIONAL AND BUSINESS EXPERIENCE (continued)**

<u>Personal Injury / Wrongful Termination / Wrongful Death</u>

Performed analyses of losses due to personal injury, wrongful termination and wrongful death, including loss of earnings, loss of benefits, and additional costs incurred such as retraining costs and the cost of household services.

<u>Valuation</u>

Prepared valuations of businesses in a variety of industries, including heavy equipment, warehousing and food distribution.

Assessed the value of intellectual property in industries such as medical technology, energy and manufacturing.

<u>Reorganization</u>

Analyzed the business segments of a construction and engineering company which was out of compliance with its loans. This analysis included evaluating the causes of the losses on previous contracts and the measures which the company had implemented to correct previous operational problems. Management of the company and its ability to direct additional necessary changes was also evaluated. In analyzing the projections prepared by the company, company capacity and existing backlogs were evaluated.

Evaluated a proposed plan of reorganisation on behalf of a major creditor and testified regarding the feasibility of the debtor achieving the projections proposed in the plan.

**SPEECHES, ARTICLES AND TEACHING EXPERIENCE**

<u>Speeches</u>

Various presentations to law firms for continuing legal education credit on topics such as Determination of Economic Damages in Intellectual Property Disputes, Determining Economic Damages in Lanham Act Disputes, Valuing Intellectual Property, Calculation of Lost Profits, Calculation of Damages for Personal Injury/Wrongful Termination/Wrongful Death and Presentation of Economic Damages

"Patent Damages: Beyond Panduit and Georgia-Pacific", Presentation to Licensing Executive Society Technology Transfer Meeting, 1999.

"Valuing Intellectual Property", Presentation to Oklahoma Licensing Executive Society Meeting, 2000.



**SHIRLEY WEBSTER**
page 9

**SPEECHES,
ARTICLES
AND
TEACHING
EXPERIENCE**
(continued)

"Antitrust Implications of Patent Settlements," State Bar of Texas Annual Meeting, IP Section, June 2002.

"IP Valuation: Real World Licenses v. The Hypothetical License in Litigation" Patent Lawyers Club of Washington, DC and Northern Virginia, October 28, 2002

"Monetizing IP in a Down Market", The University of Texas School of Law, 7th Annual Advanced Patent Law Institute, Austin, Texas, November 1, 2002

"Determining Economic Damages in Trade Secrets Litigation", lecture at University of Houston Law School, March 2003

"Licensing and Competition: FTC/DOJ Views", LES Washington, DC chapter,  May 2003

"Current Topics in IP Licensing and Litigation", Patent Lawyers Club of Washington, DC and Northern Virginia, September 2003
"Report from the Cutting Edge: Current Antitrust Issues in Patent Cases", 8th Annual Advance Patent Law Institute, Austin, Texas, October 31, 2003

"Economic Damages Under the Lanham Act", lecture at University of Houston Law School, November 2003

"How Do I Develop Strategies to Maximize the Gold?", Law Seminars International Mining Your Patent Portfolio, December 2003

"How Economics Works", Texas Bar CLE on Real Damages after House Bill 4, February 2004

"Determining Economic Damages in Trade Secrets Litigation", lecture at University of Houston Law School, March 2004

"Standard Setting Issues", IP Licensing Nuts and Bolts 2005, Houston, March 3, 2005

<u>Articles</u>

"Determining the Value of a Foreign Market for a Drug in Clinical Testing" - *les Nouvelles*, Journal of the Licensing Executives Society, September 2000 (co-authored with Patrick McLane).

07/27/2005  15:21    713-739-0821              THE CARRIGAN LAWFIRM                    PAGE   25/43



**SPEECHES, ARTICLES AND TEACHING EXPERIENCE (continued)**

### Articles (continued)

"Standard Setting Under the Microscope" – *Managing IP*, October 2004 (co-authored with Stafford Matthews, Robert S. Harrell, and V. Walter Bratic).

"How Patent Pools Can Avoid Competition Concerns" - *Managing IP*, April 2005 (co-authored with Stafford Matthews, Robert S. Harrell, and Walter Bratic).

"Analyzing and Presenting Business Damages", Houston Bar Association, May 17, 2005.

### Macroeconomic Principles

Taught topics including unemployment/full employment, economic growth/gross national product, and monetary and fiscal policies.

### Internal Courses

Taught Lost Profits Course to Coopers & Lybrand Litigation Services professionals (Associates through Partners) 1995 – 1996

Taught Intellectual Property Litigation to PricewaterhouseCoopers professionals (Managers through Partners) 1998

**PROFESSIONAL BUSINESS, AND COMMUNITY AFFILIATIONS**

Member, Licensing Executive Society

Member, Women's Energy Network

Past President, National Association for Business Economics, Houston Chapter

Member, National Association for Business Economics

Member, International Association for Energy Economics, Houston Chapter

Past President, Texas Accountants and Lawyers for the Arts



INTERNATIONAL

## Shirley Webster

### Expert Testimony Past Four Years

*Juan Mireles and Erin Mireles v. Stapleton Corporation,* State Court, Gillespie County
Texas (trial testimony)

*Alan R. Stahlman and Suzanne Stahlman v. Northern Trust Bank of Texas, N.A.,* State
Court, Harris County, Texas (deposition testimony)

*CFS Bakel B.V. v. Stork Gamco and Stork Titan B.V.,* Federal Court, Delaware
(deposition testimony)

*Gwen Vandergriff v. Hydrochem Industrial Services, Inc.,* State Court, Harris County,
Texas (trial testimony)

*Ronald H. Presler, et ux v. Lincoln Electric, et al.,* State Court, Brazoria County, Texas
(trial and deposition testimony)

*Halliburton Energy Services, Inc. v. Smith International, Inc.,* Federal Court, Tyler,
Texas (trial testimony)

*Johnny Devoltz v. Britain Electric Company,* State Court, Harris County, Texas
(deposition testimony)

*CAPS Logistics v. H. Donald Ratliff and William Nulty,* Arbitration, Georgia, (deposition
and arbitration testimony)

*Verna Clark, et al. v. Agrium U.S., Inc.,* State Court, Hutchinson County, Texas
(deposition testimony)

*Puritan-Bennett Corp., et al. v. Penox Technologies, Inc., et al.,* Federal Court,
Indianapolis, Indiana (deposition testimony)

*Mary Harrell, et al. v. Reagan National Advertising of Austin, Inc.,* Federal Court,
Austin, Texas (deposition testimony)

*Goss, et al. v. Kellogg Brown & Root, et al.* State Court, Houston, Texas (deposition
testimony)

*Walter Conway v. Lenzing Aktiengesllschaft,* Federal Court, Houston, Texas (deposition
testimony)



INTERNATIONAL

*Universal Computing Service, Inc., et al. v. Dealer Solutions, et al.* Houston, Texas (deposition and arbitration testimony)

*Tommy Dickerson v. Temple Inland Forest Products Corp.* State Court, Angelina County, Texas (deposition testimony)

*Seitel, Inc. v. Herbert M. Pearlman,* Federal Court, Houston, Texas (deposition testimony)

*Everett Wayne White v. Carbis, Inc.,* State Court, Houston, Texas (trial and deposition testimony)

*Safoco, Inc. v. Cooper Cameron Company,* State Court, Houston, Texas (deposition and arbitration testimony)

*Braden St. John Brown v. Swett & Crawford of Texas, Inc. f/d/b/a/ Insurance Brokers Services, Inc. of Texas, et al.,* State Court, Houston Texas (deposition testimony)

*Lesley Wortman v. ExxonMobil,* State Court, Houston, Texas (trial testimony)

*Texas Gulf Bank, et al. v. Allright Parking Texas, Inc., et al.,* State Court, Houston, Texas (deposition and trial testimony)

*George M Construction, et al. v. TJ&T Enterprises, et al.,* State Court, Houston, Texas (deposition testimony)

*Ford Dealer Computer Services, Inc. n/k/a Dealer Computer Services, Inc. v. Jim Marsh Ford, Inc.,* Arbitration (deposition and arbitration testimony)

*Circa 2K Gifts, Inc. v. TY, Inc.,* Federal Court, Eastern District of Texas (deposition testimony)

*Joseph F. Mazoch v. Cherry Moving Company, Inc. d/b/a Cherry Demolition, and Marathon Ashland Petroleum Company,* State Court, Galveston, Texas (deposition testimony)

*Black Max Downhole Tools, Inc. v. Pegasus Directional Drilling Limited Partnership, et al.,* State Court, Houston, Texas (deposition testimony)

*Maria Martinez, et al. v. Phillips Petroleum Company, et al.,* State Court, Houston, Texas (deposition and trial testimony)

*Trema Jean Morris, et al. v. Archer-Daniels-Midland, et al.,* State Court, Houston, Texas (deposition and trial testimony)

# Exhibit 2

Exhibit 2

ARY Jewelers, LLC. v. IBJTC Business Credit Corp. and David Molinario

## List of Documents Reviewed

_Documents With Bates Number_

| Bates Prefix | Beginning Bates | Ending Bates |
|---|---|---|
| ARY | 00180 | 00421 |
| ARY | 00424 | 00482 |
| ARY | 00493 | 00518 |
| ARY | 00582 | 00618 |
| ARY | 00677 | 00684 |
| ARY | 00745 | 00746 |
| ARY | 00753 | 00795 |
| ARY | 00797 | 00801 |
| ARY | 00844 | 00859 |
| ARY | 00870 | 00891 |
| ARY | 00923 | 00933 |
| ARY | 00939 | 00953 |
| ARY | 00956 | 00968 |
| ARY | 00973 | |
| ARY | 00989 | |
| ARY | 00995 | 00996 |
| ARY | 00998 | 01000 |
| ARY | 01003 | |
| ARY | 01005 | 01006 |
| ARY | 01014 | 01015 |
| ARY | 01018 | 01019 |
| ARY | 01030 | 01037 |
| ARY | 01049 | 01052 |
| ARY | 01055 | 01072 |
| ARY | 01075 | |
| ARY | 01078 | 01087 |
| ARY | 01091 | 01108 |
| ARY | 01114 | 01136 |
| ARY | 01147 | 01149 |
| ARY | 01151 | 01222 |
| ARY | 01608 | 01669 |
| ARY | 01674 | 01733 |
| ARY | 01742 | 01873 |
| ARY | 01927 | 01930 |
| ARY | 01947 | 01952 |
| ARY | 01955 | 01967 |
| ARY | 01982 | 01991 |
| ARY | 01994 | 02003 |
| ARY | 02006 | 02035 |
| F | 00352 | 00361 |

CONFIDENTIAL

Exhibit 2

ARY Jewelers, LLC. v. IBJTC Business Credit Corp. and David Molinario

## List of Documents Reviewed

*__Legal Filings__*

First Amended Complaint

*__Depositions & Exhibits:__*

Deposition of Albert A. Armstrong, Jr, December 11, 2001
Deposition of Scott Krigel, January 18, 2002

*__Other Documents/Independent Research__*

DGSE Companies, Inc. Form 10-K, fiscal year ended December 31, 2004
Finlay Enterprises, Inc. Form 10-K  fiscal year ended January 29, 2005
Friedman's Inc. Form 10-K fiscal year ended September 28, 2002.
Mayor's Jewelers, Inc. Form 10-K, fiscal year(s) ended March 26, 2005 and 2004.
Reeds Jewelers, Inc. Form 10-K, fiscal years ended February 28, 2003 and 2002.
Samuels Jewelers, Inc. Form 10-K, fiscal year ended June 1, 2002.
Tiffany & Co. form 10-K, fiscal year(s) ended January 31, 2005, 2004 and 2002
Whitehall Jewellers, Inc. Form 10-K, fiscal year ended January 31, 2005 and 2004.
Zale Corporation Form 10-K, fiscal year ended July 31, 2004.
www.research.thomsonib.com
http://premium.hoovers.com
http://edgarscan.pwcglobal.com

CONFIDENTIAL

07/27/2005  15:21    713-739-0821                THE CARRIGAN LAWFIRM                    PAGE  31/43

Exhibit 3

ARY Jewelers LLC v IBJTCC Business Credit Corp and Davie Molinario          Exhibit 3

## ARY Lost Profits

| | |
|---|---|
| Net Present Value of Krigel's Net Income<br>Before Taxes as of 03/27/01<br>for the period 3/01/01 - 2/28/06<br>December 2000 Emergence Financing Terms | $ 6,446,129 |
| Net Present Value of Krigel's Net Income<br>Before Taxes as of 03/27/01<br>for the period 3/01/01 - 2/28/06<br>March 27, 2001 Emergence Financing Terms | 3,361,668 |
| **ARY Lost Profits due to change in financing terms** | **$ 3,084,461** |

*Sources:*

1. Exhibit 4 - based on documents dated 12/4/00.
2. Exhibit 5 - based on documents dated 04/2/01.

Confidential

Exhibit 4

07/27/2005  15:21    713-739-0821        THE CARRIGAN LAWFIRM        PAGE 34/43

Exhibit 4

ARY Jewelers, LLC. v. IBJTC Business Credit Corp. and David Molinaito

## Projected Operating Performance of Krigel's, Inc.
## per December 2000 Emergence Financing Terms

| Year Ended Feb. 28 | 2001 Historical[1] | % | 2002 Projected[2,3] | % | 2003 Projected[3] | % | 2004 Projected[3] | % | 2005 Projected | % | 2006 Projected | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Merchandise sales | $24,811,330 | 100.0% | $30,788,419 | 100.0% | $32,327,840 | 100.0% | $33,944,232 | 100.0% | $35,641,444 | 100.0% | $37,423,516 | 100.0% |
| Cost of goods sold | 12,740,699 | 51.4% | 15,028,135 | 48.8% | 14,870,806 | 46.0% | 15,274,904 | 45.0% | 16,038,650 | 45.0% | 16,840,582 | 45.0% |
| Gross profit | 12,070,631 | 48.6% | 15,760,284 | 51.2% | 17,457,034 | 54.0% | 18,669,328 | 55.0% | 19,602,794 | 55.0% | 20,582,934 | 55.0% |
| Repair sales | 780,766 | 3.1% | 892,864 | 2.9% | 937,507 | 2.9% | 984,383 | 2.9% | 1,033,602 | 2.9% | 1,085,282 | 2.9% |
| Finance charge income | 404,189 | 1.6% | 451,063 | 1.5% | 473,616 | 1.5% | 497,297 | 1.5% | 522,162 | 1.5% | 548,270 | 1.5% |
| Miscellaneous income | 126,854 | 0.5% | 123,154 | 0.4% | 129,312 | 0.4% | 135,777 | 0.4% | 142,566 | 0.4% | 149,694 | 0.4% |
| Trade-ins | 170,977 | 0.7% | 215,519 | 0.7% | 226,295 | 0.7% | 237,610 | 0.7% | 249,491 | 0.7% | 261,965 | 0.7% |
| **Store expenses** | | | | | | | | | | | | |
| Store wages | 4,841,635 | 19.5% | 5,328,118 | 17.3% | 5,594,524 | 17.3% | 5,874,250 | 17.3% | 6,167,963 | 17.3% | 6,476,361 | 17.3% |
| Rent | 2,359,349 | 9.5% | 2,380,437 | 7.7% | 2,499,459 | 7.7% | 2,624,432 | 7.7% | 2,755,654 | 7.7% | 2,893,436 | 7.7% |
| Depreciation | 386,798 | 1.6% | 418,758 | 1.4% | 618,758 | 1.9% | 818,758 | 2.4% | 859,696 | 2.4% | 902,681 | 2.4% |
| Check guarantee | 30,558 | 0.1% | 41,027 | 0.1% | 43,078 | 0.1% | 45,232 | 0.1% | 47,494 | 0.1% | 49,868 | 0.1% |
| Phone | 100,821 | 0.4% | 100,380 | | 103,391 | | 106,493 | | 109,688 | | 112,979 | |
| Credit card commission | 353,689 | 1.4% | 443,179 | 1.4% | 465,338 | 1.4% | 488,605 | 1.4% | 513,035 | 1.4% | 538,687 | 1.4% |
| Store supplies | 208,845 | 0.8% | 198,000 | 0.6% | 203,940 | 0.6% | 210,058 | 0.6% | 216,360 | 0.6% | 222,651 | 0.6% |
| Merchandise shortages | 200,090 | 0.8% | 197,046 | 0.6% | 206,898 | 0.6% | 217,243 | 0.6% | 228,105 | 0.6% | 239,510 | 0.6% |
| Other store expenses | 682,712 | 2.8% | 700,041 | 2.3% | 735,043 | 2.3% | 771,795 | 2.3% | 810,385 | 2.3% | 850,904 | 2.3% |
| **Total store expenses** | 9,164,497 | 36.9% | 9,805,986 | 31.9% | 10,470,429 | 32.4% | 11,156,866 | 32.9% | 11,706,378 | 32.9% | 12,267,276 | 32.8% |
| Bad debt expenses | 348,761 | 1.4% | 401,249 | 1.3% | 398,321 | 1.2% | 418,237 | 1.2% | 439,149 | 1.2% | 461,106 | 1.2% |
| Bad debt recoveries | 108,333 | 0.4% | 108,000 | 0.4% | 101,313 | 0.3% | 106,379 | 0.3% | 111,698 | 0.3% | 117,283 | 0.3% |
| **Earnings from store operations** | 4,148,512 | 16.7% | 7,343,649 | 23.9% | 8,456,327 | 26.2% | 9,055,671 | 26.7% | 9,514,785 | 26.7% | 9,997,045 | 26.7% |
| Shop expenses | 785,357 | 3.2% | 780,000 | 2.5% | 819,505 | 2.5% | 860,480 | 2.5% | 903,504 | 2.5% | 948,679 | 2.5% |
| **General & administrative expenses** | | | | | | | | | | | | |
| Wages | 1,586,407 | 6.4% | 1,547,317 | | 1,593,737 | | 1,641,549 | | 1,690,795 | | 1,741,519 | |
| Health & dental insurance | 145,994 | 0.6% | 157,044 | | 161,755 | | 166,608 | | 171,606 | | 176,754 | |
| Phone service | 80,685 | 0.3% | 87,348 | | 89,968 | | 92,667 | | 95,447 | | 98,310 | |
| Advertising expense | 1,510,635 | 6.1% | 1,537,764 | | 1,892,897 | | 1,948,684 | | 2,008,175 | | 2,068,420 | |
| Postage & freight | 155,826 | 0.6% | 147,732 | | 152,164 | | 156,729 | | 161,431 | | 165,274 | |
| Depreciation | 106,706 | 0.4% | 182,736 | | 188,218 | | 193,865 | | 199,681 | | 205,671 | |
| General insurance | 127,230 | 0.5% | 144,800 | | 149,144 | | 153,618 | | 158,227 | | 162,973 | |
| Rent | 157,587 | 0.6% | 146,350 | | 133,657 | | 133,657 | | 137,667 | | 141,797 | |
| Agency/attorney commission | 40,166 | 0.2% | 39,996 | 0.1% | 41,576 | 0.1% | 43,655 | 0.1% | 45,838 | 0.1% | 48,130 | 0.1% |
| Security expense | 7,490 | 0.0% | 4,140 | | 4,264 | | 4,392 | | 4,524 | | 4,659 | |
| Travel & meal expense | 103,147 | 0.4% | 148,546 | | 153,004 | | 157,595 | | 162,323 | | 167,193 | |
| Legal & professional | 173,045 | 0.7% | 98,000 | | 100,940 | | 103,968 | | 107,087 | | 110,300 | |
| Misc. consulting fees | – | 0.0% | 27,000 | | 27,810 | | 28,644 | | 29,503 | | 30,386 | |
| Office supplies | 60,404 | 0.2% | 72,000 | | 74,160 | | 76,385 | | 78,677 | | 81,037 | |

Confidential

07/27/2005  15:21    713-739-0821    THE CARRIGAN LAWFIRM    PAGE  35/43

Exhibit 4

ARY Jewelers, LLC. v. IBJTC Business Credit Corp. and David Molinario

## Projected Operating Performance of Krigel's, Inc.
## per December 2000 Emergence Financing Terms

| Year Ended Feb. 28 | 2001 Historical[1] | | 2002 Projected[2,3] | | 2003 Projected[3] | | 2004 Projected[3] | | 2005 Projected | | 2006 Projected | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Donations | 18,898 | 0.1% | 12,000 | | 12,360 | | 12,731 | | 13,113 | | 13,506 | |
| Credit bureau | 28,397 | 0.1% | 19,794 | | 20,388 | | 20,999 | | 21,629 | | 22,278 | |
| Repairs & maintenance | 24,301 | 0.1% | 48,000 | | 49,440 | | 50,923 | | 52,451 | | 54,024 | |
| Training expenses | - | 0.0% | 60,000 | | 61,800 | | 63,654 | | 65,564 | | 67,531 | |
| Other general & admin expenses | 268,397 | 1.1% | 199,992 | | 205,992 | | 212,172 | | 218,537 | | 225,093 | |
| Reorganization expenses | 327,395 | 1.3% | - | | - | | - | | - | | - | |
| Amortization of leased equipment | 67,644 | 0.3% | 67,644 | | 67,644 | | 67,644 | | 67,644 | | 67,644 | 0.0% |
| Total G&A | 4,590,555 | 20.1% | 5,048,205 | 18.4% | 5,180,918 | 16.0% | 5,331,139 | 15.7% | 5,489,917 | 15.4% | 5,663,502 | 15.1% |
| Earnings before interest & taxes | (1,627,400) | -6.6% | 1,516,444 | 4.9% | 2,455,904 | 7.6% | 2,864,052 | 8.4% | 3,121,354 | 8.8% | 3,394,864 | 9.1% |
| Interest expense | 1,106,031 | 4.5% | 923,496 | 3.0% | 925,000 | 2.9% | 925,000 | 2.7% | 925,000 | | 925,000 | |
| Earnings before taxes | $ (2,733,431) | -11.0% | $ 591,948 | 1.9% | $ 1,530,904 | 4.7% | $ 1,939,052 | 5.7% | $ 2,195,364 | 6.2% | $ 2,469,864 | 6.6% |
| | | | | | | | | | | | | |
| NPV of Earnings before taxes (midyear convention) | | | 561,867 | | 1,310,285 | | 1,496,497 | | 1,528,045 | | 1,549,435 | |
| | | | | | | | | | | | | |
| Discount Rate | 10.9% | | | | | | | | | | | |
| Total NPV before taxes (thru FY2006) | 6,446,129 | | | | | | | | | | | |
| Total Net Present Value (thru FY2009) (recoupment of total investment) | 9,573,147 | | | | | | | | | | | |

### Assumptions

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|
| Number of stores | | 21 | 21 | 21 | 21 | 21 |
| Average annual sales per store | | $ 1,466,115 | $ 1,539,421 | $ 1,616,392 | $ 1,697,212 | $ 1,782,072 |
| Percentage increase from prior year | | 24.1% | 5.0% | 5.0% | 5.0% | 5.0% |
| Gross profit percentage | | 51.2% | 54.0% | 55.0% | 55.0% | 55.0% |
| Sales expenses (shown with percentage of sales) | | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| Fixed expenses inflation rate | | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |

Amortization of leased equipment and interest expenses remain flat each year
Projections for 2005-2006 based on same assumptions as 2003 and 2004 including expenses as a % of merchandise sales.
NPV is calculated as of March 27, 2001, date of latter identifying change in financing terms.

### Sources:

1. Krigel's Inc. Income Statement, Fiscal Year 2000 - 2001, ARY - 01114.
2. Krigel's Inc. Projected Income Statement, Fiscal Year 2001-2002 Forecast, document dated 12/4/00 ARY - 00387 - 8.
3. Krigel's Inc. Operating Proforma For the Years Ended February 28, 2002, 2003 and 2004, document dated 12/4/00 ARY - 00995.

Confidential

# Exhibit 5

Exhibit 5

**ARY Jewelers, LLC v IBJTC Business Credit Corp. and David Molinario**
**Projected Operating Performance of Krigel's, Inc.**
**per March 27, 2001 Emergence Financing Terms**

| Year Ended Feb. 28 | 2001 Historical [1] | % | 2002 Projected [2,3] | % | 2003 Projected | % | 2004 Projected | % | 2005 Projected | % | 2006 Projected | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Merchandise sales | $ 24,811,330 | 100.0% | $ 28,543,203 | 100.0% | $ 29,970,360 | 100.0% | $ 31,468,878 | 100.0% | $ 33,042,322 | 100.0% | $ 34,694,438 | 100.0% |
| Cost of goods sold | 12,740,699 | 51.4% | 13,930,753 | 48.8% | 13,786,366 | 46.0% | 14,160,995 | 45.0% | 14,869,045 | 45.0% | 15,612,497 | 45.0% |
| Gross profit | 12,070,631 | 48.6% | 14,612,450 | 51.2% | 16,183,994 | 54.0% | 17,307,883 | 55.0% | 18,173,277 | 55.0% | 19,081,941 | 55.0% |
| Repair sales | 780,786 | 3.1% | 827,753 | 2.9% | 869,141 | 2.9% | 912,598 | 2.9% | 958,227 | 2.9% | 1,005,139 | 2.9% |
| Finance charge income | 404,189 | 1.6% | 443,322 | 1.6% | 465,488 | 1.6% | 488,762 | 1.6% | 513,201 | 1.6% | 538,861 | 1.6% |
| Miscellaneous income | 126,654 | 0.5% | 114,173 | 0.4% | 119,882 | 0.4% | 125,876 | 0.4% | 132,170 | 0.4% | 138,778 | 0.4% |
| Trade-ins | 170,977 | 0.7% | 199,802 | 0.7% | 209,792 | 0.7% | 220,282 | 0.7% | 231,296 | 0.7% | 242,861 | 0.7% |
| Store expenses | | | | | | | | | | | | |
| Store wages (1) | 4,841,635 | 19.5% | 5,189,263 | 18.2% | 5,184,872 | 17.3% | 5,444,116 | 17.3% | 5,716,322 | 17.3% | 6,002,138 | 17.3% |
| Rent (2) | 2,355,349 | 9.5% | 2,380,437 | 8.3% | 2,499,459 | 8.3% | 2,624,432 | 8.3% | 2,755,654 | 8.3% | 2,893,436 | 8.3% |
| Depreciation (2) | 386,798 | 1.6% | 418,758 | 1.5% | 618,758 | 2.1% | 818,758 | 2.6% | 859,696 | 2.6% | 902,681 | 2.6% |
| Check guarantee (2) | 30,556 | 0.1% | 35,749 | 0.1% | 37,536 | 0.1% | 39,413 | 0.1% | 41,384 | 0.1% | 43,453 | 0.1% |
| Phone | 100,821 | 0.4% | 100,380 | 0.4% | 103,391 | 0.4% | 105,493 | | 109,688 | | 112,979 | |
| Credit card commission (2) | 353,689 | 1.4% | 410,860 | 1.4% | 431,403 | 1.4% | 452,973 | 1.4% | 475,622 | 1.4% | 499,403 | 1.4% |
| Store supplies | 208,845 | 0.8% | 198,000 | 0.8% | 203,940 | | 210,058 | | 216,360 | | 222,851 | |
| Merchandise shortages (2) | 200,090 | 0.8% | 182,677 | 0.8% | 191,811 | 0.6% | 201,401 | 0.6% | 211,471 | 0.6% | 222,045 | 0.6% |
| Other store expenses | 682,712 | 2.8% | 700,041 | 2.5% | 735,043 | 2.5% | 771,795 | 2.5% | 810,385 | 2.5% | 850,904 | 2.5% |
| Total store expenses | 9,164,497 | 36.9% | 9,616,165 | 33.7% | 10,006,214 | 33.4% | 10,659,440 | 33.4% | 11,196,581 | 33.9% | 11,749,889 | 33.9% |
| Bad debt expenses (2) | 348,761 | 1.4% | 371,062 | 1.3% | 359,644 | 1.2% | 377,627 | 1.2% | 396,508 | 1.2% | 416,333 | 1.2% |
| Bad debt recoveries (2) | 108,333 | 0.4% | 108,000 | 0.4% | 89,911 | 0.3% | 94,407 | 0.3% | 99,127 | 0.3% | 104,083 | 0.3% |
| Earnings from store operations | 4,148,512 | 16.7% | 6,318,273 | 22.1% | 7,572,350 | 25.3% | 8,102,740 | 25.7% | 8,514,208 | 25.8% | 8,946,440 | 25.8% |
| Shop expenses | 785,357 | 3.2% | 713,590 | 2.5% | 749,259 | 2.5% | 786,722 | 2.5% | 826,058 | 2.5% | 667,361 | 2.5% |
| General & administrative expenses | | | | | | | | | | | | |
| Wages | 1,585,407 | 6.4% | 1,547,317 | | 1,593,737 | | 1,641,549 | | 1,690,795 | | 1,741,519 | |
| Health & dental insurance (2) | 145,594 | 0.6% | 157,044 | | 161,755 | | 166,608 | | 171,606 | | 176,754 | |
| Phone service | 80,685 | 0.3% | 87,348 | | 89,868 | | 92,667 | | 95,448 | | 98,311 | |
| Advertising expense (2) | 1,510,835 | 6.1% | 1,837,764 | | 1,892,697 | | 1,949,684 | | 2,006,174 | | 2,068,420 | |
| Postage & freight | 155,826 | 0.6% | 147,732 | | 152,164 | | 155,729 | | 161,431 | | 166,274 | |
| Depreciation (2) | 106,706 | 0.4% | 182,735 | | 188,216 | | 193,865 | | 199,681 | | 205,671 | |
| General insurance (2) | 127,230 | 0.5% | 144,800 | | 149,144 | | 153,616 | | 158,227 | | 162,974 | |
| Rent (2) | 157,587 | 0.6% | 146,350 | | 133,657 | | 133,657 | | 137,667 | | 141,797 | |
| Agency/attorney commission (2) | 40,166 | 0.2% | 39,996 | 0.1% | 41,576 | 0.1% | 43,655 | 0.1% | 45,838 | 0.1% | 48,129 | 0.1% |
| Security expense | 7,490 | 0.0% | 4,140 | | 4,264 | | 4,392 | | 4,524 | | 4,660 | |
| Travel & meal expense | 103,147 | 0.4% | 148,548 | | 153,004 | | 157,595 | | 162,322 | | 167,192 | |
| Legal & professional (2) | 173,046 | 0.7% | 96,000 | | 100,940 | | 103,966 | | 107,087 | | 110,300 | |
| Misc. consulting fees | - | 0.0% | 27,000 | | 27,810 | | 28,644 | | 29,504 | | 30,389 | |
| Office supplies | 60,404 | 0.2% | 72,000 | | 74,160 | | 76,385 | | 78,676 | | 81,037 | |

Confidential

Exhibit 5

ARY Jewelers, LLC v IBJTC Business Credit Corp. and David Molinario

**Projected Operating Performance of Krigel's, Inc.**
**per March 27, 2001 Emergence Financing Terms**

| Year Ended Feb. 28 | 2001 Historical[1] | % | 2002 Projected[2,3] | % | 2003 Projected | % | 2004 Projected | % | 2005 Projected | % | 2006 Projected | % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Donations | 18,898 | 0.1% | 12,600 | | 12,360 | | 12,731 | | 13,113 | | 13,506 | |
| Credit bureau (2) | 28,397 | 0.1% | 19,794 | | 20,388 | | 20,999 | | 21,629 | | 22,278 | |
| Repairs & maintenance | 24,301 | 0.1% | 48,000 | | 49,440 | | 50,923 | | 52,451 | | 54,024 | |
| Training expenses | - | 0.0% | 60,000 | | 61,800 | | 63,654 | | 65,564 | | 67,531 | |
| Other general & admin expenses (2) | 268,397 | 1.1% | 199,992 | | 205,992 | | 212,172 | | 218,537 | | 225,093 | |
| Reorganization expenses | 327,395 | 1.3% | - | | - | | - | | - | | - | |
| Amortization of leased equipment | 67,644 | 0.3% | 67,644 | | 67,644 | | 67,644 | | 67,644 | | 67,644 | |
| **Total G&A** | 4,990,555 | 20.1% | 5,046,205 | 17.7% | 5,160,918 | 17.3% | 5,331,138 | 16.9% | 5,489,916 | 16.6% | 5,653,501 | 16.3% |
| Earnings before interest & taxes | (1,527,400) | -6.6% | 556,488 | 1.9% | 1,642,172 | 5.5% | 1,984,880 | 6.3% | 2,198,234 | 6.7% | 2,425,577 | 7.0% |
| Interest expense | 1,106,031 | 4.5% | 767,073 | | 767,073 | | 767,073 | | 767,073 | | 767,073 | |
| Earnings before taxes | $ (2,733,431) | -11.0% | $ (210,585) | -0.7% | $ 875,099 | 2.9% | $ 1,217,807 | 3.9% | $ 1,431,161 | 4.3% | $ 1,658,504 | 4.8% |
| | | | | | | | | | | | | |
| NPV of Earnings before taxes (midyear convention) | | | (198,428) | | 713,828 | | 906,345 | | 946,310 | | 974,613 | |

Discount Rate    12.5%

Total NPV before taxes  (thru FY 2006)    3,361,668

Total Net Present Value  (thru FY2009)    5,461,725
(Under financing terms dated 12/4/00, ARY recovers 100% of investment through FY2009)

**Assumptions**

| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|---|
| Number of stores | 21 | 21 | 21 | 21 | 21 | 21 |
| Average annual sales per store | | $ 1,359,200 | $ 1,427,160 | $ 1,498,518 | $ 1,573,444 | $ 1,652,116 |
| Percentage increase from prior year | | 16.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| Gross profit percentage | | 51.2% | 54.0% | 55.0% | 55.0% | 55.0% |
| Sales expenses (shown with percentage of sales) | | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| Fixed expenses inflation rate | | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |

Amortization of leased equipment & interest expenses remain flat each year

Interest expense based on ARY 00995, adjusted for reduced loan under March 27, 2001 Financing Terms. ($6,800,000/$8,200,000 x $325,000)

Projections for 2005 and 2006 based on same assumptions as 2003 and 2004 including expenses as a % of merchandise sales.

NPV is calculated as of March 27, 2001, date of letter identifying change in financing terms.

**Sources:**
1. Krigel's Inc. Income Statement, Fiscal Year 2000 - 2001, ARY - 01114.
2. Krigel's Inc. Projected Income Statement, Fiscal Year 2001-2002 Forecast, document dated 4/2/00 ARY - 01129
3. Krigel's Inc. Operating Proforma For the Years Ended February 28, 2002, 2003 & 2004, document dated 12/4/00 ARY - 00995.

Confidential

Exhibit 6

ARY Jewelers, LLC v IBJTC Business Credit Corp. and David Molinario                    Exhibit 6

## Discount Rate Calculation

**Weighted Average Cost of Capital under
December 15, 2000 Financing Terms**

| | | | |
|---|---|---|---|
| Equity [1] | $ | 3,000,000 | 27% |
| Debt [2] | | 8,200,000 | 73% |
| Total Capital | $ | 11,200,000 | |

| | |
|---|---|
| Cost of Equity [3] | 15.42% |
| Cost of Debt [4] | 9.25% |

| | |
|---|---|
| Weighted Average Cost of Capital | 10.9% |
| **Discount Rate** | **10.9%** |

**Weighted Average Cost of Capital under
March 27, 2001 Financing Terms**

| | | | |
|---|---|---|---|
| Equity [5] | $ | 4,250,000 | 38% |
| Debt [6] | | 6,800,000 | 62% |
| Total Capital | $ | 11,050,000 | |

| | |
|---|---|
| Cost of Equity [3] | 15.42% |
| Cost of Debt [4] | 9.25% |

| | |
|---|---|
| Weighted Average Cost of Capital | 11.6% |
| Risk Factor due to Shortened Term [7] | 0.9% |
| **Discount Rate** | **12.5%** |

_Source:_
1. Weighted Equity = $3,000,000 (ARY's net cash infusion divided by $11,200,000 (Total Equity and Debt).
2. Weighted Debt = $8,200,000 (Foothill debt) divided by $11,200,000 (Total Equity and Debt).
3. Cost of Equity = SIC Code 5944, Jewelry Stores, Ibbotson Cost of Capital 2001 Yearbook.
4. Cost of Debt = Prime rate plus 1.25%, www.moneycafe.com, April 2001 and Financing Proposal Letter(s) dated 12/15/00 and 03/27/01, F00352-00361.
5. Weighted Equity = $4,250,000 (ARY's net cash infusion divided by $11,050,000 (Total Equity and Debt).
6. Weighted Debt = $6,800,000 (Foothill debt) divided by $11,050,000 (Total Equity and Debt).
7. www.federalreserve.gov/releases

Confidential

Exhibit 7

ARV Jewelers, LLC. v. IB/TC Business Credit Corp. and David McGrade

Operating Performance of Companies in the Jewelry Watch Retail and/or Manufacturing Industry

Exhibit 7

### REVENUES (US$)

| | Primary Industry | Year Ended | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|
| DGSE Companies, Inc.[1] | Jewelry & Watch Retail | Dec. 31 | $ 20,523,000 | 19,254,000 | 21,239,000 | 25,426,000 | 28,842,000 |
| Finlay Enterprises, Inc. | Jewelry & Watch Retail | Jan. 31[6] | $ 944,756,000 | 900,628,000 | 877,286,000 | 902,416,000 | 923,606,000 |
| Friedman's Inc.[2] | Jewelry & Watch Retail | Sept. 30 | $ 376,351,000 | 411,037,000 | 436,068,000 | | |
| Mayor's Jewelers, Inc. | Jewelry & Watch Retail | Mar. 31[6] | $ 179,597,000 | 160,727,000 | 118,391,000 | 125,467,000 | 142,710,000 |
| Reeds Jewelers Inc.[3] | Jewelry & Watch Retail | Feb. 28[6] | $ 120,037,000 | 113,449,000 | 102,011,000 | | |
| Samuels Jewelers Inc.[4] | Jewelry & Watch Retail | May 30 | $ 160,168,000 | 148,044,000 | 122,007,000 | | |
| Tiffany & Co.[5] | Jewelry & Watch Manuf & Retail | Jan. 31[6] | $ 1,668,058,000 | 1,606,535,000 | 1,706,602,000 | 2,000,045,000 | 2,204,831,000 |
| Whitehall Jewelers, Inc. | Jewelry & Watch Retail | Jan. 31[6] | $ 355,085,000 | 338,911,000 | 341,037,000 | 344,655,000 | 334,206,000 |
| Zale Corporation | Jewelry & Watch Retail | July 31 | $ 1,814,362,000 | 2,087,189,000 | 2,191,727,000 | 2,212,241,000 | 2,304,440,000 |

### Sales Growth Rate

| | Primary Industry | Year Ended | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|
| DGSE Companies, Inc.[1] | Jewelry & Watch Retail | Dec. 31 | | -6.2% | 10.3% | 19.7% | 12.8% |
| Finlay Enterprises, Inc. | Jewelry & Watch Retail | Jan. 31[6] | | -4.7% | -2.6% | 2.9% | 2.3% |
| Friedman's Inc.[2] | Jewelry & Watch Retail | Sept. 30 | | 9.2% | 6.1% | | |
| Mayor's Jewelers, Inc. | Jewelry & Watch Retail | Mar. 31[6] | | -10.5% | -26.3% | 6.0% | 13.7% |
| Reeds Jewelers Inc.[3] | Jewelry & Watch Retail | Feb. 28[6] | | -5.5% | -10.1% | | |
| Samuels Jewelers Inc.[4] | Jewelry & Watch Retail | May 30 | | -7.6% | -17.8% | | |
| Tiffany & Co.[5] | Jewelry & Watch Manuf & Retail | Jan. 31[6] | | -3.7% | 6.2% | 17.2% | 10.2% |
| Whitehall Jewelers, Inc. | Jewelry & Watch Retail | Jan. 31[6] | | -4.5% | 0.6% | 1.1% | -3.0% |
| Zale Corporation | Jewelry & Watch Retail | July 31 | | 15.0% | 5.0% | 0.8% | 4.2% |
| Average | | | | -2.6% | -3.1% | 8.0% | 6.7% |
| Median | | | | -4.7% | 0.6% | 4.4% | 7.2% |

### GROSS PROFIT MARGIN

| | Primary Industry | Year Ended | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|
| DGSE Companies, Inc.[1] | Jewelry & Watch Retail | Dec. 31 | 22.2% | 23.4% | 23.5% | 21.1% | 20.6% |
| Finlay Enterprises, Inc. | Jewelry & Watch Retail | Jan. 31[6] | 50.4% | 49.7% | 51.6% | 51.2% | 50.8% |
| Friedman's Inc.[2] | Jewelry & Watch Retail | Sept. 30 | 47.6% | 47.4% | 47.6% | | |
| Mayor's Jewelers, Inc. | Jewelry & Watch Retail | Mar. 31[6] | 43.5% | 37.1% | 33.5% | 41.5% | 42.7% |
| Reeds Jewelers Inc.[3] | Jewelry & Watch Retail | Feb. 28[6] | 49.0% | 45.3% | 48.5% | | |
| Samuels Jewelers Inc.[4] | Jewelry & Watch Retail | May 30 | 40.6% | 32.0% | 28.1% | | |
| Tiffany & Co.[5] | Jewelry & Watch Manuf & Retail | Jan. 31[6] | 56.9% | 58.7% | 59.3% | 57.9% | 55.8% |
| Whitehall Jewelers, Inc. | Jewelry & Watch Retail | Jan. 31[6] | 38.8% | 39.1% | 37.5% | 38.9% | 33.8% |
| Zale Corporation | Jewelry & Watch Retail | July 31 | 48.7% | 50.4% | 50.6% | 50.2% | 51.3% |
| Average | | | 44.1% | 42.6% | 42.3% | 43.1% | 42.6% |
| Median | | | 47.0% | 45.3% | 47.6% | 45.9% | 46.8% |

### OPERATING PROFIT MARGIN (EBITDA MARGIN)

| | Primary Industry | Year Ended | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|
| DGSE Companies, Inc.[1] | Jewelry & Watch Retail | Dec. 31 | 4.3% | 4.7% | 5.0% | 5.2% | 4.1% |
| Finlay Enterprises, Inc. | Jewelry & Watch Retail | Jan. 31[6] | 9.1% | 8.1% | 8.6% | 8.2% | 8.0% |
| Friedman's Inc.[2] | Jewelry & Watch Retail | Sept. 30 | 11.5% | 8.2% | 10.8% | | |

Confidential

ARY Jewelers, LLC. v. IBJTC Business Credit Corp. and David Molinario

Exhibit 7

Operating Performance of Companies in the Jewelry Watch Retail and/or Manufacturing Industry

| | Primary Industry | Year Ended | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|---|---|
| Mayor's Jewelers, Inc. | Jewelry & Watch Retail | Mar. 31[6] | 4.8% | -10.4% | -11.9% | -0.2% | 5.1% |
| Reeds Jewelers Inc.[3] | | Feb. 28[6] | 4.9% | -1.3% | 2.1% | | |
| Samuels Jewelers Inc.[4] | | May 30 | 1.4% | -7.7% | -7.4% | | |
| Tiffany & Co.[5] | Jewelry & Watch Manuf & Retail | Jan. 31[6] | 22.4% | 23.4% | 23.3% | 22.3% | 18.3% |
| Whitehall Jewelers, Inc. | Jewelry & Watch Retail | Jan. 31[6] | 8.5% | 9.6% | 9.2% | 0.6% | 0.9% |
| Zale Corporation | Jewelry & Watch Retail | July 31 | 13.9% | 9.7% | 10.3% | 9.9% | 10.1% |
| Average | | | 9.6% | 4.9% | 6.5% | 7.7% | 7.7% |
| Median | | | 8.6% | 8.1% | 8.5% | 6.7% | 6.5% |

*Notes:*

1. DGSE Companies, Inc.'s principal activity is to sell jewelry and bullion products to both retail and wholesale customers throughout the United States.  It also makes collateralized loans to individuals.

2. In 2005 the Friedman's filed for Chapter 11 bankruptcy protection.  The latest available 10K of the company was filed on Dec. 20, 2002.

3. Operating nearly 100 jewelry stores mainly in malls on the East coast, Reeds offers diamond rings and jewelry, gold jewelry and chains, gemstone rings, watches, and other adornments.  The family of president and CEO Alan Zimmer formed a new company called Sparkle, LLC in 2004 which bought out the company a few months later.

4. Samuels sells fine jewelry items through about 102 jewelry stores in 18 states, stores are primarily located in regional shopping malls, power centers, and strip centers.  Samuels also operates some stand-alone stores and sells jewelry online at Samuelsjewelers.com.  Plans announced for re-emergence from bankruptcy include taking the company private.

5. Tiffany & Co.'s principal activities are retailing and distributing jewelry, timepieces, sterling, silverware, china, crystal, stationery, fragrances and personal accessories, the other activities include product designing and manufacturing activities.

6. Data for companies with fiscal years ending in the first quarter are reported under the prior year (i.e.  Fiscal year end 01/31/05 is reported under 2004)

Confidential