IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| M. FABRIKANT & SONS, INC., *et al.* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 01-0671-CV-W-5 |
| v. ) | |
| ) | |
| ARY JEWELERS, L.L.C. ) | |
| ) | |
| Defendant. ) | |

### AFFIDAVIT OF MAX JEVINSKY

STATE OF MISSOURI    )
                     ) ss.
COUNTY OF JACKSON    )

Max Jevinsky, first being duly sworn, and upon his oath, states as follows:

1. My name is Max Jevinsky. I am over 18 years of age, of sound mind and am competent to make this Affidavit. The facts stated herein are based on my personal knowledge.

2. I am an attorney licensed to practice law in the State of Missouri and in the United States District Court for the Western District of Missouri. I represented defendant ARY Jewelers, L.L.C. in the Bankruptcy Court in connection with the proposed purchase of Krigel's, Inc. I have reviewed a supplemental affidavit of Scott W. Krigel dated July 18, 2001, on file herein.

3. Mr. Krigel's supplemental affidavit states that Gohar Husain told him on several occasions that if he "was unsuccessful in negotiating for the post-Chapter 11 financing that ARY would pay cash to close on the Stock Purchase Agreement without any financing."

4. For the reasons set forth below, I believe that Mr. Krigel is incorrect about that statement.



EXHIBIT
// 
MM 12-11-01

WA 603817.1

ARY - 00685

EXHIBIT
E

5. One of the terms that ARY required to be part of the Stock Purchase Agreement it executed with the Scott W. Krigel Revocable Trust as a condition to its performance was set forth in paragraph 4(c) of that Agreement, which provides that Foothill Capital Corporation had to consent to the continued financing of Krigel's, Inc. within four weeks. ARY would not have negotiated for this term if ARY merely had wanted an option to seek acceptable financing from Foothill Capital Corporation, as such a provision would not have been necessary.

6. On numerous occasions, ARY had notified Sanford (Sandy) Krigel, counsel for the Debtor, and other parties to the Bankruptcy action that extensions of time were necessary so that work on financing could be continued. Specifically:

   a. ARY requested a continuance of the March 5, 2001 confirmation hearing so that financing could be arranged, and notified all parties that consent had not yet been obtained from Foothill. The Debtor refused to consent to the continuance, and the Court denied ARY's motion;

   b. ARY requested a continuance of the March 15, 2001 effective date for the same reason. The Debtor consented to extend the date until March 30, 2001; and

   c. ARY requested an extension of the March 30, 2001 effective date, again because financing was not in place. The Debtor would not consent to the extension, and the Court denied ARY's request.

7. In connection with each of the foregoing continuances or extensions, ARY stated that Foothill had not consented to continued financing of Krigel's, Inc.

8. In my presence, no representation that ARY would waive the financing condition in the Stock Purchase Agreement and obligate itself to pay cash to fund the Plan was made to Mr.

2

WA 603817.1

ARY - 00686

Krigel by any representative of ARY, including Gohar Husain.

9. However, I heard Gohar Husain say to Krigel's, Inc. that because of the wealth of its financial backers, ARY was capable of paying cash to fund the Plan if it could not obtain acceptable financing, if it chose to close even without such financing.

10. On every occasion when I heard Mr. Husain make such a statement, he stated in effect that ARY *could* close the deal even without Foothill's consent or other financing, but he did not state that ARY *would* do so under any particular circumstances. At no time did I hear Mr. Husain commit ARY to closing this transaction on an all-cash basis or otherwise waive the financing condition set forth at paragraph 4(c) of the Stock Purchase Agreement.

11. At the March 5, 2001 confirmation hearing in the Bankruptcy Court, Scott Krigel testified it was his "understanding" that ARY would fund the Plan with cash if financing was not available. I never heard any representative of ARY make such a representation to Mr. Krigel, either before or after the March 5, 2001 hearing.

12. I have reviewed an affidavit of James E. Bird dated August 1, 2001, and an affidavit of Gerald W. Brenneman dated July 27, 2001, on file herein.

13. Both Mr. Bird's affidavit and Mr. Brenneman's affidavit discuss a meeting held at their offices on March 4, 2001, which I, Ronald S. Weiss, and Gohar Husain also attended.

14. That meeting is one of the occasions I recall Mr. Husain making the statement that ARY could close the deal on an all-cash basis as described by paragraphs 9 and 10 of this affidavit.

15. During that March 4, 2001 meeting, I at no time heard Mr. Husain commit ARY to closing this transaction on an all-cash basis or otherwise waive the financing condition set forth

3

WA 603817.1

ARY - 00687

at paragraph 4(c) of the Stock Purchase Agreement, but I heard Mr. Husain say that ARY *could* do so.

16. Regarding the Stock Purchase Agreement between ARY and the Scott W. Krigel Revocable Trust executed on November 21, 2000, I am the attorney who was responsible for the final negotiations on behalf of ARY regarding the terms and conditions of that Agreement and related agreements, although Ron Weiss had also been involved when negotiations regarding the terms of the written agreement began on or around November 8, 2000. Sandy Krigel was the attorney responsible for the final negotiations on behalf of Sellers regarding the terms and conditions of that Agreement and related agreements.

17. Throughout the negotiations, ARY insisted that the Agreement had to include a term that made ARY's securing a commitment for adequate financing a condition of its closing under the Agreement. The earlier drafts of the Agreement included such a provision in the section of the contract that set forth general conditions to closing. For example, a draft of the Agreement that I faxed to Sandy Krigel on or around 5:48 p.m. on November 17, 2000 included the following provision at paragraph 5(b):

> (b) The obligations of the Sellers hereunder are, at the option of the Purchaser, subject to the satisfaction on or prior to the closing of the following conditions:
>
> (i) All current bank loans at Foothill Capital, . . . shall be renegotiated with the Company and with the other parties to such agreements in a manner acceptable to the Purchaser, in the sole and absolute discretion of the Purchaser.

A true and accurate copy of the November 17, 2000 draft is attached hereto as Exhibit A.

18. Sandy Krigel initially proposed revising this condition to establish an "objective standard" for what terms ARY would deem acceptable in its renegotiation of the Krigel's, Inc.

WA 603817.1

4

ARY - 00688

loan from Foothill Capital. Later, on November 18, 2000, Sandy Krigel prepared a separate draft of the Stock Purchase Agreement, which ARY never accepted, that would have eliminated the financing condition and which would have required ARY to represent or warrant that it would pay off all of Krigel's, Inc.'s "secured obligations" – including the Foothill loan – at closing. The latter provision was set forth at paragraph 4(c) of that draft of the Agreement. A true and accurate copy of the November 18, 2000 draft Stock Purchase Agreement I received from Sandy Krigel is attached hereto as Exhibit B.

19. On November 20, 2000, I advised Sandy Krigel that the financing condition was a necessary term. To satisfy the Sellers' desire that ARY make a representation regarding how Krigel's, Inc.'s "secured obligation" to Foothill Capital would be paid off and ARY's desire for a financing condition, paragraph 4(c) was revised to include two separate sentences. In the first sentence of this November 20, 2000 draft, ARY would have represented that it would give Sellers evidence within a specified time frame that Foothill had consented to an assumption of the loan by Purchaser. The second sentence set forth the financing condition which provided that if ARY did not receive Foothill's consent to its assumption of the loan, the transaction would be void and of no further effect. A true and accurate copy of this November 20, 2000 draft is attached hereto as Exhibit C.

20. During a meeting at the offices of Krigel & Krigel, Sandy Krigel and I negotiated the final revisions to the Stock Purchase Agreement. During that meeting, we agreed to two changes from the November 20, 2000 draft of paragraph 4(c) that are set forth in paragraph 4(c) of the executed Stock Purchase Agreement dated November 21, 2000. First, we agreed that the time for ARY to obtain consent from Foothill would be four weeks from the date of execution of

5

WA 603817.1

ARY - 00689

loan from Foothill Capital. Later, on November 18, 2000, Sandy Krigel prepared a separate draft of the Stock Purchase Agreement, which ARY never accepted, that would have eliminated the financing condition and which would have required ARY to represent or warrant that it would pay off all of Krigel's, Inc.'s "secured obligations" – including the Foothill loan – at closing. The latter provision was set forth at paragraph 4(c) of that draft of the Agreement. A true and accurate copy of the November 18, 2000 draft Stock Purchase Agreement I received from Sandy Krigel is attached hereto as Exhibit B.

19.  On November 20, 2000, I advised Sandy Krigel that the financing condition was a necessary term. To satisfy the Sellers' desire that ARY make a representation regarding how Krigel's, Inc.'s "secured obligation" to Foothill Capital would be paid off and ARY's desire for a financing condition, paragraph 4(c) was revised to include two separate sentences. In the first sentence of this November 20, 2000 draft, ARY would have represented that it would give Sellers evidence within a specified time frame that Foothill had consented to an assumption of the loan by Purchaser. The second sentence set forth the financing condition which provided that if ARY did not receive Foothill's consent to its assumption of the loan, the transaction would be void and of no further effect. A true and accurate copy of this November 20, 2000 draft is attached hereto as Exhibit C.

20.  During a meeting at the offices of Krigel & Krigel, Sandy Krigel and I negotiated the final revisions to the Stock Purchase Agreement. During that meeting, we agreed to two changes from the November 20, 2000 draft of paragraph 4(c) that are set forth in paragraph 4(c) of the executed Stock Purchase Agreement dated November 21, 2000. First, we agreed that the time for ARY to obtain consent from Foothill would be four weeks from the date of execution of

5

WA 603817.1

ARY - 00690

the Agreement. Second, we agreed that paragraph 4(c) should provide that ARY would give evidence of Foothill's consent to "continued" financing rather than consent to ARY's assuming the existing loan. These changes are reflected in the executed version of the Stock Purchase Agreement.

21. The second sentence of paragraph 4(c) does not require ARY to make any representation or warranty for the benefit of Sellers. It was requested by ARY, and was intended solely for ARY's benefit.

22. The attorney and agent for the Sellers, Sandy Krigel, clearly understood that this was its purpose. During our meeting on November 19 or 20, 2000, Sandy Krigel referred to the second sentence of paragraph 4(c) of the Stock Purchase Agreement as ARY's "walk away" clause.

23. On December 19, 2000, I sent a letter to Scott W. Krigel on behalf of ARY advising Sellers that Foothill Capital had not consented to continued financing within the four weeks specified by paragraph 4(c). A true and accurate copy of that letter is attached hereto as Exhibit D.

24. In that same letter, I expressed my hope that, despite the failure of this condition, this deal could nevertheless be revived. I advised Mr. Krigel that I believed a lending commitment that satisfied ARY's requirements could be obtained if the parties agreed to extend the deadline for that commitment to January 18, 2001. I requested that Mr. Scott Krigel execute a duplicate copy of that letter to accept this proposal. However, I never received a signed copy of that letter.

25. ARY never received a commitment from Foothill Capital for continued financing.

Executed this 6th day of August, 2001

_____
Max Jevinsky

Subscribed and sworn to before me, a notary public in and for the state and county aforesaid, on this 6th day of August, 2001.

_____
Notary Public

My commission expires:

12/14/02

> KAREN S. HUTSON
> Notary Public - Notary Seal
> STATE OF MISSOURI
> Jackson County
> My Commission Expires December 14, 2002

WA 603817.1

ARY - 00692