# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

—————————————————————
                           )

ARY JEWELERS, LLC,        )

                           )

        Plaintiff,      )     Civil Action No. 04-10281 (EFH)

                           )

        v.             )     **TRIAL BRIEF**

                           )

IBJTC BUSINESS CREDIT CORP.    )

AND DAVID MOLINARIO,     )

                           )

        Defendants.    )

                           )
—————————————————————

## DEFENDANT IBJTC BUSINESS CREDIT CORP.'S
## TRIAL BRIEF and PROPOSED RULINGS

Christopher R. Dillon (BBO No. 640896)
F. Turner Buford (BBO No.661311)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

Robert S. Fischler (Admitted Pro Hac Vice)
Ropes & Gray LLP
45 Rockefeller Plaza
New York, NY 10111
(212) 841-5700

## PRELIMINARY STATEMENT

The issue to be tried in this case is whether Defendant IBJTC Business Credit Corp. ("IBJ") tortiously interfered with Plaintiff ARY Jewelers, LLC's ("ARY") prospective business relationship with Foothill Capital Corp. ("Foothill").   To prevail at trial, ARY must prove four elements: (1) a business relationship or contemplated contract of economic benefit between ARY and Foothill; (2) IBJ's knowledge of such relationship; (3) IBJ's interference with that contract through improper motive or improper means; and (4) ARY's loss of advantage directly resulting from IBJ's conduct.  *See Boyle v. Douglas Dynamics, L.L.C.*, 292 F. Supp. 2d 198, 213 (D. Mass. 2003), *aff'd*, No. 03-2430, 2004 WL 1171370 (1st Cir. May 25, 2004); *Trent Partners & Assocs. Inc. v. Digital Equip. Corp.*, 120 F. Supp. 2d 84, 112 (D. Mass. 1999).  ARY's failure to meet its burden with respect to any one of these elements is fatal to its claim.  Yet ARY cannot meet its burden on even a single element.

## BACKGROUND[1]

In this trial, the testimony, documentary evidence, and the parties' stipulation of facts will establish the following facts.

ARY is a limited liability company that is part of the ARY Group, a multinational, billion-dollar enterprise headquartered in the United Arab Emirates.  The ARY Group, which is chaired by Abdul Razzak, conducts its business in several industries, including gold and jewelry, foreign exchange, media, and real estate.

As of November 21, 2000, Krigel's Inc. ("Krigel's"), was a privately owned company that operated a chain of retail jewelry stores in the Midwestern United States.  Scott Krigel owned all of the outstanding stock of Krigel's.  On November 21, 2000, ARY and Mr. Krigel

---

[1] The Court is familiar with the background facts of this case, which it discussed in its February 7, 2006 Order, partially granting summary judgment.  For a further discussion, IBJ directs the Court to its previously filed Rule 56.1 statement of facts in support of that motion.

entered into a Stock Purchase Agreement (the "SPA"), pursuant to which ARY agreed to buy all of Krigel's stock. The SPA was negotiated and signed on behalf of ARY by Gohar Husain. Under the SPA, Krigel's, which had experienced severe financial problems, was to file a bankruptcy petition and to emerge from bankruptcy under ARY's ownership. Krigel's bankruptcy petition was filed in January 2001.

Foothill, which was based in Boston, was Krigel's lender at the time the SPA was signed. Krigel's then owed Foothill approximately $8 million. Under the SPA and related agreements, the total price ARY agreed to pay was approximately $15.5 million, which included assumption of the Foothill debt. Although ARY had the ability to pay the full price in cash, section 4(c) of the SPA conditioned the agreement on Foothill's continued financing of Krigel's, post acquisition by ARY, on the same credit terms Krigel's had at the time the SPA was signed.

On December 15, 2000, Foothill presented ARY with a term sheet outlining the terms of a proposed credit facility (the "December Terms" or "December Term Sheet") that differed from the existing Foothill credit facility. The December Term Sheet did not constitute a commitment to lend; it was subject to negotiation and several conditions. Because the December Terms were not the same terms that Foothill had previously extended to Krigel's, under section 4(c) of the SPA, that agreement was "void and of no further effect." However, neither party invoked section 4(c) at the time, and ARY sought more favorable financing terms from other lenders, including IBJ, a lender located in Braintree, Massachusetts.

IBJ presented ARY with a term sheet on January 24, 2001, which contemplated refinancing Krigel's by providing funds to repay the Foothill debt and additional funds for working capital. The IBJ term sheet, which was subject to due diligence by IBJ and other

conditions, was accepted by ARY in late January or early February 2001.  The parties sought in the next few weeks to finalize a financing agreement.

In accord with its standard practice, IBJ used an outside vendor to assist in the due diligence process.  On or about February 28, 2001, the vendor sent IBJ two news articles published by Dow Jones Newswire on the Internet.  These articles reported that Abdul Razzak, the chairman of the ARY Group, and others associated with ARY, had been charged with paying a $10 million bribe to the former Pakistani prime minister to obtain a favorable contract.  ARY had not previously disclosed this to IBJ.  On the basis of these articles and discussion about them with Gohar Husain of ARY, IBJ decided not to proceed with the anticipated refinancing.  On February 28, 2001, IBJ informed ARY of this decision.

At this time, Frank O'Connor was the senior IBJ officer overseeing the ARY account. He correctly understood that Foothill was expecting to be repaid the $8 million it was owed by Krigel's from the IBJ refinancing.  Accordingly, as a professional courtesy to Foothill, Mr. O'Connor instructed one of IBJ's junior loan officers, David Molinario,[2] to inform Foothill that IBJ would not be going forward.  Thus, on or about February 28, Molinario telephoned Tom Morgan of Foothill and informed him of IBJ's decision, and the reason therefor.  At Morgan's request, Molinario faxed to him copies of the Dow Jones articles reporting the criminal charges against ARY.

After IBJ declined to provide financing for Krigel's, ARY turned back to Foothill.  On March 19, 2001, Krigel's provided Foothill with updated sales and revenue results, as well as an updated business plan.  This information showed that, subsequent to the issuance of Foothill's December Term Sheet, Krigel's did not meet sales or revenue projections.  The next day, March 20, Foothill presented a revised term sheet to ARY that revised some of the December Terms

---

[2] ARY initially sued Mr. Molinario in this case, but has voluntarily dismissed him as a defendant.

due to Krigel's lackluster performance.  After ARY commented on the March 20 proposal, Foothill issued another term sheet to ARY on March 27, 2001 (the "March Terms").  As understood by Foothill, the March Terms were intended as "bridge" financing; in other words, as a short-term credit facility that would be replaced by another bank shortly after ARY consummated its purchase of Krigel's.  By the time the March Terms had been offered, Husain was already in discussions with other banks about replacing Foothill as ARY/Krigel's lender.

Husain recommended to ARY's Chairman, Mr. Razzak, that ARY accept the March Terms (explaining that alternative refinancing from another bank could be secured with no prepayment penalty).  However, Razzak declined.  As Razzak explained in a letter to Scott Krigel dated April 5, 2001, he decided not to accept the March Terms, and not to buy Krigel's, because Foothill would not provide financing to ARY on the same terms that were in place at the time the SPA was executed.  Thus, Razzak informed Mr. Krigel, ARY was now declaring the SPA void under section 4(c) of the SPA.

Due to ARY's business decision not to consummate the SPA, litigation between ARY and Krigel's ensued.  Krigel's was sold out of bankruptcy to another buyer for a substantially lower price than ARY had agreed to pay.  Two years later, ARY commenced this lawsuit.

## I.    ARY CANNOT PROVE THAT A FOOTHILL CREDIT FACILITY WAS PROBABLE AT THE TIME OF THE ALLEGED INTERFERENCE

ARY cannot prove, as it must, the existence of a "*probable*" financing agreement with Foothill at the time the articles were sent.  *Boyle*, 292 F. Supp. 2d at 213 (plaintiff alleging tortious interference must, at a minimum, prove "a probable future business relationship").  At the time it signed the SPA, in November 2000, ARY had no business relationship with Foothill.  In December 2000, Foothill presented ARY with the December Terms.  *ARY rejected the*

*December Terms* – months before the alleged interference by IBJ.  ARY then sought financing from IBJ, which made a preliminary proposal that ARY accepted.

ARY and Foothill were not even in negotiations in late February 2001, when IBJ sent the news articles to Foothill.  Rather, it was only after the articles were sent that ARY and Foothill renewed discussions about possible financing.  ARY cannot establish the first element of its tortious interference claim – that it probably would have entered a credit facility with Foothill – for two independent reasons:  (1) ARY cannot establish that it would have accepted the December Terms, and (2) ARY cannot establish that Foothill's credit committee would have accepted the December Terms.

## A.    Foothill Decided Before The Alleged Interference By IBJ Not To Extend "Same Terms" Financing

The SPA permitted ARY to avoid the agreement if Foothill did not commit, by December 19, 2000, to continue its existing credit facility after ARY purchased Krigel's.  Foothill decided prior to December 19, 2000 that it would *not* provide "same terms" financing to ARY due to Krigel's distressed financial condition and highly uncertain prospects.  Foothill was willing, however, to consider different terms at that time, and thus made the December proposal.  It is a stipulated fact that the December Terms are not the same as the financing terms that Foothill had offered Krigel's.  *See* Joint Stipulation of Undisputed Facts ¶ 6. ARY rejected the December Terms when offered.  Thus, Foothill decided in December 2000 – *well before it received the Dow Jones articles* in late February or early March 2001 – not to continue the same financing it had been providing to Krigel's.  As the terms Foothill was willing to offer (the December Terms) were not acceptable to ARY, it was not probable that ARY would have entered into a credit facility with Foothill.

5

**B.    There Was Not Going To Be "A Probable Future Business Relationship" Because ARY Did Not Accept And Would Not Have Accepted The December Terms**

ARY alleges that even though it rejected Foothill's December Terms in December 2000, it would have accepted those terms in March 2001 but for the alleged tortious interference by IBJ. ARY's present litigation position is undercut by ARY's contemporaneous admissions that it would accept only continued financing from Foothill on the same terms it had previously extended to Krigel's. These admissions are found in: (1) contemporaneous letters from Mr. Razzak to Scott Krigel; (2) Mr. Razzak's deposition testimony in this case; and (3) a sworn declaration and other papers filed by ARY in prior litigation with Krigel's.

(1)    The Contemporaneous Correspondence

ARY admitted in two letters authored by its Chairman before this litigation began that it would have accepted only "same terms" financing from Foothill. The first letter was sent to Scott Krigel on March 28, 2001. In the letter, Mr. Razzak stated that ARY would consummate the SPA only if Foothill agreed to finance ARY *"upon the same terms and conditions as were in effect at the time the [SPA] was entered into." See* March 28, 2001, letter from A. Razzak to S. Krigel (emphasis added). As the Supreme Court of Kansas put it: "Finally, on March 28, ARY notified Krigel's Inc. that if Foothill did not approve continued financing on the same terms as Krigel's Inc. had enjoyed prior to insolvency, ARY would consider the [SPA] void." *ARY Jewelers, LLC v. Krigel,* 82 P.3d 460, 465 (Kan. 2003) ("*Krigel Litigation*").

Mr. Razzak's other letter, dated April 5, 2001, stated that, after further discussion between ARY and Foothill, Foothill had "categorically" refused to extend financing on the *"same terms and conditions as were in effect at the time the [SPA] was entered into." See* April 5, 2001, letter from A. Razzak to S. Krigel (emphasis added). Mr. Razzak went on to say that, as a result, ARY was "*left with little option but to declare that the [SPA] and related agreements*

6

*are null and void pursuant to Section 4(c) of the [SPA] since Foothill Capital has not given its consent to the continued financing of Krigel's Inc.'s obligations to Foothill.*"  *See id.*  (emphasis added).

In stark contrast to ARY's current litigation position, neither letter makes any reference whatsoever to the December proposal.  Rather, both letters state unequivocally that ARY was unwilling to proceed with a transaction because Foothill had refused to continue financing on the *same terms* previously extended to Krigel's.

(2)     Razzak's Deposition Testimony in This Case

In deposition testimony concerning his efforts to obtain financing from Foothill in March 2001, after IBJ declined to finance, Mr. Razzak confirmed that ARY considered "same terms" financing from Foothill a prerequisite to any transaction.  Mr. Razzak testified as follows:

> Q:     Did you tell [Foothill] that you wanted Foothill to continue financing on the same terms that had been provided previously?
> A:     Yes.[3]
> …
> Q:     Did Mr. Krigel tell you that Foothill would not continue financing on the same terms?
> A:     Yes.  And after that, the terms and conditions they offered were not acceptable at all.
> Q:     If Foothill had offered to continue financing on the same terms, would that have been acceptable to you?
> A:     Hundred percent why I come over here.
> …
> Q:     Who was not honoring their commitment?
> A:     It was Krigel, Scott Krigel.
> Q:     In what way did Mr. Krigel not honor his agreement?
> A:     They were to provide financing from the bank.  The way they were getting that.
> Q:     Meaning on the same terms?
> A:     Yes.

---

[3]  This admission is telling.  Rather than asking for the December Proposal, which ARY now claims it wanted, Mr. Razzak admits that in this March 2001 time frame, he told Foothill that ARY wanted "same terms" financing.  Of course, that is also what he said in his letters to Mr. Krigel of March 28 and April 5, 2001.  In his deposition testimony, Mr. Razzak admitted that these letters were true statements of ARY's position at the time.  Razzak Dep. at 43:4-25.

Q:    And because they did not do that, you decided not to proceed.
A:    So who's the culprit now?
Q:    I'm trying to get a yes or no.
A:    *That's the reason.*
      …
Q:    Let me see if I can understand what you have said.  Are you saying Mr. Krigel's obligation was to arrange for the bank to provide financing on the same terms they had provided previously, and that Mr. Krigel failed to arrange for that?
A:    Yes.
Q:    And that was his failure to honor his commitment?
A:    Yes.  Then we decided –
Q:    And because of that you decided not to proceed.
A:    *Yes.*

Razzak dep. 21:20-23, 22:22-23:8, 33:3-34:8 (emphasis added).  Thus, consistent with his March 28 and April 5, 2001 letters to Mr. Krigel, Mr. Razzak conceded in his deposition that "the reason" for ARY's decision not to proceed with the Krigel's financing was Foothill's refusal to continue financing on the same terms previously provided to Krigel's.

(3)    Judicial Admissions

ARY's present litigation position is inconsistent with the position it took in two prior litigations and should be foreclosed under the doctrine of judicial estoppel.  *See Alternative System Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 32-33 (1st Cir. 2004) (Doctrine of judicial estoppel "prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding").  As discussed below, ARY prevailed in both the *Fabrikant Litigation* and the *Krigel Litigation* by expressly arguing, in a sworn declaration from its Chairman and in other court filings, that continued financing on the same terms in the then-existing Foothill credit facility was essential – indeed an "*absolute prerequisite*" – to the potential transaction with Krigel's.  Having successfully asserted that position before the Western District of Missouri and

the Kansas state courts, ARY should not be allowed to now come into this Court and assert –

directly contrary to its prior position – that it was willing to accept the December proposal.

(a)    <em>Fabrikant Litigation</em>

In *M. Fabrikant & Sons, Inc. v. ARY Jewelers, LLC*, Case No. 01-0671-CV-W-5 (W.D.

Mo.) (the "*Fabrikant Litigation*"), Krigel's unsecured creditors alleged that ARY breached the

SPA, and they sought a preliminary injunction freezing ARY's domestic assets.  ARY argued

that it did not breach because Foothill had not agreed, by the date specified in the SPA, to "same

terms" financing.  *See ARY Jewelers, LLC's Suggestions In Opposition to Plaintiffs' Emergency*

*Motion For Temporary Restraining Order* at 4[4] ("Rather than continuing the financing available

to Krigel's, Foothill proposed terms on December 15 that were *very different*.") (emphasis

added).  In addition, ARY made clear, in a sworn declaration filed by Mr. Razzak, that it was

unwilling to close the Krigel's transaction unless Foothill agreed to continue the same financing

then in place.  Indeed, Mr. Razzak swore in his declaration that

> … the foundation of all of the discussions between Foothill, ARY
> and Mr. Krigel in February, March, and April 2001 was the fact that
> continued financing was *an absolute prerequisite to closing the*
> *transaction*.

Declaration of Haji Abdul Razzak, sworn to August 1, 2001 (emphasis added).  This sworn

statement, of course, is fatal to ARY's newly-minted position that it would have accepted the

"very different" terms set forth in the December proposal.

In the *Fabrikant Litigation*, the Western District of Missouri upheld ARY's position, and

denied the creditors' motion for a preliminary injunction.  The unsecured creditors then

dismissed the lawsuit.  Brief of Appellee ARY Jewelers, LLC at 10.

---

[4]  ARY's brief in opposition to the creditors' motion for a temporary restraining order was incorporated by reference
in ARY's subsequent brief in opposition to the motion for a preliminary injunction.  *ARY Jewelers, LLC's*
*Supplemental Suggestions In Opposition to Motion For a Preliminary Injunction* at 3.

9

(b)    *The Krigel Litigation*

In the *Krigel Litigation*, which involved ARY's right to the funds escrowed under the SPA, ARY again argued that its refusal to consummate the SPA was not a breach of the agreement because Foothill refused to finance "*on the same terms that were currently in effect with Krigel's*".  Brief of ARY Jewelers, LLC at 7 (emphasis added).  The Supreme Court of Kansas agreed, and it affirmed summary judgment in ARY's favor.  The court held that Foothill's decision to offer only "significantly different" terms to ARY in December 2000, *Krigel Litigation*, 82 P.3d at 465, did not satisfy the SPA's financing condition, and that ARY therefore had no obligation to purchase Krigel's.

**C.    There Was Not Going To Be "A Probable Future Business Relationship" Because There Is No Evidence That Foothill's Credit Committee Would Have Approved A Credit Facility For ARY/Krigel's**

Moreover, even if ARY had accepted the December Terms; ARY has no evidence that the December Terms would have been approved by Foothill's credit committee, which was a condition to entering into any credit facility.[5]  Indeed, as Mr. Cole of Foothill testified, one can only speculate as to how Foothill's credit committee would have reacted to any credit facility it might have been asked to approve.  And ARY has previously acknowledged the conditional nature of the December Terms asserting that the financing condition in paragraph 4(c) of the SPA was not satisfied, in part, because Foothill's proposals were not a "commitment to lend," but rather were "subject to, among other things, Foothill Capital's Credit Committee approval."  *See* Amended Petition for Declaratory Relief filed by ARY Jewelers, LLC, ¶19.

Notably, in order for the December Terms to be approved by Foothill's credit committee ARY would have had to (1) disclose all litigation (including the Pakistani criminal charges)

---

[5]  The December Terms and the later proposals all state that they "should not be considered a commitment to lend" and that "[a]ny commitment to lend would be subject to, among other things, Foothill Capital's Credit Committee approval."  *See* December Term Sheet.

pursuant to the litigation search requirement contained in the December Terms and (2) been

subject to a background check as part of Foothill's due diligence.  If, as ARY asserts, IBJ's

disclosure of the Pakistani charges to Foothill is what resulted in Foothill's decision to offer the

less favorable March Terms, then it is equally certain that Foothill would never have approved

the December Terms once ARY disclosed the charges as part of the litigation search or Foothill

learned of them during its background check.

In sum, ARY was prepared to accept nothing less than "same terms" financing from

Foothill – and Foothill, for reasons unrelated to IBJ, was not prepared to extend such financing to

ARY.  Furthermore, there is no evidence that Foothill would have even agreed to a credit facility

on the basis of the December Terms.  Therefore, ARY cannot establish that, but for the alleged

interference by IBJ, it was *probable* that ARY would have entered into a credit agreement with

Foothill.  For this reason alone, Judgment should be entered for IBJ.  *See Boyle v. Douglas*

*Dynamics, L.L.C.*, 292 F. Supp. 2d 198, 213 (D. Mass. 2003).

## II.    ARY CANNOT PROVE THAT ANYONE AT IBJ KNEW ON FEBRUARY 28, 2001, THAT ARY AND FOOTHILL WERE PROBABLY GOING TO AGREE TO A CREDIT FACILITY

The fact that no agreement between ARY and Foothill was probable necessarily means

that ARY cannot prove, as it must, that anyone at IBJ knew of such agreement at the time of the

alleged tortious interference.  *See Boyle*, 292 F. Supp. 2d at 213-14.  From the time ARY

accepted IBJ's term sheet in January 2001, it did not take any steps to move forward with

Foothill on the December Terms until after IBJ declined financing on February 28, 2001. The

evidence is uncontroverted that neither Mr. O'Connor nor Mr. Molinario of IBJ knew of any

agreement or even of any ongoing negotiations between ARY and Foothill.  Indeed, IBJ had

signed a term sheet with ARY in January 2001, IBJ was conducting due diligence, and IBJ was

11

proceeding as if it was going to enter a credit facility with ARY. From IBJ's eyes the only probable credit facility was the one it was attempting to close with ARY. Because ARY cannot establish IBJ's knowledge of a business relationship between ARY and Foothill, the Court should enter judgment for IBJ.

## III.    ARY CANNOT PROVE THAT IBJ ACTED WITH AN IMPROPER MOTIVE OR THROUGH IMPROPER MEANS

To show intentional interference through improper motive, ARY must prove that defendants acted out of "enmity" or to "hurt" ARY. *See Adcom Prods. Inc. v. Konica Bus. Machs. USA, Inc.*, 41 Mass. App. Ct. 101, 105 (1996); *United Truck Leasing Corp. v. Geltman*, 406 Mass. 811, 817 (1990). In its summary judgment decision, the Court found that there was no evidence of improper motive (February 7 Order at 5), and, at trial, ARY will not produce any such evidence. To the contrary, defendants had no motive, much less an improper one, to interfere with a potential Foothill-ARY loan agreement because *IBJ was not competing with Foothill for ARY's business.* Rather, IBJ had already decided *not* to do business with ARY, and therefore had no reason to attempt to cause ARY not to enter into a loan agreement with Foothill. Mr. O'Connor decided to contact Foothill concerning IBJ's decision not to refinance Krigel's because Foothill was expecting to be repaid some $8 million from funds it expected IBJ would be advancing to Krigel's. He therefore considered it to be a "professional courtesy" to let Foothill know that the anticipated refinancing would not happen. In view of this uncontroverted testimony, ARY cannot prove that IBJ intentionally interfered or that it acted to "hurt" ARY or out of "enmity" toward ARY. [6]

---

[6] Of course, even if IBJ *were* competing for ARY's business, that would not have constituted an improper motive for purposes of a tortious interference claim. *See American Private Line Servs., Inc. v. E. Microwave*, 980 F.2d 33, 37 (1st Cir. 1992) ("A competitor may interfere with another's contractual expectancy by picking the deal off for himself, if, in advancing his own interest, he refrains from employing unlawful means." (quoting *Doliner v. Brown*, 21 Mass. App. 692 (1986)).

Nor can ARY prove that IBJ used improper means. As an initial matter, ARY cannot establish "that IBJ violated a statute or rule of common law," *Boyle*, 292 F. Supp. 2d at 214, or that IBJ made threats, defamatory statements, or misrepresentations of fact. *United Truck Leasing Corp.*, 406 Mass. at 817; *American Private Line Serv.*, 980 F.3d at 37. Rather, at trial, ARY asserts that it will establish that IBJ used improper means by violating an established standard of the banking industry. ARY will not be able to meet its burden. The testimony of IBJ's expert, Edward Davis – who has extensive experience with virtually all aspects of commercial lending in Massachusetts through his thirty years of work as a banker, corporate officer, and consultant – along with the fact testimony of the Massachusetts bankers in this case will conclusively establish that IBJ did not act contrary to the customary practices of Massachusetts bankers. To wit:

- There is no custom or practice that would in any way prohibit a bank from communicating public information concerning a prospective borrower.

- IBJ did not act inappropriately by sending Foothill the Dow Jones news articles. In doing so, IBJ did not disclose any confidential information of ARY (such as non-public financial details of ARY's business), but rather information that was already in the public domain.

- Whether or not a bank agrees to refinance a loan is not generally considered confidential, and it is common for the results of a refinancing decision to be shared with the prospective borrower's existing lender, especially where a decision is made not to refinance.

- IBJ did not act contrary to banking practice in telling Foothill the reason why IBJ declined to refinance Krigel's. By sharing this information, IBJ disclosed its own thought process, and did not disclose any confidential information of ARY.

It is undisputed that IBJ merely advised Foothill of a true fact – *i.e.*, that IBJ would not be financing ARY because of an issue related to IBJ's background check. As requested by Foothill, IBJ then faxed news articles which were not private or confidential, but which were *in the public domain*. There is no allegation or evidence that ARY vouched for the accuracy of the

articles or purported to have independent knowledge of the criminal conduct described in the articles. The articles were sent in the context of a communication initiated by IBJ for the sole purpose of advising Foothill that IBJ would not be refinancing Krigel's, and thus would not be providing the funds which Foothill expected to receive in repayment of its outstanding loan. In view of the foregoing, ARY cannot establish that IBJ intentionally interfered through improper means and, thus, the Court should enter judgment for IBJ. *See Boyle v. Douglas Dynamics, L.L.C.*, 292 F. Supp. 2d 198, 213 (D. Mass. 2003).

## IV.    ARY CANNOT PROVE CAUSATION – ANY LOST ADVANTAGE WAS NOT THE DIRECT RESULT OF THE ALLEGED INTERFERENCE

As discussed above, there is no reason to believe that ARY and Foothill would have agreed to establish a credit facility on the terms outlined in the December Term Sheet; thus, ARY cannot establish that it was harmed by any purported change to those terms. If the December Terms were unacceptable, any change to them was irrelevant.

Moreover, even if ARY had been willing to accept the December Terms, ARY cannot prove that its inability to secure those terms was a "direct result" of IBJ sending Foothill the Dow Jones articles. As set forth below, (1) Foothill would have inevitably learned of the information in these articles and IBJ's decision not to provide financing and (2) Foothill's decision to change the terms in March 2001 was not caused by IBJ's disclosure, but rather due to Krigel's deteriorating financial situation. For each of these independent reasons, ARY can not establish the causation element of its claim. *See Boyle v. Douglas Dynamics, L.L.C.*, 292 F. Supp. 2d 198, 213 (D. Mass. 2003).

### A.    Foothill Would Inevitably Have Learned Of The Criminal Charges Pending Against ARY

ARY would have learned of the charges *when it did its own background check* prior to finalizing any agreement with ARY.  Mr. Cole's testimony establishes that the background check IBJ performed was standard practice for lenders, and that Foothill would have done essentially the same background check as IBJ, including a search of media databases.[7]  Thus, Foothill would have learned, before entering into an agreement with ARY, of the bribery charges even had IBJ not sent Foothill the Dow Jones articles.  Therefore, ARY cannot prove the causation element of its claim.

Moreover, even if Foothill's background check did not reveal the articles, Foothill would have learned of the criminal charges because, under its lending procedures, a prospective borrower must execute a "litigation search," which requires disclosure of any litigation in which the borrower or its principals are involved. As Mr. Cole's testimony makes clear, the "litigation search" condition would have required ARY to disclose to Foothill the existence of the bribery charges prior to the closing of any financing agreement.  For this additional reason, Foothill would have learned of the bribery charges even had IBJ not sent Foothill the Dow Jones articles; and, thus, ARY cannot establish causation.

Similarly, Foothill was going to learn that IBJ had declined to provide ARY with financing because Foothill knew that ARY had entered into a term sheet with IBJ and would have learned of IBJ's decision not to finance when ARY returned to Foothill for financing.  Mr. Cole's testimony establishes that in late January or early February, ARY and Krigel's told Foothill that ARY was seeking to finalize a financing agreement with IBJ, and that the IBJ

---

[7]  The Dow Jones articles were not the only places where Razzak's allegedly illicit dealings were publicly reported. For example, The New York Times reported on the matter in some detail.

financing would be used to repay Foothill. Thus, even if IBJ had not disclosed to Foothill that it would not be providing the financing to repay Foothill's loan, Foothill would inevitably have learned that IBJ had declined to refinance Krigel's when ARY returned to Foothill for financing. Moreover, if Foothill believed that IBJ's reasons for declining financing were important, Foothill would likely have requested additional information from ARY. Thus, because Foothill would have inevitably have learned that IBJ had declined financing, ARY cannot establish the causation element of its claim.

**B.    Foothill Did Not Change The Terms Of Its Proposed Financing As A Direct Result Of IBJ's Disclosures To Foothill**

Any differences between the December Terms and the March Terms were the result of Krigel's deteriorating financial situation and not due to IBJ's disclosures. Mr. Cole's testimony on this subject establishes several key points: (1) Foothill was satisfied with Mr. Razzak's explanation of the Pakistani charges; (2) had Mr. Cole not been satisfied, he would have decided not to provide any financing or would have included certain additional terms (such as restrictions on the ability of implicated personnel to sign company checks or to sit on the board of directors) – these additional terms were not included in the March Terms; (3) Krigel's financial situation was worse in March than it had been in December; and (4) Mr. Cole changed the terms because Krigel's had been less profitable than expected during the Christmas and Valentine's season. ARY has no evidence that the changes from the December Terms to the March Terms was a direct result of IBJ's February 28, 2001, disclosure, and, thus, the Court should enter judgment for IBJ. *See Boyle v. Douglas Dynamics, L.L.C.*, 292 F. Supp. 2d 198, 213 (D. Mass. 2003).

## REQUESTS FOR RULINGS

1.     ARY has not established the first element of a tortious interference claim, namely, the existence of a business relationship or contemplated contract of economic benefit between ARY and Foothill.  *See Boyle v. Douglas Dynamics, L.L.C.*, 292 F. Supp. 2d 198, 213 (D. Mass. 2003).

A.     ARY has not established that a credit facility between ARY and Foothill was probable at the time of the alleged interference.

B.     ARY has not established that it would have accepted the December Terms.

C.     ARY has not established that Foothill would have entered into a credit facility on the basis of the December Terms.

II.     ARY has not established the second element of a tortious interference claim, namely, that anyone at IBJ knew that a credit facility between ARY and Foothill was probable at the time of the alleged interference.  *See Boyle v. Douglas Dynamics, L.L.C.*, 292 F. Supp. 2d 198, 213 (D. Mass. 2003).

A.     ARY has not established that from the time it accepted IBJ's term sheet in January 2001, that it took any steps to move forward with Foothill on the December Terms until after IBJ declined financing on February 28, 2001.

B.     ARY has not established that Mr. O'Connor knew that a credit facility between ARY and Foothill was probable at the time of the alleged interference.

C.     ARY has not established that Mr. Molinario knew that a credit facility between ARY and Foothill was probable at the time of the alleged interference.

III.    ARY has not established the third element of a tortious interference claim, namely, that IBJ's interference with that contract through improper motive or improper means. *See Boyle v. Douglas Dynamics, L.L.C.*, 292 F. Supp. 2d 198, 213 (D. Mass. 2003).

    A.    ARY has not established that anyone at IBJ acted with an improper motive.

        1.    ARY has not established that IBJ was a competitor of Foothill for the ARY/Krigel's account.

        2.    ARY has not established that IBJ intended to harm ARY by sending the articles to Foothill.

    B.    ARY has not established that IBJ acted through an improper means.

        1.    ARY has not established that IBJ's communicated any non-public information to Foothill.

        2.    ARY has not established that IBJ's communications with Foothill on February 28, 2001, violated a statute or rule of common law.

        3.    ARY has not established that IBJ's communications with Foothill on February 28, 2001, violate established banking standards?

IV.    ARY has not established the fourth element of a tortious interference claim, namely, that ARY's loss of the December Terms was a direct result of IBJ's conduct. *See Boyle v. Douglas Dynamics, L.L.C.*, 292 F. Supp. 2d 198, 213 (D. Mass. 2003).

        1.    ARY has not established that it would have accepted the December Terms if they were offered in March 2001.

        2.    Foothill would have inevitably learned of the information that IBJ disclosed to Foothill regarding the Pakistani criminal charges.

        a.      ARY was obligated to disclose this information to Foothill.

        b.      Foothill would have learned of this information when it conducted its own background check.

        3.      Foothill would have inevitably learned of IBJ's decision not to provide financing to ARY.

        4.      ARY has not established that Foothill's decision to change the terms in March 2001 was a direct result of IBJ's disclosure.

        5.      Foothill's decision to change the terms in March 2001 was due to Krigel's deteriorating financial situation.

    VI.      ARY has not established that IBJ directly caused any damages to ARY under the measure of damages set forth in the Court's Order of October 24, 2006.

## CONCLUSION

For all of the foregoing reasons, the Court should enter judgment for IBJ.

IBJTC BUSINESS CREDIT CORPORATION
By its attorneys,

/s/ F. Turner Buford
Christopher R. Dillon (BBO No. 640896)
F. Turner Buford (BBO No. 661311)
Ropes & Gray LLP
One International Place
Boston, Massachusetts 02110-2624
(617) 951-7000

Robert S. Fischler (Admitted *Pro Hac Vice*)
Ropes & Gray LLP
45 Rockefeller Plaza
New York, NY 10111
(212) 841-5700

Dated: December 4, 2006

## CERTIFICATE OF SERVICE

I, F. Turner Buford, hereby certify that, pursuant to Fed. R. Civ. P. 5.4(c), a true copy of this document was electronically served upon counsel of record for the plaintiff in this action on December 4, 2006.

By: /s/ F. Turner Buford
F. Turner Buford (BBO No. 661311)